## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **CLEON ABRAMS, SR., et.** | * | |
| | * | **CIVIL NO.    08-68** |
| | * | |
| | * | |
| **VERSUS** | * | **DIVISION    WS-B** |
| | * | |
| **CIBA SPECIALTY CHEMICALS CORPORATION** | * | |
| **CIBA-GEIGY CORPORATION, NOVARTIS, LTD.,** | * | **JURY DEMAND** |
| **INC., and SYNGENTA CROP PROTECTION, INC.** | * | |
| | * | |

**************************************************************

### PLAINTIFFS' FIRST AMENDED COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs and hereby

file their First Amended Petition.  Plaintiffs bring this Civil Action on their own behalf to

obtain damages, both compensatory and punitive, and other tortious losses they have

suffered and continue to suffer, as well as all costs of this suit, and attorneys' fees, from

the named Defendants.  Plaintiffs allege, upon information and belief, in this Amended

Complaint as follows:

### I. PARTIES - PLAINTIFFS

1.    Upon information and belief, Plaintiffs, **CLEON ABRAMS, SR., CLEVELAND**

**ABRAMS, SR, ADELL M. ADAMS, ALFRED ADAMS, IDA ADAMS, JAMES C.**

**ADAMS, KATIE L. ADAMS, LULA M. ADAMS,  ODELL ADAMS, SAMUEL**

**LEE ADAMS, SEXTON ADAMS, VERNON L. ADAMS, WILLIE ADAMS,**

**CONSTANCE F. ALSOBROOK, WILLIAM H. ALSOBROOK, MARY LEE**

**ANDERSON , SAVINA & JAMES ANDERSON, ELSIE BACK, NORMA BACK,**

**DORIS BARNES, MARVIN BARNES, TERRELL L. BARNES, CASTAROR L.**

BELL, ROBERT BELL, VALERIE BELL, JOSEPH RICKY BENJAMIN, SR.,
SHELIA J. BOYKIN, LINDA BRAGG-WILLIAMS, DORA J. BROWN, MYRTLE
L. BROWN, SANDRA F. BURTON, LaSHUNDA BYRD, PEGGY A. BYRD,
DORIS ADAMS CAMPBELL, RACHAL S. CARPENTER, DONNA F.
CHAISSON, BOBBY J. CHESTANG, KANDICE CHESTANG, MELBA
CHESTANG, SHELBY A. CHESTANG, TOSHA L. CHESTANG, FAIRLEY B.
COLE, ROSETTA COLLINS, GWENDA L. CORDELLE, DILLARD
COVINGTON, PLAZE COVINGTON, LENA COVINGTON, GEORGE CURTIS,
MARION R. DAVIS, MARSHALL O. DAVIS, SHERRY DEAN, VERA R. DEAN,
SALLIE DIANNA DYKES, FAYE W. EATON, AGNES ECHOLS, MICHAEL
EDDINGS, WILLIE B. EDWARDS, MARIE EVANS, ROY & MARIE ALAN
EVANS, RUTH EVERETTE, GEORGIA A. FARRELL, MARY THOMAS
FARRELL, ELLIOTT KEVIN FIELDS, ERINE L. FIELDS, ANGIE L. FINNEY,
JANICE GREEN, ALVIN HAMILTON, ERMA JEAN HARDY, NORMA HARRIS,
LIZZIE HENDERSON, JOYCE T. HISAY, JACQUELINE HITTON, YOLANDA
HOCKADAY, SUNDRA HOWARD, TONI E. JACKSON, VERNON LEE
JACKSON, FELIX E. JOHNSON, GERTRUDE L. JOHNSON, WILBURT
JOHNSON, YOLANDA F. JOHNSON, CYNTHIA M. JOHNSTON, CLARA
JOHNSTON, ESTHER JOHNSTON, JOHNNY JOHNSTON, DAVID JONES,
RONALD L. JONES, EVA G. JONES, JACQUELINE REED JONES, GEORGE
JORDAN, CARRIE J. LaBAUVE, ALTON LANG, KATHY LANG, SANDRA
LANG, MELINDA L. LATHAN, LAURINA L. LAW, WILLARD & HELEN LAW,

JANICE REED LOFTON, LEVI LOFTON, CORNELIUS DIANNA LUDEN,
DELIA McDONALD, LISA G. McINTYRE, MARION McINTYRE, JR., PATSY C.
MIDDLETON, GLORIA MITCHELL, JOYCELYN MOORE, LOLA MOORE,
EDGAR & EMMA L. MOSS, LaBARRON MOSS, SHELLY HALL MURPHY,
MARY LUCILLE NORWOOD, ADDIE LUCILLE ODOM-MORRIS, ALEX ORSO,
CLARENCE ORSO, DEBBIE B. ORSO, DELPHINE ORSO, EUNICE ORSO,
MARIE ORSO, MARY L. ORSO, VELMA M. PATRICK, BERNICE PRESSLEY,
ALBERT REED, JR., ANGELYNN O. REED, BERTHA REED, BILL REED,
BONNIE & UNA POSTON REED, BROOKS REED, CARA P. REED, CARL
BRUCE REED, CARL V. REED, CASEY R. REED, CLEVE P. REED, COLLIE
REED, CONEY IKE REED, DILLARD A. REED, DOMAR T. REED, DONNY
RAY REED, DOTSY R. REED, ELBERT LEE REED, EVA REED, GLEN O.
REED, JOANN REED, JOHNNIE V. REED, LELA MARIE REED, LEMALIE U.
REED, LEOLA REED, LILLIE L. REED, LINDA REED, LYNETTE REED,
MALANDA REED, MELISSA C. REED, MURELDA Y. REED, NAPOLEON
REED, SR., OSCAR REED, OSCAR T. REED, RAINO REED, SANDY &
VERINA R. REED, TEX REED, THEODORE REED, TOLLIE BELL REED
WEAVER, VIRCHUS T. REED, VIRGINIA REED, WALTER O. REED,
WILBERT REED, WILLA DEAN REED, WILLIE MAE REED, WILMER & M.
REED, CONNIE RIVERS, LAURA & TODD RIVERS, PERCY CARL RIVERS,
PERCY RIVERS, CORIA RIVERS, DAN RIVERS, MAXWELL A. RIVERS, SR.,
MARY MELISSA RIVERS, NYOKA RIVERS, SONYA A. ROBERSON, ELOISE

ROBERTS, GUSTAREAN ROBERTS, JENNIFER ROBERTS, SHARON C.
ROSS-AKRIDGE, JOE & KATIE M. RUSSELL, LINDEN MARIE SCOTT, VICKY
SMITH, ALICE I. SNOW, BERNETTA SNOW, DAMARIS SNOW, GLEN T.
SNOW, HANK M. SNOW, JOHNNY D. SNOW, KRISTY SNOW, McCLINTON
SNOW, MERL T. SNOW, PHILLIP O. SNOW, VERNON SNOW, YAVONNE
SNOW, ESTHER O. STEWART, BONNIE SULLIVAN, ELMER SULLIVAN,
JULIA BELL SULLIVAN, SHARON D. SULLIVAN, SHESTER SULLIVAN,
SONORA SULLIVAN, WELCH SULLIVAN, GENE V. TAYLOR, SR., NETTIE
TAYLOR, WILFORD S. TAYLOR, BEVERLY CLARK THOMAS, CURTIS
THOMAS, EDWARD D. THOMAS, EDWINA B. THOMAS, ERNEST THOMAS,
ETHEL M. THOMAS FRED THOMAS, LINDA THOMAS, LUCILLE A.
THOMAS, ROBERT LEE THOMAS, SR., ETORIA A. TOOLE, PATRICK &
REBECCA TRUJILLO, AMY WAITE, CRYSTAL L. WAITE, LORA T. WARD,
BOBBY WARE, JOHNNIE L. WARE, ROSETTA WARE-FOSTER, CONNIE
RENA WASHINGTON, DIANNE WASHINGTON, GEORGE WASHINGTON,
BEULAH WEAVER, BILL ELLIOTT WEAVER, BONNIE ALLEN WEAVER,
BRANDY WEAVER, CHRISTY WEAVER, CLARA WEAVER, CLARA MAE
WEAVER, CLAY A. WEAVER, DOTSIE WEAVER, DOVIE JEAN WEAVER,
ELTON L. WEAVER, GAILASNEED WEAVER, JEWITT W. WEAVER, JOSEPH
& CRYSTAL REED WEAVER, LEONARD WEAVER, JR., LETTIE WEAVER,
MARY D. WEAVER, RAYMOND WEAVER, RONDELL WEAVER, SHAOMO
WEAVER, JR., SHELIA R. WEAVER, SHELTON WEAVER, TAMMY WEAVER,

**TOMMY L. WEAVER, TINY WEAVER, URSULA LAKAY WEAVER, VANESSA A. WEAVER, VANELLA WEAVER, ZAN WEAVER, ZEMON WEAVER, DEMETRIS R. WELLS, WANDA FAYE WESTERDAHL, SUSIE WHISENHUNT, JESSIE WILEY, RAFE WILEY, AARON L. WILLIAMS, ANNIE R. WILLIAMS, CHARLOTTE M. WILLIAMS, AVELLA ROBERTS YOUNG**, are persons of the full age of majority and residents of and/or own property in the County of Washington, State of Alabama. Because of the close proximity of Plaintiffs' property to the Ciba-Giegy site (hereinafter referred to as "CG Site") and/or confirmed DDTr contamination on the Plaintiffs property, the sites have adversely affected the value of their property.

2.    The Plaintiffs are also residents of McIntosh, Alabama and/or the surrounding communities, whose properties have been adversely affected because of confirmed DDTr contamination of the Plaintiffs properties and the close proximity of their properties to the CG site.

3.    The chemicals wrongly discharged, emitted, stored, dispersed, and disposed of, as aforesaid, are considered to be potentially harmful, hazardous, toxic, mutagenic, neurotoxic, and/or carcinogenic and have adversely affected the value of the Plaintiffs' properties.

4.    Plaintiffs are also past and present residents of the communities surrounding the Defendants' facilities. Because of the confirmed contamination of the Plaintffs' properties with DDTr and the proximity of Plaintiffs' properties to Defendants' sites, the land they own, possess and/or otherwise have the right to use and

enjoy has been exposed to toxic contaminants emanating from Defendants' sites through contaminated soil, sediments, and airborne contaminants. Their property has been unjustly serving as a hazardous waste dump site for Defendants.

## II. PARTIES - DEFENDANTS (COLLECTIVELY "CIBA")

5.     Defendant, Ciba Specialty Chemicals Corporation, individually and as successor to Ciba-Geigy Corporation, Ciba States Limited, Ciba Corporation, Ciba-Geigy Limited, Geigy Chemical Corporation, and/or Novartis Ltd., Inc., is a Delaware corporation with its principal place of business at 520 White Plains Road, Tarrytown, New York. Defendant is authorized to do and/or is doing business in the State of Alabama. Defendant has been served and the Court has ordered that an answer by filed by May 12, 2008.

6.     Defendant, Ciba-Geigy Corporation, individually, and as successor to Ciba States Limited, Ciba Corporation, Geigy Chemical Corporation, is a New York corporation qualified and authorized to do and/or doing business in the State of Alabama. Defendant has been served and the Court has ordered that an answer by filed by May 12, 2008.

7.     Defendant, Novartis Ltd., Inc., individually and as successor to Ciba-Geigy Corporation, Ciba States Limited, Ciba Corporation, Ciba-Geigy Limited, Geigy Chemical Corporation, and/or Sandoz Corporation, is a Delaware Corporation qualified and authorized to do and/or doing business in the State of Alabama. Defendant has been served and the Court has ordered that an answer by filed by May 12, 2008.

8.    Upon information and belief, Syngenta Crop Protection, Inc. was created by the merger of the agricultural divisions of AstraZeneca and Novartis in 1999. Novartis was formed from a merger of Ciba Geigy and Sandoz in 1996. Defendant, Syngenta Crop Protection, Inc., is a Delaware Corporation qualified and authorized to do and/or doing business in the State of Alabama.    Defendant has been served and the Court has ordered that an answer by filed by May 12, 2008.

## III. SUBSTANTIVE ALLEGATIONS

9.    Beginning in or about October, 1952, Ciba (and its predecessor and successor corporations) operated a chemical manufacturing plant on property located two (2) miles northeast of McIntosh, Alabama and approximately fifty (50) miles north of Mobile, Alabama.  The property consists of approximately one thousand five hundred (1,500) acres, of which one thousand one hundred and thirty (1,130) acres (2.4 sq. miles) are developed plant site.

10.    Currently, the site contains nine (9) production units and an onsite waste management facility. The remaining three hundred and seventy (370) acres consist of undeveloped swamp and bottomlands that comprise a portion of the Tombigbee River floodplain.  The floodplain is separated from the developed portions of the plant property by a steep escarpment known as the "bluffline." The plant is located in the Southern Pine Hills District of the East Gulf Coastal Plain Physiographic Provence and is situated in the bottomland floodplain adjacent to the Tombigbee River.

11.    Upon information and belief, Defendants are situated near the Tombigbee River

floodplain.

12.    Annual rainfall in south Alabama is among the highest in the contiguous United

States, averaging about sixty four (64) inches.

13.    The McIntosh floodplain is a seasonally dynamic system influenced to a large

extent by frequency and duration of inundation.  Due to the seasonal variations in

water depth and rainfall in the region, the entire floodplain is flooded for three (3)

to five (5) months of the year (typically from December to April).  In the vicinity of

the Site, areas twenty five (25) feet in elevation and below are typically inundated

with water during this period.  Those areas may be under ten (10) feet of water or

more during part or all of the period of inundation.

14.    Much of the floodplain is contiguous with the Tombigbee River during periods of

complete inundation, and movements of fish and other aquatic organisms are

largely unrestricted.  From mid to late spring, water begins to recede due to

decreased flow rate in the Tombigbee River, decreased precipitation, and

increased evaporation.  The amount of available aquatic habitat shrinks as water

collects in pools and depressions on the floodplain.  Gradually, throughout the

summer months, aquatic habitat becomes restricted to the areas of permanent

water described above.

15.    The Tombigbee River flows in a southeasterly direction from its headwaters in

northeastern Mississippi where it is linked to the Tennessee River, to its

confluence with the Black Warrior River near Demopolis, Alabama, two hundred

and sixty seven (267) miles downstream.  From Demopolis, the Tombigbee River

flows south one hundred and seventy five (175) miles where it converges with

the Alabama River to form the Mobile River.  The Mobile River flows south forty

five (45) miles to Mobile, entering into the Mobile Bay estuary.  Significant

portions of the Tombigbee River are flooded annually.

16.     Upon information and belief, in the 1980s, the United States EPA determined that

at least the shallow alluvial aquifer was contaminated in the area of the sites.

Contamination has also been found within the floodplain including upper and

lower portions of an offsite drainage ditch and areas in the Tombigbee River in

proximity of the sites.  The contamination continues to this day.

17.     Upon information and belief, the manufacturing processes at the CG site

generated liquid and solid wastes.  According to the USEPA, beginning in about

1952, solid and liquid wastes were disposed of by CG in several known source

areas.  These source areas and the manufacturing processes have been

managed in such a way that large amounts of chemicals, commonly known as

DDT, DDD, and DDE (collectively DDTr), have impacted the McIntosh

community and the homes of the Plaintiffs.

18.     The residences contain concentrations of DDTr at levels which pose an

unacceptable risk to human health thereby reducing the property values of the

community.

19.     Upon information and belief, the USEPA and the State of Alabama have

determined that there was a completed human exposure pathway to CG-related

contaminants through the inhalation by nearby residents of contaminated dust

particles from the waste management areas with suspected surficial chemicals;

inhalation by nearby residents of volatile chemicals from subsurface sources in

the waste management areas; and ingestion of venison by local hunters from deer feeding in vegetated areas of the floodplain.  Plaintiffs contend that these pathways continue to exist today.

20.    The property of the Plaintiffs in this area has been substantially adversely affected.

21.    The Defendants manufactured, distributed, buried, disposed of, or otherwise contributed to the CG site-related contaminants to which the Plaintiffs were exposed and continue to be exposed while residing in the areas surrounding the plant and/or various offsite dumpsites and/or areas affected by contaminants from the site.  Therefore, each Defendant should be held jointly and severally liable.

22.    At all relevant times herein, upon information and belief, Defendants were aware that the contaminants they discharged into the environment posed a danger to human health and the environment.

23.    Any and all conditions precedent necessary to bring this Civil Action have been complied with or fulfilled by Plaintiffs.

## IV. FIRST COUNT - NEGLIGENCE

24.    Plaintiffs repeat, reallege and make a part hereof each and every allegation contained in the preceding sections of this Complaint and incorporate same by reference as though fully set forth herein.

25.    Defendants, at all times material hereto, acted through their respective officers, employees, and agents, who in turn were acting within the scope of their authority and employment in furtherance of the business of Defendants.

26.    Air contamination has occurred and continues to occur at or around this site each day.  Residents have been located near the site and the de facto hazardous waste dump sites and other areas affected by the contaminants since 1952.

27.    As a result of Defendants' acts and omissions, extensive contamination has been documented in the surrounding area and nearby communities.

28.    At all relevant times, upon information and belief, Defendants knew or should have known, that the hazardous and toxic substances discharged were contaminating the surface area at the McIntosh sites and would eventually enter Plaintiffs' properties in the area.

29.    At all relevant times, Defendants failed to advise or warn Plaintiffs of the dangers emanating from the discharge of hazardous and toxic substances.

30.    Upon information and belief, Defendants failed and continue to fail to use reasonable care to safeguard those residing on nearby property from the risk of injury or property damage.

31.    As a direct and proximate result of the acts and omissions of Defendants: (1) Plaintiffs have lost the beneficial use, enjoyment, and exclusive possession of their property; (2) Plaintiffs' properties have declined in value and continue to decline in value as a result of the contamination and spectre of contamination in the future; and (3) Plaintiffs suffered and continue to suffer property damage, economic loss, and inconvenience in having to reside on contaminated property or in close proximity to contaminated property as well as Plaintiffs' inability to fully utilize and enjoy waterways in the areas which are contaminated by substances from these sites.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, individually, jointly, and severally, for compensatory damages, punitive damages, relocation expenses, interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

### V. SECOND COUNT - CONSPIRACY

32.     Plaintiffs repeat, reallege, and make a part hereof each and every allegation contained in the preceding First Count and other parts of this Complaint, and incorporate same by reference as though fully set forth herein.

33.     Upon information and belief, the Ciba Defendants (hereinafter "Ciba") conspired with Clement International Corporation to underestimate the risk posed by exposures to DDTr. Further Ciba conspired with BCM Converse, Inc., and Clements to provide false and/or misleading information to the State and federal authorities and to the McIntosh community regarding the risks associated with the DDTr in the McIntosh community causing harm to Plaintiffs.

34.     Upon information and belief, in the process of performing the ecological risk assessment in connection with the Feasibility Study for the Olin Superfund site and Ciba Superfund site, the environmental contractors for Olin (URS) and the environmental contractors for Ciba (Clements) along with corporate representatives from Olin and Ciba met at a motel in early 1993 to conspire to defraud the Environmental Protection Agency (EPA) and the public at large.  The Risk Assessment is an integral part of the Feasibility Study to be submitted to the EPA and then to the public for comment.  Olin and Ciba organized a meeting

wherein corporate representatives and contractors traveled from different parts of the country to conspire to  manipulate data from their respective Risk Assessments so that conflicting results would not be reported to the EPA in the two studies for the respective corporations.  According to Mr. Conner's sworn testimony, the following people attended this meeting at the motel: Mr. Conner, Judi Durda (Clements - Ciba's environmental contractor), Scott Tew (Ciba), Jim Brown (Olin - Olin's environmental contractor), Jim Brown's counterpart at Ciba whose name the witness could not recall, and Willie Beal (URS).

35.     The ultimate result of these and other manipulations based on a "covenant" between the two corporations is fraudulent misrepresentations made to the EPA, ADEM, and the McIntosh community that result in damages to Plaintiffs.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, individually, jointly, and severally, for compensatory damages, punitive damages, relocation expenses, interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

## VI.  THIRD COUNT - STRICT LIABILITY

36.     Plaintiffs repeat, reallege, and make a part hereof each and every allegation contained in the preceding Counts and other parts of this Complaint and incorporate same by reference as though fully set forth herein.

37.     Upon information and belief, Defendants, by generating, discharging, transporting, or allowing the discharge of DDTr and/or concealing knowledge of same knowingly and deliberately and/or consciously and/or internally engaged in

an abnormally dangerous activity and/or ultra hazardous activity.

38.    As a direct and proximate result of the acts and omissions of Defendants: (1) Plaintiffs have lost the beneficial use, enjoyment, and exclusive possession of their property; (2) Plaintiffs' properties have declined in value and continue to decline in value as a result of the contamination and spectre of contamination in the future; and (3) Plaintiffs suffered and continue to suffer property damage, economic loss, and inconvenience in having to reside on contaminated property or in close proximity to contaminated property.

39.    Defendants are strictly liable for the above damage which resulted directly from their engaging in an abnormally dangerous activity.

    **WHEREFORE,** Plaintiffs demand judgment against Defendants, individually, jointly, and severally, for compensatory damages, punitive damages, relocation expenses, interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

## VII. FOURTH COUNT - TRESPASS

40.    Plaintiffs repeat, reallege, and make a part hereof each and every allegation contained in the preceding Counts and parts of this Complaint and incorporate same by reference as though fully set forth herein.

41.    Defendants' wrongful conduct as set forth above resulted in the direct physical invasion of Plaintiffs' properties by hazardous and toxic substances contaminating their properties and the surrounding surface and subsurface areas.

42.    The hazardous and toxic substances emanating from the Defendants' pollution continues to contaminate Plaintiffs' properties.

43.    The presence of the hazardous and toxic contaminants on Plaintiffs' property is unauthorized and unreasonable.

44.    To date, Defendants have not removed the trespass from Plaintiffs' properties. Each day that Defendants fail to remove the trespass constitutes a continuous trespass and breach of the duty to remove the trespass.

45.    As a direct and proximate result of the acts and omissions of Defendants: (1) Plaintiffs have lost the beneficial use, enjoyment, and exclusive possession of their property; (2) Plaintiffs' properties have declined in value and continue to decline in value as a result of the contamination and spectre of contamination in the future; and (3) Plaintiffs suffered and continue to suffer property damage, economic loss, and inconvenience in having to reside on contaminated property or in close proximity to contaminated property.

    **WHEREFORE,** Plaintiffs demand judgment against Defendants, individually, jointly, and severally, for compensatory damages, punitive damages, interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

## VIII.  FIFTH COUNT - NUISANCE

46.    Plaintiffs repeat, reallege, and make a part hereof each and every allegation contained in the preceding Counts and parts of this Complaint and incorporate same by reference as though fully set forth herein.

47. Defendants' wrongful conduct resulted in the interference with Plaintiffs' rights to the exclusive use and enjoyment of their properties through the invasion of hazardous and toxic substances contaminating their properties and the surrounding surface and subsurface areas.

48. To date, Defendants have not removed the nuisance from Plaintiffs' properties and surrounding areas.  Each day that Defendants fail to remove the nuisance constitutes a continuous nuisance and breach of the duty to remove the nuisance.

49. This interference with Plaintiffs' use and enjoyment of their property is unreasonable, unwarranted, uncompensated, and unlawful.

50. Plaintiffs have suffered and continue to suffer material annoyance and economic loss due to Defendants' wrongful interference with Plaintiffs' property rights.

51. As a direct and proximate result of the acts and omissions of Defendants: (1) Plaintiffs have lost the beneficial use, enjoyment, and exclusive possession of their property; (2) Plaintiffs' properties have declined in value and continue to decline in value as a result of the contamination and spectre of contamination in the future; and (3) Plaintiffs suffered and continue to suffer property damage, economic loss, and inconvenience in having to reside on contaminated property.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, individually, jointly, and severally, for compensatory damages, punitive damages, interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

## IX.  SIXTH COUNT - INTENTIONAL MISREPRESENTATION

52.    Plaintiffs repeat, reallege, and make a part hereof each and every allegation contained in the preceding Counts and parts of this Complaint and incorporate same by reference as though fully set forth herein.

53.    Upon information and belief, Defendants issued, published or otherwise produced numerous reports, studies, informational videos, and/or publicity guides about the CG site and its effect on the surrounding community to government officials and the general public.  Thereafter, upon information and belief, the government released reports and other similar documents to the general public and utilized the information provided by Defendants.

54.    Plaintiffs aver that Defendants submitted reports and/or documents in connection with alleged environmental compliance to the following government agencies including, but not limited to, the Alabama Department of Environmental Management, United States Environmental Protection Agency - Region 4, and U.S. Fish & Wildlife Service that resulted in those agencies publishing documents such as Records of Decision and/or Consent Decrees and causing agencies to undertake the study of damage to the environment in connection with Defendants' practices.  Plaintiffs relied on the false information to their detriment. Peter Tuttle of the U.S. Fish & Wildlife Service, at a town meeting in June, 2003, stated that the companies have representatives who would have the community believe that the cleanup of the plant site is almost finished.  Jim Norris, the government-appointed representative at this town meeting, utilized information provided by the companies to the government to update the citizens regarding the cleanup efforts at the site.

-17-

55.    Defendants knew that the government would rely upon such information and prepare and release reports and other similar documents to the general public.

56.    Upon information and belief, Defendants held or participated in numerous public meetings about the CG site and its effect on the neighboring community.  Upon information and belief, during these meetings, Defendants and the government distributed numerous reports, studies, informational videos and/or publicity guides, among other documents, to the attendees.  Upon information and belief, Defendants have participated in meetings with the community concerning the sites.

57.    Upon information and belief, Defendants also directly supplied reports, studies, informational videos and/or publicity guides, among other documents, directly to the general public and waged a public education program espousing the alleged lack of health threat posed by the CG site.

58.    Upon information and belief, such misrepresentations resulted from the intentional and purposeful actions and omissions of the Defendants and/or their servants and agents.  Plaintiffs aver that Defendants have made these misrepresentations and omissions at the kinds of meetings aforementioned and, specifically, at the meeting  in June of 2003.  The information regarding Defendants' misrepresentations and omissions lies exclusively within the Defendants' control in the form of internal documents within the Defendants' community relations department and/or other departments.  Because this is the type of information that is not submitted to governmental agencies, it is not available through traditional means.  Therefore, it lies within the Defendants'

exclusive control.  Only Defendants would have information that forms the basis for Defendants' omissions of fact.

59.    The Plaintiffs had no knowledge as to the truthfulness and/or falsity and/or completeness of the information and representations made by the Defendants.

60.    The Plaintiffs reasonably relied on the representations and statements of the Defendants and their agents and servants about the safety of the CG site and its potential impact on the surrounding community and thereby were induced to their detriment into remaining within the surrounding community.

61.    As a direct and proximate result of the acts and omissions of Defendants: (1) Plaintiffs have lost the beneficial use, enjoyment, and exclusive possession of their property; (2) Plaintiffs' properties have declined in value and continue to decline in value as a result of the contamination and spectre of contamination in the future; and (3) Plaintiffs suffered and continue to suffer property damage, economic loss, and inconvenience in having to reside on contaminated property.

   **WHEREFORE,** Plaintiffs demand judgment against Defendants, individually, jointly and severally, for compensatory damages, punitive damages, relocation expenses, interest, attorneys' fees, costs of suit as provided by law and such other relief as the Court may deem just and equitable.

## X.  SEVENTH COUNT - NEGLIGENT MISREPRESENTATION

62.    Plaintiffs repeat, reallege, and make a part hereof each and every allegation contained in the preceding Counts and parts of this Complaint and incorporate same by reference as though fully set forth herein.

63.  Upon information and belief, Defendants issued, published or otherwise produced numerous reports, studies, informational videos and/or publicity guides about the CG site and its effect on the surrounding community to government officials and the general public.  Thereafter, upon information and belief,  the government released reports and/or other similar documents to the general public and utilized the information provided by the Defendants.

64.  Plaintiffs aver that Defendants submitted reports and/or documents in connection with alleged environmental compliance to the following government agencies including, but not limited to, the Alabama Department of Environmental Management, United States Environmental Protection Agency - Region 4, and U.S. Fish & Wildlife Service that resulted in those agencies publishing documents such as Records of Decision and/or Consent Decrees and causing agencies to undertake the study of damage to the environment in connection with Defendants' practices.  Plaintiffs relied on the false information to their detriment. Peter Tuttle of the U.S. Fish & Wildlife Service, at a town meeting in June, 2003, stated that the companies have representatives who would have the community believe that the cleanup of the plant site is almost finished.  Jim Norris, the government-appointed representative at this town meeting, utilized information provided by the companies to the government to update the citizens regarding the cleanup efforts at the site.

65.  Defendants knew that the government would rely upon such information and prepare and release reports and other similar documents to the general public.

66.  Upon information and belief, Defendants held or participated in numerous public

meetings about the CG site and its effect on the neighboring community.  Upon information and belief, during these meetings, Defendants and the government distributed numerous reports, studies, informational videos and/or publicity guides, among other documents, to the attendees.  Upon information and belief, Defendants have participated in meetings with the community concerning the sites.

67.    Upon information and belief, Defendants also directly supplied reports, studies, informational videos and/or publicity guides, among other documents, directly to the general public and waged a public education program espousing the alleged lack of health threat posed by the CG site.

68.    Upon information and belief, such misrepresentations resulted from the negligent actions and omissions of the Defendants and/or their servants and agents. Plaintiffs aver that Defendants have made these misrepresentations and omissions at the kinds of meetings aforementioned and, specifically, at the meeting  in June of 2003.  The information regarding Defendants' misrepresentations and omissions lies exclusively within the Defendants' control in the form of internal documents within the Defendants' community relations department and/or other departments.  Because this is the type of information that is not submitted to governmental agencies, it is not available through traditional means.  Therefore, it lies within the Defendants' exclusive control. Only Defendants would have information that forms the basis for Defendants' omissions of fact.

69.    The Plaintiffs had no knowledge as to the truthfulness and/or falsity and/or

completeness of the information and representations made by the Defendants.

70.    The Plaintiffs reasonably relied on the representations and/or statements and/or

omissions of the Defendants and their agents and servants about the safety of

the Defendants' sites and their potential impact on the surrounding community

and thereby were induced to their detriment into remaining within the surrounding

community.

71.    As a direct and proximate result of the acts and omissions of Defendants: (1)

Plaintiffs have lost the beneficial use, enjoyment, and exclusive possession of

their property; (2) Plaintiffs' properties have declined in value and continue to

decline in value as a result of the contamination and spectre of contamination in

the future; and (3) Plaintiffs suffered and continue to suffer property damage,

economic loss, and inconvenience in having to reside on contaminated property.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, individually,

jointly and severally, for compensatory damages, punitive damages, relocation

expenses, interest, attorneys' fees, costs of suit as provided by law and such other relief

as the Court may deem just and equitable.

## XI.  EIGHTH COUNT - FRAUD AND FRAUDULENT CONCEALMENT

72.    Plaintiffs repeat, reallege, and make a part hereof each and every allegation

contained in the preceding Counts and parts of this Complaint and incorporate

same by reference as though fully set forth herein.

73.    By way of example, and not by way of limitation, upon information and belief,

Defendants purposely, intentionally, and for the purpose of personal profit,

concealed the wrongful and harmful pollution at the CG site and its effects on the

surrounding community from government officials and the general public,

including the Plaintiffs.

74.    Upon information and belief, the Defendants knew that the misrepresentations

and statements made to the government officials and the general public were

false when disclosed or published.

75.    The Plaintiffs had no knowledge as to the truthfulness and/or falsity and/or

completeness of the statements and representations made by the Defendants.

76.    The Plaintiffs reasonably relied on the representations and statements of the

Defendants and their agents and servants about the safety of the CG site and its

potential impact on the surrounding community and thereby were induced to their

detriment into remaining within the surrounding community.

77.    The conduct of the Defendants constituted common law fraud, fraudulent

concealment, and intentional misrepresentation.

78.    As a direct and proximate result of the acts and omissions of Defendants: (1)

Plaintiffs have lost the beneficial use, enjoyment, and exclusive possession of

their property; (2) Plaintiffs' properties have declined and continue to decline in

value as a result of the contamination and spectre of contamination in the future;

and (3) Plaintiffs suffered and continue to suffer property damage, economic

loss, and inconvenience in having to reside on contaminated property.

   **WHEREFORE,** Plaintiffs demand judgment against Defendants, individually,

jointly, and severally, for compensatory damages, punitive damages, relocation

expenses, interest, attorneys' fees, costs of suit as provided by law, and such other

relief as the Court may deem just and equitable.

## XII.  NINTH COUNT - CONSTRUCTIVE FRAUD

79.    Plaintiffs repeat, reallege, and make a part hereof each and every allegation contained in the preceding Counts and parts of this Complaint and incorporate same by reference as though fully set forth herein.

80.    By way of example, and not by way of limitation, upon information and belief, Defendants purposely, intentionally, and for the purpose of personal profit, concealed the wrongful and harmful pollution at the CG site and its effect on the surrounding community from government officials and the general public, including Plaintiffs.

81.    Upon information and belief, the Defendants knew that the misrepresentations and statements made to the government officials and the general public were false when disclosed or published as stated herein.

82.    The Plaintiffs had no knowledge as to the truthfulness and/or falsity and/or completeness of the statements and representations made by the Defendants.

83.    The Plaintiffs reasonably relied on the representations and statements of the Defendants and their agents and servants about the safety of the CG site and its potential impact on the surrounding community and thereby were induced to their detriment into remaining within the surrounding community.

84.    The conduct of the Defendants constitutes constructive fraud.

85.    As a direct and proximate result of the acts and omissions of Defendants: (1) Plaintiffs have lost the beneficial use, enjoyment, and exclusive possession of their property; (2) Plaintiffs' properties have declined and continue to decline in

value as a result of the contamination and spectre of contamination in the future; and (3) Plaintiffs suffered and continue to suffer property damage, economic loss, and inconvenience in having to reside on contaminated property or in close proximity to contaminated property as well as Plaintiffs' inability to fully utilize and enjoy waterways in the areas which are contaminated by substances from these sites.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, individually, jointly, and severally, for compensatory damages, punitive damages, relocation expenses,  interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

### XIII.  TENTH COUNT - PUNITIVE/ EXEMPLARY DAMAGES

86.     Plaintiffs repeat, reallege, and make a part hereof each and every allegation contained in the preceding Counts and parts of this Complaint and incorporate same by reference as though fully set forth herein.

87.     At the time of the manufacture, distribution, and disposal of the CG site-related contaminants, upon information and belief, each Defendant knew the manufacture, distribution, and disposal of same was certain to result in danger and harm to persons, such as the exposed Plaintiffs, who live in the vicinity of the Ciba-Geigy McIntosh Plant and the offsite disposal areas.

88.     Further, each Defendant failed and refused to take positive steps and actions to prevent and/or minimize Plaintiffs' exposure to said CG site-related contaminants.

89.    In connection with the manufacture, distribution, and disposal of the CG site-related contaminants, upon information and belief, Defendants' conduct constituted aggravating circumstances as well as wanton and willful disregard of Plaintiffs' safety, as well as disregard for the value of Plaintiffs' property. Moreover, those acts are sufficient to constitute malice and demonstrate conscious indifference to a degree that there should be an imposition of punitive/exemplary damages against each Defendant, in an amount sufficient to punish each Defendant and deter them from such conduct in the future.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, individually, jointly, and severally, for compensatory damages, punitive damages, relocation expenses, interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

## XIV.  ELEVENTH COUNT - VIOLATIONS OF THE CIVIL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

90.    Defendants, Ciba Specialty Chemicals Corporation, Ciba Geigy Corporation, Novartis Corporation, (hereinafter collectively "Ciba")[1], and Olin Corporation and

---

[1]This is not the first time Ciba Geigy has been scrutinized for criminal behavior.  It is important to note that in 1988, the New Jersey State Grand Jury indicted Ciba, Bill Bobsein, and Jim McPherson, environmental managers at the Ciba Geigy plant in Toms River, New Jersey, for violations of the New Jersey Clean Water Enforcement Act involving criminally negligent dumping and disposal of hazardous wastes and the pollution of the Toms River basin area in New Jersey.  As part of a plea bargain, Ciba, Bobsein, and McPherson pled guilty to criminal charges and Ciba was ordered to pay a record $64 million in fines, reimbursements, and cleanup costs.  At the now closed Ciba Toms River New Jersey site, electronic monitors measuring air emissions abound and dozens of workers were covered head-to-toe wearing breathing masks and Tyvek suits during the drum removal process because the EPA was not sure what would come out of the ground at that site.  Upon information and belief, the waste disposal practices of Ciba and Olin at the two Superfund Sites in McIntosh, AL are more egregious than the conduct for

Arch Chemicals, Inc. (hereinafter collectively "Olin") ("Olin" and "Ciba", collectively, "the Corporations") in concert with their respective environmental contractors, namely, Woodward Clyde/URS, Clements, Weinberg, and others, committed several acts in furtherance of common schemes to defraud governmental agencies and the public at large to derive great economic benefit for the Corporations. These acts constituted violations of the Racketeer Influenced and Corrupt Organizations Act and 18 USC Sections 1341 (Frauds and swindles) and 1343 (Fraud by wire, radio, or television). The Corporations and their environmental contractors utilized the post office or authorized depository for mail matter as well as telephones, e-mails, and facsimile machines to communicate regarding schemes and/or artifice to defraud governmental agencies and the public to the Corporations' economic benefit and to the detriment of the public and public commerce.

91.     Upon information and belief, in 1993, as described herein, the Corporations conspired to defraud governmental agencies and the public when representatives from the Corporations met at a motel in early 1993 in a conspiracy to manipulate data from their respective Risk Assessments to assure that conflicting results would not be reported by the two studies submitted by the Corporations to the EPA and, ultimately, to the public. At this meeting and

---

which Ciba management was convicted in Toms River, New Jersey. As part of this conduct, Ciba, Bobsein, and McPherson were involved in shipping tons of hazardous wastes each year from the Ciba Toms River New Jersey Facility to the Ciba McIntosh, AL facility for disposal. See Exhibit A attached to Plaintiffs' Original Complaint. Additionally, Ciba settled a cancer cluster case associated with this New Jersey site.

possibly others, the Corporations discussed their collective "approach" to defraud the public and the governmental agencies. The collective "approach" or "covenant" between Ciba and Olin and their environmental contractors is evident through May, 1995 and continues to date. Since 1993, the Corporations and their environmental contractors have utilized the mails and wires to correspond with each other in the form of letters, e-mails, and facsimiles in furtherance of their schemes to defraud the public with their waste disposal practices and "no action plan" in regard to the "Olin" Basin.

92.    In fact, in November of 1993, Ciba hired Lorraine Pearsall of Weinberg Consulting Group, Inc. regarding "Health Effects Issues at McIntosh." In a memorandum in this regard attached as Exhibit B to Plaintiffs' Original Complaint, Lorraine Pearsall instructed Ciba management to conduct themselves as follows:

> You need to ally yourselves with the community to show your concern. Tell the community leaders that you all need to work together to come up with an approach for the site which will benefit the community. Acknowledge the scientific controversy surrounding DDT toxicity at the moment (they are probably aware of it), but say you are doing your best to resolve the issues. You need to say you are taking their concerns seriously, and have spent a great deal of time in studying the problem. **Say that the work you have done to-date leads you to believe that the Federal Government (ATSDR directed ADPH in setting up the advisory) has exaggerated the health effects associated with fish ingestion from the basin.** Tell them you are disappointed that no one from ATSDR (or ADPH) met with you to discuss their concerns, and that you have questions regarding their conclusions which you will try to clarify. We suggest that you set up separate meetings with ADPH and ATSDR to discuss these issues. Your very strong point is that you have been so pro-active and have spent so much on remediation; this is certainly evidence that you are concerned, and you should mention it.

There has been only limited remediation of the "Olin" Basin to date and money spent has been in furtherance of study/delay/ "monitor and do nothing" and no action remedies while the contamination continues to spread into the Tombigbee River and ultimately to Mobile Bay.

93.   As highlighted in the Inconsistency Alert mentioned herein at Count Two - Conspiracy, the Corporations conspired with each other and utilized the mails and wires to further their conspiracy.  On February 5, 1993, James "Jim" Brown of Olin and Willie Beal of Woodward Clyde/URS exchanged by facsimile a document entitled "Olin/Ciba McIntosh, AL, Ecological Risk Assessment Issues" attached as Exhibit C attached to Plaintiffs' Original Complaint.  This document illustrates disharmony among the co-conspirators.  It states:

> "In an effort to **coordinate** ecological risk assessments (ERAs) for the adjoining Ciba-Geigy and Olin Superfund sites at McIntosh, AL, **it was recently discovered that Ciba's corporate toxicologist and their environmental consultants (Clements International Corp.) disagreed quite strenuously with the overall approach and certain technical assumptions which WCC intended to use for the Olin site.**"

This document is illustrative of the need for enforcement of the covenant between the co-conspirators to harmonize and manipulate their ecological risk assessments for these sites.  In addition to Olin and Ciba utilizing the mails and wires to communicate with their environmental consultants regarding issues in connection with ecological risk assessment matters, the Corporations also exchanged their respective ecological risk assessments and data with the others'

corporate officers by mail and wire in furtherance of this scheme.[2]

94.    Perhaps most disturbing is the improper relationships among these co-conspirators and their scheme to defraud governmental agencies and the public regarding the health of the "Olin" basin.  Upon information and belief, J.V. Conner of Woodward Clyde/URS (Olin's environmental consultant) wrote and faxed to the other conspirators an "Ecological Parable" which clearly outlines this fraudulent scheme and is evidence of the knowledge of the conspirators with respect to the "poisons" being put into the "Olin" Basin by the Corporations, as well as the Corporations' and their contractors' knowing misrepresentations of the condition of the Basin ecosystem to the USEPA and the community that the Basin was a "healthy ecosystem."  The "Ecological Parable" which Olin's environmental consultant tailored to specifically fit this site and some of the principal players in McIntosh states in pertinent part:

> Once upon a time, there was a mythical valley where a large river joined the sea.  In the bottom of this valley, a few miles inland, there was a broad expanse of fertile floodplain associated with the river.  Because the river was useful to humans as a source of water and an avenue of boat transportation, many factories and towns had been built along the edge of the valley, just out of reach of floods that came nearly every year...

> The factory needed certain chemicals to manufacture other chemicals. There were times, over the years that this factory operated, when some of **these chemicals were discharged, and they found their way into the swamp**.  Unfortunately, some of these **chemicals were poisonous**, if consumed by animals in large enough amounts.  Most of the fish and other animals in the swamp did not die when they consumed or **absorbed**

---

[2]Please see document attached as Exhibit D in Plaintiffs' Original Complaint from Steve Tew (Ciba) to Jim Brown (Olin) which states: "In addition to a copy of your assessment for our office in Mobile, I would appreciate a copy of your report being sent directly to Dr. Al Wiedow at our Ardsley, NY office."

the chemicals. Instead, they **accumulated the chemicals in their bodies**, so that they became like **little packages of poison**. Other animals that liked to eat fish were **in peril** whenever they had a meal...

Among the animals that particularly liked to eat fish was a species of bird. This type of bird was called the Beaked Katawaller and was highly specialized, or - - as a biologist might say - - "adapted" to a way of life that made it especially vulnerable to unnatural things (**such as poison in its food**)...

This is the story of one of those **pairs of birds, Jim and Judi**...

In the case of **Judi**, however, **her chicks were always smaller and sometimes deformed. None ever lived more than a few weeks**...

**Jim and Judi never produced a single heir**. They eventually grew old and **passed on** to that heavenly fishing perch in the sky.

So tragic it is that neither **Judi** nor **Jim** ever knew that only a few months after they died a pair of Beaked Katawaller newlyweds met by accident near Jim's favorite fishing perch. The newcomers found the tidy little burrow a few yards up the bluff from the fishing perch - - the very same dwelling so lovingly excavated by Jim five years before. The newlyweds were **Al** and **Lorraine**. Years before, Judi's sister had taken up with a male along a slough at the next bend in the river, and Lorraine was their first offspring (out of three clutches) to survive - - because until this year there had been no available Beaked Katawaller habitat in all of the valley!

Epilog: The winter after **Jim and Judi** died, some **humans counted birds near the mouth of the river**. **They recorded the same density** for Beaked Katawallers as was estimated in the preceding years. **Al and Lorraine never produced any heirs, nor did any of the successive pairs that replaced them in the mythical swamp - - yet every year the humans estimated the same density of Beaked Katawallers**. This is very strange, but it is probably due to the fact that **<u>most</u> of the offspring of <u>most</u> of the pairs never survived long enough to be counted. Apparently the failure of the mythical swamp subpopulation (of two, at any given time) to successfully procreate had a negligible effect on the entire valley population.**

Please see Exhibit E attached to Plaintiffs' Original Complaint.[3]  Also see Exhibit

F (attached to Plaintiffs' Original Complaint) - Inconsistency Alert, page 7, paragraph 22.

95.    Another document from Woodward Clyde/URS' production entitled

"Inconsistency Alert", attached herein at Count Two, is illustrative of the

manipulation by the Corporations of data for the ecological risk assessments to

render the desired result of "no action".  The Corporations continued to

manipulate this data in subsequent additional ecological studies of the Basin[4].

---

[3]With regard to the names of these mythical lovebirds in the parable, interestingly, in 1993, Olin's Manager of Environmental Technology was "**Jim**" Brown.  Ciba's primary environmental consultant for the Ecological Assessments at this time was "**Judi**" Durda.  Ciba's Corporate Representative for this site at this time was "**Al**" Weidow and the Ciba environmental consultant regarding Health Issues was "**Lorraine**" Pearsall (see also paragraph 144 herein).  Thus, the parable is about "**Jim**" and "**Judi**" and "**Al**" and "**Lorraine**" (see Exhibit D (attached to Plaintiffs' Original Complaint)- Inconsistency Alert at page 5, paragraph 17).  The "healthy ecosystem" in the Basin where the lovebirds live and eat the fish ("little packages of poison") is far from "healthy" and the Corporations and their consultants know this as evident in this ecological parable of the basin.  The parable literally mocks the agencies who are buying into the conspirators' description of the Basin as a healthy ecosystem.  The conspirators clearly know that the poisons are killing the birds and other animals who eat the poisoned fish from the Basin.  This author and presumably the other consultants and the Corporations involved are making fun of the agencies and the public who are duped into thinking that the population of the birds who eat the fish is not dwindling, but remains steady.  Not surprisingly, during the same timeframe in 1993, the Corporations were telling the public and the governmental agencies that there was no substantial ecological risks associated with the contamination in the Basin.  In 1996, Olin informed the public that, despite the no fish consumption advisories and warnings by the Alabama Department of Public Health, eating fish from the Basin was acceptable.

[4]Recent testing of the Basin by Plaintiffs demonstrates significant contamination from both Ciba Geigy and Olin Corporation's manufacturing processes.  Further, Defendants' conduct in not reporting dioxins, for example, (see Exhibit G attached to Plaintiffs' Original Complaint) and testing for dioxins in water knowing that dioxins are not soluble and, therefore, will be reported as "non-detect" despite their significant presence in soil and sediment is just one example of their repeated manipulation of data.

Another example of the manipulation of data as stated in Exhibit F, attached to Plaintiffs' Original Complaint- Inconsistency Alert is the fact that Clements (Ciba's environmental contractor) "asserts that groundcover in the bottomland hardwood forest is 'limited to a few

As late as 1995, the Corporations were still conspiring to deceive government

agencies.  As illustrated in a memorandum from J.V. Conner (Woodward

Clyde/URS) to Jim Brown (Olin) and Willie Beal (Woodward Clyde/URS), Conner

stated:

> Obviously, Olin's big mistake at McIntosh was sampling and analyzing
> stuff!  **There would be no risk at all if no analytical data were
> available!**  Olin and WCC should be ashamed of unnecessarily putting
> receptors at risk by wanton gathering of analytical data.

Please see Exhibit H attached to Plaintiffs' Original Complaint.  In other words,

Olin's environmental contractor stated that if you do not look for pollution, you will

not find it.  This memorandum aptly describes the Corporations' approach to

these Superfund sites.

96.     In 1994, Olin and Ciba Geigy conspired to manipulate the Basin data and further

deceive the public.  In a document produced by Ciba Geigy, the company

outlined the "Ciba/ Olin Interaction."  The document states:

> "Recent Events:
>
> Olin Basin Fish Consumption Advisory (Nov 93) Cites DDT
> Olin Superfund Site Public Health Advisory (Oct 94) Cites DDT
> Olin Report - Additional Ecological Studies (Nov 94) Will Highlight DDT
> Ciba Floodplain ROD (Feb 95?) Will Precede Olin Basin/ Floodplain ROD
>
> Olin Proposal:
> Olin/ Ciba Meeting, Including Corporate Environmental Vice Presidents, At

---

grasses.' Potential Problem: WCC;s characterization of understory vegetation (groundcover) in
Olin's OU-2 implies a substantially richer flora.  I am unaware of any salient difference in the
density of overstory vegetation between the two sites.  It is unlikely that there would be much
difference between the respective sites unless some anthropogenic factor was suppressing plant
growth in the Ciba floodplain (or had resulted in a different interpretation of conditions)." The
cause is said to be a dense overstory (i.e., shading)  There are numerous other examples of
manipulation of data, however, those are proof of facts to be left for another day.

McIntosh on 9 Dec 94.  **Probable central issue is: "Cooperation on Basin Remediation."**

Please see Exhibit I attached to the Plaintiffs' Original Complaint.

Additionally, a document produced by Ciba with regard to the Olin Basin Human Health Advisory states:

Risk Assessments

Health Department
Ciba

**Ciba Risk Assessment shows no problem.**

**Health Department issues advisory not to eat fish.**

**Why?**

Please see Exhibit J attached to Plaintiffs' Original Complaint.

97.     Further, the Corporations executed this deceitful scheme by depositing their manipulated risk assessments into the mail for delivery to certain governmental agencies.  These governmental agencies, in turn, dispersed this information to the public by way of mails and wires.  The Corporations knowingly used the United States mails and wires in furtherance of their fraudulent scheme in the form of Public Notices regarding these Superfund sites.  These Public Notice mailings occurred and continue to occur each time the Corporations submit proposals which require public comment to governmental agencies.

98.     The Corporations also met with the Technical Assistance Grant Technical Advisor for the Olin site to further their common scheme to defraud the public.  This Technical Advisor is paid by the United States Environmental Protection

Agency through checks received in the mail.  The United States Environmental

Protection Agency receives funds for these community programs from the

Corporations, also through the mails.  In the summer of 2003, this Technical

Advisor urged the community to take steps to have at least one of the

Corporations' plant sites removed from the Superfund list ("delisted") while the

property values and health of the community were still in jeopardy because of the

offsite migration of chemicals of concern from these sites.

99.    During 1988 Sherman Williams decided that a conclusion reached by

Arthur D. Little Co., indicating that merely removing the DDTr contamination

remaining on the Ciba Site would put the residents of McIntosh at an

unacceptable risk. Rather than tailor the clean-up to alleviate the risks to the

community and these Plaintiffs, the Defendants decided to fire the consultant, lie

to Arthur D. Little Co. about the reasons for the dismissal conspiring with BCM

Converse, Inc. and Clement.  They jointly used the United States Postal Service

and/or other wires in committing the conspiracy and further, Mr. Williams

attempted to destroy much of the documentation associated with these actions.

See Exhibit K attached to Plaintiffs' Original Complaint.

100.   The result of the fraud committed against the public is financial gain by the

Corporations in terms of monies saved by the improper handling, disposing,

remediation, and/or storing of contaminated wastes.  These Corporations,

through machinations devised to convince governmental agencies and the

community to delay and/or  "do nothing" about these contaminated sites, have

saved the Corporations millions upon millions of dollars to the detriment of the

public and interstate commerce.  Plaintiffs and members of the putative class as a whole relied on the standardized misrepresentations made in furtherance of the Corporations' fraudulent scheme. As a result, the clean up of the contamination from these Superfund sites has been delayed and the contamination continues to proliferate into the community.  Property values are adversely affected and the residents in the surrounding communities are unnecessarily subjected to increased health risks from contaminants from these sites.  The Corporations have denied responsibility, calling their environmentally negligent behavior "sins of the past," conducted inadequate investigation of the pollution (using inadequate sampling points and analytical methods), and have denied environmental impacts and the urgent need for cleanup.  Their obvious tactic is pseudo-remediation.  The Corporations have shown a complete lack of responsibility towards the community and the environment.  The people of the McIntosh community are still living in these contaminated areas.

With regard to the Eleventh Count herein, Plaintiffs specifically seek damages for injuries to business and property.  Plaintiffs do not seek damages with regard to the Eleventh Count for personal injury.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, individually, jointly and severally, for compensatory damages, punitive damages, relocation expenses, interest, attorneys' fees, costs of suit as provided by law and such other relief as the Court may deem just and equitable.

## XV. JURY DEMAND

101.   Plaintiffs demand trial by jury on all issues herein stated.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray that this Honorable Court enter judgment against Defendants, individually, jointly, and severally, for compensatory damages, punitive damages, relocation expenses, interest, attorneys' fees, costs of suit as provided by law, and such other relief as the Court may deem just and equitable.

Respectfully submitted,


BY:      /s/ Michael Howell
          Michael T. Howell, Esq.
          Dennis C. Reich, Esq.
          Reich & Binstock, LLP
          4265 San Felipe, Suite 1000
          Houston, TX 77027
          Telephone: 713-622-7271
          Facsimile: 713-623-8724

          Hugh P. Lambert, Esq. (Bar 7933)
          Linda J. Nelson, Esq. (Bar 9938)
          Lambert & Nelson, PLC
          701 Magazine Street
          New Orleans, LA 70130
          Telephone: 504-581-1750
          Facsimile: 504-529-2931

          Scott Denson, Esq.
          McCleave Denson Shields, LLC
          507 Church Street
          Mobile, AL 36602
          Telephone: 251-433-2001
          Facsimile: 251-433-2053

          Fred D. Gray, Esq.
          Stanley F. Gray, Esq.
          Gray, Langford, Sapp, McGowan,
          Gray & Nathanson
          PO Box 830239

108 Eastside Street
Tuskegee, AL 36083
Telephone: 334-727-4830
Facsimile: 334-727-5877

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6,2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Hugh P. Lambert, Esq.
Linda J. Nelson, Esq.
Lambert & Nelson, PLC
701 Magazine Street
New Orleans, LA 70130

Fred D. Gray, Esq.
Gray, Langford, Sapp, McGowan, Gray & Nathanson
Post Office Box 239
108 Eastside Street
Tuskegee, Al 36083

Scott Denson, Esq.
McCleave Denson Shields, LLC
507 Church Street
Mobile, AL 36602

F. Grey Redditt, Jr., Esq.
Lisa Bradford Hansen, Esq.
L. Thomas Styron, Esq.
Vickers, Riis, Murray and Curran, LLC
Post Office Drawer 2568
Mobile, Alabama 36652-2568

Mark C. Surprenant, Esq.
Kathleen F. Drew, Esq.
William B. Gaudet, Esq.
Ann R. Koppel, Esq.
Adams & Reese
One Shell Square
701 Poydras Street, Suite 4500
New Orleans, LA 70139


By:____/s/ Michael T. Howell