**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CLEON ABRAMS, SR., *et al.*,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION No. 08-00068-WS-B** |
| | * | |
| **CIBA SPECIALTY CHEMICALS CORPORATION, *et al.*,** | * | |
| | * | |
| | * | |
| **Defendants.** | * | |

**ORDER**

This case is before the Court on Plaintiffs' Motion for Scheduling Conference to Set Scheduling Order and Test Plaintiffs' Trial (Doc. 61), Defendants' Response in Opposition (Doc. 63) and Plaintiffs' Reply (Doc. 64). The undersigned conducted a scheduling conference with counsel for the parties on October 10, 2008. For the reasons that follow, Plaintiffs' Motion is GRANTED in part and DENIED in part.

**I. Relevant Background**

Cleon Abrams and 270[1] other alleged owners, residents or users of property located in or near McIntosh, Alabama filed the instant action alleging that their properties, which are situated in close proximity to a Ciba-Geigy Chemical manufacturing plant owned and operated by Defendants, have been devalued by contamination emanating from the Ciba plant. Specifically, Plaintiffs claim that

[1]The claims of six (6) Plaintiffs were dismissed. (Doc. 55)

"beginning in about 1952, solid and liquid wastes were disposed of by CG [Defendants] in several known source areas. These source areas and the manufacturing processes have been managed in such a way that large amounts of chemicals, commonly known as DDT, DDD and DDE (collectively DDTr), have impacted the McIntosh community and the homes of plaintiffs. The residences contain concentrations of DDTr at levels which pose an unacceptable risk to human health thereby reducing the property values of the community." (Amended Complaint, ¶¶ 17-18). Plaintiffs have named as Defendants Ciba Speciality Chemicals Corp., Ciba-Geigy Corp., Novartis, Ltd, Inc. and Syngenta Corp. Protection, Inc.

Plaintiffs filed the instant motion requesting that six to eight "Test Plaintiffs" be selected for a trial setting in October 2009 and that discovery be limited to the selected "Test Plaintiffs" for this phase of the litigation. Plaintiffs assert that federal courts have the authority to conduct "bellwether trials" or "test cases" and rely on the Fifth Circuit's decision in In re Chevron U.S.A., Inc., 109 F. 3d 1016 (5th Cir. 1997) to argue that a test trial is appropriate in this case. According to Plaintiffs, the Fifth Circuit, in Chevron embraced the "[n]otion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar." Id. at 1019. Plaintiffs assert that because the

test case would not have any preclusive effect with respect to the claims of the remaining Plaintiffs, Defendants would suffer no prejudice through the use of a test case.

Defendants accuse Plaintiffs of attempting to deprive them of an opportunity to conduct discovery on the claims of each Plaintiff and of attempting to "cherry pick" the best Plaintiffs for a test trial. According to Defendants, Plaintiffs' suggestion of a test group is unfair and is inefficient because each particular Plaintiff has a specific set of facts relating to his or her property, including various ownership issues, and each Plaintiff would need to prove that he or she is the lawful owner of the property in issue, and that each suffered an injury that was caused by Defendants.

Defendants further assert that the selection method suggested by Plaintiffs is unfair because it is not representative of the actual Plaintiffs. According to Defendants, to accurately represent the actual Plaintiffs, the majority of any test group should consist of Plaintiffs with little or no DDTr on their properties since "Plaintiffs own sampling data reveals that the vast majority of the properties had values below the background rate or the screening value established by the United States Environmental Protection Agency." ( Doc. 63, p. 6). In support of their argument, Defendants note that in Chevron, the Fifth Circuit determined that a test plaintiff trial plan, with each side selecting fifteen test cases,

was not representative of the cases and was not likely to efficiently resolve the case. Defendants further argue that because a trial with "Test Plaintiffs" would only bind those parties to the actual trial, it would result in inefficiency since the claims of the remaining Plaintiffs would still need to be litigated.

Defendants assert that as opposed to establishing "Test Plaintiffs" in this case, the Court should instead enter a Lone Pine order, and should require Plaintiffs to submit a RICO Case Statement. According to Defendants, a RICO Case Statement serves the specific purpose of requiring plaintiffs that file RICO claims in federal courts to provide necessary facts in support of each element required in order to prevent plaintiffs from using discovery to obtain the facts that they should already have in their possession before filing such a claim. Additionally, Defendants assert that a Lone Pine order, which is designed to handle complex issues and potential burdens on defendants and the courts in mass tort litigation, should be utilized in this case in order to focus the discovery process.

## II. Discussion

Federal Rule of Civil Procedure 16 governs case management and provides in relevant part:

> {T]he court may take appropriate action, with respect to..(6) the control and scheduling of discovery, including orders affecting disclosures and discovery pursuant to Rule 26...(12) the need for adopting special procedures for managing potentially difficult or protracted actions that may involve

> complex issues, multiple parties, difficult legal questions or unusual proof problems...(16) such other matters as may facilitate the just, speedy and inexpensive disposition of the action.

FED. R. CIV. P. 16(c)(6), (12) and (16). Rule 16 affords judges wide discretion over case management. Chrysler Int'l Corp. v. Chemaly, 280 F.3d 1358, 1360 (11th Cir. 2002)("Given the caseload of most district courts and the fact that cases can sometimes stretch out over years, district courts must have discretion and authority to ensure that their cases move to a reasonably timely and orderly conclusion"); Perez v. Miami-Dade County, 297 F.3d 1255, 1263 (11th Cir. 2002)("Indeed, we have repeatedly emphasized the responsibility of trial courts to manage pretrial discovery properly in order to avoid 'a massive waste of judicial and private resources' and a loss of society's 'confidence in the courts' ability to administer justice.'"), *quoting* Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1333 (11th Cir. 1998). *See also* Advisory Committee Notes, Fed. R. Civ. P. 16 ("Rule 16(b) assures that the judge will take some early control over the litigation...").

In addition to Rule 16, Rule 42(b) provides in pertinent part, that a court "may order a separate trial of any claim...or any separate issue...always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution. FED. R. CIV. P. 42(b). Utilizing Rules 16 and 42(b), courts, in appropriate circumstances, have determined that the use of

"bellwether" or "representative plaintiffs" can be an effective case management tool. Chevron, 109 F.3d at 1019; *see also* County of Suffolk v. Amerada Hess Corp., (In Re: Methyl Tertiary Butyl Ether Prods. Liab. Litig., 2007 U.S. Dist. LEXIS 45543(S.D.N.Y. June 15, 2007); Morgan v. Ford Motor Company, 2007 U.S. Dist. LEXIS 36515(D. N.J. May 17, 2007). In Chevron, the Fifth Circuit explained:

> The term bellwether is derived from the ancient practice of belling a wether (a male sheep) selected to lead the flock. The ultimate success of the wether selected to wear the bell was determined by whether the flock had confidence that the wether would not lead them astray, and so it is in the tort context.
>
> The notion that the trial of some members of a large group might provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one...The reason for acceptance [of bellwether trials] by the bench and bar are apparent. If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts.

Id. at 1019. While recognizing the value of bellwether trials, the Court in Chevron[2] went on to hold that "before a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any

[2]The question before the Court in Chevron was what preclusive effects should attach to findings from a bellwether trial. The court held that procedural and substantive due process dictate that before the extinquishment of claims or the imposition of liability in nearly 3000 cases is permitted, based on a "sample of individual claims or cases", the sample must be one that is randomly selected and statistically significant. Id. at 1021.

extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected. Id. at 1020.

In the case sub judice, the undersigned finds that use of a test group of Plaintiffs is appropriate for a number of reasons. As noted supra, this case involves the individual claims of 271 Plaintiffs who alleged that the value of their property has diminished as a result of DDTr which emanated from the Ciba plant beginning in 1952. As observed by Judge Steele in his Order dated September 10, 2008 (Doc. 56), the factual allegations and legal theories posited by Plaintiffs in this action are strikingly similar to those litigated before this Court in an action styled Jessie Fisher *et al.,* v. Ciba Geigy, *et al.,* Civil Action No. 03-00566-WS-B. The five Fisher plaintiffs sought and were denied class certification, and finally reached a settlement with Defendants after four years of extensive litigation. "The case at bar multiplies the five Fisher Plaintiffs' numerous legal theories across 277 Plaintiffs and four defendants. Moreover, "the identities of counsel for both sides in this action are substantially similar to those who litigated the Fisher matter." (Doc. 56)

Based upon the undersigned's personal familiarity with the amount of time and resources expended in resolving the Fisher case, which involved five (5) plaintiffs, the Court has grave concerns

that allowing full scale discovery and motions, at this stage, with regards to all 271 Plaintiffs in this case would strain resources and result in litigation that would easily surpass the four (4) year journey of the Fisher case.  While Defendants are correct in their contention that ownership issues will be unique to each Plaintiff, the undersigned finds that given the arguments advanced by Plaintiffs' counsel in the Fisher case and the substantially similar allegations asserted in Plaintiffs' Amended Complaint in this case, it appears quite likely that much of the evidence and arguments with respect to DDTr causation will be substantially the same for all 271 Plaintiffs.  Additionally, in Plaintiffs' RICO claim, they allege that Defendants Ciba Speciality Chemicals Corporation, Ciba Geigy Corporation and Novartis Corporation conspired with nonparties Olin Corporation and Arch Chemicals, Inc., as well as all of those companies' respective environmental contractors, to engage in "common schemes to defraud governmental agencies and the public at large to derive great economic benefit." (First Amended Complaint, ¶ 90). Like the DDTr claim, it appears quite likely  much of the evidence and arguments regarding the RICO claim will be substantially similar for all 271 Plaintiffs.

Accordingly, the undersigned finds that proceeding with a test group of Plaintiffs is the most efficient method for managing this action under the unique circumstances presented by this case. Focusing on a representative group of Plaintiffs will afford the

parties an opportunity to flush out the issues and realistically evaluate the strengths and weaknesses of their respective positions. It will also assist the Court in tailoring a case management plan for the remaining Plaintiffs[3].

The undersigned has reviewed the parties' positions regarding the composition of the test group and finds that the selection methods suggested by Plaintiffs are not likely to yield a representative sample. According to Plaintiffs, they should be allowed to select six to eight "Test Plaintiffs" because they bear the burden of proof and because the test case will have no preclusive effect on the claims of the remaining Plaintiffs; thus, Defendants will suffer no prejudice. Plaintiffs also suggest that the parties jointly select the test group, or that the selection of the test group be left up to the Court.

Defendants argue that if a test group is utilized, the group should be representative of the actual Plaintiffs. According to Defendants, because Plaintiffs' testing of the properties revealed that 58% of the properties have DDTr screening levels of less than 100 ppb, at least 58% of the test plaintiffs should be from this

---

[3]While a jury verdict in the test case will not have a preclusive effect on the claims of the remaining Plaintiffs, it is quite conceivable that some of the Court's rulings with respect to particular issues will, in some instances, establish the law of the case. Grant v. United States of America, 2007 U.S. Dist. LEXIS 55283(M.D. Ga. July 31, 2007)("The law of the case doctrine holds that when a court decides upon a rule of law that decision should continue to govern the same issues in subsequent steps of the same case.")

group. Defendants likewise assert that because Plaintiffs' testing of the properties revealed that 28% of the properties have DDTr screening levels of 100 through 999, 28% of the test Plaintiffs should be from this group. Defendants further assert that 3% of the test group should be made up of Plaintiffs whose properties had DDTr testing levels of 1000 to 1700, and the remaining 11% should be made up of Plaintiffs' whose properties had DDT testing levels above 1700. Assuming that the level of DDTr on each property bears some correlation to the alleged decrease in property value, composing the test group based upon these categories appears reasonable.

The undersigned finds, based on a total of 271 Plaintiffs, that a test group should encompass at least 10% of the Plaintiffs, or 27 Plaintiffs. Based on the testing results, 58% or 15 of the test Plaintiffs should come from the group with DDTr levels under 100, 28% or 7 of the test Plaintiffs should come from the group with DDTr levels in the 100 through 999 range, 3% or 1 of the test Plaintiffs should come from the group with DDTr levels in the 1000 to 1700 range, and 11% or 3 of the test Plaintiffs should be from the group with DDTr levels above 1700. Accordingly, the parties are directed to confer and select the "Test Plaintiffs" in accordance with the above guidelines. The parties are further directed to file with the Court by November 14, 2008, a joint statement detailing the names of the Plaintiffs who are to comprise the test group. In the event the parties are unable to select the test group, the undersigned will

conduct a conference with the parties on November 18, 2008, at 10:00 a.m., in courtroom 1A, to assist the parties in randomly selecting the test group based on the four categories discussed above. By separate order, the Court will enter a scheduling order which will control the litigation of the claims of the test group.

Turning next to Defendants' request for a Lone Pine Order, the undersigned finds that the request is due to be denied. Defendants seek a Lone Pine order requiring each Plaintiff to produce information regarding ownership of their subject property, the value of their subject property, and the sampling results for their subject property. Lone Pine orders are "pre discovery" orders designed to handle the complex issues and potential burdens on defendants and the courts in mass tort litigation by requiring plaintiffs to produce some evidence to support a credible claim. Steering Comm. v. Exxon Mobil Corp., 461 F.3d 598, 604, n. 2 (5th Cir. 2006); Abuan v. General Elec. Co., 3 F.3d. 329 (9th Cir. 1993) In this case, the undersigned finds that the entry of a Lone Pine order is unwarranted. As noted supra, the properties of each Plaintiff have been tested for the presence of DDTr and Defendants have been provided with the results. Moreover, since this case is going to proceed with a test group, the use of a Lone Pine order will not advance the goal of focusing the parties' attention and efforts on the efficient resolution of the test case.

Finally, Defendants' request that the Court direct Plaintiffs

to file a RICO statement, which details the basis of their RICO claim, is denied. While courts in other jurisdictions have adopted local rules and procedures which require parties to provide detailed information regarding the basis of their RICO claim, no such rule has been adopted in this district. (S.D. Fla., L.R. Gen. Rule 12.1 and U.S. Dist. Ct. Rules S.D. Ga.) Moreover, in this case, Judge Steele previously addressed Defendants' claim that Plaintiffs' RICO claim was not adequately pled (Doc. 56). Defendants argued that the RICO claim should be dismissed because Plaintiff failed to plead fraud with particularity, failed to plead causation and failed to plead two predicate acts of mail or wire fraud. Judge Steele determined that Plaintiffs sufficiently pled each element of their RICO claim, and that the allegations satisfied the increased level of specificity required for civil RICO claims. (Id.) Accordingly, Defendants' request for the issuance of an order directing Plaintiffs to file a RICO statement is denied.

DONE this **23rd** day of **October, 2008.**

**/S/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**