**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CLEON ABRAMS, SR.,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 08-0068-WS-B** |
| | ) |
| **CIBA SPECIALTY CHEMICALS** | ) |
| **CORPORATION,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter comes before the Court on defendants' Motion for Summary Judgment on All Claims for Failure to Prove any Damages (doc. 227). This Motion has been briefed and is ripe for disposition.[1]

_____

[1]    Also pending is a filing styled "Plaintiffs' Motion for Leave to Late File Response to Defendants' Motion for Summary Judgment on All Claims for Failure to Prove any Damages" (doc. 258). The briefing schedule (doc. 238) provided that all responses to summary judgment motions must be filed by no later than August 12, 2009. Plaintiffs filed eight response briefs encompassing 12 summary judgment motions on August 12; however, their Response (doc. 256) relating to defendants' damages-focused summary judgment motion was not electronically filed until 1:04 a.m. on August 13, 2009, 64 minutes after the deadline had passed. Given the absence of any prejudice to defendants, the minimal nature of the delay, and counsel's obvious efforts to comply with the applicable briefing schedule (even at the price of a sleepless night), plaintiffs' Response (doc. 256) will be accepted and considered as filed. Plaintiffs' Motion for Leave to Late File Response (doc. 258) is therefore **granted**. Plaintiffs need not refile their Response.

The Court also has reviewed Plaintiffs' Motion to File Sur-Replies (doc. 271), in which plaintiffs request leave to file a three-page sur-reply to address a single argument raised by defendants (ostensibly for the first time) in their reply brief, to-wit: that plaintiffs are not entitled to clean-up costs. Plaintiffs' premise that defendants' argument was newly raised in the reply brief is inaccurate. *See* doc. 227, at 10 ("Plaintiffs have no evidence of harm to human health requiring clean-up."). Moreover, even if defendants did raise a new argument in their reply, it is only because of plaintiffs' bombshell in their Response that they were not seeking diminution in value damages at all, but were instead claiming clean-up costs. Nonetheless, given the brevity of the proposed sur-reply and its potential value in illuminating the parties' positions, the Court in its discretion **grants** the Motion as to Exhibit A, and will consider the proposed sur-reply appended to plaintiffs' Motion as Exhibit A. Plaintiffs need not refile that document.

I.     **Background.**

This action involves claims that certain real property located in and around McIntosh, Alabama has been damaged by DDT contamination.  The 277 plaintiffs[2] who brought this lawsuit are property owners who maintain that the source of the contamination was a chemical manufacturing plant in McIntosh that is or was at various times owned and operated by defendants, Ciba Specialty Chemicals Corporation, Ciba-Geigy Corporation, Novartis, Ltd., Inc., and Syngenta Crop Protection, Inc. (collectively, "Ciba").  According to the First Amended Complaint (doc. 26), the nub of plaintiffs' claims is their contention that "beginning in about 1952, solid and liquid wastes were disposed of by [Ciba] in several known source areas.  These source areas and the manufacturing processes have been managed in such a way that large amounts of chemicals, commonly known as DDT, DDD, and DDE (collectively DDTr), have impacted the McIntosh community and the homes of plaintiffs. ... The residences contain concentrations of DDTr at levels which pose an unacceptable risk to human health thereby reducing the property values of the community."  (Doc. 26, ¶¶ 17-18.)  Plaintiffs' theory is that the wind has carried DDTr particulate matter off the Ciba site and onto their properties dating back to the 1950s and early 1960s, when Ciba was actively producing DDT at that location, and continuing through the present day.  On summary judgment, plaintiffs have staked themselves to a position that the measure of damages they seek to recover is confined to the cost of decontaminating their properties.

Upon initiating this lawsuit by filing their Complaint in February 2008, plaintiffs parlayed these basic factual allegations into 11 causes of action asserted by each plaintiff against each defendant, to-wit: negligence, conspiracy, strict liability, trespass, nuisance, intentional misrepresentation, negligent misrepresentation, fraud / fraudulent concealment, constructive fraud, punitive/ exemplary damages, and violation of the federal Racketeer Influenced and

---

[2]     By the Court's tally, 17 plaintiffs have dropped out of this action pursuant to Orders entered on August 25, 2008 (doc. 55), April 27, 2009 (doc. 165), June 24, 2009 (doc. 203), and September 16, 2009 (doc. 277) for various reasons, including settlement, failure to prosecute, acknowledgment that the plaintiff has no viable claims, or simply a stated desire not to proceed further.  That leaves 260 remaining plaintiffs.

Corrupt Organizations Act.[3]  Each defendant countered by invoking the same 41 affirmative defenses in its Answer (docs. 57 - 60).[4]

In the interests of justice, efficiency and judicial economy, Magistrate Judge Bivins developed and implemented a trial plan pursuant to which the claims of 27 representative "test plaintiffs" would proceed through the discovery and trial processes first, after which a case management plan would be tailored for the remaining plaintiffs.  (*See* docs. 66, 239.)  Of the original 27 test plaintiffs, only 17 remain in the case in a test plaintiff capacity at this time, for various reasons.  The jury's verdict as to any test plaintiff will not be binding on any non-test plaintiff.  The test plaintiff discovery period has concluded, and the test plaintiff trial is set for jury selection on November 3, 2009, with trial to follow during the November 2009 civil term.  In preparation for trial, the parties have collectively filed some 14 motions for summary judgment or partial summary judgment, presenting various legal issues for judicial resolution before trial in an effort to streamline and focus the case.

Notwithstanding the parties' proliferation of Rule 56 motions, this Order is confined to defendants' motion relating to whether plaintiffs have made a sufficient showing of damages.[5]

---

[3]      Three of those causes of action (intentional misrepresentation, negligent misrepresentation, and fraud / fraudulent concealment) were dismissed as to all plaintiffs at the pleadings stage more than a year ago for failure to comport with the heightened pleading requirements of Rule 9(b), Fed.R.Civ.P.  (Doc. 56, at 14-18.)

[4]      The factual allegations and legal theories posited by the parties (including plaintiffs' causes of action and defendants' affirmative defenses) in this action bear striking resemblance to those previously presented in a related federal action before the undersigned styled *Jessie Fisher et al. v. Ciba Specialty Chemicals Corporation, et al.*, Civil Action No. 03-0566-WS-B.  After more than four years of extensive litigation (including an unsuccessful bid for class certification), the five *Fisher* plaintiffs reached a settlement with Ciba on October 19, 2007, shortly before jury selection was to occur.  The identities of counsel for both sides in this action are substantially similar to those in the *Fisher* matter, and the pleadings in this case appear to have their genesis in the corresponding *Fisher* pleadings, with some being reproduced nearly verbatim.

[5]      The remaining 13 summary judgment motions will be addressed separately via contemporaneous orders.  In considering the damages Motion (doc. 227), the Court has reviewed the parties' respective principal briefs (docs. 227 & 256), defendants' reply (doc. 267), plaintiffs' sur-reply (doc. 271, Exh. A), and the evidentiary submissions accompanying these respective filings, as well as all other portions of the court file deemed relevant.

As expressed in their Motion, defendants seek dismissal of all plaintiffs' claims because the evidence reveals only "de minimis amounts of DDT in dust samples," "Plaintiffs have no evidence of diminished value," "Plaintiffs' testimony regarding alleged values are speculative," and the observed levels of DDT "pose no health risk to inhabitants and therefore cannot support a finding of property damage." (Doc. 227, at 1.)[6]

## II.    Relevant Facts and Positions of Parties Concerning Damages.[7]

Although nearly everything in this case is hotly disputed by the parties, they agree on a few basic facts. Indeed, there is no dispute that Ciba produced DDT at its McIntosh facility from approximately 1952 until approximately 1965.[8] (Doc. 227, at 7; doc. 256, at 3.) They also agree that Ciba has not manufactured DDT at that location in more than four decades, and that the Ciba McIntosh facility was designated a Superfund site in 1983 because of on-site contamination. (Doc. 227, at 7 & n.1; doc. 256, at 3-4.) Although defendants apparently do not agree, plaintiffs' position is that "DDT is currently being emitted and/or released into the environment to this day." (Doc. 256, at 3.)[9]

---

[6]    To the extent that Ciba's Motion seeks dismissal of all claims brought by all 277 plaintiffs herein, not simply those brought by the 27 test plaintiffs, defendants are overreaching. As explained *supra*, the case management plan for this action contemplated that the claims of 27 representative test plaintiffs would be litigated through discovery and trial before the claims of the other 90% of the plaintiffs would be subjected to those same processes. There has been no discovery as to the damages incurred by non-test plaintiffs. Accordingly, any motion for summary judgment as to the sufficiency of non-test plaintiffs' evidence of damages is premature.

[7]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiffs' version of the facts is taken as true and all justifiable inferences are drawn in their favor.

[8]    Defendants peg the terminus date for Ciba's production of DDT in McIntosh as 1965. (Doc. 227, at 7.) Plaintiffs counter that the actual date of cessation was January 1966. (Doc. 256, at 3.) This factual dispute is immaterial for purposes of this Order, and has no bearing on the analysis and conclusions set forth herein.

[9]    The only record evidence to which plaintiffs point in support of this proposition are two short excerpts from the deposition of Paulo Zannetti, Ph.D., a defense expert who conducted air modeling for DDT emissions from the Ciba facility in McIntosh. (Doc. 254, at Exh. 2.) The cited portions of Dr. Zannetti's deposition reflect that he performed air modeling,

The crux of Ciba's summary judgment argument is that none of the test plaintiffs can establish that they have been damaged by the observed DDT contamination on their properties. Given this theory, one would expect a cornerstone of the summary judgment briefs to be a recitation of the evidence of DDT contamination at each test plaintiff's property. However, the parties have not even referenced that information in briefing this Motion. The Court will not sift through their thousands of pages of summary judgment submissions in connection with all 14 motions in an effort to excavate record evidence of that contamination.[10] Nonetheless, defendants do not argue that any test plaintiff's property is devoid of DDT contamination; to the contrary, the parties appear to be in agreement (at least for Rule 56 purposes) that some level of DDT contamination was found at each of these locations. Additionally, uncited portions of the 178-page expert report of Randy D. Horsak, P.E., plaintiffs' decontamination and remediation cost expert, do set forth summaries of the sampling results for the test plaintiffs. In particular, Horsak's report indicates that of the 17 remaining test plaintiffs, nine were observed to have DDTr concentrations of between 25 and 99 parts per billion ("ppb"), five were observed to have

———————————

that he feels qualified to do so, that there was or may have been open burning of DDT wastes at the Ciba facility sometime prior to 1974, and that if DDT particulate was transported by air from the Ciba site into the community, concentrations offsite would decrease with distance, even if there was never a "magic distance" after which those concentrations would fall to zero. (*Id.* at 13-15, 21-25.) The Court is hard-pressed to understand how these limited excerpts bolster plaintiffs' contention of continued DDT emissions from the Ciba facility into the McIntosh community through the present. Be that as it may, the Court need not definitively resolve that question for purposes of ruling on the narrow issues presented by defendants' Motion for Summary Judgment for Failure to Prove Any Damages, and therefore declines to do so.

[10]     *See, e.g., United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."); *Carolina Acquisition, LLC v. Double Billed, LLC*, 627 F. Supp.2d 1337 (S.D. Fla. 2009) ("Federal judges are not archaeologists. ... We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment."); *Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial.").

DDTr concentrations of between 100 and 999 ppb, and three were observed to have DDTr concentrations of between 1,000 and 3,800 ppb.  (Doc. 256, Exh. 9, at Table 3-1.)[11]

Defendants' Motion is directed primarily at plaintiffs' oft-repeated contention that DDT contamination has impaired the value of their properties.  From the outset of this case, and dating back to the predecessor *Fisher* litigation, plaintiffs' counsel have consistently articulated a theory of injury predicated on diminution in property values because of Ciba's environmental contamination.[12]  In what can only be described as a sudden tectonic shift, however, plaintiffs reveal in their opposition brief that they are no longer seeking recovery for reduced property values.  They endorse the expert opinion of defense expert William Desvousges, Ph.D., and concede that "there is no reliable way to determine the diminution in value of Plaintiffs' properties."  (Doc. 256, at 12.)[13]  Moreover, plaintiffs firmly disavow any intent to claim

---

[11]     The plaintiff-by-plaintiff breakdown of these measurements is as follows, in alphabetical order: Cleon Abrams, Jr. (51 ppb), Sexton Adams (3,780 ppb), Bobby Chestang (950 ppb), Marie Adams (79 ppb), Ruth Everette (300 ppb), Mary Ferrell (375 ppb), Elliott Fields (234 ppb), Toni Jackson (70 ppb), Edgar & Emma Moss (1,300 ppb), Bertha Reed (75 ppb), Wilford Taylor (3,240 ppb), Beverly Thomas (90 ppb), Etoria Toole (339 ppb), Johnnie Ware (25 ppb), Raymond Weaver (99 ppb), Tommy Weaver (70 ppb), and Annie Williams (55 ppb). (*Id.*)

[12]     For example, the Amended Complaint (doc. 26) in this case is replete with allegations that, because of Ciba's conduct, "Plaintiffs' properties have declined in value and continue to decline in value as a result of the contamination and spectre of contamination in the future."  (Doc. 26, ¶¶ 31, 38, 45, 51, 61, 71, 78, 85.)  Indeed, the opening paragraphs of that pleading allege that because of "confirmed DDTr contamination on the Plaintiffs [*sic*] property, the sites have adversely affected the value of their property" and that Ciba's emissions of chemicals "have adversely affected the value of the Plaintiffs' properties."  (*Id.*, ¶¶ 1, 3.)  Even in briefing the instant Rule 56 Motion, plaintiffs admit that they "filed a lawsuit in 2008 alleging devaluation of their properties due to chemical contamination from DDT."  (Doc. 256, at 4.)

[13]     The following excerpt is reasonably representative of Dr. Desvousges' testimony cited by plaintiffs on this issue:

"Q:     I just want to be clear for the record that you have not calculated any diminution in values for the properties in McIntosh?
"A:     I have not.
"Q:     And as we stand today with the information available to you, it is your opinion that you can't calculate the diminution in value?
"A:     My opinion is that there's not enough data to be able to do it and certainly

damages for diminution in value, as follows: "Plaintiffs do not seek damages in the amount of diminished property value as Defendants contend." (Doc. 256, at 2, 11.) Having made an unequivocal statement repudiating any intent to seek damages in this action for diminution of property values, upon which representation both Ciba and this Court have relied in framing the summary judgment discussion and adjudication, plaintiffs will be held to it. As such, the issue of diminished property value is no longer part of this case. Plaintiffs are precluded by principles of estoppel and waiver from arguing otherwise henceforth. *See generally Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1266 (11th Cir. 2008) ("The equitable doctrine of estoppel is invoked to avoid injustice in particular cases.") (citation and internal quotation marks omitted); *General American Life Ins. Co. v. AmSouth Bank*, 100 F.3d 893, 899 (11th Cir. 1996) ("The purpose of estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders that assertion contrary to equity and good conscience."); *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994) ("Waiver is the voluntary, intentional relinquishment of a known right."); *DeShong v. Seaboard Coast Line R. Co.*, 737 F.2d 1520, 1522 (11th Cir. 1984) ("Under the doctrine of equitable estoppel a party with full knowledge of the facts, who accepts the benefits of a[n] ... order, may not subsequently take an inconsistent position to avoid the corresponding obligations or effects.").[14]

Plaintiffs' diminution in value theory of damages having been excised from the case by their own admissions in summary judgment filings, the obvious follow-up inquiry is what form of damages they <u>are</u> claiming. Plaintiffs' brief is clear that, in lieu of damages for reduced

---

that if you – you can't do it in a reliable way. And frankly I don't think anyone could be able to come up with a reliable estimate."

(Desvousges Dep. (doc. 256, Exh. 13), at 52.)

[14]    Although plaintiffs' disavowal of diminution in value damages may not constitute a judicial admission, strictly speaking, that doctrine provides additional support for the conclusion that plaintiffs are bound by their representations on this point for the duration of this litigation. *See, e.g., Purgess v. Sharrock*, 33 F.3d 134, 144 (2nd Cir. 1994) ("A court can appropriately treat statements in briefs as binding judicial admissions of fact."); *Garamendi v. SDI Vendome S.A.*, 276 F. Supp.2d 1030, 1037 n.5 (C.D. Cal. 2003) ("The Court may, in its discretion, treat statements made in briefs as binding judicial admissions.").

property values, they "seek restoration costs to rid their properties of the DDTr presently contaminating their homes and land." (Doc. 256, at 2, 11.) To that end, plaintiffs submit substantial evidence purporting to quantify those restoration costs. As a threshold matter, plaintiffs offer the expert opinion of Marco Kaltofen, P.E., a civil engineer who collected and analyzed samples from plaintiffs' properties and at other locations in the vicinity of the Ciba plant, that the appropriate "background concentration" levels of DDTr in household dust are approximately 10 ppb. (Doc. 256, Exh. 10, at 3; Kaltofen Dep., at 50-52, 217.) This 10 ppb figure represents the concentration of DDTr that one might reasonably expect to find in household dust samples taken from plaintiffs' property in the absence of environmental contamination from the nearby Ciba facility.[15] Kaltofen's opinion concerning background DDTr concentrations in dust was relayed to plaintiffs' remediation expert, Horsak, as a remediation target value. Horsak then performed property-specific analyses to estimate the cost of cleaning up the DDT contamination on each test plaintiff's property to restore said property to the background 10 ppb concentration of DDTr.[16] Horsak estimated the costs of decontamination and restoration of each remaining test plaintiff's property to that 10 ppb target as ranging from a low of $7,620.25 to a high of $32,786.22, for an aggregate figure of $316,467.48 for the 17

---

[15]    As Kaltofen explained, "[I]t was my judgment that if I took a large number of samples, using essentially the same methods from a location just like McIntosh, but that never had a Ciba-Geigy, I would expect to be centering around a ten-part per billion value in dust." (Kaltofen Dep., at 217.) This opinion was apparently rooted in Kaltofen's specialized knowledge and expertise as a civil engineer, as well as his review of industry studies and reference materials.

[16]    Ciba insinuates that plaintiffs' counsel picked the 10 ppb figure out of thin air and directed Horsak to use it, with no foundation in science or risk assessment. (Doc. 227, at 8.) This contention distorts the record. To be sure, Horsak testified that the 10 ppb clean-up figure was "a number given to me by plaintiffs' counsel," the source of which he did not know, and that he "didn't do any type of independent assessment to see if it should be 10 or 11 or 500 or 1,000." (Horsak Dep., at 80, 146.) But Horsak also testified that he was not retained by plaintiffs to make any assessment of human health risks, that he is not a toxicologist, and that the scope of his opinions in this case is confined to cost estimates of decontamination and restoration of plaintiffs' properties. (*Id.* at 79-80.) The scientific underpinning of the 10 ppb clean-up target lies not in any expert opinions that Horsak formed, but in those of Kaltofen. As such, plaintiffs have clearly come forward with a record basis for the 10 ppb figure utilized in Horsak's estimates.

remaining test plaintiffs.  (Doc. 256, Exh. 9, at Exh. 4-1.)[17]

For their part, defendants dispute the validity of this 10 ppb remediation goal.  In particular, defendants' environmental risk assessment expert, Elizabeth Anderson, Ph.D., opines that the "most stringent screening level" that should apply to the test plaintiffs' properties from a health/risk standpoint is 36,000 ppb.  (Doc. 227, Exh. 2, at 22.)  Indeed, Dr. Anderson's report expresses her opinion that the DDTr concentrations observed at the test plaintiffs' properties do not "exceed even a de minimis level of risk and ... that none of the 27 properties require any cleanup for DDT and related compounds."  (*Id.* at 26.)[18]  Alternatively, defendants invoke the 1,700 ppb standard proffered by the EPA for clean-up of soils contaminated with DDT.  (Horsak Dep., at 113-14.)  Under either metric, defendants maintain that test plaintiffs' contemplated clean-up costs are not available as damages in this case because in the absence of any meaningful risk to human health there is no need for clean-up of any kind on those properties.[19]

### III.    Analysis.

#### A.    *Summary Judgment Standard.*

Summary judgment should be granted only if "there is no genuine issue as to any

---

[17]    The plaintiff-by-plaintiff cost breakdown is as follows, in alphabetical order: Cleon Abrams, Sr. ($24,855.94), Sexton Adams ($20,162.63), Bobby Chestang ($32,786.22), Marie Evans ($12,816.38), Ruth Everette ($24,696.41), Mary Ferrell ($16,300.82), Elliott Fields ($13,239.94), Toni Jackson ($7,620.25), Edgar & Emma Moss ($23,516.89), Bertha Reed ($17,435.23), Wilford Taylor ($18,629.02), Beverly Thomas ($15,393.56), Etoria Toole ($29,108.73), Johnnie Ware ($17,471.18), Raymond Weaver ($11,016.38), Tommy Weaver ($14,784.63), and Annie Williams ($16,633.27).  (*Id.*)

[18]    Plaintiffs devote nearly five pages of their Response to attacking the reliability of Dr. Anderson's expert conclusions.  (Doc. 256, at 4-8.)  In the absence of a formal *Daubert* motion and full briefing on that issue, the Court will reserve ruling on the merits of plaintiffs' objections to the admissibility of Dr. Anderson's proposed testimony.

[19]    Although it is not clear from their filings, it appears that plaintiffs intend to present testimony from Kaltofen that the appropriate standard for risks to human health from DDT exposures is actually 34.5 ppb, based on guidance promulgated by the National Institute for Occupational Safety and Health for workplace chemical exposure hazards.  (Kaltofen Decl. (doc. 256, at Exh. 14), at 1.)  Defendants do not mention Kaltofen's testimony on this point in their principal brief, but instead bury it on a single sheet of paper amidst hundreds of pages of exhibits; therefore, the Court will not address it further herein.

material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c),
Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district
court, by reference to materials on file, that there are no genuine issues of material fact that
should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11ᵗʰ Cir. 1991).
Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to
show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make
'a sufficient showing on an essential element of her case with respect to which she has the burden
of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v.
Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party
has met its burden, the court must stop short of weighing the evidence and making credibility
determinations of the truth of the matter. Instead, the evidence of the non-movant is to be
believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-
Siegen*, 965 F.2d 994, 999 (11ᵗʰ Cir. 1992) (internal citations and quotations omitted).
"Summary judgment is justified only for those cases devoid of any need for factual
determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11ᵗʰ Cir. 1987)
(citation omitted).

**B.      *Remediation Costs and the Measure of Damages.***

For all of plaintiffs' tort claims based on damage to their property, the measure of
damages is the same. Under Alabama law, "[t]he proper measure of compensatory damages in a
tort action based on damage to real property is the difference between the fair market value of
the property immediately before the damage and the fair market value immediately after the
damage." *Birmingham Coal & Coke Co. v. Johnson*, 10 So.3d 993, 998 (Ala. 2008) (citations
omitted); *see also Poffenbarger v. Merit Energy Co.*, 972 So.2d 792, 801 (Ala. 2007) ("We hold
that the appropriate measure of direct, compensatory damages to real property generally is the
diminution in the value of that property, even when the cost to remediate the property exceeds
the diminution in the value thereof."); *Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL
2995525, *6 & n.14 (S.D. Ala. Oct. 11, 2007) (reciting standard).

In this action, however, plaintiffs have expressly disclaimed any intent to recover for
diminution in property value, and have presented no evidence of pre- and post-contamination
property valuations. Instead, they contend that the measure of damages they seek in this case

-10-

consists of the "restoration costs to rid their properties of the DDTr presently contaminating their homes and land." (Doc. 256, at 2, 11.)[20]  Faced with this contention, Ciba does not challenge or even address whether restoration costs are a proper measure of damages in this action under Alabama law, but instead focuses on the contention that the record establishes that the value of those restoration costs in this case is zero.  Defendants having eschewed any argument on summary judgment that clean-up costs do not represent a valid measure of damages in this case, the Court will not explore that issue *sua sponte*, but will instead assume (without deciding) that remediation costs are a legally appropriate category of compensatory damages in the case at bar.[21]

---

[20]      In so doing, plaintiffs suggest that this Court's rulings in *Fisher* pave the way for them to proceed on this theory of damages. *See* doc. 256, at 12 ("This Court previously stated that the cost of restoring properties to their original, pre-contamination condition is an alternative means of establishing damages under Alabama law."). But plaintiffs place far more weight on the *Fisher* opinion than it can reasonably bear. In *Fisher*, this Court merely dropped a footnote recognizing that rental value and restoration costs "are alternative means of establishing damages in at least certain types of property damage cases." 2007 WL 2995525, at *6 n.15. It was unnecessary in *Fisher* to consider those alternative methodologies or their potential applicability in the McIntosh contamination context because, as the same footnote observed, "plaintiffs are not proceeding on a restoration or rental value theory of damages." *Id.* Thus, the Court in *Fisher* did not have occasion to examine whether and under what circumstances a restoration theory of damages is permissible under Alabama law in property damage cases, nor did it purport to endorse the viability of same in the McIntosh DDT litigation context.

[21]      Nonetheless, the Court observes that there is some measure of support for this alternative measure of damages in the case law. Notwithstanding blanket statements touting the difference in property value pre- and post-invasion as the measure of damages in such actions, the Alabama Supreme Court has indicated that "[t]his rule is subservient to the underlying proposition for measuring damages in trespass cases: The Plaintiff is ordinarily entitled to an amount which will compensate him for actual damages sustained." *Borland v. Sanders Lead Co.*, 369 So.2d 523, 530 (Ala. 1979). Thus, "in determining the amount of damages recoverable by a plaintiff whose property has been trespassed upon, the law is flexible and the rule simple: What will compensate the plaintiff for the injury he has received?" *Id.* at 531. Given the expressed flexibility in this area, there is reason to believe that Alabama courts would allow recovery of clean-up costs in property damage cases where such amounts would compensate a plaintiff for his injury. This construction is reinforced (albeit with certain limitations and caveats that need not be explored here because defendants have not invoked them) in more recent Alabama Supreme Court jurisprudence. *See Birmingham Coal*, 10 So.3d at 998 (finding no error where trial court awarded damages based on repair costs and diminution of value of plaintiffs'

-11-

C.     *Sufficiency of Plaintiffs' Evidence of Damages.*

Rather than maintaining that clean-up costs are not a permissible measure of damages in this case, Ciba asserts that plaintiffs (a) have failed to prove substantial actual damage to their property, as required to sustain a cause of action for indirect trespass, and (b) have failed to show that any clean-up is necessary in this case. Each contention will be considered in turn.

1.     *The "Substantial Actual Damage" Requirement.*

As noted *supra*, plaintiffs have interposed a host of state-law tort claims against Ciba, including causes of action for negligence, conspiracy, strict liability, trespass, nuisance, constructive fraud, and punitive/ exemplary damages, as well as a federal statutory claim for violation of RICO. Defendants' summary judgment motion begins with the unremarkable proposition that plaintiffs must show actual damages in order to recover on their claims. *See, e.g., American General Life and Acc. Ins. Co. v. Underwood*, 886 So.2d 807, 812-13 (Ala. 2004) ("A suit on a tort claim may not be commenced until the defendant's tortious act proximately causes the plaintiff to suffer an actual injury."); *Black v. Acme Markets, Inc.*, 564 F.2d 681, 685 (5th Cir. 1977) ("[i]t is hornbook law that one of the elements of a tort is damage").

That said, the degree and type of injury required to sustain a claim is not identical for all of plaintiffs' causes of action. With respect to their indirect trespass claim, Alabama law requires a showing of substantial damage to plaintiffs' property. *See, e.g., Borland v. Sanders Lead Co.*, 369 So.2d 523, 529 (Ala. 1979) (for claim of indirect trespass, "a plaintiff must show 1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) ***substantial damages to the Res***") (emphasis added); *see also LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005) (recognizing legal standard); *Roberts v. City of Geneva*, 114 F. Supp.2d 1199, 1214 (M.D. Ala. 2000) (similar). By contrast, plaintiffs' nuisance causes of action do not require such a showing of substantial damage to the property itself. *See, e.g., Borland*, 369 So.2d at 529 ("In the

---

houses, even as to plaintiffs who expressed no opinion concerning diminution in value, and indicating that defendant had failed to demonstrate that plaintiffs' evidence of repair costs did not present a reasonable inference of damages).

traditional sense, the law of nuisance applies where the invasion ***results in no substantial damage to the Res***, but where there is interference with the use and enjoyment of one's property.") (emphasis added).[22]

As to the trespass claims, defendants insist that plaintiffs cannot meet their burden of showing that "some substance has entered upon the land itself, affecting its nature and character, and causing substantial actual damage to the res." *Russell Corp. v. Sullivan*, 790 So.2d 940, 946-47 (Ala. 2001) (citation omitted). At the core of Ciba's argument is defendants' contention that DDT contamination on test plaintiffs' property has not caused "substantial actual damage to the res." Unfortunately, Alabama courts do not appear to have fleshed out the precise scope and dimensions of this term, or to have delineated the minimum threshold of property damage needed to comport with the substantiality element. To be sure, the requisite substantial damage has been found in circumstances where sewage floods a plaintiff's house, where foreign matter

---

[22]    On the nuisance issue, defendants contend that "it is reasonable to conclude that" the DDT contamination on test plaintiffs' properties did not interfere with their use and enjoyment of such properties because test plaintiffs neither moved away nor sold their homes. (Doc. 227, at 9-10.) This is a jury argument, not a summary judgment argument. In any event, plaintiffs responded in detail to defendants' conclusory argument that there was no evidence of infringement upon the use and enjoyment of their property by making a substantial showing to the contrary. A few examples will illustrate the point. Several test plaintiffs attribute their inability or unwillingness to grow gardens, hedges, flowers or grass on their property to DDT contamination from Ciba. (Abrams Dep., at 51; Fields Dep., at 34; Ferrell Dep., at 45; Williams Dep., at 44; Adams Dep., at 32, 52.) Test plaintiffs testified to being uncomfortable living on contaminated property and being worried about the consequences of living with a potentially hazardous substance on their land and in their homes. (Fields Dep., at 84; Williams Dep., at 44.) Test plaintiffs testified to the pain of having their home "violated" by Ciba contamination. (Taylor Dep., at 79-80.) There is at least some indication in Alabama case law that these kinds of inconveniences and dissatisfactions are actionable in nuisance. *See, e.g., Borland*, 369 So.2d at 530 ("For example, if the smoke or polluting substance emitting from a defendant's operation causes discomfort and annoyance to the plaintiff in his use and enjoyment of the property, then the plaintiff's remedy is for nuisance ...."). Plaintiffs having made a showing of impingement on their use and enjoyment of their property resulting from DDT contamination, Ciba did not undertake to rebut it or to challenge the legal sufficiency of same for summary judgment purposes, but instead remained silent. The Court will not make movants' Rule 56 arguments for them, and will not *sua sponte* investigate the adequacy of the test plaintiffs' proof of injury to satisfy the elements of their nuisance claim in the absence of any attempt by Ciba to argue that this quantum of proof is deficient.

-13-

washes onto a plaintiff's property, and the like.  *See, e.g., W. T. Ratliff Co. v. Henley*, 405 So.2d 141, 145 (Ala. 1981) (in indirect trespass action based on washing of sand and gravel onto plaintiff's property from defendant's mining operations, plaintiff's property was substantially damaged for *Borland* purposes); *Snyder v. Howard Plumbing and Heating Co.*, 792 So.2d 425, 429 (Ala.Civ.App. 2000) (reversing grant of summary judgment to defendants on indirect trespass claim where plaintiff's evidence showed that defendants' improper sewer line connection caused sewage to flood plaintiff's basement on two occasions in four years, giving rise to questions of fact as to each *Borland* element).  But the lower boundary of the "substantial actual damage to the res" requirement has not been defined with any kind of bright-line clarity.

Ciba suggests that the test plaintiffs are impermissibly stacking inference upon inference to show substantial damage, and likens this case to *Russell Corp. v. Sullivan*, 790 So.2d 940, 947 (Ala. 2001).  The analogy is ill-fitting.  In *Russell*, the plaintiffs, who were owners of property adjacent to Lake Martin, sued textile mills for discharging contaminated effluent into the lake (which the plaintiffs did not own).  Of particular interest, the *Russell* plaintiffs pursued an indirect trespass claim on the theory that contaminated lake water had splashed onto their land.  The Alabama Supreme Court found that the textile mills were entitled to judgment as a matter of law on this claim because the plaintiffs' theory was unduly speculative, as exemplified by the following passage:

> "Based on these unsupported conclusions, drawn from a series of inferences ungrounded in scientific data and unsupported by the evidence, the plaintiffs asked the jury to infer (a) that the chemicals they allege were present rose to the top of the water, (b) that at the moment they rose to the surface, the water was at or above the 490-foot contour line, and (c) that the water then splashed onto the plaintiffs' properties, although no evidence of chemical contamination of the plaintiffs' properties was ever presented."

*Russell*, 790 So.2d at 950.

But the case at bar is nothing like *Russell*.  In *Russell*, the plaintiffs could not show that their property was contaminated at all, but instead resorted to a contorted theory about contaminants bubbling to the surface of Lake Martin and splashing onto their lands, all without an iota of supporting evidence.  That frankly absurd leap of logic prompted the *Russell* Court's admonition against stacking inferences upon inferences.  Here, by contrast, test plaintiffs have come forward with substantial evidence of actual, scientifically verified chemical contamination

-14-

to their properties, and have also shown that Ciba was (and maybe still is) emitting that chemical into the air from a nearby location for many years.  In the light most favorable to the test plaintiffs, the record shows that while expected DDTr concentrations on their property in the absence of Ciba's activities were approximately 10 ppb, sampling data pegs the actual DDTr concentration at those locations at between 25 ppb (2.5 times the background level) and 3,790 ppb (379 times the background level).  Unlike in *Russell*, the finder of fact in this case would not have to resort to pure conjecture or guesswork in order to conclude that the test plaintiffs' properties are contaminated by DDT from Ciba.  There is no improper stacking of inferences at work here.

Next, defendants invoke the proposition that there is, in fact, a lower asymptote of substantiality below which a claim of indirect trespass cannot stand.  That principle is, of course, correct.  Indeed, "there is a point where the entry is so lacking in substance that the law will refuse to recognize it, applying the maxim *De minimis non curat lex* the law does not concern itself with trifles."  *Borland*, 369 So.2d at 529.  The *Borland* case provides as an example of the sort of trifling matter that is not actionable the circumstance of "a passing motorist, whose exhaust emissions come to rest upon another's property."  *Id.*  In *Borland*, the Court found that the plaintiffs' evidence did not show a mere trifling intrusion, but rather demonstrated "a real and substantial invasion of a protected interest," where a nearby smelting operation had damaged the plaintiffs' property by "a dangerous accumulation of lead particulates and sulfide deposits on their property."  *Id.* at 526, 529.  In the Court's view, this case bears much closer similarity to the accumulation of lead and sulfide deposits that *Borland* deemed a real and substantial invasion than to the passing motor vehicle exhaust emissions that *Borland* suggested was trifling.  If test plaintiffs' evidence is to be believed, then Ciba's activities have deposited DDT (which defendants' expert, Dr. Anderson, acknowledges has been designated as a "probable" human carcinogen (doc. 227, Exh. 2, at 17))[23] on their properties at concentrations of up to several hundred times greater than would be expected to occur otherwise.  On this record, the Court is not prepared to rule as a matter of law that such an intrusion is so ethereal and insubstantial that

---

[23]      In that regard, Dr. Anderson testified that "in this particular situation" she was "assuming that DDT causes cancer in humans."  (Anderson Dep., at 45.)

Alabama law would refuse to recognize it, and defendants have provided no persuasive legal basis for doing so.

In short, a jury question is presented as to whether the DDT concentrations observed on the test plaintiffs' properties constitute "substantial damage to the res" for purposes of their indirect trespass causes of action against Ciba. Plaintiffs' evidence, if believed, shows the presence of a harmful compound on their properties at concentrations far in excess of background concentrations. As such, test plaintiffs' evidence fits the paradigm in which a "polluting substance emitting from a defendant's operation ... is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the Res," for which they may seek remedy in trespass. *Borland*, 369 So.2d at 530. That said, "nothing herein forbids or impairs defendants' ability to argue at trial that plaintiffs cannot prove injury from any DDT contamination by Ciba because the concentrations found on their property are too small to matter." *Fisher*, 2007 WL 2995525, at *23. In the context of this specific record, it is for the jury to decide whether the substantiality threshold is satisfied.[24]

> 2.      *Whether Clean-up Costs Can Exist Without Health Risks.*

In addition to their arguments directed at the indirect trespass causes of action, defendants seek summary judgment on all of test plaintiffs' property damage claims (not just those sounding in trespass) on the ground that the test plaintiffs' actual clean-up costs are nil,

---

[24]      In reaching this conclusion, the Court rejects plaintiffs' conclusory and reductive reasoning that, in evaluating the legal sufficiency of the test plaintiffs' indirect trespass claims, "the amount of DDTr detected on Plaintiffs' properties is of no consequence since any amount of DDTr constitutes a trespass by Defendants." (Doc. 256, at 10.) This argument improperly conflates distinct elements of the cause of action. *Borland* provides that a plaintiff proceeding on an indirect trespass theory must show: (1) an invasion affecting his interest in exclusive possession of the property; (2) that defendant intentionally performed the act resulting in the invasion; (3) reasonable foreseeability that the act could result in invasion of the plaintiff's possessory interest; and (4) substantial damage to the res. Plaintiffs are correct that even the tiniest invasion of DDT might satisfy the first three elements of the indirect trespass test; however, those elements are not in dispute on summary judgment. Rather, defendants' Rule 56 Motion is focused on the requirement that there be "substantial damage to the res." Under any reasonable reading of that element, the amount of DDTr deposited on the property matters; therefore, plaintiffs are incorrect in their insistence that the quantity of DDTr is inconsequential to their trespass claims.

such that they have no damages.  Ciba's position is that because the reported concentrations of DDT on test plaintiffs' properties do not pose a threat to human health, compensable restoration and decontamination costs are nonexistent, as a matter of law.[25]  Defendants contend that plaintiffs have made no showing that "the trifling amounts of DDT, which do not rise above the levels that could pose a health risk, need to be remediated nonetheless," and cite Dr. Anderson's opinions "that the levels of DDT found in house dust are below the EPA required clean-up levels ... thus requiring no clean up."  (Doc. 267, at 5.)

    In all candor, the Court is struggling to understand the legal and analytical underpinnings of Ciba's premise that clean-up costs are not recoverable as a matter of law because the DDT contamination they allegedly inflicted on test plaintiffs' properties is below levels that threaten human health.  Recall that in a property damage case, Alabama law provides that compensatory damages are to be awarded flexibly based on the following simple inquiry: "What will compensate the plaintiff for the injury he has received?"  *Borland*, 369 So.2d at 531.  It is not at all apparent why health risks are or should be the exclusive touchstone of that inquiry in this case, as Ciba maintains.  Plaintiffs have never pursued a theory of personal injury in this case, but are instead proceeding solely on the basis of property damage.  Yet defendants insist, with minimal authority or explanation, that the alleged property damage in this case is not compensable unless the contamination to plaintiffs' properties jeopardizes human health.  The reasoning underlying this notion is opaque.  Suppose plaintiffs were suing defendants on the grounds that defendants' conduct had caused sand and gravel to wash onto plaintiffs' property, thereby damaging it.[26]  Surely plaintiffs would not be barred from recovering the cost of hauling away those sand and gravel deposits without proof that those items posed a risk to human health.

---

[25]    Defendants' memoranda are rife with such statements.  For instance, defendants assert in their principal brief as follows: "Plaintiffs have no evidence of harm to human health from the de minimis amounts of DDT on their properties.  Thus, there is no basis for the request for remediation costs."  (Doc. 227, at 10.)  Elsewhere, defendants contend that "[c]lean up costs are non-existent, as the DDT levels on Plaintiffs' land are far below any level of EPA required clean-up."  (Doc. 267, at 4.)

[26]    This is a stripped-down variant of the scenario in *W. T. Ratliff Co. v. Henley*, 405 So.2d 141 (Ala. 1981).

Or, to use a more pedestrian hypothetical, suppose plaintiffs were suing defendants for property damage caused by defendants spray-painting graffiti on plaintiffs' property. Surely plaintiffs could recover the costs of remediation of that graffiti without establishing that their health was at risk. The point is that there are innumerable examples where award of remediation costs may be sensible and appropriate in the property damage context to compensate a plaintiff for his or her injury, even in the absence of any human health implications whatsoever.

The sole authority cited by Ciba in support of the proposition that risk to human health is a prerequisite to availability of clean-up costs in the property damage context is a 53-page slip opinion from Delaware, styled *In re W.R. Grace & Co.*, Bankruptcy No. 01-01139, slip op. (Bankr. D. Del.  Dec. 14, 2006).[27]  In that case, which concerned homeowners' claims of asbestos contamination relating to attic insulation manufactured by the defendant, the parties filed cross-motions for summary judgment on consumer protection claims. The court explained that "[c]laimants must still establish unreasonable risk of harm to support consumer protection claims. ... [T]he question before us is whether ZAI poses an unreasonable risk of harm." *W.R. Grace*, 355 B.R. at 473. On its face, *W.R. Grace* is inapposite. The case at bar does not involve consumer protection statutes, or any other cause of action as to which an unreasonable risk of harm is a required element. Certainly, nothing in *W.R. Grace* lends support to the proposition that Alabama law disallows recovery of remediation costs in a property damage case unless the plaintiffs prove that the thing to be remediated creates an unreasonable risk of harm.

Nor do defendants fare better by invoking the deposition testimony of one of plaintiffs' experts. In particular, defendants characterize the testimony of plaintiffs' cost-of-remediation expert, Horsak, as being "that if contamination on a piece of property poses no risks to human health, it is unnecessary to remediate or clean it up." (Doc. 227, at 10.)[28]  But plaintiffs did not

---

[27]    Although defendants present *W.R. Grace* as a slip opinion and attach a complete copy of same as an exhibit to their brief, a quick online search confirms that it is a published opinion, properly cited as *In re W.R. Grace & Co.*, 355 B.R. 462 (Bankr. D. Del. 2006). Although slip opinions may be cited in this District Court, counsel must provide a proper reporter citation and refrain from submitting a slip copy of any published court decision.

[28]    That statement is, in fact, a fair encapsulation of Horsak's testimony on this point, as demonstrated by the following exchanges:

retain Horsak for the purpose of determining the extent of remediation required; rather, as discussed *supra*, his expert opinions for plaintiffs are confined to estimating the cost of remediating test plaintiffs' properties to achieve a given benchmark of DDT decontamination (namely, 10 ppb). Thus, Horsak's personal opinions about whether and to what extent remediation is "needed" or "required" are unilluminating because they are beyond the scope of his limited expert involvement in this case. More fundamentally, it is important to remember that the issue raised by Ciba is properly couched as a legal question of whether Alabama law allows plaintiffs to recover remediation costs in property damage cases absent proof of risk to human health. That question does not turn on whether, in some metaphysical sense, removal of Ciba-caused DDT contamination from plaintiffs' properties is "necessary" or "required," based on whatever value judgments a witness or attorney may inject into those loaded terms. Whether an expert thinks removal of contamination is "needed" (from an engineering standpoint or a human health standpoint, as opposed to an aesthetic standpoint, a psychological standpoint, a worry standpoint, etc.) is an entirely distinct question from whether a plaintiff may legally be awarded the costs of such removal as a remedy for property damage caused by a defendant. By framing the issue in those terms, Ciba misunderstands and distorts the purpose of the damages inquiry in this case.

At the risk of redundancy, the appropriate damages inquiry under Alabama law in cases of property damage is as follows: "What will compensate the plaintiff for the injury he has received?" *Borland*, 369 So.2d at 531. Assuming that plaintiffs succeed in establishing tortious conduct and causation (which assumptions are warranted given the damages focus of this Motion

---

"A:     Well, if there's no risk -- for instance, if it was -- if the house was contaminated with flour, then the cleanup is aesthetic except for, you know, the particulate impacts and stuff.

"Q:     Right.

"A:     If there's no risk, there's probably no need to clean it up.

                    *               *               *

"Q:     You would only clean up the contamination of there was a health risk associated with it; is that correct?

"A:     Yes."

(Horsak Dep., at 77-78.)

for Summary Judgment), Ciba is legally responsible for the contamination of test plaintiffs' properties with DDT at levels up to several hundred times greater than expected background concentrations. Test plaintiffs' deposition testimony makes clear that they do not like having DDT on their property, that the presence of DDT causes them worry and discontent on a variety of different levels, and that they want Ciba's DDT to be eliminated from their homes. What would compensate test plaintiffs for these injuries? That is for the jury to decide, but remediation of contaminants that Ciba caused to be on test plaintiffs' properties could reasonably be viewed by the factfinder as appropriate compensation.[29] A jury could reasonably decide that the question of whether the observed DDT placed test plaintiffs' health at risk is beside the point. If Ciba caused unwelcome, unwanted foreign matter to invade and settle on test plaintiffs' properties, then the cost of removal of that foreign matter is a reasonable metric for making plaintiffs whole, irrespective of whether there is a health risk component to that foreign matter.[30]

All of that said, the Court recognizes Ciba's arguments concerning the *de minimis* nature of the DDT contamination, in terms of both its relatively low concentrations and the "rarely accessed and undisturbed locations" in which it was found. (Doc. 267, at 4-6.) Defendants may have a convincing jury argument that, for example, test plaintiff Johnnie Ware was not really injured by defendants' actions because the observed DDT concentration on his property was just 25 ppb and that was found on a ceiling fan or in a vacuum cleaner. Defendants might also argue that awarding test plaintiff Cleon Abrams, Sr., his requested $24,855 in clean-up costs would be far higher than necessary to compensate him for his injuries, where the observed level of DDT

---

[29]     Again, defendants have elected not to raise any issues concerning the availability of remediation costs under principles discussed by the Alabama Supreme Court in *Poffenbarger* or *Birmingham Coal*, and the Court declines to raise and examine those matters *sua sponte*.

[30]     To elaborate on that point, it may be helpful to return to Horsak's flour example. Suppose Ciba had caused flour (a harmless substance commonly found in residences all across the country) to waft through the air into plaintiffs' homes. Horsak's testimony would suggest that he does not believe it "necessary" (again, based on whatever value judgments are pre-loaded into that term) to clean up that flour because there is no risk to human health. But in that case plaintiffs would still have been injured by Ciba's tortious actions because their homes would be laden with flour. Under *Borland* and its progeny, Alabama law would generally allow plaintiffs to recover the cost of cleaning up that flour "contamination" if the jury found that such recovery would compensate them for the tortious conduct of Ciba in spreading flour into their homes.

on his property was just 51 ppb in an air conditioning filter or vacuum cleaner bag.  But such arguments are properly reserved for the trier of fact, not for this Court on summary judgment. On this record, there are genuine issues of material fact as to whether test plaintiffs were injured and, if so, what sums would compensate them for those injuries.  As such, these matters cannot be resolved on summary judgment.

The way the parties have framed the issues for purposes of this Motion for Summary Judgment warrants inclusion of an important caveat concerning the scope of trial.  The Court understands that the parties (and principally Ciba) may have valid reason to present limited evidence to the jury concerning the human health dimension of the DDT contamination observed on test plaintiffs' properties.  After all, upon learning that DDT is a possible or probable human carcinogen, the jury's verdict on damages may be unfairly skewed by inappropriate conclusions about health risks presented by defendants' actions.  Under the circumstances, it is reasonable to allow the parties to present scientific evidence concerning the human health implications of the DDT contamination found on test plaintiffs' properties, so that the jury will be able to place in appropriate scientific context the measured concentrations of DDT for purposes of determining the sums that would compensate test plaintiffs for the complained-of injuries to their property. That said, however, the Court has no intention of allowing this property damage trial to be derailed by extensive evidence of human health considerations.  In that regard, the undersigned's previous admonition to counsel in the *Fisher* case holds with equal force here:

> "In allowing the parties some leeway to present these matters at trial, however, the Court emphasizes that this is a property damage case, not a personal injury case. ... The Court also cautions the parties not to hijack the property damage issues joined in this action and sidetrack this trial with a prolonged exploration of the ancillary question of whether the DDT found on plaintiffs' properties constitutes a human health risk. ... While the risk of personal injury by DDT contamination on a plaintiffs' property may be linked to the [proper remediation target or the sum needed to make plaintiffs whole], that nexus is not so compelling as to render such evidence impervious to Rule 403 objections, particularly if such evidence is offered in a manner that threatens to consume extensive trial time disproportionate to its limited evidentiary value."

*Fisher*, 2007 WL 2995525, at *23 n.44.

**IV.    Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.    Plaintiffs' Motion for Leave to Late File Response (doc. 258) is **granted**, and plaintiffs' response (doc. 256) will be accepted and considered as filed, without the need for re-submission.

2.    Plaintiffs' Motion to File Sur-Replies (doc. 271) is **granted** with respect to the proposed sur-reply appended to the Motion as Exhibit A.  That proposed sur-reply will be accepted and considered as filed, without the need for re-submission.

3.    Defendants' Motion for Summary Judgment on All Claims for Failure to Prove any Damages (doc. 227) is **denied**.


DONE and ORDERED this 1st day of October, 2009.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE