**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **CLEON ABRAMS, SR.,** *et al.***,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 08-0068-WS-B** |
| ) | |
| **CIBA SPECIALTY CHEMICALS** ) | |
| **CORPORATION,** *et al.***,** ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

This matter comes before the Court on defendants' Motion for Partial Summary
Judgment on Constructive Fraud Claims as to All Plaintiffs (doc. 212), as well as defendants'
Motion for Partial Summary Judgment on Conspiracy and Civil RICO Claims as to All Plaintiffs
(doc. 220).  Both Motions have been briefed and are ripe for disposition.

**I.      Background.**

This action involves claims that certain real property located in and around McIntosh,
Alabama has been damaged by DDT contamination.  The 277 plaintiffs[1] who brought this
lawsuit are property owners who maintain that the source of the contamination was a chemical
manufacturing plant in McIntosh that is or was at various times owned and operated by
defendants, Ciba Specialty Chemicals Corporation, Ciba-Geigy Corporation, Novartis, Ltd., Inc.,
and Syngenta Crop Protection, Inc. (collectively, "Ciba").  According to the First Amended
Complaint (doc. 26), the nub of plaintiffs' claims is their contention that "beginning in about
1952, solid and liquid wastes were disposed of by [Ciba] in several known source areas.  These
source areas and the manufacturing processes have been managed in such a way that large

---

[1]      By the Court's tally, 17 plaintiffs have dropped out of this action pursuant to
Orders entered on August 25, 2008 (doc. 55), April 27, 2009 (doc. 165), June 24, 2009 (doc.
203), and September 16, 2009 (doc. 277) for various reasons, including settlement, failure to
prosecute, acknowledgment that the plaintiff has no viable claims, or simply a stated desire not
to proceed further.  That leaves 260 remaining plaintiffs.

amounts of chemicals, commonly known as DDT, DDD, and DDE (collectively DDTr), have impacted the McIntosh community and the homes of plaintiffs. ... The residences contain concentrations of DDTr at levels which pose an unacceptable risk to human health thereby reducing the property values of the community." (Doc. 26, ¶¶ 17-18.) Plaintiffs' theory is that the wind has carried DDTr particulate matter off the Ciba site and onto their properties dating back to the 1950s and early 1960s, when Ciba was actively producing DDT at that location, and continuing through the present day. On summary judgment, plaintiffs have staked themselves to a position that the measure of damages they seek to recover is confined to the cost of decontaminating their properties.

Plaintiffs have parlayed these basic factual allegations into 11 causes of action asserted by each plaintiff against each defendant, to-wit: negligence, conspiracy, strict liability, trespass, nuisance, intentional misrepresentation, negligent misrepresentation, fraud / fraudulent concealment, constructive fraud, punitive/ exemplary damages, and violation of the federal Racketeer Influenced and Corrupt Organizations Act.[2] Three of those causes of action (intentional misrepresentation, negligent misrepresentation, and fraud / fraudulent concealment) were dismissed as to all plaintiffs at the pleadings stage more than a year ago for failure to comport with the heightened pleading requirements of Rule 9(b), Fed.R.Civ.P. (Doc. 56, at 14-18.)[3]

---

[2]     The factual allegations and legal theories posited by plaintiffs in this action bear striking resemblance to those previously presented in a related federal action before the undersigned styled *Jessie Fisher et al. v. Ciba Specialty Chemicals Corporation, et al.*, Civil Action No. 03-0566-WS-B. After more than four years of extensive litigation (including an unsuccessful bid for class certification), the five *Fisher* plaintiffs reached a settlement with Ciba on October 19, 2007, shortly before jury selection was to occur. The identities of counsel for both sides in this action are substantially similar to those in the *Fisher* matter, and the pleadings in this case appear to have their genesis in the corresponding *Fisher* pleadings, with some being reproduced nearly verbatim.

[3]     Plaintiffs' constructive fraud claim survived defendants' Rule 12(b)(6) motion based on the following reasoning:

"Plaintiffs assert that the constructive fraud claim set forth in Count Nine of the First Amended Complaint is not subject to Rule 9(b) heightened pleading standards. For whatever reason, defendants did not undertake to respond to or

In the interests of justice, efficiency and judicial economy, Magistrate Judge Bivins developed and implemented a trial plan pursuant to which the claims of 27 representative "test plaintiffs" would proceed through the discovery and trial processes first, after which a case management plan would be tailored for the remaining plaintiffs.  (*See* docs. 66, 239.)  The jury's verdict as to any test plaintiff will not be binding on any non-test plaintiff.  The test plaintiff discovery period has concluded, and the test plaintiff trial is set for jury selection on November 3, 2009, with trial to follow during the November 2009 civil term.  In preparation for trial, the parties have collectively filed some 14 motions for summary judgment or partial summary judgment, presenting various legal issues for judicial resolution before trial in an effort to streamline and focus the case.

Notwithstanding the parties' proliferation of Rule 56 motions, this Order is confined to two of defendants' motions relating specifically to the viability of plaintiffs' constructive fraud, conspiracy and RICO causes of action.[4]  In summary, defendants seek dismissal of plaintiffs' constructive fraud claims on the ground that plaintiffs have not shown that they relied upon specific statements to their detriment, or that a special or fiduciary relationship existed as between plaintiffs and Ciba.  Likewise, defendants contend that the conspiracy and RICO causes of action fail as a matter of law because plaintiffs have no evidence of an enterprise, a pattern of racketeering activities, specific acts committed by each defendant, causation, or a conspiracy. The Court will consider each of these Motions in turn.

---

> rebut that assertion in any fashion in their reply brief. ... Accordingly, given defendants' failure to respond to plaintiffs' contention that Rule 9(b) does not apply to constructive fraud allegations, the Motion to Dismiss is **denied** with respect to Count Nine."

*Abrams v. Ciba Specialty Chemicals Corp.*, 2008 WL 4183344, *9 (S.D. Ala. Sept. 10, 2008).

[4] The remaining 12 summary judgment motions will be addressed separately via contemporaneous orders.  In considering the constructive fraud Motion (doc. 212), the Court has reviewed the parties' respective principal briefs (docs. 212, 248), defendants' reply (doc. 266), and the evidentiary submissions accompanying these respective filings, as well as all other portions of the court file deemed relevant.  Similarly, in considering the conspiracy/RICO Motion (doc. 220), the Court has reviewed the parties' respective principal briefs (docs. 220, 254), defendants' reply (doc. 269), and the evidentiary submissions accompanying these respective filings, as well as all other portions of the court file deemed relevant.

## II.     Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.     Motion for Summary Judgment on Constructive Fraud Claims.

### A.     *Relevant Facts.*[5]

Although nearly everything in this case is hotly disputed by the parties, they agree on a few basic facts.  Indeed, there is no dispute that Ciba produced DDT at its McIntosh facility from approximately 1952 until approximately 1965.[6]  (Doc. 212, at 7-8; doc. 248, at 2-3.)  They also

---

[5]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiffs' version of the facts is taken as true and all justifiable inferences are drawn in their favor.

[6]     Defendants peg the terminus date for Ciba's production of DDT in McIntosh as 1965.  (Doc. 212, at 7.)  Plaintiffs counter that the actual date of cessation was 1966.  (Doc. 248, at 2.)  This factual dispute is immaterial for purposes of this Order, and has no bearing on the

agree that Ciba has not manufactured DDT at that location in more than four decades, and that the Ciba McIntosh facility was designated a Superfund site in 1983 because of on-site contamination.  (Doc. 212, at 8 & n.2; doc. 248, at 3.)  Although defendants apparently do not agree, plaintiffs' position is that "DDT is currently being emitted and/or released into the environment to this day."  (Doc. 248, at 3.)[7]

Of the 17 remaining test plaintiffs, plaintiffs offer neither evidence nor argument that 13 of them (Bobby Chestang, Ruth Everette, Mary Ferrell, Elliott Fields, Edgar & Emma Moss, Bertha Reed, Wilford Taylor, Beverly Thomas, Etoria Toole, Johnnie Ware, Raymond Weaver, Tommy Weaver and Annie Williams) ever heard or relied in any way on representations or reassurances from Ciba concerning DDT contamination or cleanup efforts relating to same. (Doc. 248, at 3-4 (silent as to those 13 test plaintiffs).)[8]  With respect to those 13 test plaintiffs,

---

analysis and conclusions set forth herein.

[7]     The only record evidence to which plaintiffs point in support of this proposition are two short excerpts from the deposition of Paulo Zannetti, Ph.D., a defense expert who conducted air modeling for DDT emissions from the Ciba facility in McIntosh.  (Doc. 254, at Exh. 2.)  The cited portions of Dr. Zannetti's deposition reflect that he performed air modeling, that he feels qualified to do so, that there was or may have been open burning of DDT wastes at the Ciba facility sometime prior to 1974, and that if DDT particulate was transported by air from the Ciba site into the community, concentrations offsite would decrease with distance, even if there was never a "magic distance" after which those concentrations would fall to zero.  (*Id.* at 13-15, 21-25.)  The Court is hard-pressed to understand how these limited excerpts bolster plaintiffs' contention of continued DDT emissions from the Ciba facility into the McIntosh community through the present.  Be that as it may, the Court need not definitively resolve that question for purposes of ruling on the narrow issues presented by defendants' Motions for Summary Judgment relating to the constructive fraud, conspiracy and RICO causes of action, and therefore declines to do so.

[8]     All of those individuals (or, in the case of Bobby Chestang, his survivor and personal representative) expressly denied having heard or relied upon any statements from defendants, or otherwise having personal knowledge of any such statements, regarding contamination on their property.  (Shelby Chestang Dep., at 85, 96; Everette Dep., at 22-23; Ferrell Interrog. Responses, at #5; Fields Interrog. Responses, at #5; Edgar Moss Dep., at 63-64; Emma Moss Dep., at 29-30, 32; Reed Dep., at 33, 38; Taylor Dep., at 48-49; Thomas Dep., at 49, 61; Toole Dep., at 69; Ware Dep., at 32-33; R. Weaver Dep., at 23-24; T. Weaver Dep., at 30-31; Williams Dep., at 17.)  Several of these test plaintiffs indicated that they had never even attended any community meetings relating to the McIntosh Superfund sites.

the theory animating their constructive fraud claim is apparently that Ciba should have made disclosures, but did not.  As for the other four test plaintiffs, Cleon Abrams, Sr., testified that his wife had attended two meetings in the 1990s concerning the Superfund status of the Ciba facility, after which the "[o]nly thing" she reported to her husband was "where Ciba-Geigy was cleaning up in different areas in the plant and stuff there.  They was cleaning it up."  (Abrams Dep., at 58.)  Additionally, test plaintiff Sexton Adams testified that he had received letters from Ciba concerning site cleanup efforts, but that he had not retained those letters.  According to Adams, those letters indicated "what they were doing around the perimeter of the site to clean up contamination, what they had spent ... around the site, not in the community."  (Adams Dep., at 42.)  Adams did not profess to have been soothed or placated by those letters, but instead stated that he "really didn't think very much of it" because "it wasn't doing anything in the community to clean up."  (*Id.*)  As for test plaintiff Marie Evans, she testified that "they" (whoever "they" were, with Evans not differentiating among "Olin and Ciba representatives and the mayor") "had some kind of meeting and they said everything was fine," but that her reaction to their statements was, "Somebody's been whitewashed."  (Evans Dep., at 63.)  Finally, test plaintiff Toni Jackson testified merely that she read pamphlets that she received from the plants, without any indication of what statements were made therein.  (Jackson Dep., at 54.)[9]

Furthermore, it is undisputed that none of the test plaintiffs have sold their DDT-contaminated properties that are the subject of this litigation.  (Doc. 212, at 9; doc. 248, at 4.)  At best, plaintiffs have mustered record evidence that one test plaintiff, Edgar Moss, "wanted to sell" and "attempted to sell" his property in 2005.  (Edgar Moss Dep., at 37, 54.)  Apparently, those efforts were unsuccessful, for reasons that do not appear in the record.[10]

---

[9]      In their brief, plaintiffs allege that "Toni Jackson testified that she saw the Ciba Plant manager on the news stating that all of the contamination would be cleaned up."  (Doc. 248, at 3-4.)  However, the cited excerpt from Jackson's deposition states no such thing, and the Court cannot take counsel's word for it.  *See, e.g., Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence.").

[10]     Moss's admitted failure ever to post a "for sale" sign on the property, or to list the property for sale anywhere other than Mobile, could not have fortified his odds of attracting an interested buyer.  (Edgar Moss Dep., at 59.)

B.      *Analysis.*

The common-law tort of constructive fraud is recognized under Alabama law; however, it remains something of an enigma, inasmuch as it is rarely invoked by litigants and has garnered scant mention in published Alabama authorities.[11]   That said, the Alabama Supreme Court explained more than a half century ago that "[c]onstructive fraud at common law is the breach of a legal or equitable duty which, irrespective of the moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to inspire public interest."  *Hornaday v. First Nat'l Bank of Birmingham*, 65 So.2d 678, 687 (Ala. 1953); *see also Frost v. Latham & Co.*, 181 F. 866, 868 (S.D. Ala. 1910) (constructive fraud is "an act which the law declares to be fraudulent without inquiring into its motive") (citation omitted).  A critical distinction between constructive fraud and other species of fraud is that "fraudulent intent does not have to be proven to establish a constructive fraud."  *First Bank of Childersburg v. Florey*, 676 So.2d 324, 332 (Ala.Civ.App. 1996); *see also Hornaday*, 65 So.2d at 687 ("Neither actual dishonesty nor intent to deceive is an essential element of constructive fraud.").

Consistent with the foregoing, it has been routinely held in jurisdictions throughout the country that the elements of proof for a common-law constructive fraud claim bear marked similarity to those for an ordinary fraud claim, except that the intent element is generally replaced by an element of some special circumstance or relationship requiring disclosure.  *See, e.g., E*TRADE Financial Corp. v. Deutsche Bank AG*, --- F. Supp.2d ----, 2009 WL 1561610, *77 (S.D.N.Y. June 1, 2009) ("Constructive fraud requires establishing the same elements as

---

[11]      Indeed, most references to constructive fraud in Alabama jurisprudence are in the context of Alabama's fraudulent conveyance statute.  *See, e.g., Cox v. Hughes*, 781 So.2d 197, 201 (Ala. 2000) (statutory fraudulent conveyance case in which court opined that "[t]he term constructive fraud is generally used to refer to those instances where a grantor, indebted at the time, conveys property without receiving valuable consideration") (citations omitted); *McPherson Oil Co. v. Massey*, 643 So.2d 595, 596 (Ala. 1994) (in statutory fraudulent transfer context, observing that "without regard to the actual intent of the grantor, the law infers constructive fraud when it appears that an indebted grantor has conveyed property to a family member without receiving valuable consideration").  Inasmuch as this action does not involve statutory claims of fraudulent conveyance, but instead involves a purely common-law cause of action, the line of Alabama authorities applying the concept of constructive fraud to the fraudulent conveyance statute is of limited utility here.

actual fraud, except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties.") (citations and internal quotation marks omitted); *3D Global Solutions, Inc. v. MVM, Inc.*, 552 F. Supp.2d 1, 9 (D.D.C. 2008) ("Constructive fraud differs from actual fraud in that constructive fraud need not be intentional.").  Given the parallels between constructive fraud and ordinary fraud, it is hardly surprising that the elements of false representations and detrimental reliance are cornerstones of a common-law constructive fraud cause of action.[12]  Plaintiffs do not contest these principles, and do not quarrel with Ciba's contention that they bear the burden of establishing detrimental reliance in order to recover on a constructive fraud theory.

As set forth in their Response, the test plaintiffs' reasoning for why they think they should prevail on their constructive fraud claims is as follows: Ciba made false representations and omissions concerning the volume of DDTr on its premises, the spread of such DDTr into the community, and its attendant safety and health risks.  (Doc. 248, at 1, 4.)  According to plaintiffs' lawyers, "[a]s a result of Defendants' suppression of the truth regarding DDTr on the plant site, remediation efforts, and the possible spread of DDTr into the McIntosh community, Plaintiffs remained in an area that became increasingly contaminated with DDTr over time."  (*Id.* at 11.)  The record evidence taken in the light most favorable to test plaintiffs falls well short of

---

[12]        *See, e.g., Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1180-81 (10th Cir. 2008) (elements of constructive fraud under Oklahoma law include "[t]hat the defendant misstated a fact or failed to disclose a fact to plaintiff," "[t]hat plaintiff relied on defendant's material misstatement or omission," and "[t]hat plaintiff suffered damages as a result of defendant's material misstatement or omission"); *3D Global*, 552 F. Supp.2d at 8 (under Virginia law of constructive fraud, plaintiff must show false representations of material fact that "resulted in damages to the plaintiff as a result of his or her reliance"); *In re Verisign, Inc., Derivative Litigation*, 531 F. Supp.2d 1173, 1218 (N.D. Cal. 2007) (under Delaware law, "[b]oth actual and constructive fraud require reliance on an alleged misrepresentation by the defrauded party"); *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp.2d 829, 850 (S.D. Ind. 2005) (under Indiana law, constructive fraud elements include "the making of deceptive material misrepresentations," "reliance thereon by the complaining party," and "injury to the complaining party as a proximate result thereof"); *Eason Publications, Inc. v. NationsBank of Georgia*, 458 S.E.2d 899, 903 (Ga. App. 1995) (recognizing that duty to disclose is not only element of constructive fraud, but that plaintiff must also show, *inter alia*, false representations, justifiable reliance, and damage); *see generally* Am. Jur. 2d Fraud § 9 ("Constructive fraud arises on a breach of duty ... that induces justifiable reliance by the other to his or her prejudice.").

supporting this theory in several respects.

First, to the extent that test plaintiffs predicate their constructive fraud claims on a theory of actual misrepresentations, the evidence is woefully lacking.  No fewer than 13 of the 17 remaining test plaintiffs denied having heard or knowing any misrepresentations by Ciba concerning contamination.  As for the other 4 test plaintiffs, one (Abrams) says he heard indirectly that Ciba indicated that it was "cleaning up in different areas of the plant."  Another (Adams) says that Ciba wrote about "what they were doing around the perimeter of the site to clean up contamination ..., not in the community."  A third test plaintiff (Evans) said she attended "some kind of meeting" where an unspecified "they" said "everything was fine."  And the fourth test plaintiff (Jackson) said only that she had received pamphlets from Ciba.  None of these four test plaintiffs have identified any false or misleading statements by Ciba.  Indeed, plaintiffs proffer no evidence that Ciba was not actually "cleaning up in different areas of the plant," that Ciba lied in the letter to Adams when it talked about "what they were doing around the perimeter of the site," that anyone from Ciba made the statement that "everything was fine" (or even if they did, what the vague reference to "everything" means), or that any false or misleading information was set forth in the pamphlets received by Jackson.  The test plaintiffs' failure to show any false or misleading statements is fatal to their constructive fraud claims, as a matter of law.  *See Lake Martin / Alabama Power Licensee Ass'n, Inc. v. Alabama Power Co.*, 547 So.2d 404, 408 (Ala. 1989) ("there is no basis for a constructive fraud claim, because there is no evidence of a false statement, without which there can be no fraud, constructive or actual").

Even assuming that record evidence supported the notion that Ciba had made false misrepresentations to them, plaintiffs point to no testimony or other evidence that Abrams, Adams, Evans or Jackson did or refrained from doing <u>anything</u> in reliance on those alleged misrepresentations.  To the contrary, far from relying on these statements, Adams admitted that he "really didn't think very much of it" and Evans testified that her immediate reaction to the "everything is fine" reassurance was that "somebody's been whitewashed," implying that she did not believe them.  This evidence that test plaintiffs disregarded and discounted whatever statements they did hear from Ciba about contamination and remediation is the exact opposite of reliance, and cannot sustain viable constructive fraud claims.

Second, to the extent that test plaintiffs' constructive fraud claims are predicated on

alleged omissions, they have once again failed to make an adequate showing to survive Rule 56 scrutiny.  As an initial matter, while plaintiffs invoke the doctrine that "[w]here one party has some particular knowledge or expertise not shared by the plaintiff a duty to disclose has been recognized" (doc. 248, at 8), they fail to point to any evidence that Ciba in fact possessed any such special knowledge or expertise.  At best, plaintiffs make vague suggestions that "Defendants had a duty to warn them of the possibility of DDTr from the Ciba site spreading throughout the community" (doc. 248, at 9), without pointing to evidence that (a) Ciba was aware of that possibility, and (b) Ciba never issued such a warning.  It is not enough on summary judgment for a non-movant simply to bandy about nebulous what-ifs and abstract theories untethered to record evidence.  *See, e.g., LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("To defeat a motion for summary judgment, the nomoving party may not rely on mere allegations" but "must raise significant probative evidence that would be sufficient for a jury to find for that party") (citations and internal quotation marks omitted).

More importantly, even in the "fraudulent omission" context, plaintiffs gloss over the element of reliance.  This Court has previously summarized Alabama's reliance requirement in the *Fisher* litigation as follows:

> "'Reliance requires that the misrepresentation actually induced the injured party to change its course of action.'  *Hunt Petroleum Corp. v. State*, 901 So.2d 1, 4 (Ala. 2004). "If [the plaintiff] would have adopted the same course irrespective of the misrepresentation and would have sustained the same degree of damages anyway, it can not be said that the misrepresentation caused any damage, and the defendant will not be liable therefor." *Id.* (quoting *Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co.*, 390 So.2d 601, 611 (Ala. 1980)).  Thus, 'for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation.' *Id.* at 5."

*Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL 2995525, *12 (S.D. Ala. Oct. 11, 2007). Assuming (without deciding) the validity of plaintiffs' premise that Ciba possessed and breached a duty to speak about the risk of DDT contamination spreading throughout the community, plaintiffs identify not an iota of evidence that any test plaintiff would have taken a different course of action had he or she received that information.  To be sure, test plaintiffs' counsel suggests that, as a result of the alleged omissions, "Plaintiffs remained in an area that became increasingly contaminated with DDTr over time."  (Doc. 248, at 11.)  But where is the record

evidence that test plaintiffs would have sold their homes and moved away had Ciba made timely and complete disclosures in this regard? Test plaintiffs point to none, but instead offer nothing more than the unvarnished say-so of counsel.[13] That is simply not good enough to create genuine issues of material fact for trial. This point is reinforced by the fact that, even after learning of the scope of contamination from the Ciba site, 16 of the 17 test plaintiffs did not even attempt to sell their property and relocate, and the 17th appears to have made no more than a token effort to do so. Test plaintiffs' inertia in this regard is incompatible with the notion that they would have moved away had Ciba made DDT disclosures earlier.

Carrying the analysis one step further, even if there were evidence that test plaintiffs who otherwise would have sold their property elected to stay based on Ciba's failure to disclose the risk of DDT contamination, test plaintiffs identify no evidentiary basis for finding that they were injured thereby. Plaintiffs recently disavowed any intent to claim damages for diminution in property value and stated with unambiguous clarity that the damages they seek are solely for remediation costs.[14] But plaintiffs make no attempt to draw any factual linkage between the alleged wrongdoing of Ciba (*i.e.*, misrepresenting or failing to disclose DDT contamination) and the damages they seek to recover (*i.e.*, cleanup costs for DDT contamination). Test plaintiffs have never contended that they would have taken proactive, defensive measures to prevent DDT from infiltrating their property had they known it was being blown in with the dust. Nor do test

---

[13]    Nor is there any evidence that, had test plaintiffs actually attempted to sell their properties, they could have done so. The only test plaintiff who has attempted to sell his property, Edgar Moss, apparently did not succeed. (Edgar Moss Dep., at 37, 54.) If the local real estate market is such that test plaintiffs could not sell their homes even if they wanted to do so, then any detrimental reliance stemming from Ciba's purported nondisclosure becomes even further attenuated because test plaintiffs could not have altered their course of action by selling their homes upon disclosure in any event. The point is that test plaintiffs have failed to come forward with any record evidence that the damages they seek in this action bear any nexus to misrepresentations or omissions made by Ciba in public communications relating to DDT contamination in the community.

[14]    In particular, plaintiffs stated as follows: "Plaintiffs do not seek damages in the amount of diminished property value as Defendants contend. Rather, Plaintiffs seek restoration costs to rid their properties of the DDTr presently contaminating their homes and land." (Doc. 256, at 11.) Having made such representations, plaintiffs (including test plaintiffs and non-test plaintiffs alike) are now bound by them.

plaintiffs present a scintilla of evidence that their restoration/remediation costs are higher now than they would have been had Ciba made the requisite disclosures in the 1990s and early 2000s. Simply put, test plaintiffs have failed to explain, and the record does not show, how they are worse off (in terms of clean-up costs) because of Ciba's alleged misrepresentations than they would have been had Ciba made full disclosures. As such, test plaintiffs have failed to come forward with any evidence or argument sufficient to create a cognizable jury question as to their constructive fraud cause of action.

For all of these reasons, defendants' Motion for Summary Judgment is due to be **granted** with respect to the test plaintiffs' constructive fraud causes of action.[15]

### C.    Whether the Summary Judgment Reaches All Plaintiffs.

The parties skirmish in their briefs as to whether the Motion for Summary Judgment should reach all plaintiffs, or whether it should be limited to the test plaintiffs' claims. With one minor exception, the Court finds that it would be premature and improper to extend this

---

[15]    In so concluding, the Court expressly declines to adopt Ciba's argument that the lack of a special or fiduciary relationship between test plaintiffs and Ciba dooms their constructive fraud claims, as a matter of law. Defendants maintain that "[t]here is no special confidential or fiduciary relationship that would permit a claim of constructive fraud. This fact alone is fatal to the constructive fraud claim of every Plaintiff in this case." (Doc. 212, at 11.) The problem with this argument is that it reads Alabama's law of constructive fraud far more narrowly and rigidly than relevant authorities can support. Ciba has not cited any Alabama authority holding that a "special confidential or fiduciary relationship" is a mandatory prerequisite to a constructive fraud claim in this state. At best, the Alabama Supreme Court has explained that constructive fraud "***usually*** arises from a breach of duty where a relationship of trust and confidence exists." *Hornaday*, 65 So2d at 687 (emphasis added). "Usually" is not the same as "necessarily" or "always." Moreover, *Hornaday* also explained that constructive fraud may be recognized where a defendant's actions have a "tendency to deceive others, to violate public or private confidence, or to inspire public interest." *Id.* Defendants have not explained why a manufacturer's misrepresentations to a community concerning the spread of DDT contamination from its facility into the community would not qualify as "breach of a legal or equitable duty which ... the law declares fraudulent because of its tendency ... to violate ***public or private confidence***, or to ***inspire public interest***." *Id.* (emphasis added). The Court will not blithely assume that the circumstances presented here are beyond the pale of those recognized in *Hornaday* and that Alabama courts would not a impose a legal or equitable duty on Ciba to disclose truthfully, merely because Ciba denies having a "special confidential or fiduciary relationship" with plaintiffs.

summary judgment ruling to every plaintiff's constructive fraud claim at this time.  As explained *supra*, the case management plan for this action contemplated that the claims of 27 representative test plaintiffs would be litigated through discovery and trial before the claims of the other 90% of the plaintiffs would be subjected to those same processes.  There has been no discovery as to the constructive fraud claims of non-test plaintiffs.  Moreover, the Court's summary judgment analysis of test plaintiffs' claims was fundamentally fact-based, turning on record evidence of what misrepresentations test plaintiffs said they had heard and what (if anything) test plaintiffs would have done differently had full disclosures been made earlier.  The Court cannot and will not assume that all 250 non-test plaintiffs' evidence of constructive fraud (particularly as to reliance and damages) will fall within the same factual parameters, and suffer from the same factual infirmities, as those of the 17 test plaintiffs.  At this time, we simply do not know what the non-test plaintiffs' evidence of false statements or detrimental reliance will be.  Accordingly, defendants' Motion for Summary Judgment as to all non-test plaintiffs' constructive fraud claims is premature and is due to be **denied**, except as described below.[16]

_____

[16]    Two additional points bear noting.  First, to the extent that defendants insist that <u>all</u> plaintiffs' constructive fraud claims are legally defective because of the absence of a special relationship with Ciba, the flaws in that objection have already been addressed in footnote 15, *supra*.  Second, defendants' attempt in their reply to re-inject Rule 12(b) pleadings-based arguments based on *Twombly/Iqbal* principles into their summary judgment motion is improper.  As defendants well know, new arguments are impermissible in reply briefs.  *See, e.g., Evans v. Infirmary Health Services, Inc.*, --- F. Supp.2d ----, 2009 WL 1691512, *6 n.14 (S.D. Ala. Jun. 12, 2009) ("this Court's general practice is not to consider new arguments raised in a reply brief"); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief").  Moreover, with respect to test plaintiffs, this case has proceeded well past the time for revisiting the sufficiency of the Complaint.  Defendants have already availed themselves of a full and fair opportunity to litigate Rule 12(b) issues as to all plaintiffs at the outset of this litigation, including specifically arguments to dismiss the constructive fraud claims as having been inadequately pleaded.  Those arguments were considered and ruled on more than a year ago.  (*See* doc. 56.)  Ciba is not entitled to relitigate that Rule 12(b) motion now by raising arguments that were either considered and rejected at the pleadings stage, or that could have been raised by defendants at that time but were not.  Although defendants are correct that the Supreme Court's *Iqbal* decision was not available to them when Rule 12(b) issues were decided in this case previously, Ciba cites *Iqbal* only for principles that echo *Twombly*, which predated the undersigned's ruling on Ciba's Rule 12(b) motion by a substantial margin and was expressly discussed in same.

-13-

The one aspect of plaintiffs' constructive fraud claims that can be decided as to all plaintiffs (not just test plaintiffs) at this time is their request for punitive damages. Such damages are not cognizable in Alabama constructive fraud claims, as a matter of law. Indeed, under Alabama law, "[a] finding of legal fraud or constructive fraud ... is not sufficient to support an award of exemplary or punitive damages. Punitive damages may be awarded only if the evidence establishes an intent to deceive or defraud." *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Griffin*, 493 So.2d 1379, 1384 (Ala. 1986); *see also Ford Motor Co. v. Sperau*, 708 So.2d 111, 116 n.1 (Ala. 1997) ("The defendant's intent to deceive or mislead, or 'scienter,' has been the standard prerequisite for imposing punitive damages in fraud cases."). Plaintiffs apparently concede the unavailability of punitive damages for constructive fraud claims, inasmuch as they have failed to respond to defendants' request for summary judgment on the punitive damage aspects of those claims. Accordingly, the Motion for Summary Judgment is **granted** as to all plaintiffs' requests for punitive damages embodied in their constructive fraud causes of action.

**IV.    Motion for Summary Judgment on Conspiracy / Civil RICO Claims.**

   *A.    Nature of Plaintiffs' RICO and Conspiracy Causes of Action.*

In Count Two of their Amended Complaint (doc. 26), plaintiffs bring a cause of action against Ciba for common-law conspiracy. This claim is predicated on allegations that Ciba (i) "conspired with Clement International Corporation to underestimate the risk posed by exposures to DDTr;" (ii) "conspired with BCM Converse, Inc., and Clements to provide false and/or misleading information to the State and federal authorities and to the McIntosh community regarding the risks associated with the DDTr in the McIntosh community;" (iii) attended a meeting with representatives of Clement, Olin, and Olin's environmental contractor "to conspire to defraud the [EPA] and the public at large" by "manipulat[ing] data from their respective Risk Assessments;" and (iv) engaged in "other manipulations" with Olin pursuant to a "covenant" that damaged plaintiffs. (Doc. 26, ¶¶ 33-35.) Thus, the gist of plaintiffs' conspiracy claim is that Ciba conspired with Olin and their environmental contractors to manipulate data and lie to government regulators and to the public concerning DDTr risks to the McIntosh community.

The premise of plaintiffs' cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), set forth in Count Eleven is similar. In particular, the Amended Complaint alleges that Ciba, Olin and their environmental contractors

-14-

"committed several acts in furtherance of common schemes to defraud governmental agencies and the public at large to derive great economic benefit." (Doc. 26, ¶ 90.) The alleged fraud involves misrepresenting DDTr risks, and the alleged economic benefit consists of money saved on remediation expenses for Ciba. In other words, plaintiffs' RICO theory is that Ciba and others lied to minimize remediation payments for the DDT contamination they caused. In summary judgment briefing, plaintiffs clarify that their RICO cause of action is brought pursuant to 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Id.* Circuit law provides that a plaintiff bringing a RICO claim under § 1962(c) "must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Industries, Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (citations omitted). Additionally, to sustain a civil RICO claim, a plaintiff must show that he was "injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). On summary judgment, defendants challenge, *inter alia*, plaintiffs' ability to satisfy the "pattern of racketeering activity" and the "injured in his business or property" requirements.

      **B.**    ***Plaintiffs' Evidence.***[17]

In an attempt to show the existence of genuine issues of fact, plaintiffs proffer some 52 exhibits spanning more than 500 pages, with nearly all of those exhibits consisting of decades-old documents, including environmental assessments, internal memoranda, newspaper articles and the like. (Doc. 254, Exhs. 1-52.) Using interpretations, inferences and assumptions drawn from these various materials, plaintiffs endeavor to weave a narrative of nefarious and deceitful activity by Ciba.[18] However, careful review of the documents reveals a pair of glaring infirmities

---

[17]    Once again, pursuant to the strictures of Rule 56, plaintiffs' version of the facts is taken as true and all justifiable inferences are drawn in their favor.

[18]    As a preliminary matter, this patchwork evidentiary submission suffers from substantial procedural defects, insofar as certain of these documents are not admissible in their current form and plaintiffs identify no mechanism through which they intend to reduce them to admissible form at trial. *See generally Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be

-15-

in plaintiffs' factual recitation and evidentiary submission.

          *1.     The Record Does Not Support Plaintiffs' Story.*

     First and foremost, there is a recurring disconnect between the narrative presented in plaintiffs' summary judgment brief and the contents of the summary judgment record, one so formidable that drawing reasonable inferences in plaintiffs' favor cannot bridge the chasm. Although numerous illustrations of this point could be recited, the Court will present only a few to demonstrate the basis for this observation. Plaintiffs contend that a draft Baseline Endangerment Assessment (Exh. 9) dated April 1988 "recognized the potential for property damage." (Doc. 254, at 7.) Yet plaintiffs selectively ignore the fact that the same document stated that "We have not been able to identify any adverse impacts on public welfare caused by contamination at the Ciba-Geigy McIntosh site," including specifically loss of property value. (Exh. 9, at CIBAD00001327.)[19] Continuing their narrative, plaintiffs insist that "Ciba was so enraged by the conclusions" of that draft Baseline Endangerment Assessment that they "fired

---

reduced to an admissible form."). In one particularly striking example, plaintiffs devote nearly a paragraph of their brief to describing statements penned by "one Mobile reporter" in something called *The Harbinger*, wherein the reporter summarized his own views and findings concerning contamination in the Mobile-Tombigbee River System. (Doc. 254, Exh. 41.) Given Rules 701 and 802 of the Federal Rules of Evidence, it is highly improbable that a newspaper article setting forth a journalist's lay opinions concerning the degree of contamination in the water could be reduced to admissible form at trial. Yet plaintiffs cavalierly submit this "evidence" on summary judgment anyway, thereby disregarding both the Federal Rules of Evidence and fundamental summary judgment procedures.

    [19]    Plaintiffs attach the 198-page Exhibit 9 to their summary judgment filing in its entirety, in derogation of the Local Rules' directive that "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." Local Rule 5.5(c). The Court will not review uncited portions of this voluminous exhibit in search of some scrap of evidence that might support plaintiffs' position on summary judgment. *See, e.g., United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."); *Carolina Acquisition, LLC v. Double Billed, LLC*, 627 F. Supp.2d 1337 (S.D. Fla. 2009) ("Federal judges are not archaeologists. ... We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment.").

[the consultant, David Langseth] for the conclusions" because "Ciba could not tolerate a report that showed Ciba was harming the community and lowering property values."  (Doc. 254, at 7.) Where is the record evidence that Ciba was "enraged," that the consultant's services were terminated as a cover-up to hide contamination, or that the draft showed that Ciba was lowering property values?  Plaintiffs have not identified it; however, they do not let a lack of proof get in the way of a good story.

Plaintiffs' very next exhibit (Exh. 10) is a August 1988 letter from a Ciba official named Sherman Williams to someone named Kenneth Lovell at BCM Converse, Inc. (apparently Ciba's environmental contractor).  Plaintiffs cite this letter for the proposition that Ciba "lied to Mr. Langseth about the reason his firm was not allowed to finish the Endangerment Study."  (Doc. 254, at 7.)  On its face, however, the Williams letter does not suggest any sort of deception or cover-up, but simply indicates that a Ciba Toxicology Group in New York reviewed the draft Endangerment Study and concluded that "the work described in the report does not have an adequate scientific foundation."  (Exh. 10, at CIBA023870.)  Thus, far from establishing that Ciba was trying to "bury the initial risk assessment" (doc. 254, at 10), plaintiffs' exhibit shows only that Ciba disagreed with the scientific underpinnings of Langseth's draft.  Plaintiffs do not identify a single false or fraudulent statement in the Williams letter.[20]

Plaintiffs also point to a memorandum from Lorraine Pearsall of the Weinberg Group

---

[20]     With regard to the reason for Langseth's termination, the letter includes Williams' instruction that the contractor be told "that the CIBA-GEIGY Toxicology Group is completing a final endangerment assessment using ADL's work as baseline information."  (Exh. 10, at CIBA023871.)  Plaintiffs do not explain how this is a "lie," when the letter also stated that Ciba's true plans were to have another contractor complete the assessment "under the direct supervision of the CIBA-GEIGY Toxicology Group."  (*Id.* at CIBA023870.)  Nor do plaintiffs cite any evidence for what the contractor was actually told; thus, even if Williams instructed Lovell to lie to Langseth, plaintiffs offer no evidence that Lovell actually did so.  Thus, there is no indication that the "lie" ever happened.  At best, plaintiffs suggest that Ciba hired defense expert Elizabeth Anderson's firm "to start the chemical spin machine that pesticides and herbicides do not hurt anyone."  (Doc. 254, at 7.)  Yet the only record evidence proffered for this proposition is an excerpt from Anderson's deposition wherein she testified that "Clement had done some of the Superfund site risk assessment work and that [Anderson] may have billed a few hours."  (Anderson Dep., at 159.)  Once again, the record simply does not support plaintiffs' version of the facts.  The same goes for plaintiffs' disparagement of Anderson's firm as being "a more malleable contractor" (doc. 254, at 8), without citing any evidence of same.

-17-

(apparently a public relations consultant) to Ciba dated November 5, 1993 (Exh. 16). Plaintiffs attribute sinister motive to the Pearsall memo, and suggest that her instructions to Ciba management were part of a contamination cover-up. However, while review of the Pearsall memo certainly reflects an intent to position Ciba in the best possible light in terms of public perception, plaintiffs do not identify a single false statement that Pearsall was instructing Ciba to make. Moreover, even if Pearsall's memo were advocating that Ciba make misrepresentations about contamination, the memo was not an edict or a commandment; to the contrary, the last paragraph reads, "I hope these recommendations are helpful. Please let me know what you think." (Exh. 16, at CIBA009714.) Plaintiffs identify no record evidence as to whether Ciba ever implemented any of Pearsall's recommendations, even assuming them to have been fraudulent or deceitful in some way.[21]

The record also contains a copy of Ciba's "Final Risk Assessment" dated November 29, 1988. (Exh. 18.) Plaintiffs state that this report was "submitted to EPA **through the mail**." (Doc. 254, at 10 (emphasis in original).) However, they offer no evidence of that. Plaintiffs then malign the report on the ground that it "failed to account for any of the DDE and DDD contamination at the Ciba facility." (*Id.*) This statement is irreconcilable with the plain text of the report itself. Plaintiffs' excerpt of the report includes seven tables purporting to quantify potential risks associated with inhalation of fugitive dusts emitted from the McIntosh facility at various locations. Each table includes a line item estimating inhalation intake for DDT, with a footnote stating as follows: "Using the sum of the concentrations for DDT, DDE, and DDD."

---

[21]     Plaintiffs also tout Pearsall's memo as "specifically [telling] Ciba that property values can be affected by the news of the health risks." (Doc. 254, at 9.) In fact, Pearsall's statement concerning property values is entirely innocuous, arising in the context of her recommendation that Ciba set up a "Focus Group meeting" to allow members of the community to "discuss all of their concerns together with a trained professional." (Exh. 16, at CIBA009713.) Pearsall wrote, "Surprising issues can surface from this, even issues which are not related to health (*i.e.* property values)." (*Id.*) Thus, far from telling Ciba that news of contamination could cause McIntosh residents' property values to plummet, Pearsall merely pointed out the fairly benign and self-evident proposition that community members might be worried about property values and might wish to discuss those issues at a community meeting that Pearsall was recommending Ciba conduct. Far from "burying" this issue, as plaintiffs suggest, Pearsall's memo advocated that Ciba bring it out into the open, a course of action that is incompatible with the cloak-and-dagger intrigue to which plaintiffs' narrative alludes.

(Exh. 18, at CIBA012598-604.)  On its face, then, the report does precisely what plaintiffs say it does not (*i.e.*, account for DDE and DDD emissions).  Once again, while plaintiffs trumpet the allegation that this report was sent "through the mail," they fail to identify a single false or misleading statement contained therein, much less to connect the report to the purported coordinated campaign of deceit and manipulation on which plaintiffs' RICO claim rests.

Based on careful review of plaintiffs' factual allegations in their brief as compared to the contents of their exhibits, the Court is of the opinion that plaintiffs have taken unwarranted liberties with their exhibits, going well beyond the reasonable inferences to which they are entitled on summary judgment.  In fact, plaintiffs appear to have contorted multiple exhibits beyond recognition in order to shoehorn them into a prefabricated narrative that villifies defendants without evidentiary foundation.

2.      *Many of Plaintiffs' Exhibits Have No Bearing on the Alleged Injury.*

The second global problem with plaintiffs' Rule 56 filings concerning RICO is that a considerable fraction of the exhibits and narrative on which plaintiffs rely have nothing to do with DDT contamination on their property.  Plaintiffs have committed themselves to a RICO claim that "Defendants conspired with each other, nonparties BCM Converse, Inc. and Clement International, Inc. to deceive the government and the public of serious risks of DDT contamination in the McIntosh community."  (Doc. 254, at 5.)  That being plaintiffs' RICO theory, it is perplexing that the vast majority of the summary judgment evidence which they present to support such theory has nothing to do with offsite DDT contamination.

Examples of this defect are myriad.  Plaintiffs devote substantial space in their brief and several exhibits to arguing that Ciba's replacement of Langseth with another contractor in 1988 violated a May 1990 Consent Decree entered into between Ciba and the EPA.  (Doc. 254, at 7-8.)  Leaving aside the inscrutable reasoning that a contractor substitution in 1988 could violate a Consent Decree entered into in 1990, plaintiffs do not explain how breach of that Decree would constitute a RICO violation or have any bearing on plaintiffs' RICO claim herein.  Presumably, it was for the EPA (and not plaintiffs) to enforce the terms of that Decree.  Elsewhere, plaintiffs deem it "extraordinary" that risk assessments prepared by and for Ciba excluded chlordane and dioxins (doc. 254, at 8), but they fail to explain why omission of chlordane and dioxins from a risk report matters for a lawsuit in which plaintiffs are complaining that their homes are

contaminated with DDTr.

Similarly, in the section of their brief labeled "The Racketeering Activities and the Pattern of Racketeering Activities," plaintiffs present evidence of fish kills in the Tombigbee River in the 1950s and 1960s and argue at length that Ciba lied to regulators about emission of poisons into the river.  (Doc. 254, at 13-15.)  They assert that Ciba representative Sherman Williams lied to a reporter in 1986 about the health of nearby wildlife and the dissolution of Ciba waste in groundwater and rainwater.  (*Id.* at 15-16.)  They accuse Williams of "unscientific logic" because "[t]he mere fact that an animal is still living and moving is no evidence of its health."  (*Id.*)  They further lambaste Williams for allegedly deceiving the press about groundwater contamination in the 1980s and early 1990s.  (*Id.* at 16-17.)  And they recount a troubling anecdote from March 1979 about another chemical (Galecron) leaking from corroded drums transported to Ciba's McIntosh facility, without ever being reported to the EPA.  (*Id.* at 17-18.)  Yet throughout this entire narrative presented under the heading of "Racketeering Activities," plaintiffs neglect to connect this evidence (factually, legally or logically) to their RICO cause of action predicated on the alleged airborne DDTr contamination of their properties. Stringing together episodes of purported misrepresentations occurring over a period of decades and relating to a variety of environmental issues concerning substances other than DDTr may portray Ciba as an unrepentant polluter and dissembler; however, it does not, in and of itself, constitute a factual predicate sufficient to support the viability of plaintiffs' specific RICO claim asserted herein.

### C.    Analysis of RICO Cause of Action.

After reviewing the briefs and the summary judgment record evidence cited by plaintiffs, the Court is of the opinion that their RICO cause of action suffers from a number of fatal defects rendering it invalid as a matter of law.  In the interests of brevity, the Court will focus on two, to-wit: lack of proof of a pattern of racketeering activity, and lack of proof of causation.

#### 1.    Pattern of Racketeering Activity.

Defendants' Motion expressly asserts that plaintiffs cannot prove a pattern of racketeering activity.  Under well-established law, a plaintiff in a civil RICO action under § 1962(c) "must identify and prove a pattern of racketeering activity, defined as two 'predicate acts' of racketeering activity within a 10 year period."  *Langford v. Rite Aid of Alabama, Inc.*,

231 F.3d 1308, 1311-12 (11th Cir. 2000); *see also Klay v. Humana, Inc.*, 382 F.3d 1241, 1252 (11th Cir. 2004) ("To violate RICO, a defendant must engage in a pattern of racketeering activities."); *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004) ("Essential to any successful RICO claim are the basic requirements of establishing a RICO enterprise and a pattern of racketeering activity.").  "The phrase 'racketeering activity' is defined as including any act which is indictable under a lengthy list of criminal offenses, including the federal statutes prohibiting mail and wire fraud."  *Langford*, 231 F.3d at 1312; *see also Klay*, 382 F.3d at 1252 ("RICO designates the violation of certain federal criminal laws as 'racketeering activities.'").  "The upshot is that RICO provides a private right of action ... to any person injured in his business or property by reason of the conduct of a qualified enterprise's affairs through a pattern of acts indictable as mail fraud."  *Bridge v. Phoenix Bond & Indem. Co.*, --- U.S. ----, 128 S.Ct. 2131, 2138, 170 L.Ed.2d 1012 (2008).  Plaintiffs' brief implies (without offering any specifics) that mail and/or wire fraud are the racketeering activities in which Ciba engaged.

To gauge whether plaintiffs have shown two predicate acts of mail or wire fraud, as is necessary to proceed on a RICO theory, we must first examine the elements of such an offense. As the Supreme Court summarized last year:

> "Mail fraud, in turn, occurs whenever a person, having devised or intending to devise any scheme or artifice to defraud, uses the mail for the purpose of executing such scheme or artifice or attempting to do so. ... The gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, ... even if the mailing itself contains no false information."

*Bridge*, 128 S.Ct. at 2138 (internal citations and quotation marks omitted); *see also United States v. Maxwell*, --- F.3d ----, 2009 WL 2513619, *12 (11th Cir. Aug. 19, 2009) ("The elements of mail and wire fraud are: (1) intentional participation in a scheme to defraud, and (2) the use of the interstate mails or wires in furtherance of that scheme.").  Mail fraud "requires proof of a specific intent to defraud or deceive."  *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 783 (11th Cir. 2004).

By their admission, plaintiffs' RICO cause of action is rooted in the theory that Ciba "conspired with nonparties BCM Converse, Inc. and Clement International, Inc. to suppress the

true extent of risks from Ciba's DDTr releases." (Doc. 254, at 4.) Even assuming that plaintiffs' evidence is sufficient to show that Ciba harbored a specific intent to defraud or deceive regulators and the general public (a questionable proposition given the largely benign statements in plaintiffs' exhibits and plaintiffs' failure to proffer evidence of their falsity, much less a calculated design to mislead), in order for such conduct to constitute mail or wire fraud, and hence rise to the level of a predicate act for RICO purposes, plaintiffs must show use of interstate mails or wires in furtherance of that scheme. Plaintiffs have not done so.

Remarkably, plaintiffs' summary judgment filing is devoid of evidence or argument that the wires or mails were used incident to an essential part of the alleged scheme to defraud. *See Bridge*, 128 S.Ct. at 2138 ("any mailing that is incident to an essential part of the scheme satisfies the mailing element"); *United States v. Evans*, 473 F.3d 1115, 1118 (11th Cir. 2006) ("A transmission is for the purpose of executing the scheme if it is incident to an essential part of the scheme.") (citation and internal quotation marks omitted). The 6-page section of plaintiffs' brief labeled "The Racketeering Activities and The Pattern of Racketeering Activities" fails to identify a single use of mail or wire in furtherance of the alleged enterprise's alleged scheme "to suppress the true extent of risks from Ciba's DDTr releases." (Doc. 254, at 13-18.) In that section, plaintiffs allege that Ciba lied to regulators during inspections, lied to newspaper reporters about such matters as fish kills and wildlife health, lied to Alabama's Assistant Chief of Fisheries about the facility's effluent storage capacity, lied about hazardous wastes escaping the facility, and failed to tell the EPA about Galecron leaks, with most of those incidents occurring many years ago. Yet plaintiffs do not identify a single use of the mail or wire, much less proffer evidence or argument that any such usage was incident to an essential part of the scheme.

Looking beyond the portion of plaintiffs' brief ostensibly devoted to defining and elaborating on the pattern of racketeering activities, and instead reading the brief as a whole, the result is the same. Despite defendants' express challenge on summary judgment to the existence of a pattern of racketeering activities, plaintiffs' entire brief identifies only a single exhibit that they contend was submitted through the mail. In particular, plaintiffs refer to a November 1988 risk assessment that they say was "submitted to EPA **through the mail**," and assert that this document "failed to account for any of the DDE and DDD contamination at the Ciba facility." (Doc. 254, at 10 (emphasis in original).) But plaintiffs proffer no evidence that this document

-22-

was mailed by anyone to anyone.  Nor do they show that any such mailing was incident to an essential part of a scheme to deceive regulators and the public about DDT contamination; to the contrary, the proposition for which plaintiffs cite the exhibit (*i.e.*, Ciba's failure to account for any DDE and DDD contamination at the Ciba facility) is directly controverted by the text of that document which shows that Ciba <u>did</u> account for those substances.  As such, plaintiffs have failed to make any showing that the November 1988 risk assessment qualifies as a predicate act of mail fraud for purposes of establishing a RICO pattern of racketeering activity.  More generally, plaintiffs have entirely failed to meet their burden on summary judgment of showing the existence of evidence from which a reasonable factfinder could conclude that a pattern of racketeering activity took place, as is necessary to support plaintiffs' civil RICO cause of action.  For that reason, defendants are entitled to summary judgment on Count Eleven of the First Amended Complaint.[22]

> 2.     *Causation.*

Leaving aside the dearth of evidence of a pattern of racketeering activity, plaintiffs' RICO claims also founder on the rocks of the applicable causation requirement.

The Eleventh Circuit has emphasized that, for any plaintiff bringing a § 1964(c) cause of

---

[22]     It appears that plaintiffs felt they were excused from showing a pattern of racketeering activity on summary judgment because this Court concluded back at the Rule 12(b) stage that plaintiffs had adequately pleaded same.  Plaintiffs' brief quotes extensively from the undersigned's Order (doc. 56) entered on September 10, 2008, concerning the nature of the conspiracy and the sufficiency of plaintiffs' pleading to show examples of wire and mail fraud.  (Doc. 254, at 12-13.)  But it is not September 2008 anymore.  This case has now progressed to the summary judgment stage.  A plaintiff may rest on his pleadings at the Rule 12(b)(6) stage; however, he must do more in order to withstand Rule 56 scrutiny.  *See, e.g., LaChance,* 146 F.3d at 835 ("To defeat a motion for summary judgment, the nomoving party may not rely on mere allegations" but "must raise significant probative evidence that would be sufficient for a jury to find for that party") (citations and internal quotation marks omitted); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) ("When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and ... designate specific facts showing that there is a genuine issue for trial.") (citation and internal quotation marks omitted); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) ("The party responding to summary judgment may not rest on her pleadings to demonstrate the presence of an issue of fact.").  Thus, any perception that this Court's findings at the motion to dismiss stage immunize plaintiffs from demonstrating proof of a pattern of racketeering activity at the summary judgment stage is unfounded and incorrect, as a matter of law.

action, "evidence of injury ... [is] an essential element of its RICO claim."  *Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, --- F.3d ----, 2009 WL 2833115, *6 (11th Cir. Sept. 4, 2009); *see also Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292, 1307 (11th Cir. 2003) ("In addition to proving racketeering activity, a civil RICO plaintiff must show that the racketeering activity caused him to suffer an injury."); *Beck v. Prupis*, 162 F.3d 1090, 1095 (11th Cir. 1998) ("[A] civil RICO plaintiff must show that the racketeering activity caused him to suffer an injury.").  The law of this Circuit is clear that "when a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries. ... [I]n RICO cases there must be some direct relation between the injury alleged and the injurious conduct in order to show proximate cause." *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1287-88 (11th Cir. 2006) (internal citations and quotation marks omitted); *see also Green Leaf*, 341 F.3d at 1307 ("In order for a pattern of racketeering activity to be a cognizable cause of civil RICO injury to a private plaintiff, one or more of the predicate acts must not only be the 'but for' cause of the injury, but the proximate cause as well. ... Plaintiffs must show a direct relation between the injury asserted and the injurious conduct alleged.") (internal citations and quotation marks omitted).

     The injury asserted by plaintiffs in this action has been narrowly circumscribed to the cost of decontaminating their properties.  On the subject of damages relating to the RICO cause of action, plaintiffs offer no additional evidence or argument, but instead reprise and incorporate their failed arguments from Ciba's summary judgment motion relating to constructive fraud. (Doc. 254, at 21.)  In other words, plaintiffs have staked themselves to a position that the <u>only</u> injury they are claiming from defendants on the RICO cause of action is the cost of cleaning up DDTr contamination from their properties.[23]

---

[23]     Plaintiffs also reiterate their contention that "Plaintiffs relied on Defendants [*sic*] statements and representations to the McIntosh residents that there was no reason to be concerned about DDTr in the community and such statements induced Plaintiffs to remain in the McIntosh area during and after the Superfund clean-up process at the Ciba plant."  (Doc. 254, at 21.)  But this statement is of questionable relevance and factually unsupported by the record.  In the first place, plaintiffs are making a reliance argument when they expressly recognize that reliance is not an element of RICO claims predicated on mail fraud.  *See, e.g., Bridge*, 128 S.Ct. at 2145 ("a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an

The problem for plaintiffs is that, for their RICO claim to satisfy applicable causation requirements, they must come forward with a showing of a direct relation between defendants' alleged racketeering activities (*i.e.*, their mail fraud acts in furtherance of a scheme to suppress the true extent of risks of Ciba's DDTr releases) and plaintiffs' injuries (*i.e.*, the clean-up costs they will incur to remove DDTr contamination from their homes).  Plaintiffs proffer neither evidence nor argument of any such direct relationship between violation and injury.  They present neither evidence nor argument that the existence or degree of DDTr contamination in their homes is greater than it would have been in the absence of Ciba's alleged RICO violation. They do not offer evidence that any new DDTr contamination from Ciba reached their property after any of Ciba's alleged racketeering activities took place, or that they were lulled into inaction in the interim by Ciba's RICO violation.  They do not maintain (much less demonstrate) that their remediation costs would be mitigated in the absence of Ciba's alleged RICO violation. They do not present evidence that test plaintiffs remained in their homes or declined to move away because of any racketeering activities by the alleged enterprise, or even because of any fraudulent or misleading statements (whether or not part of the RICO enterprise, and whether or not such statements would qualify as racketeering activities) made by Ciba at any time.

Among many evidentiary hurdles facing plaintiffs on the causation issue is the fact that Ciba produced DDT at the McIntosh site from 1952 until, at the latest, early 1966, while the vast majority of the facts on which plaintiffs' RICO claims are based concern statements to regulators and media decades later.  Although plaintiffs assert that DDTr is continuing to seep off Ciba's site and into the McIntosh community through the present day, they have not identified any

---

element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations").  *Bridge* recognized that reliance remains an available avenue for showing causation in RICO actions based on a pattern of mail fraud, so presumably that is plaintiffs' purpose in making a reliance argument; however, they do not expressly state as much, but instead leave the Court to guess as to the legal significance of their reliance point.  In the second place, the bald statement of reliance is refuted by record evidence that most test plaintiffs heard no statements from Ciba at all, and those that did hear such statements did not alter their conduct as a result.  In the third place, as discussed *supra*, plaintiffs proffer no evidence that any test plaintiff refrained from moving or selling his or her property during the Superfund clean-up process because of any statements or representations made by Ciba, or that any test plaintiff changed course after learning the truth.

evidence supporting the existence of that phenomenon.  Unless new DDTr contamination reached plaintiffs' property after and as a result of the alleged RICO violations by Ciba, it is difficult to imagine a scenario in which the direct relationship requirement could be satisfied. Yet plaintiffs have identified no evidence from which a reasonable finder of fact could conclude that the DDTr concentrations at plaintiffs' homes (or the clean-up costs that represent plaintiffs' only asserted measure of damages) were exercabated after, much less because of, the alleged racketeering activity by Ciba.  This failure of proof constitutes a separate and independent ground for granting defendants' summary judgment motion as to the RICO cause of action.[24]

          3.          *Dismissal of RICO Claims as to All Plaintiffs.*

          As discussed *supra*, the Court finds that plaintiffs have failed on summary judgment to make the required showing of a pattern of racketeering activity.  This defect in proof is fatal not only to test plaintiffs' RICO cause of action, but also to all plaintiffs' RICO cause of action. After a full period of discovery as to the test plaintiffs in this action, as well as expansive discovery in *Fisher* and *LaBauve*, plaintiffs have been unable to muster sufficient evidence of a pattern of racketeering activity to survive defendants' summary judgment motion as to the RICO claim.  There is no reason to believe that non-test plaintiff discovery would yield any new evidence that might support the existence of a pattern of racketeering activity.  Surely, all necessary discovery into defendants' conduct has long since been completed; therefore, plaintiffs will not be afforded a second bite at the apple to remedy these across-the-board (*i.e.*, not plaintiff-specific) failings in their RICO theory in future stages of this action dealing with other non-test plaintiffs' claims.  Accordingly, defendants' Motion for Summary Judgment as to the

---

[24]          This outcome and reasoning were clearly foreshadowed more than a year ago, when the Court administered a stern warning to plaintiffs on this point.  At the Rule 12(b)(6) stage, plaintiffs were cautioned that the causation aspects of their RICO theory were problematic, given the Eleventh Circuit's strict "direct relation" standard.  Although the Court found that plaintiffs had satisfied the minimum pleading threshold for that theory, it admonished them as follows: "Unless plaintiffs' evidence at trial establishes that defendants' alleged racketeering activities led directly to there being contamination on plaintiffs' properties that would not have been there in the absence of such racketeering activities, their RICO claims will fail.  Accordingly, the Court will closely scrutinize the evidence at the Rule 56 and trial stages for evidence of such causation ...."  *Abrams v. Ciba Specialty Chemical Corp.*, 2008 WL 4183344, *11 n.24 (S.D. Ala. Sept. 10, 2008).

RICO cause of action will be granted against all plaintiffs, not merely test plaintiffs.

> **D.      Analysis of Conspiracy Cause of Action.**

As mentioned *supra*, plaintiffs have also brought a common-law conspiracy cause of action against defendants.  That claim largely parallels the RICO cause of action, inasmuch as plaintiffs ground it in allegations that Ciba conspired with Clement and others "to underestimate the risk posed by exposures to DDTr," "to provide false and/or misleading information ... regarding the risks associated with the DDTr in the McIntosh community," and "to manipulate data" from Risk Assessments, all to the detriment of plaintiffs.  (Doc. 26, ¶¶ 33-35.)  Defendants seek summary judgment on the conspiracy cause of action.

Under Alabama law, "[t]he gist of an action alleging civil conspiracy is not the conspiracy itself but, rather, the wrong committed."  *Hooper v. Columbus Regional Healthcare System, Inc.*, 956 So.2d 1135, 1141 (Ala. 2006) (citations omitted).  Indeed, "[a] civil conspiracy cannot exist in the absence of an underlying tort."  *Goolesby v. Koch Farms, LLC*, 955 So.2d 422, 430 (Ala. 2006); *see also Callens v. Jefferson County Nursing Home*, 769 So.2d 273, 280 (Ala. 2000) ("A conspiracy claim must fail if the underlying act itself would not support an action.") (citation omitted).

The underlying tort on which plaintiffs' common-law conspiracy cause of action is framed is some species of fraud, misrepresentation or fraudulent suppression.  As stated *supra*, in the context of the constructive fraud cause of action, the test plaintiffs have proffered no evidence that they were damaged by the underlying wrong (*i.e.*, the fraud or misrepresentation).  The record is devoid of evidence that test plaintiffs relied to their detriment on any of the fraudulent activity that Ciba or its co-conspirators are alleged to have engaged in pursuant to their conspiracy, much less that test plaintiffs' clean-up costs were exacerbated in any way by the alleged wrongful acts committed in furtherance of the conspiracy.  In the absence of any evidence of reliance, causation or damages, test plaintiffs' conspiracy claim against Ciba would fail, even assuming (without deciding) that the record supported reasonable inferences that Ciba had conspired with others in the manner described by plaintiffs.

That said, the Court cannot conclusively discount the possibility that non-test plaintiffs will be able to come forward with evidence of detrimental reliance and damages during discovery on their claims.  Accordingly, because the Court's reasoning for granting summary

judgment on the conspiracy cause of action does not necessarily extend to all non-test plaintiffs without a plaintiff-by-plaintiff showing of their reliance and damages, and because discovery to this juncture has been confined to the test plaintiffs, defendants' Motion for Summary Judgment as to the civil conspiracy claim will be denied to the extent it seeks dismissal of non-test plaintiffs' conspiracy claim.

## V.      Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.      Defendants' Motion for Partial Summary Judgment on Constructive Fraud Claims as to All Plaintiffs (doc. 212) is **granted in part**, and **denied in part**.  The Motion is **granted** as to the constructive fraud claims of test plaintiffs, and also as to the punitive damages component of all plaintiffs' constructive fraud claims. Those claims are **dismissed with prejudice**.  In all other respects, the Motion is **denied**.

2.      Defendants' Motion for Partial Summary Judgment on Conspiracy and Civil RICO Claims as to All Plaintiffs (doc. 220) is **granted in part**, and **denied in part**.  The Motion is **granted** as to the civil RICO causes of action asserted by all plaintiffs (test plaintiffs and non-test plaintiffs alike), and those claims are **dismissed with prejudice**.  The Motion is further **granted** as to the conspiracy claims of test plaintiffs only, and those claims are **dismissed with prejudice**.  The Motion is **denied** insofar as defendants seek summary judgment on the conspiracy claims of non-test plaintiffs.

DONE and ORDERED this 1st day of October, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE