IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CLEON ABRAMS, SR., *et al.*, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 08-0068-WS-B |
| | ) | |
| CIBA SPECIALTY CHEMICALS | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
|     Defendants. | ) | |

ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment on Claims of Edgar and Emma Moss (doc. 234), Defendants' Motion for Summary Judgment on Claims of Mary Ferrell (doc. 235), Defendants' Motion for Summary Judgment on Claims of Johnnie Ware (doc. 236), and Defendants' Motion for Summary Judgment on Claims of Ruth Everette (doc. 237). All four Motions have been briefed and are ripe for disposition.

I.      **Background.**

This action involves claims that certain real property located in and around McIntosh, Alabama has been damaged by DDT contamination. The 277 plaintiffs[1] who brought this lawsuit are property owners who maintain that the source of the contamination was a chemical manufacturing plant in McIntosh that is or was at various times owned and operated by defendants, Ciba Specialty Chemicals Corporation, Ciba-Geigy Corporation, Novartis, Ltd., Inc., and Syngenta Crop Protection, Inc. (collectively, "Ciba"). According to the First Amended Complaint (doc. 26), the nub of plaintiffs' claims is their contention that "beginning in about 1952, solid and liquid wastes were disposed of by [Ciba] in several known source areas. These

---

[1]      By the Court's tally, 17 plaintiffs have dropped out of this action pursuant to Orders entered on August 25, 2008 (doc. 55), April 27, 2009 (doc. 165), June 24, 2009 (doc. 203), and September 16, 2009 (doc. 277) for various reasons, including settlement, failure to prosecute, acknowledgment that the plaintiff has no viable claims, or simply a stated desire not to proceed further. That leaves 260 remaining plaintiffs.

source areas and the manufacturing processes have been managed in such a way that large amounts of chemicals, commonly known as DDT, DDD, and DDE (collectively DDTr), have impacted the McIntosh community and the homes of plaintiffs. ... The residences contain concentrations of DDTr at levels which pose an unacceptable risk to human health thereby reducing the property values of the community." (Doc. 26, ¶¶ 17-18.) Plaintiffs' theory is that the wind has carried DDTr particulate matter off the Ciba site and onto their properties dating back to the 1950s and early 1960s, when Ciba was actively producing DDT at that location, and continuing through the present day. On summary judgment, plaintiffs have staked themselves to a position that the measure of damages they seek to recover is confined to the cost of decontaminating their properties.

Upon initiating this lawsuit by filing their Complaint in February 2008, plaintiffs parlayed these basic factual allegations into 11 causes of action asserted by each plaintiff against each defendant, to-wit: negligence, conspiracy, strict liability, trespass, nuisance, intentional misrepresentation, negligent misrepresentation, fraud / fraudulent concealment, constructive fraud, punitive/ exemplary damages, and violation of the federal Racketeer Influenced and Corrupt Organizations Act.[2] Each defendant countered by invoking the same 41 affirmative defenses in its Answer (docs. 57 - 60).[3]

In the interests of justice, efficiency and judicial economy, Magistrate Judge Bivins

---

[2]     Three of those causes of action (intentional misrepresentation, negligent misrepresentation, and fraud / fraudulent concealment) were dismissed as to all plaintiffs at the pleadings stage more than a year ago for failure to comport with the heightened pleading requirements of Rule 9(b), Fed.R.Civ.P. (Doc. 56, at 14-18.)

[3]     The factual allegations and legal theories posited by the parties (including plaintiffs' causes of action and defendants' affirmative defenses) in this action bear striking resemblance to those previously presented in a related federal action before the undersigned styled *Jessie Fisher et al. v. Ciba Specialty Chemicals Corporation, et al.*, Civil Action No. 03-0566-WS-B. After more than four years of extensive litigation (including an unsuccessful bid for class certification), the five *Fisher* plaintiffs reached a settlement with Ciba on October 19, 2007, shortly before jury selection was to occur. The identities of counsel for both sides in this action are substantially similar to those in the *Fisher* matter, and the pleadings in this case appear to have their genesis in the corresponding *Fisher* pleadings, with some being reproduced nearly verbatim.

developed and implemented a trial plan pursuant to which the claims of 27 representative "test plaintiffs" would proceed through the discovery and trial processes first, after which a case management plan would be tailored for the remaining plaintiffs.  (*See* docs. 66, 239.)  Of the original 27 test plaintiffs, only 17 remain in the case in a test plaintiff capacity at this time, for various reasons.  The jury's verdict as to any test plaintiff will not be binding on any non-test plaintiff.  The test plaintiff discovery period has concluded, and the test plaintiff trial is set for jury selection on November 3, 2009, with trial to follow during the November 2009 civil term. In preparation for trial, the parties have collectively filed some 14 motions for summary judgment or partial summary judgment, presenting various legal issues for judicial resolution before trial in an effort to streamline and focus the case.

Notwithstanding the parties' proliferation of Rule 56 motions, this Order is confined to defendants' four Motions for Summary Judgment addressing the timeliness of the claims of particular test plaintiffs under a statute of limitations analysis.[4]  The crux of all four Motions is defendants' position that particular test plaintiffs (Edgar and Emma Moss, Mary Ferrell, Johnnie Ware, and Ruth Everette) knew or should have known of their claims against Ciba well outside of the applicable limitations periods, such that their claims should be dismissed as time-barred. Plaintiffs counter that genuine issues of material fact remain as to the accrual date for the claims of the Mosses, Ferrell, Ware and Everette, and that a triable issue exists as to whether those claims were brought within the applicable limitations period.

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

---

[4]       The remaining 10 summary judgment motions will be addressed separately via contemporaneous orders.  In considering the Motions (docs. 234, 235, 236, 237), the Court has reviewed the parties' respective principal briefs (docs. 234-237, 255), defendants' reply (doc. 259), and the evidentiary submissions accompanying these respective filings, as well as all other portions of the court file deemed relevant.

Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

III.     **Applicable Legal Principles Governing Limitations Issues.**

        Their fraud/misrepresentation, conspiracy and RICO claims having been dismissed at the Rule 12(b)(6) stage or via separate Order entered on this date, the only remaining causes of action brought by the Mosses, Ferrell, Ware and Everette are state-law claims for negligence, strict liability, trespass, nuisance, and punitive/ exemplary damages. The applicable limitations period for the negligence, nuisance, and strict liability claims is two years. *See Ex parte Brian Nelson Excavating, LLC*, --- So.3d ----, 2009 WL 1643351, *2 (Ala. June 12, 2009) (referencing "the two-year statute of limitations in § 6-2-38, Ala.Code 1975, for nuisance claims"); *Boyce v. Cassese*, 941 So.2d 932, 945 (Ala. 2006) (negligence claims are governed by two-year statute of limitations); Ala.Code § 6-2-38(*l*) ("All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."). Plaintiffs' trespass claims are subject to a six-year limitations period. *See, e.g., Jackson v. City of Auburn*, 971 So.2d 696, 704 n.3 (Ala.Civ.App. 2006) ("Of course, the six-year statute of limitations applicable to trespass to real property, *see* Ala.Code 1975, § 6-2-34(2), would bar an action based on any trespasses committed more than six years before the institution of the action."); Ala. Code § 6-2-34(2) (actions for trespass to real or personal property must be

commenced within six years).[5]

Importantly, the state-law commencement date for both the two-year and six-year claims in this case is preempted by the federal Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"). CERCLA provides that in state-law actions for property damages "which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility," the applicable limitations period "shall commence at the federally required commencement date in lieu of the date specified in such State statute." 42 U.S.C. § 9658(a)(1). The federally required commencement date ("FRCD") is defined in CERCLA as meaning "the date the plaintiff knew (or reasonably should have known) that the ... property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). There can be no reasonable dispute -- and the parties agree -- that the FRCD establishes the commencement date of the applicable statute of limitations for all remaining state-law claims brought by the Mosses, Ferrell, Ware and Everette.[6] Thus, Ciba's statute of limitations defense rests, at least in the first instance, on determination of the FRCD.

In identifying the FRCD in this case, a number of well-settled parameters apply.[7] As an

---

[5]   Plaintiffs' punitive damages cause of action is not a distinct claim under Alabama law; therefore, it has no limitations period separate and apart from those attached to other claims. Alabama courts recognize that "there is no such thing as a claim of punitive damages. Rather, there are claims on which our law authorizes the trier of fact to impose punitive damages if certain wrongfulness is proved by a sufficient weight of the evidence." *Horn v. Brown*, 4 So.3d 1106, 1109 (Ala. 2008) (quoting *Haynes v. Alfa Financial Corp.*, 730 So.2d 178, 181 (Ala. 1999)). Accordingly, the timeliness of test plaintiffs' punitive damages claims hinges on that of the underlying claims as to which punitive damages are sought, and no separate limitations analysis is needed for the punitive damages claims themselves.

[6]   Defendants state in their brief that "[t]he statute of limitations period for the other claims [excepting the now-dismissed RICO cause of action] are governed by the FRCD under CERCLA." (Doc. 234, at 6.) Similarly, plaintiffs include an entire section of their brief under the heading "The Federally Required Commencement Date ("FRCD") provision of CERCLA preempts Alabama's Statute of Limitations." (Doc. 255, at 3.)

[7]   Plaintiffs have not invoked the continuous tort doctrine in opposing defendants' limitations arguments on summary judgment; therefore, the Court has no occasion here to

initial matter, "because different plaintiffs may have become aware, or should have become aware, of the existence of their claims at different times, the FRCD must be fixed separately on a plaintiff-by-plaintiff basis." *Abrams v. Olin Corp.*, 248 F.R.D. 283, 291 (S.D. Ala. 2007); *see also Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 310 (S.D. Ala. 2006) ("The Court would have to fix a separate FRCD for each plaintiff."); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 674 (S.D. Ala. 2005) (identifying plethora of plaintiff-specific factors to be considered in fixing the FRCD for each plaintiff in property contamination case). To ascertain a plaintiff's FRCD, where actual knowledge is lacking, "the critical legal inquiry ... is when he 'reasonably should have known' that his property had been damaged by industrial contamination from Ciba." *Fisher*, 238 F.R.D. at 309.

Next, in construing the meaning of § 9658's "reasonably should have known" language, courts have explained that "[a] plaintiff knows or reasonably should know of a claim when he or she knows both the existence and the cause of his injury." *O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1147 (9th Cir. 2002) (citation and internal quotation marks omitted). Thus, "[s]ummary judgment [is] improper here unless the only reasonable inference that can be drawn is that Plaintiffs knew or should have known more than [six years (trespass) or two years (all other claims)] before filing their claims that the [Ciba] contamination was the cause of their [property damage]." *O'Connor*, 311 F.3d at 1150. The "reasonably should have known" prong of the FRCD test is objective, not subjective. *See LaBauve*, 231 F.R.D. at 659 ("As reflected by the statutory language, the reasonably should have known requirement is an objective standard for accrual based not on what a plaintiff actually knew, but what she reasonably should have known.") (citation and internal quotation marks omitted).

The case law is clear that a plaintiff's mere suspicion that he or she incurred property damage because of defendant's contamination is inadequate to satisfy the "reasonably should have known" standard. Indeed, the FRCD "focuses on knowledge, actual or imputed, not on suspicion. Mere suspicion, whatever its reasonableness, cannot be equated with knowledge ...."

---

consider or apply it. That said, the Court notes that a continuous tort theory was unsuccessfully raised in one of the predecessor lawsuits filed by plaintiffs' counsel concerning McIntosh contamination. *See LaBauve v. Olin Corp.*, 231 F.R.D. 632, 655-57 (S.D. Ala. 2005).

*Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 205-06 (2nd Cir. 2002); *see also O'Connor*, 311 F.3d at 1148 ("In sum, we reject an interpretation of the federal discovery rule that would commence limitations periods upon mere suspicion of the elements of a claim."); *Collins v. Olin Corp.*, 2009 WL 279027, *7-8 (D. Conn. Jan. 12, 2009) (finding material questions of fact "as to whether any plaintiff reasonably would have *known*, rather than merely *suspected* (prior to receiving the EPA's test results) that they had or would suffer harms as a result of Olin's contamination of the neighborhood").  Furthermore, "notice of controversy ... is not the standard for determining the Federal Commencement date."  *Freier*, 303 F.3d at 210 (documents showing local concerns and controversies about potential health problems from landfill did not permit court to conclude as a matter of law that plaintiffs should have known that landfill was cause of their injuries, starting the limitations clock).  Thus, a plaintiff's awareness of local controversy and upheaval in McIntosh concerning Ciba contamination does not equate, as a matter of law, to the triggering of the FRCD.

That said, the necessity for awareness beyond mere suspicion does not imply that a plaintiff's FRCD requires absolute certainty.  To the contrary, the law is clear that the FRCD's "discovery rule does not permit a party to await certainty."  *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 932 (6th Cir. 2004) (trespass claim accrued before 1996 where plaintiff knew that defendant had released specific chemicals, that those chemicals were present in plaintiff's water supply, and that there were few, if any, realistic alternative sources of contamination).  Furthermore, courts have routinely found that, for purposes of ascertaining the FRCD, "it is not necessary that the plaintiff know the identity of every specific pollutant or contaminant, but only the fact of the contamination."  *Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F. Supp. 1116, 1126 (N.D. Fla. 1995).[8]

---

[8]     *See also Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 983 F. Supp. 360, 364 (W.D.N.Y. 1997) ("It is not necessary ... for a plaintiff to know the identity of each defendant's specific contaminants that damaged the property before the statute of limitations begins to run; it is only necessary for plaintiff to know the fact of the contamination.") (citations and internal quotation marks omitted); *Presque Isle Harbor Development Co. v. Dow Chemical Co.*, 875 F. Supp. 1312, 1319 n.11 (W.D. Mich. 1995) (finding "wholly without merit" plaintiffs' position "that actual knowledge of each specific hazardous substance, pollutant, or contaminant is required for the limitation period under 42 U.S.C. § 9658(b)(4)(A) to begin to run").  Plaintiffs'

The foregoing discussion demonstrates that the threshold for accrual under the FRCD's "reasonably should have known" formulation falls somewhere between mere suspicion and certainty.  To identify the tipping point between those extremes at which a plaintiff's FRCD commencement date occurs, the following test is instructive:  "A two-part analysis determines whether Plaintiffs reasonably should have known of their claim. ... First, we consider whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury. ... Second, if the plaintiff was on inquiry notice, we must next determine whether an inquiry would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim. ... The plaintiff will be charged with knowledge of facts that he would have discovered through inquiry."  *O'Connor*, 311 F.3d at 1150 (citations and internal quotation marks omitted).  As the *O'Connor* test demonstrates, a plaintiff "must be diligent in discovering the critical facts" and "will be barred from bringing his claim after the running of the statute of limitations, if he should have known in the exercise of due diligence."  *Bibeau v. Pacific Northwest Research Foundation Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999).

A pervasive theme in opinions applying the FRCD is that, in the absence of actual knowledge, determining when a plaintiff reasonably should have known of his or her injury and its cause is often a fact-intensive matter which courts are ill-equipped to resolve on summary judgment.  Courts profess unwillingness to invade the purview of the jury and resolve conflicting inferences as to when a plaintiff reasonably should have known of the existence and cause of injury, electing instead to leave these fact-bound questions for the jury at trial.  *See O'Connor*, 311 F.3d at 1150 ("Courts routinely recognize the fact-intensive nature of the determination of when a plaintiff is on notice of a claim. ... Critical factual disputes that govern when Plaintiffs knew or should have known of their claims preclude summary judgment here."); *Lessord v. General Electric Co.*, 258 F. Supp.2d 209, 219 (W.D.N.Y. 2002) ("[D]efendants' evidence, viewed as a whole, does lend some weight to their arguments that plaintiffs knew or should have known of their injury and its cause more than three years before they commenced this action, but the weight of that evidence, and whether it is enough to find plaintiffs' claims time-barred, are for a properly-instructed jury to determine."); *Merry v. Westinghouse Elec. Corp.*, 684 F. Supp.

_____

argument to the contrary in their brief is legally infirm.

-8-

852, 856 (M.D. Pa. 1988) (lingering fact issues as to whether and when plaintiffs knew of pollution in wells or causes of same preclude summary judgment for defendant on limitations grounds); *Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL 2995525, *18 (S.D. Ala. Oct. 11, 2007) ("There are simply too many conflicting inferences to pin down with any certainty whether McIntyre was on inquiry notice from the fragmentary clues before him prior to 2001 or 1997 that his property might be contaminated with industrial wastes from the Ciba plant."); *see generally Hildebrandt v. Indianapolis Life Ins. Co.*, 2009 WL 804123, *5 (N.D. Tex. Mar. 26, 2009) ("In sum, in order to properly decide this fact-bound question of when the Plaintiffs knew or reasonably should have known of their claims, the Court must be able to examine proof ... perhaps not even permissible on summary judgment.").[9]

## IV.    Analysis.

Given the plaintiff-specific nature of the FRCD inquiry, the record evidence concerning the Mosses, Ferrell, Ware and Everette will be examined separately.[10]  The Court will likewise

---

[9]    That is not to say, of course, that courts must never fix the FRCD on summary judgment.  Such rulings are appropriate where the only reasonable inference supported by record evidence is that the plaintiff should have known by no later than a specific date that contamination emanating from defendant caused his or her property damage.  For example, in *LaBauve*, the undersigned found as a matter of law that plaintiff Daisy Mae Pressley had a FRCD of November 1998 where uncontroverted record evidence showed that (a) she had attended community meetings regarding Ciba/Olin environmental contamination in 1996 or 1997; (b) by fall 1998, she was an officer of the "Southern Organizing Committee," a community organization negotiating directly with Olin on contamination issues; (c) she actively participated in those negotiations, and in efforts to secure legal counsel for the community concerning Olin/Ciba contamination; and (d) her name appears on a short list of Task Force officers on letterhead of a November 1998 memorandum in which the Committee demanded that Olin relocate 300 families (including Pressley's) "located in the contaminated areas" at least 5 miles away because of Olin's offsite contamination.  As the Court explained, "This evidence unequivocally establishes that [by November 1998], Pressley believed that her property was contaminated, believed that the contamination was sufficiently serious to require relocation, and believed that Ciba and Olin were responsible, and that these beliefs were sufficiently solidified by that time that she initiated concerted action against Olin on the community's behalf." *LaBauve*, 231 F.R.D. at 660.

[10]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiffs' version

assess the presence or absence of genuine issues of material fact as to limitations on a plaintiff-by-plaintiff basis.  Before doing so, however, the Court will briefly address a pair of tolling arguments advanced by plaintiffs collectively.

>    A.    *Plaintiffs' Tolling Arguments.*

Whatever the FRCD might be for the Mosses, Ferrell, Ware and Everette, plaintiffs request relief from that commencement date under two theories.

First, plaintiffs maintain that the *Fisher* class action filings, and more precisely the status of each plaintiff herein as a putative class member in *Fisher*, means that "the proverbial limitations clock did not start ticking until July 15, 2006," the day after class certification was denied in *Fisher*.  (Doc. 255, at 2.)  Yet plaintiffs contradict themselves as to their tolling theory by arguing that "the applicable limitations period ***was tolled did not commence*** until July 15, 2006, the day following the Court's denial of the *Fisher* class."  (*Id.* at 10 (emphasis added).)  Which is it?  To the extent that plaintiffs are arguing that the limitations period was tolled between the filing of the *Fisher* class action complaint in August 2003 and the denial of class certification 35 months later, they are correct.  *See Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1391 (11th Cir. 1998) (en banc) (holding "that the pendency of a class action tolls the applicable statute of limitations only until the district court makes a class certification decision," and if certification is denied, "the statute of limitations begins to run again as to those putative class members who were excluded from the class").  To the extent, however, that plaintiffs would have the Court find that the denial of class certification in *Fisher* started their limitations clocks back at the beginning, they have presented no authority for the illogical proposition that a brand-new limitations period commences for excluded class members upon denial of class certification.  Nothing in *Armstrong* or its progeny would support such a principle.  Accordingly, while the applicable limitations periods will be tolled for the 35-month period bookended by the filing of the class complaint in *Fisher* and denial of class certification therein, the Court rejects plaintiffs' invitation to set a commencement date of July 15, 2006, without regard to the FRCD factors identified *supra*.

Second, plaintiffs cite Alabama case law for the proposition that the applicable

---

of the facts is taken as true and all justifiable inferences are drawn in their favor.

limitations periods are tolled by virtue of Ciba's purported "fraud and concealment" concerning offsite DDT contamination.[11]  However, the vast majority of plaintiffs' proffered evidence of fraud and concealment relates to plaintiffs who are not the subject of defendants' limitations-based summary judgment motions.  (Doc. 255, at 6-7.)  Irrespective of how others may have been misled by Ciba, the record evidence that Ciba made misrepresentations to the Mosses, Ferrell, Ware, and Everette, and that they relied on same, is scant.[12]  More fundamentally, in the context of the "reasonably should have known" standard applicable here, it is not necessary to delve separately into a fraud/concealment tolling issue.  As the undersigned explained in a related lawsuit, the "reasonably should have known" test and the fraud/concealment tolling analysis "are two sides of the same coin, where, as here, plaintiffs argue that they could not reasonably have known about the alleged injury earlier because of the fraudulent concealment." *LaBauve*, 231 F.R.D. at 661 n.60.  Because any fraudulent concealment issues are necessarily bound up in the determination of when a particular plaintiff reasonably should have known about his or her injury for FRCD purposes, the analysis of the former is subsumed in the latter, and need not be considered separately.  In other words, the Court need not discuss plaintiffs' fraudulent concealment tolling argument distinct from the FRCD issue, because any fraudulent concealment affecting a particular plaintiff will already be taken into account in calculating the date on which that plaintiff reasonably should have known of his or her injury.

---

[11]    Alabama courts have authorized tolling in such circumstances.  *See, e.g., Jim Walter Homes, Inc. v. Nicholas*, 843 So.2d 133, 136 (Ala. 2002) ("the plaintiff can overcome a defense of limitations by averment and proof of circumstances permitting tolling of the running of the limitations period, such as fraud on the part of the defendant in concealing the wrongdoing") (citations omitted).

[12]    To establish tolling on these grounds, plaintiffs must come forward with something more than vague statements of what was misrepresented or concealed, and must show specifically how it prevented them from filing suit earlier.  *See, e.g., Ball v. Union Carbide Corp.*, 385 F.3d 713, 724 (6th Cir. 2004) ("Plaintiffs needed to present to this court with sufficient clarity and particularity what they claim was fraudulently concealed by government officials and contractors and how that affected their case.").  Yet plaintiffs have done little to satisfy these requirements, instead waving around cursory assertions of fraud, reliance, and RICO violations, the sufficiency of which the Court has rejected by separate order entered on this date granting summary judgment on the constructive fraud and RICO causes of action.

###### B.      Plaintiff-Specific FRCD Findings.

######### 1.      Edgar and Emma Moss.

Viewed in the light most favorable to nonmovants, the record reveals the following relevant facts concerning the Mosses: Edgar Moss did not actually learn that DDT was on his property until he received the results of testing conducted in December 2006 and November 2007. (Moss Dep., at 72; doc. 255, at Exh. G.)[13]  However, Moss had "believed" far earlier that the McIntosh community was contaminated.  (Moss Dep., at 72.)  He had "conversations with people in the community about potential contamination in McIntosh" so far back in the past that he could not remember when they occurred.  (*Id.* at 73.)  After retiring from Ciba in 1998, Moss joined an organization he called "The Justice Task Force" and "probably attended" meetings about contamination, although he was not an officer of the group.  (*Id.* at 65-67.)  At one such meeting that apparently happened in May 2000, he requested that certain other families be relocated because he "believed" the property belonging to "those folks" was contaminated, and more specifically that the groundwater was polluted with mercury from the Olin plant.  (*Id.* at 69-72; doc. 234, at Exh. C.)  Moss also testified that, even before he retired from Ciba, he "believed" his property might be contaminated but that there "[w]asn't nothing I could do.  I didn't have the money to do anything with."  (Moss Dep., at 93.)[14]

---

[13]      The following deposition exchange bears on Moss's subjective state of mind during the relevant timeframe:

> "Q:      Okay.  When did you first become concerned that there might be contamination on your property?
> "A:      When Marco Kaltofen told us that they tested and found mercury and the DDT."

(Moss Dep., at 72.)  Taken at face value, then, Moss' testimony is that he was not even concerned about the possibility of contamination on his property until the results of testing in late 2006 and 2007 were disclosed.

[14]      There is negligible record evidence concerning Emma Moss's circumstances and knowledge.  At most, defendants point to her testimony that she attended a meeting with her husband "one time a long time ago," as to which she apparently recalls no details.  (Emma Moss Dep., at 24.)  Defendants identify no record facts that Emma Moss was on notice of her claims against Ciba outside the relevant two and six year limitations periods, and the mere fact that she attended one unspecified meeting a long time ago does not lead to a singular inference that her FRCD falls more than two or six years before the Complaint was filed.

On this record, genuine issues of material fact remain as to when Moss "reasonably should have known" of the existence and cause of his injury.  It appears that Moss harbored suspicions about contamination on his property for many years before filing suit.  Taking all reasonable inferences in his favor, however, the record shows that Moss did not serve as an officer for any community organization, that he did not negotiate with Ciba, that he did not actively seek legal counsel or redress, and that he did not have the resources to take any action to follow up on his suspicions of contamination.  To be sure, in 2000 Moss asked that 300 families be relocated because of contamination; however, there is no indication that he was requesting relocation for himself, rather than making the request on behalf of others.  Besides, Moss's testimony shows that his relocation request had nothing to do with Ciba or contaminated homes; rather, he explained that his request was prompted by concern that there was mercury in the groundwater, a very different injury than that at issue here.[15]  Based on these considerations, the Court finds that the question of when Moss's claims accrued involves the weighing of conflicting factual inferences and therefore must be left for the jury to decide.  *See, e.g., Lessord*, 258 F. Supp.2d at 216 ("While the evidence may persuade a jury that plaintiffs knew or should have known of the contamination at some earlier date, the Court cannot make such a determination on a motion for summary judgment.").  Defendants' Motion for Summary Judgment on Claims of Edgar and Emma Moss (doc. 234) is therefore **denied**.[16]

---

[15]  Defendants would liken Moss's circumstances to those of Daisy Mae Pressley in the *LaBauve* action.  *See* note 9, *supra*.  But the record facts on Moss are distinguishable from those on Pressley in several key respects.  Unlike Moss, Pressley was an officer in the community organization, actively participated in negotiations with Olin and Ciba, and sought to retain counsel for the community.  Unlike Moss, Pressley asked that she be relocated and she had concluded that her property was in a contaminated area.  By contrast, the evidence concerning Moss is far more attenuated, inasmuch as Moss's involvement was more passive than Pressley's and the record could reasonably be viewed as showing only that Moss had concluded that other McIntosh residents were affected by groundwater contamination from Olin, not that his own property was contaminated by Ciba, as of the late 1990s and early 2000s.

[16]  In reaching this conclusion, the Court has considered and rejected two additional points by defendants.  First, defendants suggest that Moss's FRCD must date back to the late 1990s because he has been employed since approximately 1999 in a "claims office" maintained by the law firms representing plaintiffs in this case, as well as in *LaBauve* and *Fisher*.  (Doc. 234, at 7.)  Perhaps it could be inferred from this testimony that Moss has spent the last decade

2.      *Mary Ferrell*

Defendants' position concerning plaintiff Mary Ferrell's FRCD is more compelling.  In the light most favorable to the nonmovant, the record shows that Ferrell was "[a]lways" concerned about contamination in McIntosh, dating back to the period from 1974 to 1984 when she worked at Ciba.  (Ferrell Dep., at 24, 27.)  According to Ferrell, she was "very, very concerned," so much so that she "tried to get two lawsuits started" against Ciba for property contamination as far back as 1986.  (*Id.* at 28.)  Ferrell testified that she initiated a consultation with an attorney in 1986 concerning a potential lawsuit, and showed him visible evidence of contamination in a ditch on her property.[17]  However, that lawyer apparently decided against taking Ferrell's case, because he "never, ever got in touch with us again."  (*Id.* at 29.)  The

_____

as an activist recruiting his friends and neighbors in McIntosh to cast their lot with plaintiffs' counsel by suing Ciba and Olin for property contamination in the *LaBauve*, *Fisher*, and *Abrams* gauntlet of litigation.  But the actual testimony also supports a far more innocuous inference.  Moss testified that he is just an "office manager" in that claims office, that he is there all by himself, and that he does "nothing but answer the telephone."  (Moss Dep., at 13, 82.)  In the light most favorable to Moss, this testimony suggests not that he is a community organizer greasing the skids for plaintiffs' law firms to bring these McIntosh environmental contamination lawsuits, but rather that he performed routine clerical functions to earn some extra money.  Which of these inferences is accurate is not for this Court to decide on summary judgment, and could not be conclusively resolved on this record, in any event.  There is certainly no indication that, during the course of performing these duties, Moss received information placing him on notice of his claims against Ciba and triggering the FRCD.  Second, defendants point to evidence that Edgar and Emma Moss attended a meeting with a lawyer in 1986, suggesting they were on notice of their claims at least that far back.  (Doc. 234, at 8.)  However, the record evidence that defendants cite for this proposition (doc. 234, at Exh. D) does not support it, and the Court will not *sua sponte* sift through thousands of pages of exhibits in an effort to locate support for defendants' claim of what they believe the record says.  Besides, even accepting defendants' representation on this point as correct, the evidence is that the Mosses accompanied Mary Ferrell to a meeting with a lawyer, not that they took any action at that meeting, that they consulted with the attorney on their own behalf, or that they were present for any self-interested purpose other than to furnish moral support to Ferrell.

[17]      Ferrell's precise testimony was as follows: "Then I had a ditch that was cut down the side of my yard with a pipe yea big, and water was twirling down through it.  And sometimes the water would be gold colored.  Sometimes it would be brown.  Sometimes it would be light, light brown.  And I – I had felt like some of the chemical was coming to us.  So I discussed and showed the lawyers certain incidents."  (Ferrell Dep., at 28-29.)

-14-

second time Ferrell tried to start a lawsuit, also apparently during the 1986 timeframe, was when she called the EPA in Atlanta to complain about contamination, prompting them to send two representatives to McIntosh to take samples from "all over the place," but she "never heard from them again" either.  (*Id.* at 28-29.)  Ferrell also acknowledged that she attended and monitored meetings in the community concerning contamination because "I was very, very concerned, very concerned, and I stayed afloat of just about everything that was going on."  (*Id.* at 43.)  Ferrell further testified that, even though the mayor said at a meeting at an unspecified time that everything was fine, she "did not believe him" because "I knew something was wrong when I could not do nothing about my front yard.  I couldn't plant flowers and, like I said, my grass seeds would come up and die. ... So I knew some kind of chemical was coming through my yard."  (*Id.* at 45.)

Taken in the aggregate, Ferrell's testimony admits of only a singular inference that she knew or reasonably should have known about both the existence and source of her injury by no later than 1986.  Her concerns about contamination emanating from Ciba date back at least as far as the early 1980s.  She observed what she believed to be visible contamination on her property from Ciba or Olin in the mid 1980s, and she showed it to an attorney in 1986 because she wanted to sue Ciba.  She called the EPA to complain about contamination, apparently on her own property once again.  During the same time frame, evidently, Ferrell "knew some kind of chemical was coming through [her] yard" because flowers and grass seeds she planted on her property would die, and she did not believe anyone's reassurances to the contrary.  This evidence unambiguously demonstrates that Ferrell's FRCD occurred well before the two-year and six-year windows (even allowing for tolling during the first 35 months of *Fisher*) for filing suit, and does not reasonably support inferences to the contrary.

In opposition to defendants' Motion, Ferrell's sole contention is that she did not identify DDT as the contaminant of concern on her property until after testing was completed in April 2005.  (Ferrell Dep., at 58.)[18]  In other words, plaintiffs make no attempt to argue (nor could

---

[18]    Plaintiffs do not submit record evidence showing the dates on which such testing was completed for Ferrell's property.  Their brief contends that such evidence is found at Exhibit J; however, Exhibit J consists of deposition excerpts of Johnnie Ware, not evidence of testing at Ferrell's property.  By all appearances, the requisite field notes and testing results concerning

they, given Ferrell's own words) that she was not on notice of contamination on her property attributable to Ciba, or the existence of her contamination-related claims against Ciba, at least as far back as 1986.  Rather than asserting that Ferrell was oblivious to the existence and cause of the injury to her property in 1986 (the applicable test for fixing the FRCD), plaintiffs' argument is that she should be excused from filing suit sooner because she did not possess actual knowledge of the precise identity of the chemical on her property until testing was conducted in 2005.  This reasoning fails as a matter of law.  Plaintiffs identify no authority for the proposition that a claim does not accrue for FRCD purposes until the exact chemical contaminant is known to a plaintiff.  There are numerous authorities to the contrary, as discussed in Section III, *supra*. *See, e.g., Reichhold Chemicals*, 888 F. Supp. at 1126 (in computing FRCD, "it is not necessary that the plaintiff know the identity of every specific pollutant or contaminant, but only the fact of the contamination").  The fact of contamination was known to Ferrell by 1986.

In short, defendants have come forward on summary judgment with overwhelming evidence that plaintiff Mary Ferrell knew or reasonably should have known of her claims against Ciba more than 20 years ago.  Plaintiffs do not maintain that any other inferences may reasonably be drawn from this evidence; rather, their only argument why Ferrell's claims are not untimely is that she had no specific knowledge that the contaminant on her property was DDT (as opposed to some other harmful chemical) until 2005.  That contention falls flat because it is irrelevant for FRCD purposes when the plaintiff learns the identity of a specific contaminant on her property.

Because the only reasonable inference from the summary judgment record is that Ferrell's FRCD was triggered by no later than 1986, all of her claims filed against Ciba in February 2008 are untimely under the applicable two-year and six-year limitations periods. Accordingly, Defendants' Motion for Summary Judgment on Claims of Mary Ferrell (doc. 235) is **granted**, and all of her claims against defendants herein will be **dismissed with prejudice** as

---

Ferrell's property were omitted from the record.  Even assuming that plaintiffs' unsupported April 2005 testing date is accurate, however, the reasoning and result of this Order would not change.

untimely filed.[19]

>        *3.        Johnnie Ware.*

As for plaintiff Johnnie Ware, the commencement date-related facts in the record, taken in the light most favorable to the nonmovant, are as follows: Ware first became concerned that his home was contaminated with DDT after the testing was completed in November 2007. (Ware Dep., at 38-40; doc. 255, Exh. K.)  However, Ware had first suspected that his home was contaminated "[a]bout a couple of years after they started Superfund" in 1983, and indicated (presumably with some hyperbole) that he had suspected contamination of his home "from my childbirth."  (Ware Dep., at 39.)  Ware believed that his property might be contaminated by the Ciba plant because of the close proximity of the two; indeed, as he put it, "I could look at the plant every second.  I am that close to it."  (*Id.* at 34, 40.)  More specifically, Ware stated that he believed his property had mercury contamination because, when he was a "young kid[]" he found and played with "shiny stuff in the water just rolling like beads" in a ditch near his house. (*Id.* at 61-62.)  Additionally, Ware stated in discovery responses that, at some unspecified time, he spoke with a Ciba employee and an Olin employee whom he regarded as "informal community representatives" to voice concerns about "being unable to grow trees, plants, fruit and other vegetation on my land."  (Doc. 236, Exh. B, at #15.)

With respect to his involvement in the community, Ware testified that he attended several meetings concerning contamination in McIntosh "a couple years ago."  (Ware Dep., at 33.)  He spoke with people from various churches about clean-up concerns after the Ciba plant was declared a Superfund site.  (*Id.* at 40.)  By talking to people in the community, including Ciba employees, Ware said, he was "trying to get the knowledge of what was being released and so

---

[19]        To the extent that plaintiffs suggest that Ferrell's claims are saved by tolling pursuant to Ciba's alleged fraud / concealment, her testimony specifically negates such an argument.  Ferrell testified that when the mayor provided assurances that everything was fine, she "just did not believe him" because it conflicted with her own observations and experiences of contamination on her own property.  (Ferrell Dep., at 45.)  When asked whether she trusted anything that Ciba and Olin said in February 1999 regarding the nature and degree of any contamination in the community, Ferrell unequivocally answered, "No, I did not."  (*Id.* at 47.)  Such testimony is irreconcilable with any attempt to argue that Ferrell was lulled into inaction as of the late 1990s through false assurances and material omissions by Ciba and/or others.

-17-

forth," but that technique was unsuccessful, as he denied receiving any additional information through that means. (*Id.* at 42.) Ware said he attended one or two meetings at unspecified times, with the purpose of "[t]rying ... to get a petition up to get some action started," such as seeking an attorney or getting land tested. (*Id.* at 44-45.) His discovery responses peg the timing of these meetings as approximately 5 years ago. (Doc. 236, Exh. B, at #13.)

In asking the Court to find as a matter of law that Ware's claims are time-barred, defendants would have all inferences from these record facts be drawn in their favor. Of course, that is not permissible on summary judgment. Most of the evidence on which defendants' Motion relies could support a reasonable inference of mere suspicion by Ware, which would not suffice to begin the limitations clock under the FRCD standard. The facts that Ware lives close to the Ciba plant, has apparently distrusted Ciba his whole life, and has always been suspicious that his house might be contaminated may reasonably be viewed by a jury as "mere suspicion" evidence. And the evidence that Ware talked to people in the community (including Ciba and Olin employees), mostly at unspecified times, about his contamination concerns could yield a variety of divergent reasonable inferences for limitations purposes. But it is telling that Ware essentially described these talks as a failed attempt to gather information about Ciba and Olin's emissions and activities, suggesting that he remained in the dark as to his claims and activities, notwithstanding those communications. That Ware attended a few meetings actually cuts against defendants' position, because the record also reflects that he attended those meetings within the last five years, and of course the limitations period was tolled from August 2003 through July 2006 because of the *Fisher* class certification issues. And while defendants seize on Ware's cryptic statement, "I come from a chemical environment" (Ware Dep., at 42), it is unclear what that remark means or whether Ware possessed any specialized training or knowledge that might have placed him on notice of his claims against Ciba at an earlier date.

To the extent that defendants would emphasize Ware's testimony that he found and played with mercury in a ditch in approximately the 1970s when he was a "kid," that evidence is also subject to conflicting reasonable inferences. Was the mercury-containing ditch actually on Ware's property or was it on a neighboring parcel? The testimony is unclear. Moreover, surely Ware did not own the property at the time of the discovery, given that he was a "kid" with a propensity to play in water-filled ditches at the time. Did he ever spot mercury or any other

-18-

contamination on the property after it was conveyed to him?  Again, the record does not specify. Even if Ware saw mercury on the property as a child, that does not necessarily mean that he was on notice of his contamination claims years later when the property was conveyed to him, absent a showing (which has not been made) that visible evidence of contamination remained. Defendants are not entitled to have all of these questions answered in their preferred manner on summary judgment; rather, the evidence concerning the mercury in the ditch is properly submitted to the finder of fact at trial to determine whether, for accrual purposes, Ware reasonably should have known that his property was contaminated in the 1970s, such that the FRCD occurred then.  And similar questions are attendant to Ware's statements about not growing vegetation on his property.  The record does not reveal the time frame in which he was unable to grow plants, nor does it reflect whether the problem was that the plants would die or simply that Ware was reluctant to attempt to grow plants because of his contamination suspicions.  Once again, ambiguities in the record produce jury questions as to when Ware was on notice of the existence and cause of his injury, and whether that FRCD occurred more than two or six years before the filing of the Complaint in this action, after subtracting 35 months for the *Fisher* class certification proceedings.

Because multiple reasonable inferences can be drawn from the record evidence concerning Ware's awareness of his claims, it would be improper to resolve on summary judgment whether those claims are timely.  That issue is for the jury to decide at trial, through weighing and balancing the conflicting inferences and evaluating the validity of defendants' interpretation of the facts on timeliness.  *See generally Lessord*, 258 F. Supp.2d at 220 ("I believe that a jury should decide at what point plaintiffs became aware of levels of contamination sufficient to put them on notice that a trespass to their property had occurred."). For these reasons, Defendants' Motion for Summary Judgment on Claims of Johnnie Ware (doc. 236) is **denied**.[20]

---

[20]    This reasoning is not undermined by the other evidence to which defendants point.  Defendants imply that Ware was spearheading McIntosh's fight against Olin and Ciba contamination, but the evidence does not necessitate such an interpretation.  In fact, Ware's testimony was simply that he was "part of a community leader myself."  (Ware Dep., at 42.)  It is unclear whether and to what extent he actually assumed a leadership role in the community on

4.      *Ruth Everette.*[21]

The record reflects that plaintiff Ruth Everette first became aware of the presence of

DDT on her property upon learning of the results of sampling done in October 2007.  (Everette

Dep., at 64-65; doc 255, Exh. M.)  But defendants insist that she was on notice for FRCD

purposes as early as 1993.  To bolster this argument, defendants show that Everette has served

on McIntosh's Community Action Panel ("CAP") for approximately the last 15 years.  (Everettte

Dep., at 16, 18.)  In that capacity, Everette would attend CAP meetings where Ciba's efforts to

clean up the Superfund site were discussed, including such matters as "[h]ot spots around the

plant and the water aquifer -- you know, the water system."  (*Id.* at 18.)  CAP meetings also

addressed health concerns, but Everette did not indicate that any of those meetings highlighted a

_____

contamination issues, and if so, when that occurred or what he did.  Ware's admitted knowledge
of when Ciba became a Superfund site because he could see signs saying things like "Keep out
of the area" (*id.* at 33-34) sheds little light as to when he was on notice of his injury; after all,
just because Ware knew the Ciba site was contaminated does not automatically mean that he
knew his property was too.  Similarly, Ware's childhood memory of an occasion when a mercury
spill had polluted a nearby river and he saw dead fish floating in the river (*id.* at 36), certainly
placed him on notice that the river was contaminated; however, it is unclear why that experience
should have prompted Ware to inquire further as to whether his property (which could not have
belonged to him personally at the time given that he was only a child) was contaminated by
Ciba.  There is no indication, for example, that Ware's property was on the banks of the river,
that the river flooded his property at any time, or that there was any reason to believe that
contamination of one necessarily produced contamination of the other.  Finally, the mere fact
that Ware accompanied Mary Ferrell to a lawyer meeting in 1986 (Ferrell Dep., at 35) is
dispositive of nothing, where no evidence has been proffered of what Ware did at the meeting or
whether he was present in any capacity other than to offer moral support to Ferrell, who is his
sister.  Contrary to defendants' argument, the evidence does not unambiguously show that Ware
(as opposed to Ferrell) "consult[ed] a lawyer in 1986 about filing a suit" (doc. 236, at 9), or that
he did anything other than tag along.  The evidence is nothing more than that Ware was present
when Ferrell consulted a lawyer in 1986 about filing suit.  That difference may (or may not)
matter for FRCD purposes.  Either way, it is a fact-intensive determination that is properly
reserved for the jury.

[21]        The court file and summary judgment filings include two different spellings of
this plaintiff's last name.  For example, the Amended Complaint and deposition transcript state
that her last name is "Everette."  By contrast, plaintiffs' summary judgment brief and at least one
exhibit use the spelling "Everett."  The Court expects plaintiffs' counsel to investigate this
discrepancy and take any appropriate corrective action to resolve it prior to trial.

nexus between those health issues and off-site property damage.  (*Id.* at 55.)  Through these CAP meetings and conversations with relatives, Everette learned that Ciba was "[t]est[ing] the land and grounds" and that there might be contamination outside of the plant, although her testimony reveals few specifics about what she heard or when she heard it.  (*Id.* at 20.)[22]  Defendants offer one document concerning CAP meetings, an exhibit showing that Everette was copied on an April 1993 letter summarizing a March 1993 CAP meeting (which she did not attend).  (Doc. 237, Exh. B.)  That letter is devoid of references to off-site property contamination.  Other than these CAP meetings, Everette testified that she attended a single McIntosh town hall meeting in the 1990s, at which a speaker described Ciba's efforts to remediate on-site contamination by digging up, burning, and replacing soil.  (Everette Dep., at 36.)

Everette also testified that between 10 and 15 years ago, her neighbor, Mr. Et Tawil, told her that he "believed" her property might be contaminated by DDT.  (*Id.* at 21.)  Everette did not reveal any understanding that Mr. Et Tawil possessed any particular expertise or experience that would render his beliefs concerning contamination on her property particularly credible or noteworthy.  Rather, Everette testified simply that she "believed him, but [she] didn't take it too serious at the time."  (*Id.* at 22.)

In approximately 1999, Everette signed a petition concerning environmental contamination in McIntosh.  (*Id.* at 46-47, 62.)  She said she signed it because Mr. Et Tawil "just wanted to get enough people interested, you know, to see what it was all about." (*Id.* at 47.)  Everette's understanding was that the purpose of the document was "to get a study about the DDT, find out about it."  (*Id.* at 61.)[23]

_____

[22]     At best, Everette's testimony on this point was that her relatives told her that Ciba had buried contamination on its own property, but that "they weren't discussing it being spread out in the community, you know."  (*Id.* at 30.)

[23]     Defendants characterize Everette's testimony concerning the petition as being that she signed it "to support a lawsuit."  (Doc. 237, at 8; doc. 259, at 9.)  This contention takes unwarranted liberties with the record.  On the cited deposition pages, Everette never indicated that she signed the petition because she supported a lawsuit or because she wanted to sue Ciba; indeed, she never even said that she did support a lawsuit against Ciba at that time.  Although her questioner asked about the lawsuit, Everette said merely that the petition was "to get enough people interested," "to see what it was all about," and "to get a study about the DDT."  (Everette

-21-

The record supporting defendants' Motion as to Everette is skimpier than that for the other plaintiffs against whom defendants have leveled untimeliness arguments on summary judgment. Although Everette was appointed to the CAP for 15 years, defendants do not point to any information she received as a result of attending those meetings that would necessarily place her on inquiry notice that her property was contaminated by Ciba. Indeed, the vast majority of Everette's testimony described information she received concerning Ciba's on-site cleanup efforts, which would not necessarily trigger her FRCD for contamination on her own property. Moreover, the mere facts that Everette's neighbor conjectured a decade ago that Everette's property might have DDT contamination, and that she believed him, neither amounted to actual knowledge of contamination nor would necessarily have caused a reasonable person to investigate further whether her property was contaminated. Her neighbor apparently had no particular expertise in chemical contamination; therefore, there was no particular reason for her to place stock in his comment. Whether Everette's belief that her neighbor was telling the truth should have prompted her to inquire about the condition of her property, and whether that inquiry ultimately would have revealed the nature and source of her injury, are questions best left for the finder of fact, inasmuch as record evidence can reasonably be read as pointing in either direction. And the Court cannot find as a matter of law that Everette's signing of a petition at the urging of her neighbor for an unspecified DDT study commenced her limitations periods against Ciba under a FRCD analysis.

Viewed in the light most favorable to Everette, the record evidence is that she never knew there was contamination on her property until 2007 testing revealed same, that her community involvement did not give her any particular reason even to suspect that her property was contaminated, that her neighbor's idle chatter that Everette's property was contaminated with DDT would not prompt a reasonable person to investigate the matter further, and that her signing of a petition at the same neighbor's urging was an isolated, passive activity that was not symptomatic of notice of her claims against Ciba.

_____

Dep., at 47, 61.) There is no indication in the record that the petition signed by Everette in 1999 sounded the drumbeats of war as a precursor to litigation, or that the signatories were pledging to join forces to sue Ciba for property damage. Rather, the stated purpose of the petition that Everette signed was merely "to see what it was all about."

Given the genuine issues of material fact surrounding the timeliness of Everette's claims, Defendants' Motion for Summary Judgment on Claims of Ruth Everette (doc. 237) is **denied**.

**V.      Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.      Defendants' Motion for Summary Judgment on Claims of Mary Ferrell (doc. 235) is **granted**.  The only reasonable inference supported by the record is that Ferrell knew or should have known that her property was contaminated by Ciba by no later than 1986, such that her FRCD occurred then.  Even after taking into account the tolling period created by *Fisher*'s class allegations, Ferrell's claims are untimely as a matter of law.  Therefore, all of Ferrell's claims are **dismissed with prejudice** for noncompliance with applicable limitations periods.

2.      Defendants' Motion for Summary Judgment on Claims of Edgar and Emma Moss (doc. 234), Defendants' Motion for Summary Judgment on Claims of Johnnie Ware (doc. 236), and Defendants' Motion for Summary Judgment on Claims of Ruth Everette (doc. 237) are all **denied**.  As to each of these plaintiffs, genuine issues of material fact remain as to when their FRCD occurred.  That fact-bound inquiry is the province of the jury at trial.

DONE and ORDERED this 1st day of October, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE