**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **CLEON ABRAMS, SR.,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 08-0068-WS-B** |
| | ) |
| **CIBA SPECIALTY CHEMICALS** | ) |
| **CORPORATION,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter comes before the Court on Defendants' Motion for Summary Judgment on the Claims of Plaintiff Elliott Fields (doc. 213), Motion for Summary Judgment as to All Property Diminution Claims of Tommy Lee Weaver (doc. 216), Motion for Summary Judgment as to Certain Named Plaintiffs for Failure to Bring Action in the Name of All Co-Tenants (doc. 221), Motion for Summary Judgment as to the Claims of Toni Jackson (doc. 231), and Motion for Summary Judgment as to the Claims of Bobby J. Chestang (doc. 228).  All five Motions have been briefed and are ripe for disposition.[1]

**I.      Background.**

This action involves claims that certain real property located in and around McIntosh,

---

[1]       Also pending is Plaintiffs' Motion to File Sur-Replies (doc. 271).  Plaintiffs request leave to file a three-page sur-reply to address an argument presented by defendants for the first time in their reply on the Rule 56 Motion concerning the claims of plaintiff Bobby J. Chestang.  Upon review of the parties' filings relating to the Chestang Motion, the Court finds that it is appropriate to allow the proposed sur-reply setting forth plaintiffs' position on a newly raised defense argument (*i.e.*, defendants' contention that Shelby Chestang is pursuing only her late husband's claims, not her own).  Defendants will not be prejudiced by this sur-reply, which is focused on a narrow argument that defendants raised for the first time in a reply brief.  Accordingly, the Motion to File Sur-Replies is **granted** as to Exhibit B.  The Court will accept and consider the proposed sur-reply submitted by plaintiffs as "Amended Exhibit B" pursuant to the Notice (doc. 273) filed on September 2, 2009.

Alabama has been damaged by DDT contamination.  The 277 plaintiffs[2] who brought this lawsuit are property owners who maintain that the source of the contamination was a chemical manufacturing plant in McIntosh that is or was at various times owned and operated by defendants, Ciba Specialty Chemicals Corporation, Ciba-Geigy Corporation, Novartis, Ltd., Inc., and Syngenta Crop Protection, Inc. (collectively, "Ciba").  According to the First Amended Complaint (doc. 26), the nub of plaintiffs' claims is their contention that "beginning in about 1952, solid and liquid wastes were disposed of by [Ciba] in several known source areas.  These source areas and the manufacturing processes have been managed in such a way that large amounts of chemicals, commonly known as DDT, DDD, and DDE (collectively DDTr), have impacted the McIntosh community and the homes of plaintiffs. ... The residences contain concentrations of DDTr at levels which pose an unacceptable risk to human health thereby reducing the property values of the community."  (Doc. 26, ¶¶ 17-18.)  Plaintiffs' theory is that the wind has carried DDTr particulate matter off the Ciba site and onto their properties dating back to the 1950s and early 1960s, when Ciba was actively producing DDT at that location, and continuing through the present day.  On summary judgment, plaintiffs have staked themselves to a position that the measure of damages they seek to recover is confined to the cost of decontaminating their properties.

Upon initiating this lawsuit by filing their Complaint in February 2008, plaintiffs parlayed these basic factual allegations into 11 causes of action asserted by each plaintiff against each defendant, to-wit: negligence, conspiracy, strict liability, trespass, nuisance, intentional misrepresentation, negligent misrepresentation, fraud / fraudulent concealment, constructive fraud, punitive/ exemplary damages, and violation of the federal Racketeer Influenced and Corrupt Organizations Act.[3]  Each defendant countered by invoking the same 41 affirmative

---

[2]     By the Court's tally, 17 plaintiffs have dropped out of this action pursuant to Orders entered on August 25, 2008 (doc. 55), April 27, 2009 (doc. 165), June 24, 2009 (doc. 203), and September 16, 2009 (doc. 277) for various reasons, including settlement, failure to prosecute, acknowledgment that the plaintiff has no viable claims, or simply a stated desire not to proceed further.  That leaves 260 remaining plaintiffs.

[3]     Three of those causes of action (intentional misrepresentation, negligent misrepresentation, and fraud / fraudulent concealment) were dismissed as to all plaintiffs at the

defenses in its Answer (docs. 57 - 60).[4]

In the interests of justice, efficiency and judicial economy, Magistrate Judge Bivins developed and implemented a trial plan pursuant to which the claims of 27 representative "test plaintiffs" would proceed through the discovery and trial processes first, after which a case management plan would be tailored for the remaining plaintiffs.  (*See* docs. 66, 239.)  Of the original 27 test plaintiffs, only 17 remain in the case in a test plaintiff capacity at this time, for various reasons.  The jury's verdict as to any test plaintiff will not be binding on any non-test plaintiff.  The test plaintiff discovery period has concluded, and the test plaintiff trial is set for jury selection on November 3, 2009, with trial to follow during the November 2009 civil term. In preparation for trial, the parties have collectively filed some 14 motions for summary judgment or partial summary judgment, presenting various legal issues for judicial resolution before trial in an effort to streamline and focus the case.

Notwithstanding the parties' proliferation of Rule 56 motions, this Order is confined to a grab-bag of five defense Motions for Summary Judgment addressed to certain narrow issues and arguments unique to particular test plaintiffs.[5]  In summary, these Motions propound the

_____

pleadings stage more than a year ago for failure to comport with the heightened pleading requirements of Rule 9(b), Fed.R.Civ.P.  (Doc. 56, at 14-18.)

[4]     The factual allegations and legal theories posited by the parties (including plaintiffs' causes of action and defendants' affirmative defenses) in this action bear striking resemblance to those previously presented in a related federal action before the undersigned styled *Jessie Fisher et al. v. Ciba Specialty Chemicals Corporation, et al.*, Civil Action No. 03-0566-WS-B.  After more than four years of extensive litigation (including an unsuccessful bid for class certification), the five *Fisher* plaintiffs reached a settlement with Ciba on October 19, 2007, shortly before jury selection was to occur.  The identities of counsel for both sides in this action are substantially similar to those in the *Fisher* matter, and the pleadings in this case appear to have their genesis in the corresponding *Fisher* pleadings, with some being reproduced nearly verbatim.

[5]     The remaining nine summary judgment motions will be addressed separately via contemporaneous orders.  In considering the Motions (docs. 213, 216, 221, 228, 231), the Court has reviewed the parties' respective principal briefs (docs. 214, 217, 222, 229, 232, 244, 246, 251, 253), defendants' replies (docs. 262, 263, 264, 265, 268), plaintiffs' sur-reply on the Chestang Motion (doc. 273, Exh. B), defendants' proposed statements of undisputed facts and conclusions of law, plaintiffs' responses to same, and the evidentiary submissions accompanying all of these respective filings, as well as all other portions of the court file deemed relevant.

following theories: (i) the claims of test plaintiff Elliott Fields should be dismissed for lack of damages and because his sale of his allegedly contaminated mobile home amounts to spoliation of evidence; (ii) the property value diminution claims of test plaintiff Tommy Lee Weaver should be dismissed because he does not own the subject property; (iii) the claims of test plaintiffs Beverly Thomas, Johnny Ware, Raymond Weaver, Elliott Fields, Etoria Toole, Sexton Adams, Cleon Abrams and Marie Evans should be dismissed because they own the subject property in co-tenancy with persons who are not joined as plaintiffs; (iv) the claims of test plaintiff Toni Jackson should be dismissed because she holds no ownership interest in the subject property; and (v) the claims of test plaintiff Bobby J. Chestang should be dismissed because he died before the Complaint was filed.  Plaintiffs oppose each of these motions, and argue that genuine issues of material fact remain as to the viability of each test plaintiff's causes of action.

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

-4-

**III.    Analysis.**

Given the varied subject matter and reasoning of the five Motions for Summary Judgment addressed in this Order, it is not feasible to aggregate and analyze them collectively. Each Motion must be considered independently on its own merits.[6]

> **A.    Motion for Summary Judgment as to Claims of Elliott Fields.**

Defendants move for summary judgment on all claims brought by test plaintiff Elliott Fields on the ground that he seeks recovery for DDT contamination of a mobile home that he sold several years ago.  Essentially, defendants argue that Fields has proven no damages and, alternatively, that his claims should be dismissed because he spoliated evidence by selling the purportedly contaminated mobile home, thereby preventing defendants from examining it, testing it or otherwise mounting an effective defense to his claims.[7]

> **1.    Relevant Facts.**

Taken in the light most favorable to Fields, the summary judgment record reflects that he has lived on test property at 5793 Topton Road in McIntosh, Alabama since approximately 1998, and that he and his wife have owned a life estate in that property since approximately 2000 or 2001.  (Doc. 214, Exh. 1, at #1.)[8]  Fields testified that he and his family live in a mobile home at that address, and that they purchased this home in 2005.  (Fields Dep., at 17.)  When asked to pin

---

[6]    With respect to all of these summary judgment motions, the Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiffs' version of the facts is taken as true and all justifiable inferences are drawn in their favor.

[7]    For unknown reasons, the parties' briefs repeatedly refer to this test plaintiff as "Elliot Fields."  However, the Amended Complaint (doc. 26), the deposition transcript, the warranty deed, and other exhibits to the summary judgment record consistently use the spelling "Elliott Fields."  The Court assumes that counsel inadvertently utilized an incorrect spelling of this plaintiff's first name in their briefs.

[8]    With respect to ownership, the record contains a Warranty Deed dating from the year 2000 (month and day fields are blank) showing that Bill Elliott Weaver and Dovie Jean Weaver conveyed a life estate in certain real property to Elliott Fields and Johanna Fields (Fields' wife) for the lifetime of Johanna Fields, with a remainder interest to the Fields' children. (Doc. 214, at Exh. 7.)

down that date with greater precision, Fields testified, "I want to say around October" of 2005, but "[i]t may have been as late as early 2006." (*Id.* at 21-22.) There is no bill of sale or other transactional documentation in the record delineating exactly when the sale occurred. Nonetheless, in written discovery responses, Fields indicated that he "purchased the trailer that is currently on the property in approximately Fall/Winter 2005 or in the Spring of 2006." (Doc. 214, Exh. 1, at #1.) Prior to purchasing the mobile home that is presently on his property, Fields and his family lived in another mobile home at that location. (Fields Dep., at 19.) Fields sold that predecessor mobile home to his cousin, a McIntosh resident named Michael Brown (whose occupation is municipal police officer), when he purchased the new home. (*Id.*)

Fields was unable to state with certainty whether his current mobile home has been tested for DDT contamination; however, he indicated that his "best recollection is yes." (Fields Dep., at 42.) But Fields qualified that statement by remarking that, with respect to "which mobile home was tested, my wife would have much better knowledge, you know." (*Id.* at 44.) Indeed, while Fields indicated, "I want to say both," when asked which mobile home had been tested for contamination, he elaborated as follows: "Because I'm not sure. I don't remember when, you know, when -- when they started and when they stopped." (*Id.* at 39.)

There is little evidence in the record documenting the results of sampling performed at Fields' property. Documents originally produced by plaintiffs state that Fields' property "was previously sampled during the *Fisher* matter. Since there were already sample results previously provided to Defendants, property was not sampled again." (Doc. 214, Exh. 3, at PLA0001387.) That same exhibit shows that plaintiffs' testing laboratory received two samples, presumably for the Fields property, on February 10, 2005, and that those samples had been collected on February 9, 2005. (*Id.* at PLA0001388-89.) One of those samples was found to contain 234 ppb of DDTr. (*Id.* at PLA0001391.) These lab records are buttressed by handwritten field notes dated February 9, 2005, and documenting samples taken from the Fields' vacuum cleaner (apparently the HEPA canister and vacuum cleaner bag) on that date. (*Id.* at PLA0001531.) There is no record evidence of any other test results for DDTr or any other chemical based on

sampling performed in Fields' home subsequent to February 9, 2005.[9]  However, plaintiffs'
expert on clean-up costs, Randy Horsak, inspected the Fields' mobile home in February 2009,
not for sampling purposes, but to formulate an estimate for decontaminating that dwelling to a
level of 10 ppb of DDT, based on the February 2005 test results at that address.  (Doc. 214, at
Exh. 4.)

> 2.    *Merits of Motion for Summary Judgment.*

It is fundamental that a plaintiff seeking to recover for tortious conduct under Alabama
law must show an injury.  *See, e.g., American General Life and Acc. Ins. Co. v. Underwood*, 886
So.2d 807, 812-13 (Ala. 2004) ("A suit on a tort claim may not be commenced until the
defendant's tortious act proximately causes the plaintiff to suffer an actual injury."); *Southern
Bakeries, Inc. v. Knipp*, 852 So.2d 712, 716 (Ala. 2002) ("Alabama has long required a manifest,
present injury before a plaintiff may recover in tort."); *Black v. Acme Markets, Inc.*, 564 F.2d
681, 685 (5th Cir. 1977) ("[i]t is hornbook law that one of the elements of a tort is damage").

As described in contemporaneous summary judgment orders entered in this matter,
plaintiffs have expressly disclaimed any intent to recover for diminution in property value in this
action, and have presented no evidence of pre- and post-contamination property valuations.
Instead, they have committed themselves to a measure of damages consisting of the "restoration
costs to rid their properties of the DDTr presently contaminating their homes and land."  (Doc.
256, at 2, 11.)  To quantify and prove up these restoration costs, plaintiffs have relied solely on
the expert report of Randy D. Horsak, P.E., their decontamination and remediation cost expert.
Horsak's opinions are limited to the cost of reducing measured DDTr levels inside each test
plaintiff's home to the background concentration level of 10 ppb.  Plaintiffs have failed to
present any evidence (whether opinions by Horsak or in any other form) of methodology, cost
estimates, or other damages for clean-up costs to soil.  Simply put, plaintiffs have proffered no

---

[9]    That said, plaintiffs submit evidence showing that on December 15, 2004, soil
samples were collected from Fields' property at an area outside of the dwelling, and that those
samples tested positive for DDTr in a concentration of approximately 40 ppb.  (Doc. 244, at Exh.
A.)  Plaintiffs do not, however, make any showing that Fields' home was tested for DDTr
contamination at any time subsequent to February 2005, or that lab results for any such post-
February 2005 testing reveal DDTr contamination in Fields' home.

evidence on summary judgment tending to show methodology or estimates of remediation costs for decontaminating the raw land belonging to Fields or any other test plaintiff, but have instead confined their evidentiary submission on damages to the methodology and cost of reducing DDTr concentrations inside each plaintiff's dwelling to the 10 ppb background level.

Defendants have satisfied their initial burden on summary judgment of showing, by reference to materials on file, that there are no genuine issues of material fact as to whether plaintiff Fields can prove damages.  In particular, defendants rely on record evidence that (a) no DDTr sampling results exist for testing performed inside Fields' home after February 2005, and (b) Fields admitted in written discovery responses that he is now living in a mobile home that he purchased in approximately late 2005 or early 2006, at which time he sold the mobile home in which he was living previously.  That evidence satisfies Ciba's initial burden of showing that Fields has no evidence that his present home has ever tested positive for DDTr.  If Fields has no evidence that the home in which he now lives is contaminated with DDTr, then it inexorably follows that he has no factual or legal basis for seeking remediation costs (the sole measure of damages requested by plaintiffs herein) in connection with removing DDTr contamination in same.[10]  Fields does not (and could not reasonably) contend that he is entitled to an award of clean-up costs for a predecessor mobile home that he admittedly sold to a third party more than three years ago.[11]

Faced with this evidence, plaintiffs offer a pair of unsatisfactory, unavailing responses. First, they attempt to conjure a genuine issue of material fact from inconsistencies in Fields' own testimony, such as where he states that his "best recollection" is that the new mobile home was tested and that he was not certain exactly when in 2005 or 2006 he purchased the mobile home in

---

[10]    In so finding, the Court rejects plaintiffs' suggestion that defendants' initial burden on summary judgment is to come forward with "conclusive" proof that Fields' current mobile home was never tested for DDTr.  (Doc. 244, at 5 ("Defendants have no conclusive evidence to prove that the mobile home sitting on Elliot [*sic*] Fields' land today was not tested for DDTr.").)  Plaintiffs' argument misstates and misconstrues the applicable burden of proof on summary judgment, and is not buttressed by any authority.

[11]    Certainly, there is no evidence that Fields either incurred clean-up costs on the old mobile home to remove DDTr, or that the purchase price was reduced in any way to offset the purchaser's anticipated DDTr clean-up costs.

-8-

which he and his family now live.  Based on these discrepancies, plaintiffs maintain that there are genuine issues of fact as to whether the new mobile home has been tested for DDTr. Plaintiffs' position ignores well-settled Eleventh Circuit jurisprudence forbidding a non-movant from creating a genuine issue of material fact by stitching together the portions of his testimony that are most favorable to his case and ignoring inconsistent statements to the contrary.  Indeed, "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.  Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided."  *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) (decrying practice in which courts "pick and choose bits from ... essentially incompatible accounts ... and then string together those portions of the record to form the story we deem most helpful to the nonmovant").

Pursuant to *Evans*, plaintiffs cannot fend off summary judgment scrutiny by selectively emphasizing the portions of Fields' deposition testimony and interrogatory responses they like and disregarding the unfavorable, conflicting parts.  More specifically, Fields stated both in his deposition and in written discovery that he purchased the mobile home in which he now lives in approximately late 2005 or early 2006.  It is undisputed that the latest DDTr sample results existing for Fields' property are based on sampling performed in February 2005.  In order to create a genuine issue of material fact as to whether Fields' new mobile home has tested positive for DDTr, plaintiffs must do more than simply point to Fields' inability to recite the precise date of purchase, and his admitted guesswork that both old and new mobile homes were tested.[12]  *See,*

---

[12]  More fundamentally, even if Fields' ambiguous, admittedly uncertain testimony that the new trailer was tested for something at some time after Fields purchased it, the fact remains that there are no DDTr sampling results in the record that could possibly apply to that mobile home given Fields' own chronology of when the mobile home sale and purchase took place.  Whether testing was performed in the new mobile home or not really is not the question.  Rather, the relevant inquiry is whether Fields has any evidence that his new mobile home is contaminated with DDTr.  As to this critical factual matter, Fields' equivocation that he thinks the new home might

*e.g., Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (to meet burden on summary judgment, nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts") (citation omitted); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citation omitted); *Thomas v. City of Columbus*, 198 F. Supp.2d 1360, 1367 (M.D. Ga. 2002) ("Speculation and possibility are insufficient bases for avoiding summary judgment.").[13]

Second, plaintiffs seek to divert attention from the mobile home issue by pointing to evidence that DDTr contamination was discovered in soil on Fields' property back in 2004, such that there is evidence of contamination on his property irrespective of whether the new mobile home was or was not tested for DDTr.  (Doc. 244, at 3-5.)  This argument is disingenuous. Plaintiffs' damages theory and evidence are limited to the cost of restoring the interior of test plaintiffs' homes by reducing DDTr levels inside those dwellings to the background concentration of 10 ppb.  Indeed, the "clean-up cost" summary for Fields' property set forth in Horsak's expert report identifies "Total costs to decontaminate house" at $13,239.94, based on myriad line items such as cleaning of interior fixed surfaces, carpet removal and replacement, temporary living costs, and so on.  (Doc. 256, Exh. 9, at Table 4-1.)  Nothing in Horsak's report or anywhere else in the summary judgment record provides any evidence of decontamination

---

have been tested is insufficient to avoid summary judgment.  There is simply a dearth of record evidence from which a reasonable factfinder could conclude either that the February 2005 test results applied to Fields' new mobile home or that any test results post-dating February 2005 show DDTr contamination on Fields' property.

[13]    It appears that, with diligence, plaintiffs could have done much more to develop evidence of genuine issues of material fact on this point.  Fields deferred to his wife for whether the new mobile home was tested for contamination, yet plaintiffs submit no affidavit from her. Furthermore, the buyer of Fields' old mobile home and the seller of Fields' new mobile home are known to him (the buyer is his cousin) and apparently reside in McIntosh.  Surely plaintiffs could have obtained an affidavit or other testimony from them as to the date of sale of the old mobile home or the date of purchase of the new mobile home.  Again, they did not.  The point is that plaintiffs were required under *Celotex* to do more than simply say that Fields' uncertainty equates to genuine issues of material fact, when his testimony specifically placed the date of purchase of the new mobile home nearly a year after the last occasion on which positive DDTr sampling results for his property were reported.

costs associated with removing DDTr from soils of the property of Fields or anyone else.  The time for marshaling such evidence has long since passed, and plaintiffs cannot shift tactics and damages theories once again on the eve of trial simply because they lack evidence that Fields' present home is contaminated with DDTr (and therefore lack any factual basis for asking a jury for the $13,239.94 in decontamination costs calculated by Horsak for Fields' home, as to which there is exactly zero evidence of contamination).

For all of these reasons, the Court finds that Defendants' Motion for Summary Judgment on the Claims of Elliott Fields (doc. 213) is due to be **granted** because the record reflects no genuine issues of material fact as to whether Fields can prove damages at trial.  Fields cannot recover his requested clean-up costs to remove DDTr contamination found in a mobile home he sold more than three years ago, and he has come forward with no evidence from which a reasonable jury could conclude that any DDTr has ever been found in his present mobile home. Evidence of DDTr contamination in the soil outside of Fields' home is not probative of damages, where plaintiffs have committed themselves to a cost-of-remediation theory of damages and their only evidence of clean-up costs is confined to the cost of decontaminating the interior of plaintiffs' homes, not the soils outside them.[14]

---

[14]     Based on this conclusion that Fields' claims fail as a matter of law for want of evidence of damages, the Court finds it unnecessary to reach defendants' alternative theory that dismissal of Fields' claims is appropriate as a sanction because his sale of his mobile home in February 2005 amounts to spoliation of evidence.  The Court notes, however, that defendants' spoliation theory is suspect, at best, given the absence of any plausible basis for concluding that Fields sold his old mobile home in bad faith to hide evidence from defendants, so as to warrant the severe sanction of dismissal.  *See generally Penalty Kick Management Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1294 (11th Cir. 2003) ("In this circuit an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith.") (citation and internal quotation marks omitted).  Nor have defendants made a showing of prejudice.  There is no evidence that the old mobile home was destroyed or was otherwise unavailable to defendants for inspection via third-party discovery; indeed, the buyer of the mobile home is a McIntosh police officer who is Fields' cousin.  Yet defendants do not suggest that they ever took any formal or informal steps to inspect or test the old mobile home.  Much more is needed to show prejudice warranting the kind of draconian spoliation sanctions sought by defendants.  *See, e.g., Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) ("sanctions for discovery abuses are intended to prevent unfair prejudice to litigants").

**B.    Motion for Summary Judgment as to Property Diminution Claims of Tommy Lee Weaver.**

Defendants' next summary judgment motion is captioned "Motion for Summary Judgment as to All Property Diminution Claims of Tommy Lee Weaver" (doc. 216).  From the text of the Motion, defendants' briefs, and their suggested determinations of undisputed facts and conclusions of law, it is evident that defendants do not seek summary judgment as to Weaver's claims in their entirety.  Rather, defendants expressly limit the relief they seek through this Motion to dismissal of Weaver's claims for diminution in property value, without regard to his claims for other kinds of damages.  (*See* doc. 216, at 1; doc. 217, at 4; doc. 218, at 3.)

As chronicled in other summary judgment orders entered herein, plaintiffs' summary judgment filings unequivocally confirm that no plaintiffs are pursuing claims for diminution in property value.  Indeed, plaintiffs have irrevocably committed themselves to a course of action in this litigation under which "Plaintiffs do not seek damages in the amount of diminished property value as Defendants contend."  (Doc. 256, at 2, 11.)  In light of this representation, the undersigned has explained via separate order that plaintiffs are bound by this statement and that the issue of diminished property value is no longer part of this case.  The upshot is that defendants are seeking summary judgment as to Weaver's claims for diminution in property value, but neither Weaver nor any other plaintiff is pursuing any such claims.  Therefore, the Motion for Summary Judgment as to All Property Diminution Claims of Tommy Lee Weaver (doc. 216) is **moot**.[15]  Based on this determination, plaintiffs' Motion for Extension (doc. 253)

---

[15]    The Motion centers on the factual issue of whether Weaver does or does not own the real property that he claims is contaminated with DDT from Ciba.  Defendants' position on summary judgment is that Weaver cannot recover for diminution in value of property that he does not own.  Defendants do not suggest, however, that property ownership is an essential prerequisite for Weaver's claims to recover the costs of removing DDTr from his home.  Alabama courts appear to define the right to recover in trespass claims by reference to a plaintiff's possessory rights, not his ownership rights.  *See generally Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753, 782 (Ala. 2006) ("Our law on trespass is plain that the gist of any trespass action is the interference with a right to possession of property.  Absent such right of possession, there can be no action based on trespass.") (citation omitted).  That said, the Court will not *sua sponte* explore this issue without the benefit of briefing by the parties.  To the extent that defendants contend that Weaver (or other test plaintiffs) cannot recover decontamination costs absent proof that they own the allegedly contaminated property, the Court may order trial

enmeshed in their opposition brief is likewise **moot**.

### C.  *Motion for Summary Judgment as to Certain Plaintiffs for Failure to Bring Action in Name of All Co-Tenants.*

Defendants also filed a Motion for Summary Judgment seeking dismissal of all claims brought by eight test plaintiffs (Beverly Thomas, Johnny Ware, Raymond Weaver, Elliott Fields, Etoria Toole, Sexton Adams, Cleon Abrams and Marie Evans) for failure to join their co-tenants as parties plaintiff.[16]  The Motion's reasoning is straightforward.  According to defendants, each of the allegedly contaminated parcels in which one of these eight test plaintiffs has an ownership interest is jointly held with someone else (such as a spouse or a sibling); however, that co-tenant is not a named plaintiff in the lawsuit.  In the absence of joinder of all co-tenants as parties plaintiff, defendants maintain, these test plaintiffs are foreclosed by Alabama law from pursuing claims for property damage against Ciba in these proceedings.

Plaintiffs counter with a variety of objections to this Rule 56 Motion.  In particular, they contend that, as a factual matter, certain of these eight test plaintiffs either do not have co-tenants on the subject property or those co-tenants are already named plaintiffs.  They struggle to draw a meaningful distinction between the concepts of co-tenancy and co-ownership.  They complain that defendants have interposed this legal challenge in untimely fashion pursuant to Rule 9(a)(2), Fed.R.Civ.P.  And they contend that Alabama law does not require all co-tenants to be joined as parties plaintiff in order for an action to be brought for injury to property.  Because the Court finds that plaintiffs are correct on this last point and that the legal premise undergirding defendants' Motion is incorrect, the parties' other arguments need not be addressed.

Although both sides cite hoary Alabama precedent, some of it dating back to the nineteenth century, in support of their respective positions, Alabama courts have actually spoken more recently on the question of an owner's right to sue for property damage without joinder of his co-tenant.  Most notably, in *Abbot v. Braswell*, 265 So.2d 871 (Ala. 1972), the plaintiff sued

---

briefing on that issue.

[16]     With respect to plaintiff Cleon Abrams, defendants' Motion and other summary judgment filings repeatedly refer to him as "Cleon Adams."  Because there is no test plaintiff by that name, the Court assumes that this was a typographical error, and that defendants intended to request summary judgment as to the claims of test plaintiff Cleon Abrams.

two defendants on a nuisance theory claiming that the defendants' activities caused mud and water to wash onto his property, and received a favorable $12,500 jury verdict.  The plaintiff was a tenant in common, and none of his joint tenants were joined as plaintiffs in the suit.  When the defendant raised this issue on appeal, the Alabama Supreme Court rejected this assignment of error in the following terms:

> "Appellant also contends that Braswell could not maintain the action alone. Appellant says that where property is owned by joint tenants, as it was here, one of them alone cannot maintain an action for damages to the property as distinguished from damage suffered individually by one tenant in common who attempts to bring the action.  We find no merit in appellant's contention."

*Abbot*, 265 So.2d at 876.  The *Abbot* Court went on to cite authority for the proposition that when fewer than all tenants in common sue for injury to their property, they may do so, provided that their recovery is limited to a proportionate share of the total damage.  For example, if there were seven tenants in common but only five were plaintiffs, "[t]he measure of the recovery by the five would be five-sevenths of the total damage."  *Id.* at 877 (citation omitted).

Similarly, in *McClurkin v. Ziebach & Webb Timber Co.*, 666 So.2d 520 (Ala.Civ.App. 1995), the plaintiff was a landowner who brought suit against a forest manager for the clear-cutting of timber on her property.  On appeal, the forest manager asserted that "a dismissal would have been proper, because only Shirley McClurkin was named as a plaintiff and that the other owners were necessary parties."  *McClurkin*, 666 So.2d at 522.  Citing *Abbot*, the *McClurkin* court rejected this argument, noting that "[e]ven if Mr. McClurkin and the McClurkins' two daughters are also owners, Mrs. McClurkin has the right to sue for damages based on her proportionate share of the damage suffered."  *Id.*

Simply put, defendants' position flies in the face of Alabama courts' rulings in *Abbot* and *McClurkin*, neither of which appears distinguishable from the case at bar.[17]  Ciba's argument that a co-tenant cannot recover for injury to property unless all of his co-tenants are also joined as

---

[17]      The roots of the *Abbot* and *McClurkin* decisions extend much deeper in Alabama jurisprudence.  For example, more than a half century ago, the Alabama Supreme Court explained that "[i]n cases where there has not been a joint letting of lands held by tenants in common, either tenant may maintain a separate action for his proportion of the sum due ... for a trespass or wrong done to the freehold or possession."  *Ayers v. Ayers*, 74 So.2d 250, 253 (Ala. 1954) (quoting *Wood v. Montgomery*, 60 Ala. 500 (Ala. 1877)).

parties plaintiff has been squarely debunked by Alabama appellate authorities.  Accordingly, the test plaintiffs will be permitted to proceed to trial on their claims for property damage even in the absence of their co-tenants as parties plaintiff, provided, however, that the award to any prevailing test plaintiff whose co-tenants are not joined as plaintiffs herein will be limited to a proportionate share of the damage to the property.[18]  The Motion for Summary Judgment as to Certain Named Plaintiffs for Failure to Bring Action in the Name of All Co-Tenants (doc. 221) is

---

[18]        Plaintiffs have endorsed this condition.  Indeed, plaintiffs' brief includes a statement that "the Alabama Supreme Court recognized instances in which a single co-tenant could bring a separate action.  The caveat is that a single co-tenant may only recover for the portion of his interest in the property."  (Doc. 251, at 7.)  Plaintiffs will have to live with that proviso, which the Court finds is an accurate statement of Alabama law.  As for plaintiffs' alternative suggestion that they "should be permitted leave to amend the live Complaint to join any co-tenants or co-owners who are not party to this lawsuit" (*id.* at 10), that request is **denied**.  Plaintiffs have not filed a motion to amend the complaint on this basis.  Even if they had, the deadline for amending pleadings expired eight months ago, and plaintiffs have failed to show the requisite good cause for amending the Rule 16(b) Scheduling Order at this late date to add co-tenants about whom plaintiffs' counsel knew or should have known since the inception of this litigation.  The Court also finds that allowing such an amendment on the cusp of trial would work unfair prejudice on defendants (who have not taken discovery from or relating to these individuals on such important matters as ownership interest, statute of limitations commencement date under the FRCD, DDT usage, and so on), would unduly delay the trial, and therefore would be improper under Rule 15.  As this Court observed more than three months ago in denying a motion to amend filed by plaintiffs' counsel, "plaintiffs cannot expand the parameters of this action at this late date by substituting or adding ... new plaintiffs.  To allow such an untimely amendment would serve only to exacerbate the recurrent swirling confusion in this case about such basic matters as who the plaintiffs are and which parcels of land are at issue."  (Doc. 197, at 5.)

Even now, plaintiffs appear to be operating under the mistaken impression (as they did in the predecessor *LaBauve* and *Fisher* matters) that there is far more elasticity in both the scope of this action and the import of court-ordered deadlines than actually exists.  The key point is this: Plaintiffs have been given virtually free rein to structure this action in the manner of their choosing, in terms of who the named plaintiffs are, which parcels of land are at issue, which legal theories are being considered, what measure of damages they are pursuing, and the like.  Having selected these features of this action in an unfettered manner, plaintiffs now have to live with and abide by their choices.  They must try the case that they brought, not one which they might in hindsight wish they had brought.  This Court will resist any party's attempt to inject chaos into these proceedings by taking a different tack on a material aspect of the case at the eleventh hour simply because it now seems more expedient or advantageous to that party to do so.

**denied**.

        **D.**      ***Motion for Summary Judgment as to Claims of Toni Jackson.***

        Defendants also seek summary judgment as to claims brought by test plaintiff Toni

Jackson; however, their filings reveal ambiguity as to the scope of the relief requested.  The

Motion (doc. 231) and Suggested Determinations of Undisputed Fact and Conclusions of Law

(doc. 233) seem to indicate that defendants seek summary judgment as to all of Jackson's claims;

however, their principal brief argues that "their motion for partial summary judgment as to the

all [*sic*] claims by Toni Jackson ***for diminution in property value*** is due to be granted."  (Doc.

232, at 6 (emphasis added).)  It is thus unclear whether defendants seek dismissal of all of

Jackson's claims, or simply those predicated on diminution in property value.  Be that as it may,

the gravamen of defendants' Motion is that summary judgment is appropriate against Jackson

because she does not own the property in question.

        The Court finds that the Motion is not well taken for three distinct reasons.  First,

defendants engage in a selective, skewed reading of the record in taking the position that "Toni

Jackson does not own the property on which she resides, a fact which she readily admits."  (Doc.

232, at 1.)  In her interrogatory responses, Jackson wrote as follows:

> "I, Toni Jackson, own the 'Test' property located at 68 Sullivan Circle, McIntosh,
> Alabama.  The property is heirship property.  I purchased the house that is located
> on the land in 2006.  I believe the other heirs to the property are Mittie Sullivan,
> Willie B. Edwards, Vester Sullivan, Peter Sullivan, Jr."

(Doc. 251, Exh D., at #1.)  Defendants do not identify any portion of Jackson's deposition

testimony in which she contradicts these interrogatory responses, nor do they even acknowledge

the existence or summary judgment implications of those responses.  Defendants point to no

deposition testimony in which Jackson expressly denied an ownership interest in the property or

indicated that she was not an heir with an interest in the property, but instead rely on conclusory

factual representations of defense counsel in briefs.  At best, defendants advocate a reading of

Jackson's ambiguous testimony in the manner most favorable to them; however, they are not

entitled to have inferences from Jackson's admittedly unilluminating and incomplete deposition

testimony construed in their favor, particularly when defendants must share blame for failing to

elicit critical facts from her.[19]  The Court will not assume that Jackson's deposition testimony contradicts her interrogatory responses when the former could be read in a manner that harmonizes it with the latter.  And the Court certainly will not disregard Jackson's interrogatory responses on summary judgment, as defendants have, absent a showing that they are a sham or that a material inconsistency exists.

Second, defendants' position glosses over the legal effect of the undisputed facts that Jackson purchased the house in which she now lives in 2005 or 2006 and had it moved to 68 Sullivan Circle, the test property as to which she seeks to recover damages.   (Doc. 251, Exh. D, at #1; Jackson Dep., at 22-23.)[20]  Defendants' theory is apparently that even though Jackson bought the house and performed substantial renovations to it, she relinquished all ownership rights in the dwelling by moving it onto land owned by other people.  The very general cases cited by defendants do not support that suspect proposition.  *See, e.g., Middleton v. Alabama Power Co.*, 71 So. 461 (Ala. 1916) ("The general rule is that, when houses are erected upon the land of another, the prima facie intendment is that they become part of the realty, ***though this is by no means conclusive, as the intent of the parties usually controls***, and the builder may reserve the right to remove same.") (emphasis added).  Even assuming that Jackson had no ownership interest in the land, the circumstances under which she purchased, moved and

---

[19]     For example, when asked "do you own the property that you live on?" Jackson testified, "It's all heir property."  (Jackson Dep., at 19.)  This answer is really unresponsive to the question, but the questioner never followed up to get a specific, direct response to the question posed.  Similarly, while Jackson was asked if she knew "who are the heirs who have an ownership interest in that property" (*id.*), she was apparently never asked whether she was an heir with an ownership interest in that property.  Elsewhere in her deposition transcript, Jackson testified, "At this point I don't plan on selling because I'm living on it," (*id.* at 74).  This statement reasonably implies that Jackson has an ownership interest; after all, she could not sell something that she does not own.  Yet defendants would simply have the Court ignore Jackson's actual deposition testimony and simply assume that she lacks such an interest.  The Court cannot do so on summary judgment, given the ambiguity of the deposition transcript on this point (*i.e.*, she never really answered questions concerning her ownership interest one way or the other) and the clarity of the interrogatory responses that Jackson did indeed own the test property.

[20]     Furthermore, after moving the house to its present location, Jackson built a substantial addition by adding five rooms to the back of what had been a two-room house. (Jackson Dep., at 16.)

-17-

renovated the house in which she now lives on that land raise substantial questions of fact as to whether she and the land owners intended that she would relinquish all ownership interest in the house and pass same to the land owners.  Given the meager record on this point, the Court will not grant summary judgment in defendants' favor on their underdeveloped legal argument that Jackson is bereft of any ownership interest in the house she bought, paid for, moved, and substantially renovated, and in which she now lives, simply because it is on land owned by a third party.

Third, lost in all the clamor about whether Jackson does or does not own the land or the house that she contends is contaminated with Ciba DDTr is the fundamental legal question about whether ownership is a necessary element of Jackson's claims in the first place.  The parties have not briefed this question; however, the undersigned's survey of Alabama authorities and commentators suggests that Jackson need not prove ownership in order to prevail on at least certain of her claims.[21]  Absent some authority or argument by defendants that Alabama law requires Jackson to prove ownership as an essential element of her causes of action joined herein, defendants are not entitled to summary judgment on Jackson's claims on the ground that such ownership interest is lacking.

For all of these reasons, defendants' Motion for Summary Judgment as to the Claims of Toni Jackson (doc. 231) is **denied**.

---

[21]     *See generally Drummond*, 962 So.2d at 782 ("Our law on trespass is plain that the gist of any trespass action is the interference with a right to possession of property.  Absent such right of possession, there can be no action based on trespass.") (citation omitted); *Jefferies v. Bush*, 608 So.2d 361, 362 (Ala. 1992) ("Trespass is a wrong against the right of possession."); *Shelby Iron Co. v. Greenlea*, 63 So. 470, 471 (Ala. 1913) ("A tenant or occupant of property may maintain a suit for a nuisance by reason of noise, smoke, odors, etc.") (citations omitted); *Union Cemetery Co. v. Harrison*, 101 So. 517, 519 (Ala. App. 1924) (opining that nuisance "principle is for the protection of one having a leasehold interest who suffers injury therefrom, as well as the holder of a fee-simple title"); M. Roberts & G. Cusimano, *Alabama Tort Law*, § 30.03 (4th ed. 2004) (in trespass action, "[l]egal title is not a necessary element to maintain the action; possession, whether founded on good or bad title, will support an action against a wrongdoer or a stranger"); J. Evans, *Alabama Property Rights and Remedies*, § 22.2 (3rd ed. 2004) ("Trespass is a remedy for invasion of or interference with possession of land, and legal title to the property need not be in the plaintiff for the action to be maintained .... Put another way, title to land is not ordinarily tried in a trespass action ....").

### E.    Motion for Summary Judgment as to Claims of Bobby J. Chestang.

In the Complaint (doc. 1) commencing this action on February 6, 2008, one of the 277 named plaintiffs was Bobby J. Chestang.  Via Order (doc. 75) entered on November 18, 2008, Magistrate Judge Bivins culled through proposed test plaintiff lists submitted by the parties and designated Bobby J. Chestang as one of the 27 test plaintiffs.  The court file confirms that it was plaintiffs who nominated Chestang as a test plaintiff in their submission dated November 17, 2008.  (*See* doc. 72, at Exh. A.)

The problem with all of this is that Chestang died more than a year and a half before this lawsuit commenced, and more than two years before plaintiffs nominated him as a test plaintiff. Indeed, undisputed evidence confirms that Bobby Joe Chestang, Sr. of McIntosh, Alabama, passed away on July 8, 2006.  (Doc. 229, Exh. A.)  All parties concur that well-settled Alabama law dating back more than 150 years provides that a plaintiff who dies before suit is filed is not a proper plaintiff.  *See, e.g., Crump v. Wallace*, 27 Ala. 277 (Ala. 1855) ("the plea of the death of [plaintiff] before suit brought, was good as a bar to the action"); *Tait v. Frow*, 8 Ala. 543 (Ala. 1845) ("[i]t is clear then, that the suit could not be instituted in the name of [plaintiff] after his death").  Plaintiffs do not quarrel with the foregoing, but instead suggest that Bobby J. Chestang's claims in this action have passed to his personal representative, Shelby Chestang, who is also a named plaintiff (albeit not a designated test plaintiff) herein.  On summary judgment, plaintiffs announce Shelby Chestang's "willingness and right to pursue her late husband's claims" in these proceedings.  (Doc. 246, at 4.)

Plaintiffs' efforts to revive Chestang's unfiled tort claims against Ciba as of the date of his death and vest them in Shelby Chestang in these proceedings suffer from a glaring legal infirmity.  "In Alabama, a deceased's unfiled tort claims do not survive the death of the putative plaintiff." *Bassie v. Obstetrics & Gynecology Associates of Northwest Alabama, P.C.*, 828 So.2d 280, 282 (Ala. 2002).[22]  This black-letter principle of Alabama law is reinforced by Alabama

---

[22]    *See also Continental Nat'l Indem. Co. v. Fields*, 926 So.2d 1033, 1037 (Ala. 2005) ("As a general rule, causes of action in tort do not survive in favor of the personal representative of the deceased."); *Malcolm v. King*, 686 So.2d 231, 236 (Ala. 1996) ("The general rule is that under Ala. Code 1975, § 6-5-462, an unfiled tort claim does not survive the death of the person with the claim."); *Smith v. Equifax Services, Inc.*, 537 So.2d 463, 464 (Ala.

Code § 6-5-462, which provides that in proceedings for damages, "all claims upon which an action has been filed and all claims upon which no action has been filed on a contract, express or implied, and all personal claims upon which an action has been filed, except for injuries to the reputation, survive in favor of and against personal representatives."  *Id.*  Chestang's claims in this action cannot reasonably be deemed claims on an express or implied contract, nor are they personal claims upon which an action was filed before his death.  As such, by the plain language of § 6-5-462, as well as the Alabama decisional authority cited *supra*, Chestang's unfiled tort claims against Ciba as of the date of his death do not survive in favor of Shelby Chestang or any other duly appointed personal representative of his estate.[23]  Although § 6-5-463 purports to allow survival of real property claims, that section is limited on its face to "[r]eal property claims with respect to which actions have been filed" before the plaintiff's death.  Ala. Code § 6-5-463. These statutes "in aid of survival of 'causes of action' are in derogation of the common law, and are to be strictly construed."  *McDowell v. Henderson Min. Co.*, 160 So.2d 486, 488 (Ala. 1964).

Test plaintiff Bobby J. Chestang did not assert causes of action against defendants for alleged property contamination prior to his death in 2006.  Alabama law forbids plaintiffs from bringing causes of action for damages on Chestang's behalf against defendants on theories of negligence, nuisance, strict liability, and trespass some 18 months after his death.  Under firmly

1988) ("This action was filed after Mr. Smith's death.  A claim for negligence, for which no action has been filed, does not survive death in favor of the personal representative. ... A claim for intentional misconduct is *ex delicto* in nature; and, as such, it does not survive in favor of the personal representative of a deceased person under the provisions of Code 1975, § 6-5-462."); *Gillilan v. Federated Guar. Life Ins. Co.*, 447 So.2d 668, 674 (Ala. 1984) ("A claim for negligence is one sounding in tort.  A claim sounding in tort for which no action has been filed does not survive death in favor of the personal representative.").

[23]      To be sure, the general rule set forth in *Bassie* and its progeny, and codified at § 6-5-462, is not without exceptions, most notably for claims brought under Alabama's Wrongful Death Act.  *See* Ala. Code § 6-5-410(a) (authorizing personal representative to commence an action for wrongful death, and recover damages on same, "provided the testator or intestate could have commenced an action for such wrongful act, omission, or negligence if it had not caused death").  Of course, Chestang's property damage claims against defendants herein do not sound in wrongful death or have any conceivable nexus to the circumstances of his demise; therefore, plaintiffs cannot rely on this exception to skirt Alabama's general bar on a personal representative's ability to bring unfiled tort claims on behalf of a decedent or his estate.

entrenched Alabama law, none of those causes of action survived Chestang's death, nor did they pass to his personal representative, Shelby Chestang, who therefore cannot pursue his claims in this action.

For all of these reasons, the Court finds that defendants' Motion for Summary Judgment as to the Claims of Bobby J. Chestang (doc. 228) is due to be, and the same hereby is, **granted** because neither Chestang nor his personal representative can initiate tort claims (sounding on theories unrelated to wrongful death) for damages on his behalf after his death, as a matter of Alabama law.[24]

## IV.    Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.    Plaintiffs' Motion to File Sur-Replies to Defendants' Reply Briefs (doc. 271) is **granted** as to Exhibit B.  The Court will accept and consider the proposed sur-reply submitted by plaintiffs as "Amended Exhibit B" pursuant to a Notice (doc. 273) filed on September 2, 2009.  Plaintiffs need not refile their sur-reply as a

---

[24]    The parties' briefs become sidetracked by tangential discussions concerning the character and validity of the claims brought by Chestang's widow and personal representative, Shelby Chestang.  In particular, plaintiffs encourage the Court to "permit Shelby Chestang to continue as a Test Plaintiff in this matter." (Doc. 246, at 4.)  Meanwhile, defendants insist in their reply that "Shelby Chestang is pursuing her late husband's claims, not claims with respect to property she may own," and urge the Court to find that "her suit against all Defendants is null and void and is due to be dismissed." (Doc. 265, at 1, 5.)  Plaintiffs counter in their sur-reply that Shelby Chestang "was properly named as a Plaintiff at the time of filing this lawsuit and may pursue claims for the property that is now rightfully hers." (Doc. 273, Exh. B, at 2.)  All of these arguments travel far afield from the issues presently at hand.  At no time has any Order from this District Court designated Shelby Chestang a test plaintiff.  The Court will not expand Judge Bivins' list of test plaintiffs at this late date simply because one side or the other would like for an additional test plaintiff to be included.  In short, Shelby Chestang is not a test plaintiff, her personal claims will not be included in the test plaintiff trial scheduled for November 2009, and there is no constructive purpose to be served by evaluating summary judgment arguments as to her personal claims at this time.  The Court has found as a matter of law that Bobby Chestang's unfiled tort claims against defendants as of the date of his death do not survive in his name and do not pass to his personal representative; thus, none of test plaintiff Bobby Chestang's claims are properly joined in this action, either in his own name or that of Shelby Chestang.  Whether Shelby Chestang has meritorious claims in her own right (not her capacity as personal representative of Bobby Chestang) is a question that is properly reserved for another day.

separate pleading.

2.     Defendants' Motion for Summary Judgment on the Claims of Plaintiff Elliott
       Fields (doc. 213) is **granted** based on the lack of evidence that Fields sustained
       damages of the type for which plaintiffs seek recovery herein.  All claims brought
       by Elliott Fields in this action are **dismissed with prejudice**.

3.     Defendants' Motion for Summary Judgment as to All Property Diminution
       Claims of Tommy Lee Weaver (doc. 216) is **moot** because plaintiffs are no longer
       asserting claims for diminution of property value in these proceedings.  Plaintiffs'
       motion for extension encompassed in their opposition brief (doc. 253) is likewise
       **moot**.

4.     Defendants' Motion for Summary Judgment as to Certain Named Plaintiffs for
       Failure to Bring Action in the Name of All Co-Tenants (doc. 221) is **denied**
       because it proceeds from an incorrect premise under Alabama law.

5.     Defendants' Motion for Summary Judgment as to the Claims of Toni Jackson
       (doc. 231) is **denied** for several reasons, including the existence of genuine issues
       of material fact as to whether Jackson has an ownership interest in the land,
       defendants' failure to demonstrate that Jackson lacks an ownership interest in the
       home, and defendants' failure to demonstrate that ownership is an essential
       element of Jackson's claims herein.

6.     Defendants' Motion for Summary Judgment as to the Claims of Bobby J.
       Chestang (doc. 228) is **granted** because he died well before the commencement
       of this action, and the claims for damages purportedly asserted on his behalf
       herein neither survive nor pass to his personal representative, as a matter of
       Alabama law.  All claims brought by or on behalf of Bobby J. Chestang in this
       action are **dismissed with prejudice**.  Nothing herein forbids or precludes Shelby
       Chestang from pursuing claims for damages in her own right in these
       proceedings; however, she is not a test plaintiff and her claims will not be
       litigated in the test plaintiff trial.

DONE and ORDERED this 2nd day of October, 2009.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE