IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **CLEON ABRAMS, SR.,** *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION 08-0068-WS-B |
| | ) |
| **CIBA SPECIALTY CHEMICALS** | ) |
| **CORPORATION,** *et al.*, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

This matter comes before the Court on defendants' Motion for Relief under 28 U.S.C. § 1927 (doc. 307). The Motion has been briefed and is ripe for disposition.

**I.     Preliminary Considerations.**

The history of this long-running dispute is well documented in the court file, so no constructive purpose would be served by recounting it in detail here. It will suffice to note that counsel for both sides have been enmeshed in high-stakes and often acrimonious litigation in this action and its predecessor, *Jessie Fisher, et al. v. Ciba Specialty Chemicals Corporation, et al.*, Civil Action No. 03-0566-WS-B, for more than six years. From this Court's vantage point, it has proven to be a war of attrition, with every inch of turf being bitterly contested and neither side yielding on even the most minor of points. The relentless, grinding, slash-and-burn tactics employed by the parties have frequently resulted in discovery and motion practice forays that demand judicial intervention on an ongoing, virtually day-to-day basis. In the undersigned's view, many of these skirmishes have been the unfortunate (and likely unnecessary) byproduct of counsel's inability or unwillingness to work well together or to make reasonable concessions and compromises. Even if counsel were to contest that assessment, the indisputable fact remains that the breadth and scope of judicial and litigant resources that the parties' seemingly insatiable appetite for conflict has consumed to date is nothing short of breathtaking.

The Court presents this prologue not to chastise the parties or rebuke their lawyers, but to

provide vital context and bird's-eye background for defendants' present Motion for sanctions. In support of the Motion, defendants catalog a long list of grievances with plaintiffs' attorneys, including several pages of alleged misconduct dating back to the *Fisher* action.[1]  As a threshold matter, this Court is not interested in hearing about sanctionable conduct that may or may not have occurred in the distant past in the *Fisher* case, which was closed via Order entered more than 25 months ago.  The time for seeking sanctions with respect to *Fisher* has long since expired, and this Motion cannot serve as a conduit for re-litigating *Fisher* today; therefore, the Court's inquiry and analysis will focus on defendants' allegations of sanctionable conduct arising in connection with this lawsuit.

## II.     Legal Standard.

Defendants' Motion is brought pursuant to 28 U.S.C. § 1927, which provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct."  *Id.*  This statute has been construed and applied narrowly.  Indeed, the Eleventh Circuit has "consistently held that an attorney multiplies proceedings 'unreasonably and vexatiously' within the meaning of the statute only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'" *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007) (citations omitted).  Although "sanctions under § 1927 are measured against objective standards of conduct" in the sense that subjective malice need not be demonstrated, the *Amlong* panel elaborated that "an attorney's conduct must be particularly egregious to warrant the imposition of sanctions – the attorney must *knowingly* or *recklessly* pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim." *Id.* at 1241-42.  Thus, there is a high threshold for application of § 1927, and that section is not properly used to punish counsel for mere negligence or failure to meet the standard of conduct

---

[1] For example, defendants protest that plaintiffs' counsel in *Fisher* modified the list of chemicals in dispute on several occasions, adding or subtracting contaminants at crucial junctures after defendants had expended considerable resources preparing to defend against claims predicated on those chemicals. (Doc. 308, at 1-3.) Defendants also complain that plaintiffs' counsel made a mistake concerning property ownership interests of *Fisher* plaintiff Ronald McIntyre, and failed to correct same in a prompt and timely manner. (*Id.* at 3.)

expected from a reasonable attorney. *See Hudson v. International Computer Negotiations, Inc.*, 499 F.3d 1252, 1262 (11th Cir. 2007) ("For sanctions under section 1927 to be appropriate, something more than a lack of merit is required.") (citation omitted); *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003) ("The plain statutory language of section 1927 makes clear that this section is not a 'catch-all' provision for sanctioning objectionable conduct by counsel.") (citation omitted).

Simply put, § 1927 "was designed to sanction attorneys who willfully abuse the judicial process by conduct tantamount to bad faith." *Schwartz*, 341 F.3d at 1225 (citations and internal quotation marks omitted). Therefore, it is by reference to that rigorous metric that defendants' Motion will be evaluated.

### III.   Analysis.

Given the expansive laundry list of purported infractions referenced in defendants' Memorandum (doc. 308), many of them in passing, the specific facts and circumstances animating defendant's Motion are not immediately obvious. After winnowing out certain of defendants' more gratuitous and/or facially meritless objections,[2] four issues remain in play.

---

[2] For instance, defendants lament that plaintiffs' counsel provided incorrect property addresses for certain of their clients and even purported to bring suit on behalf of a dead man among the 277 plaintiffs. However, those issues have already been litigated extensively herein, so the prospect of re-ploughing that ground in the context of this § 1927 Motion is not appealing. While these incidents might reasonably support a contention of negligence or lack of due care by plaintiffs' counsel, they are not the sort of egregious, abusive, bad-faith conduct necessary to trigger § 1927 sanctions. Besides, appropriate relief has already been fashioned for defendants as to both of those matters, to-wit: Certain parcels have been stripped of "test property" status based on plaintiffs' counsel's provision of an inaccurate address resulting in prejudice to defendants, and the claims brought on behalf of the deceased plaintiff have been dismissed. (*See* docs. 180, 288.) The Court finds that the remedies already afforded defendants as to these particular concerns are sufficient, and that no further relief is warranted under § 1927. With respect to defendants' expressed dismay that certain plaintiffs did not personally attend the October 20, 2009 settlement conference as directed by Magistrate Judge Bivins in her October 5 Order (doc. 289), there is no need to examine that issue here. After all, Judge Bivins knew those plaintiffs were not present, yet she took no action. Clearly, then, she did not find it appropriate to sanction plaintiffs or their attorneys for this form of non-compliance with her Order. As to defendants' request for § 1927 sanctions predicated on plaintiffs' pretrial "Motion for Jury Instruction Regarding Spoiliation [*sic*] of Evidence" (doc. 315), defendants' argument is premature because that motion has not yet been ruled on. Without having decided the Motion's

First, defendants seek sanctions because plaintiffs' counsel purportedly filed this lawsuit "before establishing chemicals at issue, and in effect us[ed] the discovery process to create the case." (Doc. 308, at 12.)  Second, defendants seek sanctions for plaintiffs' counsel's "changing of damages at the last minute."  (*Id.*)  Third, defendants ground their Motion on plaintiffs' counsel's "maintenance of claims that were clearly not supportable by any credible evidence."  (*Id.* at 12-13.)  Fourth, defendants seek relief for plaintiffs' counsel's alleged "failure to communicate settlement offers to Plaintiffs" and their "attempt to use litigation expenses rather than evaluation of Plaintiffs' claims as the baseline for settlement negotiations."  (*Id.* at 13.)  These stated grounds for relief will be evaluated sequentially.

### A. *Plaintiffs' Failure to Identify Chemicals at Issue before Filing Suit.*

To the extent that the § 1927 Motion turns on the notion that plaintiffs' counsel failed to isolate the chemicals of concern before filing the Complaint, defendants' position is not persuasive.  To be sure, although the Complaint (doc. 1) focused on DDTr as the contaminant of concern, it left open the possibility that plaintiffs could seek recovery for other types of chemicals as well.  In particular, the Complaint in various places made hazy and ill-defined references to "CG-related contaminants," "CG site-related contaminants," "hazardous and toxic substances discharged," and so on. (Doc. 1, ¶¶ 19, 21, 28, 29.)

Nonetheless, defendants' argument fails because the Court directed plaintiffs to remedy this ambiguity early in the lawsuit, thereby alleviating any vagueness and uncertainty on this point that might otherwise have multiplied the proceedings.  In an Order (doc. 56) entered on September 10, 2008, the Court stated that plaintiffs would not be allowed to embark on a "roller coaster ride here as they decide whether to sue Ciba for contamination caused by any substances other than DDTr.  Accordingly, plaintiffs are hereby **ordered** ... to file a written notice identifying the particular contaminants ... for which each plaintiff seeks relief in these

---

merits, the Court cannot possibly assess whether plaintiffs' counsel's filing of that motion constitutes willful abuse of the judicial process through conduct tantamount to bad faith.  And finally, to the extent that defendants would have the Court consider imposing § 1927 sanctions based on "Plaintiffs' counsel's recent advice to Defendants that they expect to file yet another suit by other co-tenants of the properties" (doc. 308, at 3), defendants are placing the cart before the horse.  It would be absurd to sanction plaintiffs' counsel for something they have not even done yet, merely because they are or may be contemplating it.

proceedings. ... That submission will be final and binding on the parties ...." (Doc. 56, at 7-8 n.8.) Shortly thereafter, plaintiffs filed a notice verifying that "this case is solely limited to DDTr, the name commonly given to DDT and its metabolites, DDE and DDE." (Doc. 64, ¶ 32.) From that moment forward, the identity of the exact contaminant at issue was crystal clear to all litigation participants.

As a consequence of the foregoing events, from the time discovery in this action commenced, all the way through the filing of dispositive motions and final preparations for the test plaintiff trial, it has been known to defendants that the sole contaminant at issue in this action is DDTr. Defendants do not explain, and the Court does not perceive, how plaintiff's initial lack of precision in identifying contaminants of concern in this action has vexatiously or unreasonably multiplied or expanded these proceedings. Given the prompt and definitive manner in which this defect was corrected, and the fact that plaintiffs have scrupulously honored their designation of DDTr as the sole contaminant of concern at all times thereafter, the inexactitude of the Complaint on this point cannot reasonably be viewed as knowing or willful abuse of the judicial process by plaintiffs' attorneys via conduct tantamount to bad faith. Accordingly, imposition of sanctions is not appropriate on the basis of chemical ambiguity.

### B. *Plaintiffs' Abandonment of Diminution in Value Theory of Damages.*

Next, defendants decry the fact that they "spent needless time and money defending Plaintiffs' revolving door of changing damages." (Doc. 308, at 4.) The crux of this argument is plaintiffs' abrupt abandonment of their diminution in value theory of damages at the summary judgment stage, and their adoption of a cost of cleanup measure in its stead. The Court described this strategic curveball as follows: "In what can only be described as a sudden tectonic shift, ... plaintiffs reveal in their opposition brief that they are no longer seeking recovery for reduced property values. ... Plaintiffs' brief is clear that, in lieu of damages for reduced property values, they seek restoration costs to rid their properties of the DDTr presently contaminating their homes and land." (Order (doc. 284) dated October 1, 2009, at 6-8.)

The initial problem with defendants' claims of bad faith as to damages is that plaintiffs had specifically stated in their Complaint that Ciba's contamination had damaged them in both of the following ways: (a) "Plaintiffs' properties have declined in value and continue to decline in value as a result of the contamination," and (b) "Plaintiffs suffered and continue to suffer

-5-

property damage, economic loss, and inconvenience in having to reside on contaminated property." (Doc. 1, at ¶¶ 31, 38, 45, 51, 61, 71, 78, 85.) The second of these categories of harm would logically embrace decontamination costs as a form of damages for which recovery was sought. To reinforce the point, the Complaint also included allegations such as "[t]he hazardous and toxic substances emanating from the Defendants' pollution continues [*sic*] to contaminate Plaintiffs' properties" and that "[e]ach day that Defendants fail to remove the nuisance constitutes a continuous nuisance and breach of the duty to remove the nuisance." (Doc. 1, at ¶¶ 42, 48.) Under any reasonable reading of the Complaint, both the theory of diminution in value and that of decontamination costs were in play as possible forms of compensatory damages. As such, defendants cannot reasonably contend that they were unaware that restoration costs were a part of plaintiffs' theory of damages.[3]

       The Court's understanding of defendants' position is that sanctions are appropriate based on plaintiffs' relinquishment of their diminution in value theory of recovery during the summary judgment briefing process. But a plaintiff's decision to jettison a particular theory at the Rule 56 stage is hardly an uncommon occurrence. If this Court levied § 1927 sanctions against every lawyer who walked away from a claim or theory of recovery after opposing counsel lays its cards on the table in a summary judgment brief, then § 1927 sanctions would become so widespread as to be the rule, rather than the exception. Moreover, such a practice would distort incentives by punishing plaintiffs' lawyers for dropping claims or theories upon recognizing their futility, rather than continuing to advance positions revealed to be groundless. The looming threat of § 1927 sanctions for abandoning a claim would perversely compel plaintiffs' attorneys to fight tooth and nail for claims they know to be unsustainable, thereby placing them squarely within the cross-hairs of § 1927 in that they would be vexatiously multiplying the proceedings by pursuing frivolous claims. Plaintiffs' attorneys would find themselves in an untenable lose-lose dilemma, risking § 1927 sanctions no matter what course of action they take.

---

      [3]     In briefing their § 1927 Motion, defendants admit that they knew the remediation costs theory was part of the case, explaining as follows: "Plaintiffs' decision to employ a restoration cost expert was not a shock. It was expected, in as much as Plaintiffs have to prove their damages and the law limits them to two alternatives, cost of restoration being one of the alternatives." (Doc. 342, at 3.)

Simply put, the undersigned is not at all convinced that plaintiffs' counsel's decision to walk away from a diminution in value theory that they determined at the end of the discovery period to be weak, lacking in evidentiary support, or otherwise not worth pursuing falls below the standard of conduct expected of a reasonable attorney, much less that it was reckless or egregious for them to do so.[4]  There is simply no persuasive basis for holding plaintiffs' counsel's conduct in this regard to be tantamount to bad faith, so as to warrant the imposition of § 1927 sanctions.[5]

### C. Plaintiffs' Decision to Bring Fraud and RICO Claims.

Ciba also asserts that sanctions are appropriate because of plaintiffs' counsel's "continued pursuit of various fraud and RICO based claims in this matter using identical complaint language and evidence that were deemed insufficient in *Fisher*."  (Doc. 342, at 5.)  Defendants are correct that the fraud and RICO claims asserted in this action bear striking similarity to those interposed in the *Fisher* case.  But close review of the sequence of events in *Fisher* reveals that defendants are mistaken in their suggestion that plaintiffs' counsel should

---

[4] That is not to say, however, that a defendant in Ciba's position is helplessly captive to the whims of plaintiffs' counsel.  A defendant may nail down a plaintiff's theories of damages through the discovery process, thereby committing a plaintiff to a binding universe of potential grounds for recovery.  Having set forth its damages theories in discovery responses, a plaintiff cannot later subtract weak theories or add new ones without satisfying the supplementation provisions of Rule 26(e)(1), Fed.R.Civ.P., which require correction of discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to other parties during the discovery process or in writing."  Rule 26(e)(1)(A).  Defendants in this case have not alleged Rule 26(e) violations by plaintiffs as to their theory of damages, nor have they otherwise pursued remedies provided by the Federal Rules of Civil Procedure in that context.

[5] This analysis might differ if defendants had come forward with evidence, or if there was any reason to believe, that plaintiffs' attorneys strung defense counsel along for a protracted period of time by holding out their diminution in value theory as their basis for damages even after deciding to abandon it, all the while knowing that Ciba was incurring costs to mount a defense to a damages theory that plaintiffs had no intention of pursuing.  But there is no indication that plaintiffs' counsel misled or deceived their counterparts on this point, or that they otherwise lulled defendants into thinking that this was a diminution in value case after plaintiffs had elected to proceed solely on a remediation costs theory.

have known from the unsuccessful outcome in *Fisher* that such theories of liability were doomed to failure here.

In a summary judgment ruling entered in *Fisher* in October 2007, the undersigned dismissed the fraud-related and RICO causes of action brought by four of the five named plaintiffs.[6] *See Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL 2995525 (S.D. Ala. Oct. 11, 2007). The stated grounds for that ruling, however, were not that plaintiffs had failed to prove that misrepresentations were made or that predicate acts of racketeering activity had occurred; rather, summary judgment was entered for defendants on the ground that there was no evidence of reasonable reliance by any of the four plaintiffs. *Id.* at *12-14.[7] Nothing in the *Fisher* summary judgment decision would necessarily bar the 277 original plaintiffs <u>in this case</u> from proceeding with fraud and RICO theories of liability against Ciba. Although defendants balk that sanctions are justified based on "alleged fraud and civil RICO claims that were pursued with the same evidence that was found lacking years earlier in the *Fisher* case" (doc. 308, at 4), the evidence "found lacking" in *Fisher* was plaintiff-specific evidence of reliance that could not and does not apply to the 277 plaintiffs here. Neither the sufficiency of plaintiffs' evidence of a pattern of racketeering activity, nor the reliance of the test plaintiffs, was ever examined or adjudicated in *Fisher*. As such, the Court cannot say that it was particularly egregious, reckless or in bad faith for plaintiffs' counsel to pursue constructive fraud and RICO causes of action here, despite this Court's recent findings that defendants were entitled to summary judgment as to all plaintiffs' RICO claims and the test plaintiffs' constructive fraud

---

[6] Ciba failed to move for summary judgment as to the fraud and RICO claims of the fifth plaintiff in *Fisher*.

[7] In particular, the Court concluded as follows: "Plaintiffs having come forward with no evidence tending to show that Fisher and McIntyre were aware of any alleged misrepresentations relating to any issues in this case, those two plaintiffs' fraud claims fail as a matter of law. ... There being no record evidence that Reed or Byrd took a different course of action because of Ciba's alleged misrepresentations (*i.e.*, that they would have moved out of the area if not for their reliance on Ciba's statements), their fraud claims cannot proceed, as a matter of law. ... As with the fraud claims discussed *supra*, this reliance requirement erects an insuperable hurdle to the RICO causes of action pursued by plaintiffs Fisher, McIntyre, Byrd and Reed." *Id.* at *12-14.

claims.  (*See* doc. 285.)

Furthermore, plaintiffs' decision to pursue RICO claims in this case, notwithstanding the unfavorable outcome in *Fisher*, was bolstered by an intervening change of law.  In *Bridge v. Phoenix Bond & Indemnity Co.*, --- U.S. ----, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), decided several months after the *Fisher* ruling, the Supreme Court abrogated the Eleventh Circuit precedent on which this Court's RICO ruling in *Fisher* was founded.  In particular, the *Bridge* Court held that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."  128 S.Ct. at 2145.  Thus, for most of this litigation, plaintiffs' counsel have known that the reliance defect that derailed their RICO claims in *Fisher* would not be a major impediment here.  That change in the legal landscape would reasonably strengthen plaintiffs' counsel's decision to pursue RICO claims here.

In short, although the Court remains convinced that entry of summary judgment in defendants' favor as to the test plaintiffs' constructive fraud claims and all plaintiffs' RICO claims was appropriate, the mere fact that a claim is deemed lacking in merit is insufficient to trigger § 1927 sanctions.  *See, e.g., Hudson*, 499 F.3d at 1262 ("For sanctions under section 1927 to be appropriate, something more than a lack of merit is required.") (citation omitted) *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226-27 (7th Cir. 1984) ("Where, as here, counsel's alleged misconduct was the filing and arguing of a claim, it is not sufficient that the claim be found meritless; the claim must be without a plausible legal or factual basis and lacking in justification.") (footnote omitted).  Defendants have not met the high threshold for § 1927 sanctions of showing that plaintiffs' counsel's conduct in bringing those claims was particularly egregious or that counsel knowingly or recklessly pursued frivolous claims.  Therefore, no sanctions will be imposed on counsel for bringing non-meritorious fraud and RICO causes of action herein.

### D.     *Plaintiffs' Conduct Relating to Settlement Negotiations.*

Much of defendants' briefing in support of their request for sanctions concerns allegations of misconduct by plaintiffs' counsel in the largely fruitless settlement negotiations

that have played out over a period of years.[8]  Specifically, Ciba protests that in the October 2009 settlement conference conducted before Magistrate Judge Bivins, defendants learned that (1) plaintiffs' counsel had not communicated settlement offers to their clients and (2) plaintiffs' counsel had adopted a settlement approach which "puts the lawyers [*sic*] interest in ahead of the client's and values the case on the lawyer investment by using that as a settlement floor, rather than an evaluation of each Plaintiffs' [*sic*] claim."  (Doc. 308, at 5.)  Neither of these considerations reasonably warrants imposition of § 1927 sanctions in this case.

On the topic of communication of settlement offers, defendants' sanctions argument fails for two reasons.  First, plaintiffs' counsel expressly represent to the Court that they "unequivocally fulfilled their obligations to inform their clients of the status of this matter, including sending written notice of the settlement offers made by Defendants to each Plaintiff." (Doc. 330, at 10.)[9]  In the absence of countervailing evidence that plaintiffs' counsel did not

---

[8]   This lawsuit was at its inception the byproduct of a failed negotiation.  Plaintiffs commenced this action in February 2008 upon a catastrophic meltdown in productive discourse between the two camps of attorneys as to the scope and meaning of their arrangement to resolve the *Fisher* litigation.  Pursuant to a settlement conference conducted in October 2007, "the *Fisher* case was concluded and counsel had unambiguously conveyed their intent to work together, diligently and in good faith, to establish a protocol that would resolve the remaining 332 claimants' claims."  (Doc. 41, at 2.)  Despite this amicable posture, and notwithstanding numerous court-instigated settlement discussions among counsel in the interim, the attorneys failed to resolve the outstanding claims.  As noted in an Order dated August 20, 2008, "the parties are working at cross-purposes to each other and to any joint goal of achieving an efficient, mutually acceptable compromise.  Each side appears to be proceeding in utter disregard of the concerns that are paramount to the other's negotiating stance. ... The net result is that they are talking past each other rather than to each other."  (Doc. 54, at 1-2.)  In substantial measure, defendants' request for sanctions reflects pent-up frustrations over the parties' chronic inability to engage in constructive talks.  But there are no clean hands here; rather, all indications are that there is abundant blame to go around for the drawn-out, unproductive, and ultimately futile state of their settlement discussions.  Unfortunately, a motion for sanctions is not an olive branch promoting more cooperative negotiations in the future, but instead appears likely to heap insult upon injury and fan the flames of rancor.

[9]   Plaintiffs' counsel elaborate on this point as follows: "Plaintiffs' Counsel sent letters to every single Plaintiff in this case with the exact amount initially offered by the Defendants in February 2009.  Counsel communicated with every single client *before* accepting or rejecting Defendants' offers."  (Doc. 330, at 11.)  According to plaintiffs' counsel, defendants' subsequent proposals did not raise the per-plaintiff payouts by even a dime, but

apprise their clients of settlement offers, plaintiffs' counsel's representations on this point are dispositive. Second, even if defendants are right that plaintiffs' counsel breached an ethical obligation to their clients under Section 1.4 of the Alabama Rules of Professional Conduct, this ethical issue is distinct from the § 1927 sanction issue. A state bar's ethics rules are enforced by the state bar, not by federal courts. In enacting § 1927, Congress was not creating a private remedy for attorney ethical breaches, much less a mechanism transforming federal judges into final arbiters of whether an attorney's conduct did or did not comply with ethical rules promulgated by state bar associations.[10] To the extent that defense counsel feel their accusations of professional misconduct merit further scrutiny, such concerns are properly addressed to applicable state bar officials.

As for defendants' concern about the prominence in plaintiffs' negotiation stance of their accrued expenses in this action and *Fisher*, it is not clear what defendants' objection is. Surely,

---

instead offered to bear a slightly larger portion of plaintiffs' expenses. (*Id.*) Defendants argue that those expense-related offers should have been presented to plaintiffs even though plaintiff-specific dollar figures had not changed (doc. 342, at 3-4), but they do not set forth any legal or persuasive logical basis for that stance. Defendants do not explain why a plaintiff who had rejected a settlement offer of, say, $100 plus $5 for attorney expenses must be consulted again on a subsequent offer of $100 plus $8 for attorney expenses. Either way, the plaintiff would receive only the same $100, which offer he had already turned down. In lieu of well-reasoned explanation on this point, defendants offer only the *non sequitur* that "Defendants have no control over the fee arrangement between Plaintiffs and their counsel" (*id.* at 4), which is of course true, but wholly inconsequential to defendants' insistence that plaintiffs' counsel should be sanctioned for not conducting town-hall meetings or individual consultations with their 250 clients to discuss settlement offers that would not change previously-rejected per-plaintiff payouts in the slightest.

[10]    The dearth of authority supporting defendants' position is highlighted by their extensive discussion of *Abraham v. Vokswagen of America Inc.*, 1991 WL 89917 (W.D.N.Y. Mar. 11, 1991), an unpublished decision from the Western District of New York. *Abraham* is the only case cited by defendants for the proposition that ethical violations relating to the communication of settlement offers by an attorney warrant § 1927 sanctions. But *Abraham* is distinguishable on its face, inasmuch as the *Abraham* attorney failed to inform his clients of client-specific settlement offers ranging from $37.50 to $4,653.43 per client before rejecting them. By comparison, the facts of this case are that plaintiffs' counsel conveyed all plaintiff-specific offers directly to their clients and communicated with plaintiffs in advance of accepting or rejecting each such offer. Thus, *Abraham* is neither "strikingly similar" (as defendants characterize it) nor particularly helpful to the analysis.

defendants do not maintain that allocation of responsibility for accrued expenses is an impermissible settlement parameter.  To the contrary, issues of who will pay for fees, expenses and costs factor into virtually every settlement negotiation in virtually every case.  There is certainly nothing improper about including that variable in the settlement discussion.  Moreover, to the extent that defendants are protesting that it is unfair for plaintiffs' counsel to seek reimbursement of their expenses before plaintiffs themselves see any settlement proceeds, that argument is undercut by defendants' frank admission that "Defendants have no control over the fee arrangement between Plaintiffs and their counsel." (Doc. 342, at 4.)  Section 1927 is not a tool by which counsel can dictate terms of the fee arrangements between opposing counsel and their clients, even if those arrangements are slanted against the clients' best interests in the subjective view of the § 1927 movant, nor does it provide a vehicle for rewriting fee agreements in a manner that the § 1927 movant feels may prove more conducive to settlement.[11]  Finally, to the extent that defendants' point about expenses reduces to an ethical argument that plaintiffs' counsel are placing their own interests ahead of their clients' interests and shirking their professional responsibilities, that too is an issue for the relevant bar authorities, and not for this Court to decide in the context of a § 1927 motion.

## IV.   Conclusion.

The attorneys in this case have spent the last six-plus years locked in an epic struggle.  Predictably, emotions and tempers have run high after years of interactions in close quarters, and this Motion appears to be the product of such bubbled-over frustrations.  More fundamentally, all parties were sternly admonished at the outset of this lawsuit that if they chose to remain on this path, the collateral damage would be both severe and inevitable.  Having elected to fight on, the parties cannot now be heard to complain that the road has proven to be as fraught with peril, expense and inefficiency as was advertised.  The Court perceives nothing in the circumstances presented here that would warrant the extraordinary measure of sanctioning plaintiffs' attorneys

---

[11]   Besides, there is reason to question the accuracy of defendants' understanding that plaintiffs' counsel's expenses must be repaid in full before plaintiffs can receive any funds.  After all, a number of plaintiffs have accepted settlement offers or offers of judgment in this case, which presumably they would not have done if plaintiffs were to receive nothing from those settlements.

for vexatiously and unreasonably multiplying the proceedings. Accordingly, the Motion for Relief under 28 U.S.C. § 1927 (doc. 307) is **denied**.

Given the sharpness of the rhetoric in the parties' briefs, the Court reminds counsel for both sides that they are expected to conduct themselves in a professional manner and to refrain from gratuitous personal attacks in all proceedings in this District Court. The undersigned welcomes and expects diligent, zealous advocacy; however, lack of civility will not be tolerated, regardless of how badly frayed counsel's relations may be after years of rancorous interactions in McIntosh-related litigation.

DONE and ORDERED this 2nd day of December, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE