IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CLEON ABRAMS, SR., *et al.*, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 08-0068-WS-B |
| | ) | |
| CIBA SPECIALTY CHEMICALS | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
|     Defendants. | ) | |

**ORDER**

This matter comes before the Court on plaintiffs' Motion to Exclude Portions of David Langseth's Expert Testimony, Opinions and Reports (doc. 309). The Motion has been briefed and is now ripe for disposition.[1]

**I.    Background.**

Plaintiffs are owners of property in and around McIntosh, Alabama, who allege that their homes have been contaminated by DDT and its metabolites (collectively, "DDTr") emanating from a nearby chemical manufacturing facility owned and operated by defendants (collectively, "Ciba"). On that basis, plaintiffs have brought causes of action against Ciba sounding in trespass, negligence, and nuisance. Although they initially claimed damages in the form of diminution of their property's value, plaintiffs have since abandoned that theory of recovery, and

---

[1] No party has requested an evidentiary hearing in connection with this Motion, and the Court in its discretion finds that a hearing is unnecessary to resolve the issues presented. *See generally Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2008) (in *Daubert* context, "although they are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law"); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) ("the trial court was under no obligation to hold" *Daubert* hearing, which was "not required, but may be helpful in complicated cases involving multiple expert witnesses") (citations and internal quotation marks omitted); *United States v. Frazier*, 387 F.3d 1244, 1264 (11th Cir. 2004) ("a district court need not conduct a *Daubert* hearing in every case").

are now seeking an award of compensatory damages for restoration costs, that is, the cost of reducing DDTr concentrations in their dwellings to a level of 10 parts per billion.

Defendants retained Dr. Langseth as an expert witness "to develop opinions about the extent and likely sources of DDTr" found on plaintiffs' property. (Doc. 309, Exh. A, at § 1.1.) In a lengthy Expert Report dated May 14, 2009, Dr. Langseth concluded that plaintiffs' homes were not adversely impacted by their proximity to the Ciba plant, based on the following underlying opinions: (i) DDTr concentrations in plaintiffs' homes are comparable to, or lower than, observed concentrations in other locations not proximate to DDT manufacturing plants; (ii) spatial concentration patterns (*i.e.*, the plotting of measured DDT concentrations against distance from the Ciba plant) in McIntosh are inconsistent with plaintiffs' theory that the Ciba plant was the source; and (iii) McIntosh community soil samples exhibit no DDT impacts from the Ciba plant. (*Id.*)[2] According to Dr. Langseth, "[t]he DDTr in McIntosh community indoor dust is rather more likely due to a combination of DDTr that is widely distributed in the environment

---

[2] The parties' competing *Daubert* motions on fate and transport issues reflect that they seek to hold opposing experts to a more stringent legal standard than their own. For example, defendants laud Dr. Langseth's methodology concerning spatial concentration patterns as being "generally accepted in the scientific community" (doc. 326, at 2), yet they filed a *Daubert* motion denouncing as unreliable and unscientific the opinions of plaintiffs' fate and transport expert, Dr. Robert Scates, which utilized the same type of analysis. Similarly, defendants characterize Dr. Langseth's methodology as "sound" because "he considers each possible source and tries to determine the most likely source." (*Id.* at 7.) Of course, Dr. Scates followed that same methodology, but defendants nonetheless moved to disqualify his opinions as being untethered to "true science." Elsewhere, defendants justify Dr. Langseth's "use of data from studies and evidence of general use" because of the daunting task of reconstructing conditions dating back a half century (*id.* at 3), only to castigate Dr. Scates for relying on the same types of studies and evidence. Plaintiffs also play this game by, for example, complaining that Dr. Langseth's "comparisons of the McIntosh community to known contaminated communities are [not] relevant or reliable in any way" (doc. 351, at 2), even though Dr. Scates performed similar comparisons. Similarly, plaintiffs object to certain of Dr. Langseth's opinions as "mere speculation and overreaching of his demonstrated expertise" (doc. 309, at 10), when the same objection was plausibly interposed against Dr. Scates. In reviewing these dueling *Daubert* motions, the Court is left with the distinct impression that they were filed tit-for-tat, with each side being outspoken in criticizing the other's expert for activities in which they both engaged, to a greater or lesser extent, because of the nature of the science and methodologies involved, the gaps in existing data, and the difficulty of reconstructing events that occurred more than 50 years ago. This is not an efficient use of the *Daubert* mechanism or scarce judicial resources.

from extensive past local use in or near the homes ...." (*Id.*)

Nearly three months later, on August 7, 2009, Dr. Langseth submitted a short document styled a "Supplemental Report" (doc. 309, Exh. C). The body of this Supplemental Report was just two pages long and was accompanied by a reference list numbering 20 items. Dr. Langseth prefaced his Supplemental Report by stating that its purpose "is not to offer rebuttal" to Dr. Scates' supplemental report dated June 15, 2009, "but is rather to call attention to some information that may not have been available to Dr. Scates." (*Id.* at 1.) A careful reading of Dr. Langseth's Supplemental Report reveals that he did not purport to be setting forth new opinions or elaborating on any opinions already made; instead, the Supplemental Report merely recited (largely without comment) additional studies and research performed by others. In particular, Dr. Langseth identified the following facts from the literature: (i) Washington County, Alabama, was pre-approved for a National Malaria Eradication Program ("NMEP") in 1948 under which houses were sprayed with DDT; (ii) homes sprayed in the NMEP program received an average of 0.43 to 1.12 pounds of DDT; (iii) the Tennessee Valley Authority produced reports of mosquito control programs that included aerial DDT spraying; (iv) long after cancellation of DDT's registration in 1972, thousands of homes still stored products containing DDT; and (v) an American Healthy Homes Survey found that DDT was detected in as many as 41% of floor wipe samples taken from residential homes. (*Id.* at 1-2.)[3]

Plaintiffs now seek to exclude Dr. Langseth's Supplemental Report as untimely, and to exclude certain of his opinions on grounds of relevance and reliability.

**II.     Legal Standard.**

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule

---

[3]     Regarding the American Healthy Homes study, defendants suggest that "[i]t is quite telling that Mr. [*sic*] Scates makes no mention of this highly relevant study" in his report. (Doc. 326, at 3-4.) On its face, this criticism is absurd. The American Healthy Homes study was published on June 15, 2009. (*Id.* at 3.) Dr. Scates' supplemental report is likewise dated June 15, 2009. (Doc. 309, Exh. B.) Defendants fail to explain how Dr. Scates could possibly have addressed the American Healthy Homes study in his reports when that study was published contemporaneously with his supplemental report.

702," such that it "appropriately assists the trier of fact." *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005).[4] In that regard, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). This gatekeeping function is guided by the well-established principle that "[t]he proponent of the expert testimony carries a substantial burden under Rule 702" to show admissibility of that testimony by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder ..., by a preponderance of the evidence.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007); *see also Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (similar). That said, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). For that reason, courts have stressed that the *Daubert* inquiry is "a flexible one," that the *Daubert* factors are mere guidelines for applying Rule 702, and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances

---

[4] Rule 702 reads as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

involved. *Brown*, 415 F.3d at 1267-68.[5]  In performing a *Daubert* analysis, the Court's focus must be "solely on principles and methodology, not on the conclusions that they generate"; thus, it matters not whether the proposed expert testimony is scientifically correct, so long as it is shown to be reliable. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

## III. Analysis.

### A. Timeliness of Supplemental Report.

Plaintiffs' first objection concerns the timing of Dr. Langseth's Supplemental Report, which was submitted on August 7, 2009, some 74 days after his deposition, 52 days after Dr. Scates' supplemental report, and 37 days after the close of discovery. (Doc. 309, at 5.) Plaintiffs maintain that Dr. Langseth's Supplemental Report is untimely because the applicable Rule 16(b) Scheduling Order provided that disclosure of expert rebuttal evidence "authorized by Rule 26(a)(2)(c), shall be made within 30 days after the disclosure made by the other party." (Doc. 67, ¶ 6.) Additionally, plaintiffs decry the timing of this Supplemental Report as prejudicial to them because it was made after the close of discovery, such that plaintiffs "have had no opportunity to seek discovery on and to test Mr. [*sic*] Langseth's" statements therein. (Doc. 309, at 6.)[6]  Finally, plaintiffs object that defendants have failed to furnish them with copies of the studies and literature cited in Dr. Langseth's Supplemental Report.

In their Response (doc. 326), defendants largely gloss over the reasons why Dr.

---

[5] The Court also proceeds in recognition of appellate guidance that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert" or "because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Such circumstances may provide fertile ground for cross-examination at trial, but they do not constitute a permissible basis for excluding testimony altogether under Rule 702 and *Daubert*.

[6] In briefing their *Daubert* motions, the parties habitually refer to their own experts with the "Dr." title, but identify opposing experts with a "Mr." or "Ms." prefix, if any. This is both improper and disrespectful. Hard-fought litigation does not justify abandonment of civility and decorum. Regardless of their disagreement with an expert's opinions, if that expert is commonly referred to as "Dr." by virtue of that person's education, training and/or experience, then both sides are expected to use that title in identifying or addressing that person at trial or in briefs.

Langseth's Supplemental Report was submitted well beyond the 30-day deadline for rebuttal reports. Nonetheless, the Court does not credit plaintiffs' objections on grounds of untimeliness and prejudice. As noted, Dr. Langseth's Supplemental Report does not express any new opinions, or any opinions at all, but simply "call[s] attention" to existing (but newly discovered) literature that might bear on some of Dr. Scates' conclusions. As such, Dr. Langseth's Supplemental Report is not properly viewed as a rebuttal expert report at all, but is simply a disclosure of additional studies and literature. Defendants could have cross-examined Dr. Scates about such literature without presenting it in the form of Dr. Langseth's Supplemental Report. That they elected to notify plaintiffs of those additional studies via Dr. Langseth's Supplemental Report does not bar defendants from engaging in such cross-examination of Dr. Scates at trial, nor does it forbid Dr. Langseth from identifying those studies (without offering any new or additional expert opinions about the veracity or application of those studies to plaintiffs) in his trial testimony.[7] Viewed through this prism, Dr. Langseth's Supplemental Report does not constitute improper sandbagging or noncompliance with expert report deadlines fixed by the Scheduling Order.

Plaintiffs also allege prejudice because they have been unable to test Dr. Langseth's assertions from his Supplemental Report via deposition or discovery; however, those objections fail. Simply put, Dr. Langseth is not offering any new opinions in his Supplemental Report, so there is nothing to test or investigate. For example, plaintiffs contend that Dr. Langseth is asserting "that the DDTr in McIntosh *may* have come from some pest and mosquito control uses." (Doc. 309, at 6.) This characterization of Dr. Langseth's Supplemental Report is

---

[7] That said, the Court will not allow Dr. Langseth to exceed the boundaries of the Supplemental Report to testify in a manner that extrapolates from those studies and literature to inject new opinions into this case at trial. Having failed to supplement his report within the prescribed period, and having limited his Supplemental Report to disclosure of additional literature, Dr. Langseth cannot now be heard to proffer new but previously available opinions, but is instead confined to those opinions recited in his initial report. If defendants wish to ask Dr. Langseth about the literature identified in his Supplemental Report to "call attention" to those materials, they may do so. But they may not ask him to render opinions about the application of those items to McIntosh because (a) he did not offer any such opinions in his initial report or his Supplemental Report, and (b) such opinions would be untimely and improper under the Scheduling Order and applicable discovery obligations.

incorrect. He does not purport to state an opinion in the Supplemental Report that pest and mosquito spraying in Washington County may be the source of the DDTr in plaintiffs' homes; rather, Dr. Langseth merely identifies literature showing that "the interiors of Washington County houses were sprayed with DDT" in 1948, and refrains from editorializing or extrapolating from same. (Doc. 309, Exh. C, at 1.) With no new opinions being proffered by Dr. Langseth's Supplemental Report, there are no new areas as to which plaintiffs reasonably require investigation via deposition or discovery; therefore, the Supplemental Report works no prejudice.

Finally, plaintiffs balk that the studies recited in Dr. Langseth's Supplemental Report had not been provided them as of the filing of their Motion to Exclude. Plaintiffs acknowledge, however, receipt of such materials on November 2, 2009, in conjunction with defendants' production of trial exhibits. (Doc. 351, at 3.) This disclosure means that plaintiffs and Dr. Scates will have had copies of these studies to review for nearly five months as of the March 30, 2010 trial setting. Surely this interval allows sufficient time for them to scrutinize those exhibits and prepare Dr. Scates for cross-examination. Given these circumstances, non-production of the cited studies is not an appropriate basis for excluding those materials from trial.[8]

### B. *Relevance / Reliability Objections.*

Plaintiffs also interpose a series of objections to Dr. Langseth's opinions on grounds of relevance and reliability. "Under Rule 702, a district court must determine that proffered expert testimony is both reliable and relevant." *American General Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009); *see also Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1312 (11th Cir. 2000) ("Scientific evidence or testimony must not only be relevant, but also

---

[8] To the extent that plaintiffs object that non-disclosure at an earlier date violates Rule 26(a)(2)(B), Fed.R.Civ.P., and constitutes non-compliance with their Notice of Deposition for Dr. Langseth, they again miss the mark. Defendants have explained that Dr. Langseth researched and located the literature cited in his Supplemental Report only after receiving Dr. Scates' supplemental report of June 15, 2009. (Doc. 326, at 3.) Thus, Dr. Langseth did not have these materials when he prepared and submitted his initial expert report, nor did he have them when he sat for his deposition. These studies and literature were newly obtained by Dr. Langseth sometime <u>after</u> June 15, 2009; therefore, defendants will not be penalized for failing to disclose them previously.

reliable."). "The party offering the expert testimony has the burden of demonstrating that the testimony is relevant to the task at hand and logically advances a material aspect of its case." *Boca Raton*, 582 F.3d at 1232 (citations and internal quotation marks omitted). Although the relevance standard is "liberal," an expert opinion should be excluded for lack of "fit" if it "does not have a valid scientific connection to the pertinent inquiry." *Id.* (citations and internal quotation marks omitted). With respect to the reliability prong, the Eleventh Circuit has explained that "[e]xactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).

Plaintiffs first contend that Dr. Langseth's opinions are unreliable because he "does not include any specific information, facts, or evidence to support his opinion that the DDT in Plaintiffs' homes and yards came from sources other than the Ciba-Geigy plant site." (Doc. 309, at 9.) According to plaintiffs, Dr. Langseth "does not even make a reasonable attempt to rule out" the Ciba plant as a cause of the contamination. (*Id.* at 14.) Such contentions are flatly irreconcilable with Dr. Langseth's report, which describes in great detail why he rejects the Ciba plant as a significant source of the DDTr found in plaintiffs' homes. For example, after analyzing plaintiffs' DDT sampling results and comparing them to studies from other communities, Dr. Langseth found that DDT concentrations from McIntosh samples "tend to be lower than concentrations in similar samples taken in other communities" where there is no Ciba plant and that "DDTr detection frequencies are no higher in McIntosh than in other communities." (Doc. 326, Exh. B, at § 3.1.) Similarly, Dr. Langseth examined spatial concentration patterns in McIntosh and concluded that they "do not provide any support for a claim that airborne transport from the Ciba McIntosh site contributed a significant, or even noticeable, portion of the DDTr found in McIntosh community indoor dust." (*Id.* at § 3.2.1.)[9]

---

[9] The Court understands that the parties' experts differ as to whether the spatial concentration pattern analysis should or should not include sampling results from the Ciba plant site. (Doc. 351, at 1-2.) On this record, the Court finds that neither approach is unreliable; rather, it appears that reasonable engineering minds can (and do) differ as to the proper way of performing a spatial concentration pattern analysis and the proper data points to include. Under

He also looked at soil sample results, and deemed them inconsistent with impacts from the Ciba plant. (*Id.* at § 3.3.) Plaintiffs may disagree with Dr. Langseth's conclusions, but they cannot plausibly attack his methodology as mere speculation, given that (a) Dr. Langseth's opinions are demonstrably founded on much more than his *ipse dixit*, and (b) plaintiffs' own fate and transport expert used many of the same methods (*i.e.*, comparing McIntosh sampling results to studies from other communities, examining patterns of observed DDT concentrations with distance from the Ciba plant).

Plaintiffs also object that Dr. Langseth "has made no effort to evaluate the amount of DDTr that was released from the Ciba-Geigy Plant site." (Doc. 309, at 10.) The Court understands that plaintiffs' expert (Dr. Scates) did perform rough calculations to determine the approximate quantity of DDT released from the Ciba plant; however, plaintiffs have not explained why Dr. Langseth's expert opinions are rendered unreliable because he failed to rely on the same type of admittedly approximate calculation used by Dr. Scates to estimate DDT emissions. Dr. Langseth examined a variety of data and evidence in reaching his opinion that the Ciba site is not a significant source of the DDTr found in plaintiffs' homes. Plaintiffs' objection is essentially that he should have considered another category of data (emission estimates) before making that determination; however, they fail to make any showing that computation of Ciba plant releases is a mandatory component of any fate and transport analysis, particularly where such a calculation is inherently inexact because of gaps in the data. If Dr. Langseth has studied other data and categories of information, and has concluded from them that the Ciba plant was not and could not have been a significant source of DDT contamination in McIntosh, then why would he need to calculate order-of-magnitude emission estimates at all? This is fodder for cross-examination, not exclusion under *Daubert*.

Close inspection of plaintiffs' filings suggests that their principal reliability objection is

---

the circumstances, it would be inappropriate for this Court to pick and choose which variant of the methodology it preferred, to the exclusion of the other. *See generally Rink*, 400 F.3d at 1293 n.7 ("a district court may not exclude an expert because it believes one expert is more persuasive than another expert"); *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citations omitted).

not so much that Dr. Langseth has rejected the Ciba plant as a significant source of the observed DDTr contamination, but that he has failed to prove that the DDT in plaintiffs' homes "came from any specific sources other than the Ciba-Geigy plant site other than identifying vague categories of DDT use that is worldwide and unspecific to McIntosh." (Doc. 309, at 10.) But plaintiffs are criticizing Dr. Langseth for using the same methodology that their own Dr. Scates did. Dr. Scates looked at each of the possible causes of the DDT contamination in plaintiffs' houses, and found that the Ciba plant was a likely contributor while the others were not. Part (though not all) of Dr. Scates' reasoning was that if (as he concluded) the DDT did not originate from the other possible sources, then it must have come from the Ciba plant. Meanwhile, Dr. Langseth utilized similar process-of-elimination methodology, but reached the opposite conclusion. In essence, Dr. Langseth reasoned that if (as he concluded, based on his research and analysis) the DDT in plaintiffs' homes did not come from the Ciba plant, then it must have come from other sources such as "background concentrations combined with the impacts of local use in or near specific properties." (Doc. 326, Exh. B, at § 3.4.) The DDT had to come from somewhere. If its source was not the Ciba plant, as Dr. Langseth found to be the case, then the source(s) must have been other categories of DDT use. This line of reasoning is not unduly speculative or unreliable.[10] He did not have to pinpoint an exact cause, of course, because as

---

[10] Moreover, it is not accurate for plaintiffs to assert that there is no evidence to support Dr. Langseth's finding that the DDT in plaintiffs' homes came from background and local sources other than the Ciba plant. For example, Dr. Langseth opined that the scattered spatial distribution of McIntosh houses with elevated DDT concentrations is consistent with localized DDT uses in or near the house, and not with a nearby manufacturing source. (Doc. 326, Exh. B, at § 3.4.) This conclusion is bolstered by Dr. Langseth's analysis of literature and data to show that background levels of DDT in air around the world would be expected to create DDTr concentrations in indoor dust without specific local sources. (*Id.* at § 3.4.1.) It is further supported by literature cited by Dr. Langseth for the proposition that dust with high concentrations of DDT "due to indoor spraying could contribute to DDTr concentrations in household dust for many years into the future." (*Id.* at § 3.4.2.) Dr. Langseth's assignment of causation to localized sources also finds support in his analysis that "pesticides that have no association with the Ciba McIntosh site were detected in 18 of the 19 samples in which DDT was detected." (*Id.* at § 3.6.) As the foregoing examples demonstrate, Dr. Langseth's conclusion that the most likely source of the DDT found in plaintiffs' homes was background DDT contamination coupled with localized use of pesticides in and around the home was not drawn from thin air, but is grounded in scientific methodology.

long as the DDT did not come from the Ciba plant, defendants cannot be liable to plaintiffs, no matter what the real source(s) might be.

Plaintiffs' remaining relevance and reliability objections can be quickly disposed of. In particular, plaintiffs suggest that any references to the NMEP program of DDT spraying in Washington County in 1948 is irrelevant because McIntosh is only part of Washington County, and there is no evidence specifically linking that program to McIntosh. (Doc. 309, at 11.) This is a classic argument for cross-examination or closing argument, not a *Daubert* motion. Defendants have evidence that DDT spraying was happening on a systematic basis inside homes in the county where plaintiffs are located. Such evidence is not rendered irrelevant or inadmissible simply because it does not isolate the specific town, neighborhood or cul-de-sac in which specific plaintiffs reside.[11] Elsewhere, plaintiffs balk at defendants' mention of the MOWA incinerator as a possible source of DDT; however, they do not tie it to Dr. Langseth and do not cite any opinions that Dr. Langseth has offered concerning the MOWA incinerator. (Doc. 351, at 2.) This objection therefore appears wholly divorced from Dr. Langseth's testimony and is misplaced here. The Court also rejects plaintiffs' criticism that Dr. Langseth used "wordsmith techniques" by referring to comparator communities in which there is no manufacturing source,

---

Given this and other supporting data set forth in Dr. Langseth's report, it is difficult to fathom plaintiffs' contention that "his entire opinion ... is simply that at one point in history DDT was so widespread and that other 'possible' sources of DDT existed throughout the world and therefore - illogically, mind you - the DDT in Plaintiffs' homes in McIntosh simply could not have come from the Ciba-Geigy plant." (Doc. 309, at 12.) Such blatant mischaracterization of expert opinions has surfaced all too frequently in these *Daubert* motions; after all, defendants did the same thing in challenging Dr. Scates' opinions. In addition to being troubling from a Rule 11 standpoint, such casual, frequent distortion of critical facts by both sides is entirely unhelpful to the Court and to the interests of the clients for whom counsel advocates.

[11] Plaintiffs' Rule 403 objection on this point is equally unavailing. According to plaintiffs, "[a] jury may easily confuse Mr. [*sic*] Langseth's opinions regarding area-wide spraying by Washington County as including McIntosh." (Doc. 309, at 15.) The Court trusts that plaintiffs will articulate that point with adequate clarity to the jury to ameliorate any meaningful risk of confusion. In any event, the probative value of evidence of the Washington County DDT spraying program in 1948 far outweighs any risk of prejudice or confusion borne from the program's reference to Washington County (in which McIntosh sits) rather than specifically to McIntosh itself.

without acknowledging that those communities "are contaminated by other non-manufacturing sources." (Doc. 351, at 2.) Again, this argument properly goes to the credibility of Dr. Langseth's testimony and opinions, rather than the relevance or reliability of his methodology, and is properly couched as cross-examination, not a *Daubert* objection.

## IV. Conclusion.

For all of the foregoing reasons, Plaintiffs' Motion to Exclude Portions of David Langseth's Expert Testimony, Opinions and Reports (doc. 309) is **denied**. There is a caveat, however. To the extent that Dr. Langseth may wish to offer new expert opinions based on the authorities identified in his Supplemental Report, he will not be permitted to do so at trial because such opinions were not rendered within the time frame mandated by the Federal Rules of Civil Procedure, the Rule 16(b) Scheduling Order, and relevant discovery protocols. To be clear, he will be permitted to identify those studies and to discuss their findings in general terms, but he may not present opinions as to the implications of those studies for plaintiffs' claims (unless, of course, plaintiffs open the door via cross-examination or otherwise).

DONE and ORDERED this 2nd day of March, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE