IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **CLEON ABRAMS, SR.,** *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION 08-0068-WS-B |
| | ) |
| **CIBA SPECIALTY CHEMICALS** | ) |
| **CORPORATION,** *et al.*, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

This matter comes before the Court on defendants' Motion in Limine Relating to Opinions or Testimony of Randy Horsak (doc. 312). The Motion has been briefed and the Court has carefully reviewed the parties' memoranda and supporting exhibits.[1]

**I.     Background.**

Plaintiffs are owners of property in and around McIntosh, Alabama, who allege that their homes have been contaminated by DDT and its metabolites (collectively, "DDTr") emanating from a nearby chemical manufacturing facility owned and operated by defendants (collectively, "Ciba"). On that basis, plaintiffs have brought causes of action against Ciba sounding in trespass, negligence, and nuisance. Although they initially claimed damages in the form of

---

[1]     The Court takes this Motion under submission without a hearing. The decision of whether to conduct a *Daubert* hearing in a particular case is discretionary. *See, e.g., Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2008) (in *Daubert* context, "although they are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law"); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) ("the trial court was under no obligation to hold" *Daubert* hearing, which was "not required, but may be helpful in complicated cases involving multiple expert witnesses") (citations and internal quotation marks omitted); *United States v. Frazier*, 387 F.3d 1244, 1264 (11th Cir. 2004) ("a district court need not conduct a *Daubert* hearing in every case"). In this case, defendants have presented their position on the admissibility of Horsak's testimony over the span of 22 pages of briefing. A hearing is not needed to enable the Court to understand the nature and bases of Horsak's opinions or to develop and define defendants' objections. In any event, no party has requested a *Daubert* hearing as to this particular motion.

diminution of their property's value, plaintiffs have since abandoned that theory of recovery, and are now seeking an award of compensatory damages for restoration costs, that is, the cost of reducing DDTr concentrations in their dwellings to a level of 10 parts per billion.

      Randy D. Horsak, P.E., is an engineer and environmental consultant with more than three decades of experience in the field of environmental science and engineering. (Doc. 312, Exh. 1, at § 1.1.) Plaintiffs retained Horsak for the limited purpose of preparing "an Engineering Cost Estimate to decontaminate and restore the indoor living environments" of plaintiffs' residences and to provide "similar estimates for restoring the attics at those residences with accessible attics." (*Id.* at § 1.2.) Because the remedy sought by plaintiffs is recovery of restoration costs, Horsak is effectively serving as plaintiffs' damages expert, providing specific data that the finder of fact can use in fixing damages for each plaintiff, should Ciba be deemed liable. To compute cost-of-remediation estimates on a plaintiff-specific basis, Horsak relied on baseline information collected during a site reconnaissance, considered the DDTr sampling results performed by other experts in and around plaintiffs' homes, worked from assumptions that the background DDTr concentration in household dust was 10 ppb and that 10 ppb was the requisite remediation target, and addressed 11 key restoration cost components (*i.e.*, goals and objectives, nature and extent of contamination, scope of work, calculation methods, base case cost, net present value cost, pricing basis, parametric sensitivity analysis, contingencies, cost risk analysis, and a catch-all category labeled "unknowns, assumptions, exclusions, deviations and Murphy's Law"). (*Id.* at §§ 4.2 - 4.3.) For those test plaintiffs whose residences were found to be contaminated with DDTr at a level exceeding 10 ppb, Horsak estimated costs of decontamination and restoration ranging from $6,382 to $33,131 per property. (*Id.* at § 5.0.)[2]

      Defendants now seek to exclude Horsak's opinions and estimates of cleanup costs on the grounds that they are "based upon a target level that is not established as the proper level," and

---

[2] Although not submitted specifically in the context of defendants' *Daubert* Motion, documentation in the court file reflects that Horsak's estimates of clean-up costs on a plaintiff-by-plaintiff basis for the remaining test plaintiffs are as follows, in alphabetical order: Sexton Adams ($20,162.63), Marie Evans ($12,816.38), Ruth Everette ($24,696.41), Toni Jackson ($7,620.25), Bertha Reed ($17,435.23), Wilford Taylor ($18,629.02), Etoria Toole ($29,108.73), Johnnie Ware ($17,471.18) and Annie Williams ($16,633.27). (Doc. 256, Exh. 9, at Exh. 4-1.)

that Horsak "discusse[d] the proper way to estimate remediation levels, and then he ignore[d] it in favor of the level the attorneys told him to use." (Doc. 312, at 6.) Defendants also frame this argument in terms of "fit" by asserting that Horsak "purports to provide an opinion as to the cost to clean-up the properties, but his target clean-up goal is far beyond what is necessary," such that "[h]is opinions relate to the cost to do something that no one has shown needs to be done." (*Id.* at 12.) Finally, defendants cast Horsak's damages estimates as unduly speculative because (1) he blindly applied the 10 ppb remediation target without confirmation or research into its validity, (2) in lieu of proper investigation and research, he built "a significant amount of extra cost into his assumptions ... based upon a paucity of data" that he could have corrected, and (3) he included cost elements that are unnecessary or gratuitous (such as hotel expenses for plaintiffs and allowances for project management and administration fees). (*Id.* at 13.)

## II.     Legal Standard.

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule 702," such that it "appropriately assists the trier of fact." *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005).[3] In that regard, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). This gatekeeping function is guided by the well-established principle that "[t]he proponent of the expert testimony carries a substantial burden under Rule 702" to show admissibility of that testimony by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The offering

---

[3]     Rule 702 reads as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder ..., by a preponderance of the evidence.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007); *see also Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (similar). That said, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). For that reason, courts have stressed that the *Daubert* inquiry is "a flexible one," that the *Daubert* factors are mere guidelines for applying Rule 702, and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances involved. *Brown*, 415 F.3d at 1267-68.[4] In performing a *Daubert* analysis, the Court's focus must be "solely on principles and methodology, not on the conclusions that they generate"; thus, it matters not whether the proposed expert testimony is scientifically correct, so long as it is shown to be reliable. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

### III.   Analysis.

#### A.   The Remediation Target.

Defendants' principal attack against Horsak's opinions is that his calibration of restoration cost estimates to a pie-in-the-sky 10 ppb remediation goal renders his opinions

---

[4] The Court also proceeds in recognition of appellate guidance that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert" or "because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Such circumstances may provide fertile ground for cross-examination at trial, but they do not constitute a permissible basis for excluding testimony altogether under Rule 702 and *Daubert*.

unreliable and irrelevant. Ciba submits several different iterations of this core argument in its principal brief. According to defendants, Horsak "selected a clean-up level of 10 parts per billion because Plaintiffs' counsel told him to." (Doc. 312, at 4.) Defendants state that while Horsak acknowledges "that a risk assessment is necessary to develop clean-up levels, ... he has not done any work to evaluate the possible risks to human health" but has instead "taken the clean-up level of 10 parts per billion from the attorneys who hired him." (*Id.* at 7.) Defendants' position is that Horsak thinks a risk assessment is necessary to evaluate the need and extent of any environmental clean-up, but that he failed to perform such a risk assessment here and "simply provided a report to clean up to levels suggested by Reich and Binstock [plaintiffs' law firm]." (*Id.* at 9.)[5] Because Horsak did not use scientific methodology to arrive at the 10 ppb

---

[5] As a threshold matter, defendants' contention that Horsak agrees that a risk assessment is a mandatory prerequisite to developing a remediation goal is both inaccurate and irrelevant. Horsak states in his report that "[g]enerally speaking, a contaminated property must be restored to either [a] its 'pre-contamination' conditions or, alternatively, [b] some condition that allows residual contamination to remain at the property, as determined by some regulatory requirement or guidance, or other criterion." (Doc. 312, Exh. 1, at § 3.1.) Horsak also opines that it is "difficult, if not impossible, to restore the subject properties to absolute 'pre-contamination' conditions, that is, with absolutely, zero DDT." (*Id.*) Defendants pair these statements out of context and construe them as an admission that only health-based remediation targets are permissible. But that is not a fair characterization of Horsak's report. Here, the "pre-contamination" target fixed by plaintiffs and Kaltofen was not 0 ppb, but 10 ppb (*i.e.*, the level of DDT that would be expected without Ciba-produced contamination). Horsak does not assert that such a clean-up target is "difficult" or "impossible" to achieve or that it otherwise lacks scientific validity in the absence of a risk assessment. To be sure, Horsak did testify that "[i]f there's no risk, there's probably no need to clean it up" and that "[t]ypically, when we do a cost estimate to decontaminate a house, a toxicologist or a medical doctor will give us input into what the level should be ...." (Doc. 312, Exh. 2 at 78, 85.) But defendants identify no testimony or opinions from Horsak that estimating decontamination costs for a dwelling is scientifically improper in the absence of a risk assessment. To the contrary, his report plainly reflects that other criteria may be used to set restoration levels. Besides, as discussed *infra*, plaintiffs have other experts and other evidence supporting the viability of the 10 ppb remediation target from a scientific standpoint, and its usefulness from a legal standpoint is not necessarily bound to human health effects at all. In light of these facts, and particularly the fact that other experts supply the foundation of the remediation target used in Horsak's cost estimates, "Horsak's personal opinions about whether and to what extent remediation is 'needed' or 'required' are unilluminating because they are beyond the scope of his limited expert involvement in this case." (Doc. 284, at 19.)

remediation target, defendants lambaste his opinions as nothing more than "pseudo-science" whereby Horsak is merely a "mouthpiece" for plaintiffs' attorneys. (*Id.* at 10.) Thoroughly flogging the dead horse, defendants go on to liken Horsak's opinions to a "baggy coat" and to assert that his failure to perform a comprehensive risk assessment before deciding the remediation target "renders his opinions useless to this case." (*Id.* at 12.)

In reviewing defendants' Motion and principal brief, the Court experienced a palpable sense of *deja vu*, not only because of the internal redundancy in those filings (with the same point being argued over and over again), but also because the Court had considered and rejected these very contentions in a summary judgment Order (doc. 284) entered weeks before defendants filed this *Daubert* Motion. In denying defendants' Rule 56 motion alleging that plaintiffs could not prove any damages, the Court found that defendants' suggestion that the 10 ppb remediation target had been spun from whole cloth by plaintiffs' lawyers "distorts the record." (Doc. 284, at 8 n.16.) After all, Horsak's testimony established "that he was not retained by plaintiffs to make any assessment of human health risks ... and that the scope of his opinions in this case is confined to cost estimates of decontamination and restoration of plaintiffs' properties." (*Id.*) Another plaintiffs' expert, Marco Kaltofen, P.E., a civil engineer who collected samples at plaintiffs' homes, had determined

> "that the appropriate 'background concentration' levels of DDTr in household dust are approximately 10 ppb. ... This 10 ppb figure represents the concentration of DDTr that one might reasonably expect to find in household dust samples taken from plaintiffs' property in the absence of environmental contamination from the nearby Ciba facility. ... Kaltofen's opinion concerning background DDTr concentrations in dust was relayed to plaintiffs' remediation expert, Horsak, as a remediation target value. Horsak then performed property-specific analyses to estimate the cost of cleaning up the DDT contamination on each test plaintiff's property to restore said property to the background 10 ppb concentration of DDTr."

(Doc. 284, at 8 (record citations and footnotes omitted).) In light of these facts, the Court opined that "plaintiffs have clearly come forward with a record basis for the 10 ppb figure utilized in Horsak's estimates." (*Id.* at 8 n.16.) To the extent that defendants' *Daubert* Motion against Horsak rehashes the incorrect notion that the 10 ppb remediation target is a made-up, lawyer-generated number with no scientific basis, that argument is again rejected for the same reasons identified in the October 1 Summary Judgment Order.

Defendants offer several variations on this theme, but all end the same way. For example, defendants criticize Horsak's opinions as unnecessary and lacking "fit" because "[h]is opinions relate to the cost to do something that no one has shown needs to be done, *i.e.*, clean up to 10 parts per billion." (Doc. 312, at 12.) Undergirding this premise is defendants' persistent stance that absent a "risk assessment performed by a toxicologist or someone with medical training to assess risk to human health," clean-up is not necessary at all. (*Id.* at 9.)[6] This argument is likewise a holdover from defendants' failed summary judgment motion. The October 1 Order dispatched this argument and found that jury questions were presented on the need for remediation to the 10 ppb level based on the following reasoning (none of which defendants acknowledge in their *Daubert* motion):

> "Recall that in a property damage case, Alabama law provides that compensatory damages are to be awarded flexibly based on the following simple inquiry: 'What will compensate the plaintiff for the injury he has received?' ... It is not at all apparent why health risks are or should be the exclusive touchstone of that inquiry in this case, as Ciba maintains. ... [T]here are innumerable examples where award of remediation costs may be sensible and appropriate in the property damage context to compensate a plaintiff for his or her injury, even in the absence of any human health implications whatsoever."

(Doc. 284, at 17-18 (citations omitted).) To sharpen the point, the October 1 Order further explained:

> "Test plaintiffs' deposition testimony makes clear that they do not like having DDT on their property, that the presence of DDT causes them worry and discontent on a variety of different levels, and that they want Ciba's DDT to be eliminated from their homes. What would compensate test plaintiffs for these

---

[6] Defendants reiterate this argument multiple times in their reply brief, where they castigate Horsak for "offer[ing] not a single credible scientific source supporting the need to clean up at all" and insist that "there is no evidence of either a risk to human health or an aesthetic need to clean up." (Doc. 343, at 3-4.)  These assertions constitute a thinly veiled improper re-argument of the cognizability of plaintiffs' damages theory, an issue that has already been thoroughly explored on summary judgment. The Court finds now as it did then: Under Alabama tort law, it is for the jury to decide whether remediation is appropriate if (a) Ciba has tortiously deposited a harmful, unwanted chemical on plaintiffs' properties in concentrations much greater than background, but (b) that chemical cannot be seen or smelled, and is in quantities too small to compromise human health. (*See* doc. 284, at 15-20.) If the jury determines that Ciba is liable and that plaintiffs were injured, then Horsak's testimony becomes instrumental to the jury's efforts to quantify the damages by fixing appropriate clean-up costs.

> injuries? That is for the jury to decide, but remediation of contaminants that Ciba caused to be on test plaintiffs' properties could reasonably be viewed by the factfinder as appropriate compensation. ... ***If Ciba caused unwelcome, unwanted foreign matter to invade and settle on test plaintiffs' properties, then the cost of removal of that foreign matter is a reasonable metric for making plaintiffs whole, irrespective of whether there is a health risk component to that foreign matter***."

(*Id.* at 20 (footnotes omitted and emphasis added).)

At the risk of belaboring the analysis, the Court observes that plaintiffs are offering Kaltofen's expert opinion that the expected background concentration of DDTr in the household dust of test plaintiffs' homes would be 10 ppb, in the absence of tortious activity by Ciba. The properties of all nine remaining test plaintiffs were found to have DDTr concentrations in excess of the 10 ppb background level. If the jury finds that Ciba is legally responsible for the above-background level of DDTr found on plaintiffs' properties, then it could reasonably determine that the appropriate measure of damages under Alabama law (*i.e.*, the amount that would compensate plaintiffs for their injuries) would be the cost of restoring their properties to that background 10 ppb level of DDTr contamination that would have been expected without Ciba's contributions. Thus, far from lacking "fit" or relating to a task that no one has shown needs to be done, as defendants insist, Horsak's decontamination estimates are clearly, logically and narrowly linked to plaintiffs' overall theory of the case and to the expected proof at trial. Plaintiffs will be asking the jury to award them damages to remove the DDTr that Ciba caused to be in their homes, and will be arguing that the DDTr to be removed equates to the difference between the current readings and the expected background concentration level. Should the jury determine that an award of remediation costs is warranted to make plaintiffs whole, then Horsak's calculations will be of great assistance to the jury in quantifying those damages. There is no "fit" problem.

Defendants next excoriate Horsak for failing to "exercise the requisite rigor of a scientist" because he did not look behind and verify independently the 10 ppb remediation parameter for which he was asked to compute engineering cost estimates. According to Ciba, by failing to investigate that number, to confirm Kaltofen's basis for same, or to select his own remediation target, Horsak is engaging in "pseudo-science" and serving as "nothing more than a mouthpiece for Kaltofen and Plaintiffs' counsel." (Doc. 312, at 10.) But this criticism

-8-

misconstrues the nature and purpose of Horsak's expert opinions in this case. He does not blindly adopt Kaltofen's background concentration figure as his own, nor does he unquestioningly vouch for its correctness or offer any opinions as to the proper remediation target. It is not his role in this case to opine that cleanup should be effected to a particular level. Rather, Horsak's testimony makes clear that "the decontamination criterion value is simply an input to a cost model that affects the field methods and intensity of decontamination, and the resultant cost." (Doc. 333, Exh. A, at 5.) Horsak was not retained by plaintiffs' counsel to fix that decontamination criterion value; rather, that value was generated through a combination of plaintiffs' legal theory of recovery (*i.e.*, plaintiffs seek to recover the cost of restoring their properties to a background level of DDTr contamination, eliminating the effects of Ciba's tortious conduct) and Kaltofen's expert opinions (*i.e.*, identifying the expected background level). If plaintiffs' legal theory of damages is viable and if Kaltofen's expert opinion as to expected background levels is admissible, then and only then do Horsak's decontamination cost estimates come into play.[7] Either way, however, defendants' "pseudo-science" and "mouthpiece" objections to Horsak's testimony are meritless because Horsak is neither passing

---

[7] In large part, defendants' *Daubert* challenge to Horsak is a backdoor attack on Kaltofen's opinions and plaintiffs' damages theory. Neither of these detours is appropriate in the context of this Motion. It is inefficient to utilize a *Daubert* motion concerning Horsak's opinions as a platform for questioning the admissibility of Kaltofen's opinions, especially when defendants have separately filed a *Daubert* motion targeting Kaltofen. The Court will not needlessly add to its inordinate workload in this case by taking up the admissibility of Kaltofen's opinions in ruling on the Horsak *Daubert* motion, when another iteration of the same arguments awaits it in the Kaltofen *Daubert* motion. The Court will assume for purposes of this Order that Kaltofen's background concentration figure is admissible. By the same token, defendants cannot properly use this *Daubert* motion to rehash and relitigate their failed summary judgment motion as to plaintiffs' damages theory, to which this Court wrote extensively on October 1, 2009. (*See* doc. 284.) Yet that is exactly what Ciba has attempted to do, by lodging a motion to reconsider in the guise of a *Daubert* motion.

Notwithstanding the foregoing, it is certainly true that Horsak's opinions are dependent on plaintiffs' remediation theory of damages and Kaltofen's estimate of background DDTr levels. If at any time the Court should determine that plaintiffs' decontamination theory of damages (*i.e.*, recovery of cleanup costs to reduce total DDTr levels in plaintiffs' homes to the background level) is not legally viable or that Kaltofen's opinions concerning the appropriate background level are not admissible, defendants may renew their motion to exclude Horsak's opinions.

off someone else's opinions as his own nor offering unfounded opinions as to the appropriate remediation targets himself.

### B.     Other Issues.

Aside from the cleanup level argument, defendants raise a number of other objections to Horsak's opinions. These can be quickly dispatched.

First, defendants find fault with Horsak's purported assumption "that there could be recontamination of the properties due to airborne dust or track-in from surface soil contamination." (Doc. 312, at 11.) However, the cited portion of the Horsak report actually states the opposite, setting forth an assumption "that recontamination will ***not*** occur as a result of further impacts from the Ciba Plant operations, airborne dust from contaminated surface soil contamination, tracking in of contaminated soil, etc." (Doc. 312, Exh. 1 at 14 (emphasis added).) Contrary to defendants' position, recontamination risk is thus an exclusion from Horsak's estimates, not an add-on. Defendants have identified no colorable basis for disputing the assumption of no recontamination, much less for holding that such an assumption disqualifies Horsak's opinions in their totality.[8]

Next, defendants maintain that Horsak's cost estimates are unduly speculative because, by allowing some latitude for "Murphy's Law" and other unknowns and deviations, he "builds a significant amount of extra cost into his assumptions." (Doc. 312, at 13.) This objection is meritless. Horsak's unrebutted testimony is that an engineering cost estimate that ignores unknowns, deviations, Murphy's Law, etc., is "inadequate." (Doc. 333, Exh. A at 5.)

---

[8]      Construing defendants' argument generously, it appears that they may have intended to attack Horsak's assumption that "[t]he levels of DDT measured are representative of the entire living space." (Doc. 312, Exh. 1, at 2.) Defendants have not persuasively shown, however, that this assumption is fatal to the reliability of Horsak's opinions. Indeed, in the absence of comprehensive sampling of every surface in every plaintiff's home (surely an impracticable and cost-prohibitive objective), such an assumption would appear to be imperative for the calculation of any remediation cost estimate. That said, the validity of this assumption in the context of Kaltofen's sampling efforts in this case may reasonably be questioned, especially if defendants are correct that DDTr levels in dust samples collected from refrigerator coils and vacuum cleaner bags are likely to be much higher than in other, unsampled areas of plaintiffs' homes. However, those issues have not been fleshed out in defendants' briefs; therefore, they are properly addressed via cross-examination and closing argument, rather than this Order.

Defendants have no answer to Horsak's assertion that accounting for such factors is a necessary component of any proper engineering cost estimate analysis. Moreover, defendants' suggestion that these factors transform his opinions into mere guesses is unfounded, in light of the evidence that Horsak performed a Monte Carlo Risk Analysis to simulate those unknowns over 40,000 iterations, in order to estimate the impact of those factors to 95% certainty, with such value being computed at 7% of base costs. (*Id.* at 7; doc. 312, Exh. 1 at 14.) There is nothing unduly speculative or unreliable about such a methodology.

Defendants also suggest that Horsak's calculations are unreliable because of his purportedly "frank admission" that they are based on a "paucity of data." (Doc. 312, at 13.) Ciba mischaracterizes Horsak's report. While it is true that he did use the phrase "paucity of data," Horsak did so not in the context of bemoaning a lack of information in this case but instead of stating the general proposition that "[a] paucity of data, or worse – conflicting data – can result in cost estimates that are incorrect or even misleading." (Doc. 312, Exh. 1 at 8.) Horsak never suggested that his estimates in this case suffer from a paucity of data or conflicting data.[9] Defendants' contention to the contrary is counterfactual.

As a further challenge, defendants balk at Horsak's inclusion of line items for hotel accommodations for plaintiffs during remediation, as well as a 10% markup for project management and administration. (Doc. 312, at 13.) Defendants may not like these line items, but they have not shown them to be improper components of the type of engineering cost estimates that Horsak was retained to provide in this case. With respect to hotels, Horsak explains that "[i]t is common practice to temporarily relocate the home owners during the decontamination for reasons of health and safety," and that those costs are reasonably included in his remediation computations. (Doc. 333, Exh. A, at 6.) Ciba submits neither expert opinion nor argument establishing otherwise. Likewise, Horsak justifies the project management and administration fee on the ground that a 10% markup for such services "is fully consistent with projects in the environmental sector which require some level of professional project

---

[9] In a rebuttal affidavit, Horsak eliminates any residual confusion on this point by expressly averring, "[I]t is my opinion that I had sufficient information from which to prepare a reasonable cost estimate" in this case. (Doc. 333, Exh. A at 6.) Again, defendants have made no persuasive showing otherwise.

management to plan, organize, and control the work," and that implementing a field decontamination program with no project management and administration (as defendants seem to propose) would be "a totally preposterous engineering approach." (*Id.* at 6.) Defendants have failed to show that Horsak's opinions in this case are rendered inadmissible by his inclusion of a project management line item in the cost calculations.[10]

Finally, defendants utilize their reply brief to unveil a new line of attack on Horsak's opinions, namely, that many inputs in his analysis appear to serve no purpose and that "the bottom line is that the estimates are square footage driven." (Doc. 343, at 4.) Defendants characterize his methodology as "basically a cleaning service charging by the square foot." (*Id.*) Defendants also offer new challenges pertaining to Horsak's treatment of attics and garages. (*Id.* at 3.) Having elected not to present these available arguments in their principal brief, it is improper for defendants to raise them in their reply, much less to devote nearly half of their reply brief to them. *See, e.g., Palmer v. City of East Brewton*, 2010 WL 231513, *4 (S.D. Ala. Jan. 14, 2010) ("[d]istrict courts, including this one, ordinarily do not consider arguments raised for the first time on reply") (citation omitted); *Abrams v. Ciba Specialty Chemicals Corp.*, --- F. Supp.2d ----, 2009 WL 3261264, *7 n.16 (S.D. Ala. Oct. 1, 2009) ("As defendants well know, new arguments are impermissible in reply briefs."); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief"). Defendants are well acquainted with this prohibition, yet they have once again disregarded it without explanation. The Court will not consider these improperly raised arguments.

### IV. Conclusion.

For all of the foregoing reasons, Defendants' Motion in Limine Relating to Opinions or

---

[10] The objection to the project management fee is particularly murky. Defendants suggest that Horsak's inclusion of this component of costs is tantamount to estimating the "cost of starting a remediation business, not the actual cost of remediation for these plaintiffs." (Doc. 312, at 13.) On their face, Horsak's estimates have no bearing whatsoever on start-up costs for a remediation business. Besides, given Horsak's opinion that project management and administration services are essential for this kind of field decontamination project, the "actual cost of remediation for these plaintiffs" would plainly encompass a markup of this sort.

Testimony of Randy Horsak (doc. 312) is **denied**.

DONE and ORDERED this 2nd day of March, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE