IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CLEON ABRAMS, SR., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION 08-0068-WS-B |
| ) | |
| CIBA SPECIALTY CHEMICALS ) | |
| CORPORATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ORDER**

This matter comes before the Court on plaintiffs' Motion to Exclude Elizabeth Anderson's Expert Testimony, Opinions, and Reports (doc. 304). The Motion has been briefed (although plaintiffs elected not to file a reply brief) and the Court has carefully reviewed the parties' memoranda and supporting exhibits.[1]

**I.     Background.**

Plaintiffs are owners of property in and around McIntosh, Alabama, who allege that their homes have been contaminated by DDT and its metabolites (collectively, "DDTr") emanating from a nearby chemical manufacturing facility owned and operated by defendants (collectively, "Ciba"). On that basis, plaintiffs have brought causes of action against Ciba sounding in

---

[1]     The Court takes this Motion under submission without a hearing. The decision of whether to conduct a *Daubert* hearing in a particular case is discretionary. *See, e.g., Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2008) (in *Daubert* context, "although they are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law"); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) ("the trial court was under no obligation to hold" *Daubert* hearing, which was "not required, but may be helpful in complicated cases involving multiple expert witnesses") (citations and internal quotation marks omitted); *United States v. Frazier*, 387 F.3d 1244, 1264 (11th Cir. 2004) ("a district court need not conduct a *Daubert* hearing in every case"). In this case, plaintiffs' objections to Dr. Anderson's opinions are straightforward, and rest to a large extent on the nexus of those opinions to the triable issues joined in this action, which can be readily discerned from the record. Under the circumstances, the Court perceives no benefit to conducting a hearing. In any event, no party has requested a *Daubert* hearing as to this motion.

trespass, negligence, and nuisance.[2] Although they initially claimed damages in the form of diminution of their property's value, plaintiffs have since abandoned that theory of recovery, and are now seeking an award of compensatory damages for restoration costs, that is, the cost of reducing DDTr concentrations in their dwellings to a level of 10 parts per billion.

Defendants retained Elizabeth L. Anderson, Ph.D., as "an expert in risk assessment who will testify that the levels of DDT in Plaintiffs' homes poses [*sic*] no health risk and does not need to be cleaned up." (Doc. 321, at 36.) In her report, Dr. Anderson explained that she applied a methodology developed by the U.S. Environmental Protection Agency for calculating risk-based screening levels specific to indoor dust, computed such screening levels for DDTr, and compared those levels to the sampling data collected by plaintiffs' experts. (Doc. 327, Exh. 1, at 2.) The result of this procedure was that Dr. Anderson found "no reason to believe that the concentrations in dust at any of the [test] plaintiffs' properties pose a threat to health" and "no rationale for cleaning these properties that can be related to possible adverse health impacts from DDT." (*Id.* at 3.) As these opinions demonstrate, Dr. Anderson is, in effect, defendants' damages expert. Even if plaintiffs prove at trial that Ciba engaged in tortious conduct which caused DDT to infiltrate and contaminate plaintiffs' homes, defendants will rely on Dr. Anderson's opinions to argue that plaintiffs have not been damaged and that clean-up is unnecessary because the concentration of DDTr measured in plaintiffs' homes is far below that which that might trigger health concerns.

Plaintiffs have now moved to exclude Dr. Anderson's opinions in their entirety, for the following stated reasons: (i) her opinions are irrelevant because this is a property damage case, while her testimony concerns health effects; (ii) her opinions will not help the jury decide whether DDT is on plaintiffs' property or whether Ciba put it there; (iii) she lacks scientifically reliable opinions as to health effects of DDT in household dust; (iv) she has ignored health risks associated with plaintiffs' past exposure to DDTr; and (v) her opinions are inadmissible under

---

[2] In their brief, plaintiffs suggest that their remaining causes of action in this case "include nuisance, trespass, strict liability and negligence." (Doc. 304, at 1.) But the Joint Pretrial Document (doc. 321), which constitutes the final statement of all triable claims joined in this action and which governs for trial purposes, omits any reference to a strict liability cause of action. As such, that claim is not joined for trial.

Rule 403 because they will likely confuse the jury.

## II.     Legal Standard.

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule 702," such that it "appropriately assists the trier of fact." *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005).[3]  In that regard, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007).  This gatekeeping function is guided by the well-established principle that "[t]he proponent of the expert testimony carries a substantial burden under Rule 702" to show admissibility of that testimony by a preponderance of the evidence.  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder ..., by a preponderance of the evidence.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007); *see also Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (similar).  That said, "[t]he rules relating to *Daubert* issues are not precisely

---

[3]     Rule 702 reads as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). For that reason, courts have stressed that the *Daubert* inquiry is "a flexible one," that the *Daubert* factors are mere guidelines for applying Rule 702, and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances involved. *Brown*, 415 F.3d at 1267-68.[4] In performing a *Daubert* analysis, the Court's focus must be "solely on principles and methodology, not on the conclusions that they generate"; thus, it matters not whether the proposed expert testimony is scientifically correct, so long as it is shown to be reliable. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

**III.    Analysis.**

    *A.    Relevancy Objection.*

Although other arguments are cited, the moving force of plaintiffs' Motion is their contention that Dr. Anderson's opinions are not relevant because "this is a property damage case, not a personal injury case. ... Ms. [*sic*] Anderson's opinions regarding the health effects of DDT have no bearing on the property issues in this case." (Doc. 304, at 4 (emphasis omitted).) It is, of course, true that "[t]he party offering the expert testimony has the burden of demonstrating that the testimony is relevant to the task at hand ...." *Boca Raton*, 582 F.3d at 1232. Nonetheless, plaintiffs' relevancy objection fails.

As a threshold matter, plaintiffs inexplicably ignore this Court's previous rulings that such evidence is relevant and will be allowed at trial, at least to a degree. For example, in a summary judgment order entered just weeks before plaintiffs filed their Motion, the undersigned explained why this evidence is relevant to this case, as follows:

    "[T]here is obviously a vigorous debate between the parties as to whether and to

---

[4]    The Court also proceeds in recognition of appellate guidance that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert" or "because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Such circumstances may provide fertile ground for cross-examination at trial, but they do not constitute a permissible basis for excluding testimony altogether under Rule 702 and *Daubert*.

> what extent clean-up of plaintiffs' properties is needed. Defendants argue that any need for clean-up should be pegged to human health risks, and that the presence of DDT at levels below those detrimental to human health does not warrant any award for clean-up. By contrast, plaintiffs' position is apparently that Ciba wrongfully caused this DDT to enter their property, that plaintiffs do not want DDT on their property, and that Ciba should have to pay the cost of removing it, irrespective of human health implications. Both sides will be allowed to make these arguments to the jury, which will then be tasked with determining what will compensate plaintiffs for the injuries received .... Defendants can make their human health showing to the extent it ties into their argument that there is no reason to clean up plaintiffs' homes (*i.e.*, that plaintiffs have no damages), but they are expected to do so in a concise manner that does not transform this trial into one about human health risks."

*Abrams v. Ciba Specialty Chemicals Corp.*, 2009 WL 3254443, *9 n.19 (S.D. Ala. Oct. 1, 2009) (emphasis omitted).

In another summary judgment ruling entered on the same day, the Court reached a similar conclusion, as follows:

> "[T]he parties (and principally Ciba) may have valid reason to present limited evidence to the jury concerning the human health dimension of the DDT contamination observed on test plaintiffs' properties. After all, upon learning that DDT is a possible or probable human carcinogen, the jury's verdict on damages may be unfairly skewed by inappropriate conclusions about health risks presented by defendants' actions. Under the circumstances, it is reasonable to allow the parties to present scientific evidence concerning the human health implications of the DDT contamination found on test plaintiffs' properties, so that the jury will be able to place in appropriate scientific context the measured concentrations of DDT for purposes of determining the sums that would compensate test plaintiffs for the complained-of injuries to their property."

*Abrams v. Ciba Specialty Chemicals Corp.*, 663 F. Supp.2d 1243, 1258-59 (S.D. Ala. 2009).

Plaintiffs fail to acknowledge the rationale of these decisions, much less to present any effective rebuttal. Moreover, plaintiffs' own remediation expert, Randy Horsak, P.E., has expressly testified that risk assessment routinely factors into the determination of appropriate clean-up levels to be used in calculating decontamination costs. According to Horsak, "[t]ypically, when we do a cost estimate to decontaminate a house, a toxicologist or a medical doctor will give us input into what the levels should be." (Doc. 312, Exh. 2, at 85.) Horsak further stated in his report that remediation targets may be properly "based on health and ecological based risk assessments and other considerations." (Doc. 312, Exh. 1, at § 3.1.) Given

the confirmation by their own remediation expert that a risk assessment of human health effects is an appropriate means of gauging the benchmark level of DDT which decontamination efforts should attain, plaintiffs' absolutist position that all evidence of health effects must be irrelevant because this is a property damage case is neither persuasive nor defensible.[5]

The fundamental insight here is a simple one that this Court has reiterated on muliple occasions in this case. The appropriate damages inquiry under Alabama law in cases of property damage is as follows: "What will compensate the plaintiff for the injury he has received?" *Borland v. Sanders Lead Co.*, 369 So.2d 523, 531 (Ala. 1979). Just as the Court cannot conclusively rule out the jury's use of non-health considerations in deciding whether plaintiffs have been damaged and if so, to what degree, the Court likewise cannot foreclose the jury's consideration of health evidence as a tool for answering those queries. *See, e.g., Abrams*, 663 F. Supp.2d at 1257-58.[6] In other words, notwithstanding plaintiffs' mantra that this is a property

---

[5] By all appearances, plaintiffs' relevance argument hinges a stray statement by defendants in a brief filed in August 2009, wherein they asserted that "potential health risks, much less calculations based on models of health effects, have no relevance to this litigation, and they certainly do not meet Plaintiffs' burden of proving they sustained *property* damage." (Doc. 243, at 15.) This statement appears to be nothing more than an ill-advised, off-the-cuff, but ultimately harmless argument based on the shifting expediencies of the moment. By essentially couching this remark as a waiver of defendants' right to put on risk assessment evidence, plaintiffs place far more weight on it than it can reasonably bear. Plaintiffs have always known that defendants retained Dr. Anderson to testify about risk assessment and health effects in this case; indeed, defendants stated as much in the same paragraph of the same brief from which plaintiffs culled the above-quoted passage. As such, plaintiffs cannot plausibly suggest that they were misled by defendants' argument, which the Court did not adopt, in any event. Besides, plaintiffs never developed a judicial estoppel argument, so the Court will not construct one for them.

[6] This summary judgment order stated, in part, as follows: "A jury could reasonably decide that the question of whether the observed DDT placed test plaintiffs' health at risk is beside the point. If Ciba caused unwelcome, unwanted foreign matter to invade and settle on test plaintiffs' properties, then the cost of removal of that foreign matter is a reasonable metric for making plaintiffs whole, irrespective of whether there is a health risk component to that foreign matter." *Id.* at 1258. That order included a specific determination that "a jury question exists as to whether the DDT concentrations observed on test plaintiffs' properties constitute 'substantial damage to the res'." *Id.* at 1255. Defendants' opposition brief improperly ignores (and, indeed, contradicts) that ruling, by arguing that "[i]f one cannot see or smell DDT in the Plaintiffs' homes, and it poses no health risk, it necessarily follows that DDT cannot

damage case, it would be reasonable for the finder of fact to determine that, if there are no health risks, plaintiffs have not been injured and do not require any cleanup of their properties to remove DDT that Ciba wrongfully deposited there. Dr. Anderson's opinions concerning the absence of health effects are therefore directly relevant to damages issues in this case.

### B. Other Objections.

Plaintiffs' remaining arguments for excluding Dr. Anderson's opinions are cursory and underdeveloped, and may be addressed in short order.

First, plaintiffs balk that Dr. Anderson's opinions will not assist the trier of fact, as required by Rule 702, Fed.R.Evid., because they "will not help the jury make a decision as to whether DDT exists on Plaintiffs' properties or whether Defendants have created a nuisance by allowing the DDT to escape their property and enter Plaintiffs' homes." (Doc. 304, at 5.) This argument is correct, as far as it goes. Dr. Anderson's testimony does not establish tortious conduct or causation, and will not help the jury to decide those issues. Defendants have never suggested otherwise. But her testimony may be extremely helpful to the jury in deciding questions of damages, as explained *supra*; therefore, Dr. Anderson's opinions unquestionably meet the "helpfulness" requirement of Rule 702.

Second, plaintiffs request that Dr. Anderson's opinions be excluded because she "does not have any scientifically reliable opinions regarding the health effects of DDT in household dust" and because "her opinions regarding the health effects of DDT according to the EPA's soil screening values are irrelevant." (Doc. 304, at 5.) Plaintiffs make no effort to expand on or flesh out these arguments. However, Dr. Anderson's report explains that she applied an established methodology for determining screening values for indoor dust, a methodology that the EPA has utilized for risk assessment purposes in its pesticide program, as well as at the World Trade Center disaster site and at least one Superfund site for indoor dust contamination. (Doc. 327,

---

constitute a substantial damage to the Plaintiffs' property." (Doc. 327, at 9.) This is not the first time that defendants have reacted to an unfavorable ruling in this case by simply pretending it does not exist in subsequent filings. Of course, plaintiffs have committed the same infraction, as evidenced by their relevance objection in this very Motion. The Court wearies of the parties' inefficient and disrespectful practice of selectively waving aside inconvenient rulings in this case that are not to their liking, and proceeding as if they never happened.

Exh. 1 at 18.) Plaintiffs do not explain why they think this methodology lacks scientific reliability, other than to suggest that the model was developed for "the World Trade Center catastrophe, a short-term incident." (Doc. 304, at 5.) It is not apparent why this proposed short-term / long-term distinction matters for reliability purposes, particularly where the EPA has also utilized this same methodology in the context of a Superfund risk assessment. The Court will neither formulate plaintiffs' arguments for them nor guess as to what those objections might entail. And plaintiffs' objection to "soil screening values" is soundly rebutted by Dr. Anderson's report, wherein she clarifies that her methodology "is a refinement on the standard approach for derivation of risk-based screening levels for soil" that specifically "incorporates dust-specific factors." (Doc. 327, Exh. 1 at 19.) Dr. Anderson further explains that her model "differs from the approaches used for soil, because it contains more sophisticated algorithms to describe the contact rates and ingestion." (*Id.* at 19 n.21.) Based on the plain text of her report, plaintiffs' accusation that Dr. Anderson wrongfully applied a soil screening level to an indoor dust case has no basis in fact.[7]

Finally, plaintiffs state that Dr. Anderson's opinions are inadmissible because she "only considers the risks going forward in time" and never "calculate[d] the risk associated with the Plaintiffs' past exposure to DDTr." (Doc. 304, at 5 (emphasis omitted).) Plaintiffs point to record evidence showing that Dr. Anderson did not assess the risks to plaintiffs from past DDT exposure, but they do not explain why that omission renders her opinions inadmissible. There is nothing obviously improper about performing a risk assessment that focuses on future exposure, especially when the purpose of the assessment is to fix appropriate remediation targets for a future cleanup. Plaintiffs do not articulate any legal argument showing why a risk assessment that fails to account for past exposure levels somehow flunks the reliability principles of *Daubert*. Again, the Court will not articulate plaintiffs' arguments for them or speculate as to what they might have intended, but failed, to state.

---

[7] The same conclusion attaches to plaintiffs' Rule 403 objection that "[a] jury may easily confuse Ms. [*sic*] Anderson's opinions regarding the EPA's screening values for DDT *in soil* as a standard for screening values for DDT in household dust in McIntosh." (Doc. 304, at 6 (emphasis in original).) Dr. Anderson's report is quite clear that she did not use soil screening values. Any confusion on this point lies with plaintiffs, not the jury.

**IV. Conclusion.**

For all of the foregoing reasons, Plaintiffs' Motion to Exclude Elizabeth Anderson's Expert Testimony, Opinions and Reports (doc. 304) is **denied**.

DONE and ORDERED this 2nd day of March, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE