IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CLEON ABRAMS, SR., *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   CIVIL ACTION 08-0068-WS-B |
| | ) |
| CIBA SPECIALTY CHEMICALS | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**ORDER**

This matter comes before the Court on plaintiffs' Motion to Exclude Portions of Paolo

Zannetti's Expert Testimony, Opinions, and Reports (doc. 310).  The Motion has been briefed

and the Court has carefully reviewed the parties' memoranda and supporting exhibits.[1]

**I.    Background.**

Plaintiffs are owners of property in and around McIntosh, Alabama, who allege that their

homes have been contaminated by DDT and its metabolites (collectively, "DDTr") emanating

from a nearby chemical manufacturing facility owned and operated by defendants (collectively,

"Ciba").  On that basis, plaintiffs have brought causes of action against Ciba sounding in

---

[1]       The Court takes this Motion under submission without a hearing.  The decision of
whether to conduct a *Daubert* hearing in a particular case is discretionary.  *See, e.g., Corwin v.
Walt Disney Co.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2008) (in *Daubert* context, "although they
are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or
established law"); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d
1092, 1113 (11th Cir. 2005) ("the trial court was under no obligation to hold" *Daubert* hearing,
which was "not required, but may be helpful in complicated cases involving multiple expert
witnesses") (citations and internal quotation marks omitted); *United States v. Frazier*, 387 F.3d
1244, 1264 (11th Cir. 2004) ("a district court need not conduct a *Daubert* hearing in every case").
In this case, plaintiffs seek to exclude only a small portion of Dr. Zannetti's opinions, based on
underlying circumstances that are uncontroverted.  As such, a hearing is not needed to enable the
Court to understand the nature and bases of Dr. Zannetti's challenged opinions or to develop and
define plaintiffs' objections.  In any event, no party has requested a *Daubert* hearing as to this
motion.

trespass, negligence, and nuisance.  Although they initially claimed damages in the form of diminution of their property's value, plaintiffs have since abandoned that theory of recovery, and are now seeking an award of compensatory damages for restoration costs, that is, the cost of reducing DDTr concentrations in their dwellings to a level of 10 parts per billion.

Defendants retained Dr. Paolo Zannetti (of California-based EnviroComp Consulting, Inc.) to provide expert opinions "in relation to the alleged atmospheric transport of DDT from the Ciba facility in McIntosh, AL to the neighboring community."  (Doc. 310, Exh A, at 4.)[2]  Dr. Zannetti is a physicist with expertise in "using computer models to simulate the transport and fate of atmospheric chemicals, including surface deposition phenomena."  (*Id.*)  Defendants have described Dr. Zannetti as "an air modeler" who "has evaluated Plaintiffs' experts' opinions regarding possible airborne dispersion of DDT from the plant."  (Doc. 321, at 36.)

Plaintiffs' *Daubert* Motion narrowly targets a specific aspect of Dr. Zannetti's testimony. In particular, one section of Dr. Zannetti's lengthy expert report challenges the estimate used by plaintiffs' fate and transport expert, Dr. Robert M. Scates, concerning comminution losses from the Ciba plant in McIntosh during the years in which DDT was produced at that facility.[3]  In calculating DDTr emissions from the Ciba plant, Dr. Scates estimated comminution losses at 2%, meaning that 2% of the DDT was escaping via vapor/air emissions during the process of

---

[2]      Although the expert report dated May 15, 2009 was identified as having been prepared by "EnviroComp Consulting, Inc.," rather than by Dr. Zannetti specifically, defendants did not initially disclose any expert witness from EnviroComp other than Dr. Zannetti.  Thus, when this expert report was produced to plaintiffs' counsel, it was properly viewed as the expert report of Dr. Zannetti, rather than that of a team of anonymous and undisclosed EnviroComp experts.

[3]      Plaintiffs' briefs frequently use the word "communition" in place of the correct term "comminution."  In any event, that term describes an industrial process that reduces a substance to powder, or pulverizes it.  At Ciba's McIntosh plant, DDT was subjected to a milling process that pulverized it into powder, or comminuted it.  Dr. Scates opined that a certain fraction of DDT powder would be lost via vapor/air emission during that process.  He then used that percentage in calculating order-of-magnitude estimates of total DDT emissions from the Ciba plant, to bolster his conclusion that the plant was the most likely source of the DDTr found in plaintiffs' homes.  Dr. Zannetti's report takes issue with the comminution loss figure utilized by Dr. Scates.

pulverizing the product into powder.[4]  Dr. Zannetti's report included a passage that was sharply critical of that analysis, advancing specific opinions as to the veracity of Dr. Scates' assumptions and estimates, as follows:

> "With respect to the statement regarding losses in comminution, this value of 2% does not correspond with normal operation of these devices.  Comminution is a closed milling process where the feed impacts the rotating blades and reflects back into the blades until it passes through a screen on the mill outlet ....  We do not have the drawings showing the actual installation, but the idea of allowing 2% of the product to be lost as dust leaks from this type of system is not reasonable.
>
> "To elaborate further, the comminution system is sealed to prevent leaks out of into the process. ... The amount of dust that might be released from these units would be a fraction of a pound over a period of processing several million pounds of product. ... The idea of having losses of 2% of production via leaks is totally contrary to the normal operating procedures in chemical operations.  Losses of this order would contaminate the workplace to an unacceptable level for normal operation and would reduce the economic viability of the process. ... Dr. Scates' 2% value is therefore a gross overestimation to quantify any production losses from Ciba ...."

(Doc. 310, Exh. A, at 45-46.)

Nowhere in the report did Dr. Zannetti indicate that these opinions concerning comminution losses were generated by a different EnviroComp scientist, or that they were someone else's words.  During his deposition taken on June 9, 2009, however, Dr. Zannetti came clean about the source of those opinions in the following excerpts:

> "My opinion is based on my discussions with industrial engineers and chemical engineers.  You know I'm a physicist, an atmospheric scientist.  So for this type of opinion I have discussion with experts, especially my senior chemical engineer, Dr. Michael Jennings."
>
>              *                        *                       *
>
> "Well, again, I'm not a chemical or a dust engineer, so I -- this sentence comes from my discussion with other experts.  This report is not just authored by me. ... So I -- I can only say that this seems to be the consensus with the expert I talk with."
>
>               *                       *                       *

---

[4]  The relevant portion of Dr. Scates' expert report stated as follows: "This assumes typical comminution loses [*sic*] on the order of 2% (Walas, 1988).  DDTr is estimated to be on the order of 50%" of those losses.  (Doc. 314, Exh. 6, at 4.)

> "I trust 100 percent the opinion of the people I talk with, and that's why I
> included these paragraphs in our report.  But in terms of being an expert in this
> industrial activity, no, I'm not an expert."

(Doc. 310, Exh. B at 31-33.)  Dr. Zannetti acknowledged in his deposition that this section of his

report was "mostly written by my senior associate Dr. Jennings."  (*Id.* at 34.)

The June 9, 2009 deposition of Dr. Zannetti marked the first occasion that plaintiff

learned of Dr. Jennings' involvement in this case, and his formulation of the opinions concerning

comminution loss rates contained in Dr. Zannetti's report.  Defendants had not previously

disclosed Dr. Jennings as an expert witness.  Nonetheless, on June 29, 2009, plaintiffs took Dr.

Jennings' deposition and had a reasonable opportunity to explore the bases of his opinions

concerning the comminution loss issue.  In his deposition, Dr. Jennings confirmed that Dr.

Zannetti had relied on him for the emission rate opinions in the report.  (Doc. 310, Exh. C at 6.)

Dr. Jennings admitted that he did not have a specific estimate for the comminution loss rate at

the Ciba facility during the relevant time period, although he claimed familiarity with the nature

of the process.  (*Id.*)  Dr. Jennings further testified that he did not know "the type of mill that was

there" and that his opinions were based in part "on [his] experience with milling."  (*Id.* at 9.)

Regarding the Ciba processes, Dr. Jennings explained that he "never did find anything that was

really a process-flow diagram that gave me all the flow data, pressures, and temperatures, and all

the other material that I'd normally want for a model."  (*Id.* at 12-13.)  Dr. Jennings also allowed

that he was making an assumption concerning the type of mill at the Ciba plant, but justified that

assumption by noting that "the statement said that it was a comminution [*sic*] unit."  (*Id.* at 13.)

## II.      Legal Standard.

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case

of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d

469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule

702," such that it "appropriately assists the trier of fact."  *United States v. Henderson*, 409 F.3d

1293, 1302 (11th Cir. 2005).[5]  In that regard, "[t]he court serves as a gatekeeper, charged with

---

[5]      Rule 702 reads as follows: "If scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). This gatekeeping function is guided by the well-established principle that "[t]he proponent of the expert testimony carries a substantial burden under Rule 702" to show admissibility of that testimony by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder ..., by a preponderance of the evidence.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007); *see also Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (similar). That said, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). For that reason, courts have stressed that the *Daubert* inquiry is "a flexible one," that the *Daubert* factors are mere guidelines for applying Rule 702, and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances involved. *Brown*, 415 F.3d at 1267-68.[6] In performing a *Daubert* analysis, the Court's focus

---

thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

[6]     The Court also proceeds in recognition of appellate guidance that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert" or "because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir.

must be "solely on principles and methodology, not on the conclusions that they generate"; thus, it matters not whether the proposed expert testimony is scientifically correct, so long as it is shown to be reliable. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

### III.    Analysis.

Plaintiffs' *Daubert* Motion concerning Dr. Zannetti's testimony actually encompasses two distinct questions, to-wit: (i) whether Dr. Zannetti should be excluded from offering expert opinions at trial concerning comminution losses and the veracity of Dr. Scates' estimates/ assumptions concerning vapor-emission rates in the comminution process; and (ii) whether the opinions of Dr. Jennings, which Dr. Zannetti has adopted as his own, satisfy the reliability prong of a *Daubert* analysis. These issues necessarily implicate a third legal inquiry, namely, whether Dr. Jennings may testify for Ciba at all given the untimely manner in which he was disclosed as an expert witness.[7]

### A.    *Dr. Zannetti Cannot Pass Off Dr. Jennings' Opinions as His Own.*

The record is clear that Ciba intends to call Dr. Zannetti as a witness at trial, and that Dr. Zannetti intends to offer opinions concerning the comminution loss rate utilized by Dr. Scates in calculating DDTr emissions from the Ciba plant during the period in which DDT was

---

2005); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Such circumstances may provide fertile ground for cross-examination at trial, but they do not constitute a permissible basis for excluding testimony altogether under Rule 702 and *Daubert*.

[7]    This collateral issue was properly raised by plaintiffs in connection with the parties' Joint Pretrial Document (doc. 321). In that filing, defendants identified Dr. Jennings as an expert whom they intend to call at trial to "testify about the manufacturing process and ... the inadequate and unsupported assumptions of Plaintiffs' expert Robert Scates." (Doc. 321, at 36.) Plaintiffs lodged an objection to this designation in the Joint Pretrial Document, on the ground that "Mr. *[sic]* Jennings was not disclosed as an expert or fact witness during this case pursuant to Fed. R. Civ. P. 26(a)(1) or Fed. R. Civ. P. 26(a)(2)." (*Id.*) In the wake of the Final Pretrial Conference, the parties submitted memoranda (docs. 360 & 364) addressing the untimeliness of Dr. Jennings' disclosure and whether he should be excluded on that basis; therefore, the parties have had ample opportunity to be heard concerning the consequences of defendants' belated disclosure of Dr. Jennings. Because the Court is already addressing the admissibility of Dr. Jennings' opinions in plaintiffs' *Daubert* motion, considerations of efficiency favor resolving plaintiffs' timeliness objection to that witness in this Order, as well, rather than writing to it separately.

manufactured there.  The clear purpose of such opinions is to discredit Dr. Scates' order-of-

magnitude calculations concerning DDT emissions from the Ciba plant, which figures are part of

a collage of evidence utilized by Dr. Scates in identifying the Ciba plant as the source of the

contamination found in plaintiffs' homes.[8]  The sticking point -- and the basis for plaintiffs'

Motion -- is that Dr. Zannetti's opinions on this topic are not really his opinions at all.  They are

Dr. Jennings' opinions.  Dr. Zannetti readily admits that he is a physicist, "not a chemical or dust

engineer," and that he is not "an expert in this industrial activity."  Nonetheless, Dr. Zannetti

proposes to offer specific opinions at trial as to vapor/air emission rates from the comminution

process at the Ciba plant, even though he did not formulate these opinions and disclaims any

expertise in the engineering discipline on which they are grounded.  Such testimony is improper

and impermissible under the Federal Rules of Evidence.

     To be sure, "[a]n expert witness is permitted to use assistants in formulating his expert

opinion, and normally they need not themselves testify."  *Dura Automotive Systems of Indiana,*

*Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002) (citing as paradigmatic example a case in

---

[8]     The Court is mystified by the vast effort the parties have expended in contesting this small aspect of Dr. Scates' proposed opinions.  After all, defendants have also filed a separate *Daubert* Motion targeted at Dr. Scates, which focuses to a large extent on those order-of-magnitude calculations.  Those computations were but one of many lines of evidence that Dr. Scates considered and synthesized in reaching his conclusion that the Ciba plant was the most likely source of plaintiffs' DDTr contamination.  The extreme lengths to which the parties have gone (in both the Dr. Scates-related *Daubert* motion and the Dr. Zannetti-related *Daubert* motion) to skirmish over this frankly minor supporting piece of Dr. Scates' analysis appears divorced from any sense of proportionality as to the significance of this evidence to the case, from either plaintiffs' or defendants' side.  That this evidence is likely of minor consequence is highlighted by its nature, as noted in the following excerpt from this Court's contemporaneous ruling on the Dr. Scates-related *Daubert* motion: "He is essentially making back-of-the-envelope calculations to reach a ballpark emissions figure using incomplete data from a half century ago, and filling gaps with assumptions drawn not from thin air ... [but that] are admittedly imprecise and subject to second-guessing."  This evidence is hardly the fulcrum on which this litigation rests, yet the parties have committed considerable resources (of their own and of this Court) to litigating the admissibility of this testimony (and defendants' rebuttal evidence) from every conceivable angle.  The parties are cautioned that this Court will not allow the trial to be hijacked, or the time of the jury to be wasted, by the over-lawyering of tertiary concerns like this one.  In this regard, the Court will not hesitate to sustain Rule 403 objections should either side embark on lengthy tangents concerning collateral matters.

which "assistants" are gofers or data gatherers who do not exercise professional judgment beyond the expert's ken); *see also TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (recognizing that Rule 703 "allows an expert to base an opinion on facts or data not admissible in evidence if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject"); *McReynolds v. Sodexho Marriott Services, Inc.*, 349 F. Supp.2d 30, 37 (D.D.C. 2004) (under Rule 703, expert statistician can rely on staff members to write the computer code on which his analysis and opinions are based).  But there are well-defined limits to this principle.  "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be responsible science."  *Dura*, 285 F.3d at 614 (citing as example a situation in which theoretical economist who lacked expertise in econometrics testified to findings of an econometrician's study, raising questions that only an econometrician could answer).[9]  One federal appeals court found that an expert's testimony was inadmissible, where he "clearly adopted the projections" of another expert, lacked "any familiarity with the methods or reasoning used by" that other expert, and "in essence assumed the very matter at issue on which he was called to express his opinion,"

---

[9]     This proposition enjoys broad acceptance among federal courts.  *See, e.g., Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.2d 558, 664 (S.D.N.Y. 2007) (although Rule 703 allows experts to rely on opinions of others, "the expert witness must in the end be giving his *own* opinion.  He cannot simply be a conduit for the opinion of an unproduced expert."); *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp.2d 722, 729 (E.D.N.C. 2007) ("the wholesale adoption of the opinion of another expert verbatim cannot be within the intent of Fed.R.Evid. 702" and the court "performing its gatekeeping function necessarily must ensure that [the expert] is not merely parroting the opinions of others"); *Fowler v. United States*, 2009 WL 2827958, *9 n.59 (W.D. La. Sept. 1, 2009) ("It is well settled that an expert ... may not simply parrot the work actually done by another expert ...."); *Wolkowitz v. Lerner*, 2008 WL 1885770, *4 (C.D. Cal. Apr. 21, 2008) (agreeing that expert "should not be permitted to serve as a conduit for the opinions of undisclosed experts") (internal quotation marks omitted); *Reginald Martin Agency, Inc. v. Conseco Medical Ins. Co.*, 2007 WL 831613, *3 (S.D. Ind. Mar. 5, 2007) ("What an expert may not do is act as a 'mouthpiece' for another undisclosed expert."); *St. Paul Fire and Marine Ins. Co. v. Nolen Group, Inc.*, 2005 WL 1168380, *9 (E.D. Pa. May 13, 2005) ("an expert may rely on the work of others, but the expert must be able to testify to the veracity of that work"); *see generally* C. Wright & V. Gold, 29 *Federal Practice & Procedure:  Evidence* § 6274 (1st ed.) ("A court also may reject expert testimony under Rule 703 where the witness relies on the findings of an expert in a different field and, because the witness is not an expert in that field, can only parrot and not critically evaluate those findings.").

such that his "lack of familiarity with the methods and the reasons underlying [the other expert]'s projections virtually precluded any assessment of the validity of the projections through cross-examination." *TK-7*, 993 F.2d at 732.[10]

Dr. Zannetti's report and deposition testimony are absolutely clear on this point. He is acting as a mere conduit for Dr. Jennings' opinions, passing off the opinions of that undisclosed expert as his own even though they admittedly are outside his ken. What he seeks to do extends far beyond mere "rel[iance] on information and data provided by [Dr.] Jennings," as defendants have wrongly characterized it. (Doc. 328, at 4.)[11] Of course, Dr. Zannetti is free to rely on information and data from another expert in formulating his opinions. However, at the end of the day, it is imperative that Dr. Zannetti apply <u>his</u> knowledge to the facts and form <u>his</u> own opinion. As to the comminution loss rates and emission estimates, Dr. Zannetti did nothing of the sort, but instead served as a conduit for the undisclosed Dr. Jennings. This is not a circumstance where Dr. Zannetti used the undisclosed expert's opinion as an input in performing his own analysis and forming his own opinions (as was the case for Dr. Horsak's use of a remediation target derived from another expert's opinions). To the contrary, Dr. Zannetti's opinion is that plaintiffs' comminution loss figures are wrong, but he has no expertise in that

---

[10]    Defendants are familiar with this line of authorities. After all, they cited some of them in arguing their *Daubert* motion concerning plaintiffs' remediation expert, Randy Horsak. In the context of that motion, Ciba urged exclusion of Horsak's opinions because he "simply parroted" someone else's opinions and acted as "nothing more than a mouthpiece" for another expert. (Doc. 312, at 10.) Ultimately, the Court disagreed with defendants' application of those principles to Horsak, because Horsak was not in fact parroting anyone else's opinions as his own. But Dr. Zannetti is. Given defendants' awareness of these principles, and their express invocation of them in arguing a contemporaneous motion in this very case, the Court is hard-pressed to understand how Ciba could in good faith have taken the position that Dr. Zannetti is "clearly entitled" to parrot Dr. Jennings' opinion as his own, when that view is obviously contrary to law and contradicted by defendants' own arguments elsewhere in this case. (Doc. 328, at 4.)

[11]    Equally inaccurate is defendants' suggestion that "the foundation for those opinions was in part supported by Dr. Jennings' expertise." (Doc. 360, at 4.) No matter how defendants try to massage or obscure them, the facts unequivocally demonstrate that these were Dr. Jennings' opinions, which Dr. Zannetti adopted wholesale, without filtering them through any expertise, experience or analysis of his own, save his general sense that he trusts Dr. Jennings.

area and is simply repeating what Dr. Jennings told him.  Such bootstrapping of an undisclosed expert witness's opinions into the reports and testimony of another is plainly improper, where the disclosed expert is treating those opinions as his own (rather than simply relying on information from another expert as underlying data from which he formulates his own expert opinions).

Accordingly, the Motion to Exclude is **granted**.  Defendants will not be permitted to introduce expert testimony, opinions or reports from Dr. Zannetti at trial concerning the validity of the 2% vapor/air emission rate (*i.e.*, losses from comminution) applied by Dr. Scates in his order-of-magnitude estimates of emissions from the Ciba plant during the so-called DDT production years.

### B.       *Dr. Jennings Was Not Timely Disclosed, but the Delay Was Harmless.*

Because Dr. Zannetti cannot testify as to Dr. Jennings' expert opinions concerning emission rates from the comminution process, the next question is whether Dr. Jennings may offer those opinions.

Plaintiffs' threshold objection to Dr. Jennings is that Ciba did not timely disclose him as a witness.  In that regard, it is undisputed that defendants failed to list Dr. Jennings as an expert witness in either their initial or expert disclosures pursuant to Rules 26(a)(1) & (2), Fed.R.Civ.P.  It is further undisputed that plaintiffs first learned during Dr. Zannetti's deposition on June 9, 2009, of Dr. Jennings' identity and his authorship of the engineering opinions on comminution losses set forth in Dr. Zannetti's report.  This, of course, was long after the initial disclosure deadline.  Moreover, by Order (doc. 152) entered on April 9, 2009, Magistrate Judge Bivins had granted Ciba's request for extension and set the deadline for defendants' expert disclosures at May 15, 2009.  Thus, the record unambiguously establishes that Ciba did not disclose Dr. Jennings to plaintiffs as an expert witness in the field of process engineering until after the initial and expert disclosure deadlines had expired.  Any suggestion by defendants that Dr. Jennings was timely disclosed is irreconcilable with the facts.

Ciba's omission in this regard implicates Rule 37(c)(1), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence ... at a trial, ***unless the failure was substantially justified or is harmless.***"  Rule 37(c)(1), Fed.R.Civ.P. (emphasis added).  "Under

Rule 37(c)(1), a district court clearly has authority to exclude an expert's testimony where a party has failed to comply with Rule 26(a) unless the failure is substantially justified or is harmless." *OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1363 (11th Cir. 2008) (emphasis omitted).[12]  Defendants' only attempt at showing substantial justification is their incorrect suggestion that it was appropriate for Dr. Zannetti to embrace Dr. Jennings' opinions as his own, without telling plaintiffs either that Dr. Jennings was the source of those opinions or that Dr. Jennings would be testifying to same at trial.  Clearly, this is not a substantial justification for defendants' violation of their disclosure obligations under the Federal Rules of Civil Procedure and the discovery orders governing this case.

That said, Rule 37(c)(1) does not require a witness's exclusion if the non-disclosure was harmless.  The burden is on the party facing the sanctions (*i.e.*, Ciba) to make the requisite showing of harmlessness.[13]  Defendants argue that the harmlessness safety valve to Rule 37(c)(1) sanctions is present here because Dr. Jennings' "opinions are contained in Dr. Zannetti's report" and "[p]laintiffs have had as much access to Dr. Jennings as they would have had to any expert," inasmuch as "[p]laintiffs cannot claim that they were unaware of Dr. Jennings or his testimony; they have deposed him."  (Doc. 360, at 3.)  There is support in the case law (albeit none cited by defendants) for the proposition that nondisclosure is harmless if the other side had a fair opportunity to depose the witness.  *See, e.g., U.S. ex rel. Purcell v. MWI Corp.*, 520 F. Supp.2d 158, 168 (D.D.C. 2007) ("The harm from the failure to disclose a witness flows from the unfair surprise hindering the prejudiced party's ability to examine and contest that witness' evidence.");

---

[12]      *See also Reese v. Herbert*, 527 F.3d 1253, 1265-66 (11th Cir. 2008) (explaining that Rule 26 requirements are not merely aspirational, and that district court clearly acted within its discretion by excluding witness where party's failure to comply with Rule 26(a) was both unjustified and harmful); *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004) (opining that it is "within the sound discretion of the trial judge to sanction plaintiffs for their failure to disclose by enforcing the unambiguous terms of Rule 37(c)").

[13]      *See, e.g., Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001) ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness."); *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001) (similar); *Harrison Bros. Dry Dock & Repair Yard, Inc. v. Pan Agri Int'l, Inc.*, 2009 WL 3273926, *3 (S.D. Ala. Oct. 9, 2009) ("The burden is on the nondisclosing party to demonstrate ... that its failure to disclose ... is harmless.").

*Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 303, 310 (E.D. Pa. 2007) (denying motion to exclude witness testimony under Rule 37(c)(1) for untimely disclosure, and instead granting other party leave to depose witness); *Spray-Tek, Inc. v. Robbins Motor Transp., Inc.*, 426 F. Supp.2d 875, 881 (W.D. Wis. 2006) (nondisclosure was harmless where other party had reasonable opportunity to depose expert and solicit expert opinions of its own).

The purpose of Rule 37(c)(1) is to eliminate unfair surprise to the opposing party. Inasmuch as plaintiffs are fully aware of the portion of Dr. Zannetti's report authored by Dr. Jennings, and availed themselves eight months ago of a court-ordered opportunity to depose him concerning those opinions, the Court agrees with Ciba that the nondisclosure is harmless and that plaintiffs have not been prejudiced.[14]  For that reason, the Court will not exclude Dr. Jennings' testimony in its entirety based on defendants' unjustifiable delay in disclosure.  Plaintiffs' objection to defendants' inclusion of Dr. Jennings as an expert witness, as set forth in the Joint Pretrial Document, is **overruled**.  Defendants will not be barred by Rule 37(c)(1) from calling Dr. Jennings at trial to testify to his opinions concerning comminution losses and vapor/air emission rates, as documented in Dr. Zannetti's expert report and plaintiffs' deposition of Dr. Jennings.

---

[14]      Plaintiffs' contention that they incurred prejudice by this sequence of events is not persuasive.  Plaintiffs complain that they did not know about Dr. Jennings' existence or involvement in the case until they took Dr. Zannetti's deposition in June 2009, but they do not say how the belated nature of this information was, in and of itself, prejudicial.  (*See* doc. 364, at 2.)  They argue that defendants deceived them by omitting references to Dr. Jennings in Dr. Zannetti's report, even though Dr. Jennings co-wrote it.  But the test is whether the nondisclosure was harmless, not whether the nondisclosing party's conduct was laudable.  The key fact is that plaintiffs admittedly learned the truth with ample time to take corrective measures by deposing Dr. Jennings.  So where is the prejudice or unfair surprise?  Plaintiffs protest that they never saw Dr. Jennings' *curriculum vitae* until the November 2009 submission of the parties' Joint Pretrial Document; however, they do not assert that defendants had wrongfully withheld that CV, or that they had ever requested it between the time that they learned of Dr. Jennings' involvement and the November 2009 Joint Pretrial Document submission.  Plaintiffs cannot be heard to complain of unfair prejudice because defendants failed to give them a CV for Dr. Jennings if plaintiffs never requested it.  There is no indication that such a request was ever made.  In sum, plaintiffs have failed to rebut defendants' showing of harmlessness as to Dr. Jennings' testimony concerning opinions set forth in Dr. Zannetti's report and Dr. Jennings' own deposition transcript.

This does not mean, however, that defendants are free to elicit any opinions from Dr. Jennings that they wish, without boundaries.  As the Court understands it, Dr. Jennings' opinions set forth in his deposition testimony and in Dr. Zannetti's report were confined to the very narrow issue of comminution losses, including the validity of the 2% figure utilized by Dr. Scates in estimating vapor/air emission rates at the Ciba plant, and the validity of Dr. Scates' assumption that 50% of the comminution losses consisted of DDT.  (*See* doc. 310, Exh. A, at 45-46.)  In connection with the *Daubert* motions as to Dr. Scates and Dr. Zannetti, however, defendants submitted an 11-page Affidavit (doc. 328, Exh. B) from Dr. Jennings dated October 5, 2009, setting forth opinions that extend beyond these areas.  Indeed, far from being limited to the 2% comminution loss and 50% DDT content assumptions, Dr. Jennings' October 5 Affidavit launches a broad-based attack on Dr. Scates' methodology, including opinions in such areas as (a) Dr. Scates' "lack of understanding of the manufacturing concept of percent of yield of production to theory"; (b) Dr. Scates' "unawareness of the role that vapor pressure of the material and solubility of the material play in the transport of that material"; and (c) Dr. Scates' "disregard[ of] those portions of the production process used to capture and recycle unspent reactants." (Doc. 328, Exh. B, at 2-3, 9-10.)  Plaintiffs have characterized these opinions from the October 5 Affidavit as "new opinions which should have been set forth from the outset in [Dr.] Zannetti's initial report or in a timely supplemental report." (Doc. 364, at 3.)  Defendants have not rebutted this accusation, and nothing in the materials before the Court suggests that Dr. Jennings' opinions in these areas were disclosed to plaintiffs at any time prior to October 5, 2009.  In short, it appears that the October 5 Affidavit, submitted in the context of hotly contested *Daubert* motions, came as a surprise to plaintiffs and that defendants had ignored their disclosure and supplementation obligations in failing to furnish those opinions to plaintiffs previously.[15]

---

[15]   The Court recognizes, of course, that the Federal Rules of Civil Procedure do not "limit an expert's testimony simply to reading his report. ... The rule contemplates that the expert will supplement, elaborate upon, [and] explain ... his report in his oral testimony." *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (citations and internal quotation marks omitted).  But the Rules do not contemplate that an expert will unveil brand new opinions, as Dr. Jennings has done, well after the discovery deadline, in an act of unfair surprise to the opposing party, without timely disclosure and supplementation.

To the extent that Dr. Jennings' October 5 Affidavit does set forth new opinions that were not previously disclosed, plaintiffs are prejudiced because they have not been able to depose Dr. Jennings about these matters.  The Court therefore **sustains** plaintiffs' objection to Dr. Jennings insofar as defendants would elicit from him opinions beyond the scope of those he wrote in Dr. Zannetti's initial report or those to which Dr. Jennings testified in his subsequent deposition.  For defendants to call upon Dr. Jennings to testify as to a litany of previously unidentified defects in Dr. Scates' opinions, when these opinions of Dr. Jennings were not disclosed until well after the discovery deadline, would constitute unfair surprise, would be prejudicial to plaintiffs, and would violate both the Federal Rules of Civil Procedure and the discovery orders entered by Magistrate Judge Bivins.

### C.      Daubert *Issues Pertaining to Dr. Jennings' Opinions.*

The final category of issues implicated by this multi-headed hydra of a *Daubert* Motion concerns the reliability of Dr. Jennings' opinions.  Plaintiffs argue that Dr. Jennings is making "mere guesses" as to the propriety of the 2% comminution loss rate utilized by Dr. Scates.  (Doc. 310, at 9.)  In particular, plaintiffs contend that Dr. Jennings must be speculating because "he had no specific information about what type of mill was used in the Ciba-Geigy plant" in the 1950s and 1960s and "no knowledge of Ciba-Geigy's process for making DDT."  (*Id.* at 8.)

However, the record is clear that Dr. Jennings did not engage in pure guesswork about manufacturing processes at the Ciba plant.  Rather, he reviewed thousands of pages of discovery materials concerning the DDT manufacturing process in McIntosh, as well as deposition transcripts and all of Dr. Scates' materials and reports. (Doc. 328, Exh. A at 12, 17.)  Of course, in reaching his opinions as to comminution loss rates, Dr. Jennings encountered the same practical obstacles that Dr. Scates did.  The manufacturing process for DDT is not in place at the Ciba site today because DDT has not been produced there since the 1950s and 1960s.  Worse still, the documents describing that process from roughly a half century ago lack comprehensive detail.  Those uncertainties and unknowns plague the analyses of Dr. Scates and Dr. Jennings equally.  Ultimately, the most fundamental flaw with plaintiffs' reliability criticism of Dr. Jennings' testimony is that they take him to task for lacking perfect information about the DDT manufacturing process in McIntosh, without acknowledging that their own expert (Dr. Scates) was working under the same informational shortcomings in formulating his opinions on the same

subject.  So plaintiffs are essentially asking this Court to hold Dr. Jennings' testimony to a more stringent standard of admissibility than their own expert, when both reviewed the same materials and same evidence, but simply drew different conclusions.  This is not a viable *Daubert* challenge.  Surely, if Dr. Scates can "assume[] typical comminution loses [*sic*] on the order of 2%" based on a citation to a 1988 study in the literature (doc. 314, Exh. 6 at 4), then Dr. Jennings can offer opinions as to the veracity of those estimates by studying documents concerning "the back end of the plant where they did the flaking and the milling" and "those flow sheets that were supplied." (Doc. 328, Exh. A, at 19.)  Based on his review of those materials, and his decades of experience as a process engineer, Dr. Jennings opined that the flaking and milling processes (which would encompass comminution) for DDT at the Ciba plant were "all closed" and that it was a "closed system" (*id.* at 19-20), such that expected comminution losses would be minimal.  (Doc. 310, Exh. A at 45.)  This opinion may face close scrutiny on cross-examination, but it meets the requisite indicia of reliability, relevance and helpfulness for admissibility under the *Daubert* line of authorities and Rule 702.

In their reply brief, plaintiffs argue for the first time that Dr. Jennings' "opinions regarding communtion [*sic*] rates at the Ciba-Geigy plant during DDT production years are based on an incorrect assumption regarding the type of milling/grinding process used." (Doc. 350, at 2.)  Nowhere in their principal brief did plaintiffs assert that Dr. Jennings' opinions fail basic admissibility standards because he wrongly assumed that the milling process was open, rather than closed.  Nor have plaintiffs made any effort to explain their failure to articulate this specific objection in their principal brief.  As this Court has observed many times, raising new arguments of this sort in a reply brief is improper.  *See, e.g., Palmer v. City of East Brewton*, 2010 WL 231513, *4 (S.D. Ala. Jan. 14, 2010) ("[d]istrict courts, including this one, ordinarily do not consider arguments raised for the first time on reply") (citation omitted); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief").  The Court therefore declines to reach the merits of this aspect of plaintiffs' admissibility challenge.[16]

_____

[16]      Even if this argument had been timely raised, it is unpersuasive.  Plaintiffs reason that Dr. Jennings' conclusion that a closed milling process had been used must be wrong because

Plaintiffs' *Daubert* objections to Dr. Jennings' opinions concerning comminution losses and vapor/air emission rates at the Ciba plant are **overruled**.

IV.     **Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.      Plaintiffs' Motion to Exclude Portions of Paolo Zannetti's Expert Testimony, Opinions, and Reports (doc. 310) is **granted**.  Defendants will not be permitted to introduce expert testimony, opinions or reports from Dr. Zannetti at trial concerning the validity of the vapor/air emission rate (*i.e.*, losses from comminution), or the DDT content of same, applied by Dr. Scates in his order-of-magnitude estimates of emissions from the Ciba plant during the DDT production years.

2.      Plaintiffs' objection in the Joint Pretrial Document to defendants' inclusion of Dr. Jennings as an expert witness on the basis that he was not timely disclosed, is **overruled**.  Defendants will not be barred by Rule 37(c)(1) from calling Dr. Jennings at trial to testify to his opinions (as documented in Dr. Zannetti's expert report and plaintiffs' deposition of Dr. Jennings) concerning Dr. Scates' estimates of comminution losses and vapor/air emission rates.

3.      Plaintiffs' objection to defendants' post-discovery attempts to inject new opinions

---

he based it solely on production diagrams, while Dr. Scates found that an open process had been used based on his review of those same diagrams plus his interviews of witnesses who worked at the plant during the production years of the 1950s and 1960s. (Doc. 350, at 2.)  Plaintiffs characterize Dr. Scates' conclusion as "rock solid," and contend that Dr. Jennings' opinions fail as a matter of law because he does not share that conclusion. (*Id.* at 3.)  But Dr. Jennings has reviewed all of the same materials that Dr. Scates did, including the materials that Dr. Scates relied on in forming his opinions.  So he was aware of those interviews, even if he did not conduct them himself.  Dr. Scates' opinion that the process was open is just that: an opinion. The Court cannot find that it was unreasonable or unreliable as a matter of law for Dr. Jennings not to afford primacy to Dr. Scates' interview results, taken some 50 years after the fact.  That Dr. Jennings chose not to weight interviews with witnesses as dispositive, or more significant than the written materials, flow sheets, and his own experience and expertise on which he relied, does not render his opinions inadmissible under *Daubert* principles.  Plaintiffs are of course free to cross-examine Dr. Jennings on this point, but they cannot bar his testimony simply because he does not share Dr. Scates' view (based on review of the same materials) that the milling process must have been an open system, not a closed one.

from Dr. Jennings beyond the scope of those identified in paragraph 2, above, is **sustained**.  Defendants will not be permitted at trial to elicit from Dr. Jennings opinions beyond the scope of those which he wrote in Dr. Zannetti's initial report or to which he testified in his subsequent deposition.

4.      Plaintiffs' *Daubert* objections to Dr. Jennings' opinions concerning comminution losses and vapor/air emission rates at the Ciba plant are **overruled**.

DONE and ORDERED this 2nd day of March, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE