IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CLEON ABRAMS, SR., *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION 08-0068-WS-B |
| | ) |
| CIBA SPECIALTY CHEMICALS | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**ORDER**

This matter comes before the Court on plaintiffs' Motion in Limine (doc. 311). The Motion has been briefed and is ripe for disposition.

**I.   Nature of the Case.**

Plaintiffs are owners of property in and around McIntosh, Alabama, who allege that their homes have been contaminated by DDT and its metabolites (collectively, "DDTr") emanating from a nearby chemical manufacturing facility owned and operated by defendants (collectively, "Ciba"). On that basis, plaintiffs have brought causes of action against Ciba sounding in trespass, negligence, and nuisance. Although they initially claimed damages in the form of diminution of their property's value, plaintiffs have since abandoned that theory of recovery, and are now seeking an award of compensatory damages for restoration costs, that is, the cost of reducing DDTr concentrations in their dwellings to a level of 10 parts per billion.

This action is set for trial before the undersigned on March 30, 2010. Plaintiffs seek to exclude defendants from introducing evidence or argument at trial concerning some 22 topics. Each of these items will be addressed in turn.

**II.   Analysis.**

    *A.   Economic Benefits of Ciba Plant.*

Plaintiffs ask the Court to bar defendants from making any reference "that any community has benefited economically from the presence of the Defendants' facilities" anywhere in the United States. (Doc. 311, at 2.) Contrary to plaintiffs' position, such evidence

is neither prejudicial nor irrelevant, provided that it is presented as background and defendants do not belabor the point in a manner that shifts the Rule 403 balance to favor exclusion. The parties will be permitted to tell their respective sides of the story to the jury. If plaintiffs intend to cast the Ciba plant as a wellspring of contamination and a scourge to the people of McIntosh (and all indications are that they do), then defendants are entitled to apprise the jury of the positive dimensions of that facility's presence in McIntosh. Accordingly, defendants will be afforded some leeway on this point. Plaintiffs' Motion in Limine is **denied** in this respect, subject to plaintiffs' right to renew their objection if defendants dwell on this line of evidence excessively.

> B.      *Settlement Negotiations.*

The parties are in agreement that neither side may offer evidence of settlement negotiations at trial, pursuant to Rule 408, Fed.R.Evid. The Motion in Limine is **granted** on this point, provided that the proscriptions of Rule 408 will be enforced equally against both sides, not just Ciba.

> C.      *Receipt of Settlement Funds from the* **LaBauve** *Matter.*

Plaintiffs next seek to preclude defendants from making any reference to settlement payments made in the predecessor *LaBauve v. Olin* litigation, reasoning that such evidence is immaterial and prejudicial.[1] In response, defendants characterize this evidence as "highly relevant because it shows that the very same Plaintiffs in this case received money for alleged contamination of their properties, yet they failed to clean up the supposed 'contamination.'" (Doc. 325, at 5.) According to defendants, evidence of the *LaBauve* payments shows that "any remediation would have been covered by the prior settlements," such that "it provides the jury with reason to question the Plaintiffs' credibility." (*Id.*)

---

[1] The plaintiffs in *LaBauve* maintained that "their properties had been affected by offsite waste disposal from the [Olin] McIntosh facility, namely mercury, and that such alleged contamination caused a diminution in the values of their properties." (Civil No. 03-0567-WS-B, doc. 214, at 6.) However, plaintiffs in this case misleadingly suggest that *LaBauve* was limited to mercury contamination "***in the soil*** on the plaintiffs' properties." (Doc. 311, at 2; doc. 347, at 3 (emphasis in original).) In fact, the samples taken in *LaBauve* included household dust samples with elevated mercury levels, such that *LaBauve* was not confined to claims of contamination in soil. *See LaBauve v. Olin Corp.*, 231 F.R.D. 632, 645-47 (S.D. Ala. 2005).

Plaintiffs have the better argument. Whether plaintiffs received settlement funds from a third party for alleged mercury contamination on their properties is not relevant to any triable issue joined in this case. Defendants do not identify any evidence that the *LaBauve* settlement funds were earmarked for a specific remediation purpose, much less that plaintiffs' acceptance of compensation for Olin's alleged mercury contamination mandated that they funnel that money into remediation efforts. Recall that the damages claimed in *LaBauve* related to diminution of value, not remediation costs. There is no inconsistency between plaintiffs' acceptance of settlement funds in *LaBauve* for mercury contamination that allegedly diminished the value of their properties, on the one hand, and their pursuit of claims against Ciba in this action for the costs of cleaning up DDT (not mercury) contamination from those properties, on the other. Simply put, the alleged harms were different in the two cases.

Moreover, to the extent that the *LaBauve* settlement may be marginally relevant, the Court readily finds that its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay and waste of time. To allow the defense to introduce evidence of plaintiffs' acceptance of settlement funds from Olin in *LaBauve* would invite, and likely necessitate, a protracted detour into the nature of the *LaBauve* action, the similarities and differences between mercury contamination and DDT contamination, the differing damages theories in the two cases, the structure of the *LaBauve* settlement, plaintiffs' subjective reasons for entering into same, the costs and efficacy of mercury remediation, plaintiffs' ability to afford mercury remediation, whether mercury remediation would have achieved DDT remediation, the mercury readings at their properties, the health implications of those values, the need for mercury remediation, and so on. In short, to admit Ciba's proposed evidence on the *LaBauve* settlement would be to open the floodgates to a mini-trial on Olin and mercury contamination, carrying us far afield from the issues joined for trial. Given the tangential (at best) nexus between the *LaBauve* settlement and the triable issues here, Rule 403 strongly favors exclusion. Plaintiffs' Motion in Limine is **granted** on this point.[2]

---

[2] In its opposition brief, Ciba devotes a full paragraph to arguing that it is entitled to put on evidence of alternative sources of the DDT contamination in plaintiffs' homes. (Doc. 325, at 5.) But this prong of plaintiffs' Motion in Limine would in no way foreclose defendants from presenting evidence that the complained-of DDTr in plaintiffs' homes might have

### D. Plaintiffs' Insurance Coverage.

As their fourth evidentiary request, plaintiffs ask that Ciba be ordered not to reference any insurance coverage that plaintiffs might have for their alleged injuries in this case. Defendants respond by agreeing that "no party (whether Plaintiffs or Defendants) should discuss the availability of insurance to either the Plaintiffs or the Defendants." (Doc. 325, at 6.) Based on the parties' concurrence that evidence of insurance coverage is not properly admissible at trial, the Motion in Limine is **granted** on this point.

### E. Adverse Impact of Money Judgment on Ciba.

Plaintiffs also petition the Court to direct Ciba to refrain from indicating to the jury that entry of a money judgment in this case would have a detrimental impact on jobs, would harm Ciba, or would threaten its competitive position in the marketplace. Defendants counter that they "do not anticipate presenting any evidence at trial regarding the adverse effect any judgment would have on the Defendants' operations." (Doc. 325, at 6.) Inasmuch as plaintiffs are asking for a ruling on the admissibility of a category of evidence that defendants do not intend to present, this aspect of the Motion in Limine is **moot**.

### F. "Litigation Crisis" or "Lawsuit Abuse" Allegations.

As with subsection E, *supra*, plaintiffs again ask the Court to forbid defendants from offering a line of argument that they do not anticipate raising by seeking the exclusion of references to "litigation crises," "lawsuit crises," "lawsuit abuses," and other similar phrases. Given defendants' representation that they "do not anticipate making reference to any of the foregoing phrases" (doc. 325, at 6), no useful purpose would be advanced by speculating as to the propriety of such a comment. The Motion in Limine is **moot** in this regard, as well, because defendants have disavowed any intention of uttering the types of phrases that plaintiffs find objectionable.

### G. Quality and Value of Ciba's Products.

Next, plaintiffs request the exclusion of "[a]ny mention that Defendants sell, manufacture, market or develop good products." (Doc. 311, at 3.) This argument is in large

---

originated from somewhere other than Ciba; rather, this request is confined to the *LaBauve* settlement.

measure redundant of the issues discussed in subsection A, *supra*.  The Court's understanding is that plaintiffs intend to portray Ciba to the jury as a careless, irresponsible purveyor of poisons.  It would be unfair to handcuff defendants by disallowing them to rebut that depiction with background evidence of the utility of products manufactured at Ciba's McIntosh facility.  The relevance of this evidence is that this case turns on the operations of the Ciba plant, and both sides are entitled to present <u>limited</u> background as to the nature of those operations and the types of products that are and historically have been produced there.  Accordingly, the Motion in Limine is **denied** as to this issue, provided that plaintiffs may renew their objection should defendants' presentation of same become so extensive or cumulative as to trigger Rule 403 concerns.

### H.     *Personal Anecdotes about Ciba.*

As part eight of their Motion in Limine, plaintiffs urge the categorical exclusion of "[a]ny comment or personal anecdote from any witness or lawyer ... who ha[s] benefited from Defendant's business."  (Doc. 311, at 3.)  This request is so broad and so vague that the Court cannot discern what types of evidence plaintiffs are worried about.  Suppose a witness says she sprayed DDT on her property in the 1960s and it was effective at killing bugs.  Or suppose a plaintiff testifies that he was gainfully employed at Ciba for 10 years.  There is nothing inappropriate on the face of such evidence, yet plaintiffs' expansive Motion in Limine would sweep these items within its ambit.  Plaintiffs' undeveloped objection cannot be effectively addressed without context and evidentiary definition; therefore, the Motion is **denied** at this time, subject to plaintiffs' right to renew the objection during trial as appropriate.[3]

---

[3]     In their reply brief, plaintiffs suggest that this portion of their Motion in Limine is animated by the fact that "one of Defendants' attorneys in this case was formerly the Environmental Manager at Defendants' Ciba-Geigy facility in McIntosh."  (Doc. 347, at 4.)  But there is no indication that this attorney intends to share personal anecdotes from his or her experiences at Ciba-Geigy with the jury.  Indeed, for that attorney to describe personal experiences as a Ciba McIntosh employee would be a highly risky endeavor that might interject that attorney as a witness in the case and entitle plaintiffs' counsel to cross-examine him or her.  The Court has no reason to believe that any defense attorney intends to recount to the jury war stories about his or her experiences as a Ciba employee in McIntosh; therefore, no useful purpose would be served by offering a speculative, advisory opinion as to the evidentiary ramifications of such a gambit.

### I.      *Dr. Langseth's Supplemental Report.*

Next, plaintiffs seek exclusion of "[a]ll references to Defendant's expert, David Langseth's supplemental/rebuttal report dated August 7, 2009 and opinions contained therein." (Doc. 311, at 4.)  This request, and the accompanying briefing on both sides, amounts to rehash of an issue that this Court has already addressed and resolved in the context of plaintiffs' Motion to Exclude Portions of David Langseth's Expert Testimony, Opinions and Reports (doc. 309).  It is unclear why plaintiffs reproduced their objections to Dr. Langseth's supplemental report in two different motions.  At any rate, the Court perceives no benefit to revisiting evidentiary issues concerning the admissibility of Dr. Langseth's supplemental report merely because the parties elected to brief them twice rather than once.  The Motion in Limine is **moot** as to this issue because it is redundant of arguments previously presented to, and resolved by, this Court via Order (doc. 381) entered on March 2, 2010.

### J.      *Plaintiffs' Lack of a Toxicologist or Medical Expert.*

Moving on to the tenth evidentiary objection, plaintiffs seek to bar defendants from commenting "that Plaintiffs have not submitted an expert report of a toxicologist or other medical expert" or that "Plaintiffs' experts agreed they would defer to a toxicologist or risk assessment expert to evaluate whether DDT is harmful to human health in the quantities found on Plaintiffs' properties." (Doc. 311, at 5.)  Plaintiffs characterize this evidence as irrelevant and prejudicial.

This argument, and the parties' briefing concerning same, is again redundant.  In its rulings on the parties' *Daubert* motions concerning Randy Horsak, Dr. Elizabeth Anderson and Marco Kaltofen, as well as its previous summary judgment opinions, this Court has furnished the parties with detailed guidance concerning the admissibility of evidence (and the propriety of argument) concerning toxicology and risk assessment.  (*See* docs. 383, 384, 386.)  For example, a summary judgment order dated October 1, 2009 contains the following excerpt:

> "[T]here is obviously a vigorous debate between the parties as to whether and to what extent clean-up of plaintiffs' properties is needed.  Defendants argue that any need for clean-up should be pegged to human health risks, and that the presence of DDT at levels below those detrimental to human health does not warrant any award for clean-up.  By contrast, plaintiffs' position is apparently that Ciba wrongfully caused this DDT to enter their property, that plaintiffs do not want DDT on their property, and that Ciba should have to pay the cost of

> removing it, irrespective of human health implications. Both sides will be
> allowed to make these arguments to the jury, which will then be tasked with
> determining what will compensate plaintiffs for the injuries received ....
> Defendants can make their human health showing to the extent it ties into their
> argument that there is no reason to clean up plaintiffs' homes (*i.e.*, that plaintiffs
> have no damages), but they are expected to do so in a concise manner that does
> not transform this trial into one about human health risks."

*Abrams v. Ciba Specialty Chemicals Corp.*, 2009 WL 3254443, *9 n.19 (S.D. Ala. Oct. 1, 2009) (emphasis omitted). Likewise, in deciding plaintiffs' *Daubert* motion as to Dr. Anderson, the undersigned observed that "[j]ust as the Court cannot conclusively rule out the jury's use of non-health considerations in deciding whether plaintiffs have been damaged and if so, to what degree, the Court likewise cannot foreclose the jury's consideration of health evidence as a tool for answering those queries." (Doc. 384, at 6.)

      The implications of these rulings are straightforward: Ciba will be allowed to put on its toxicology and risk assessment evidence at trial, and to point out to the jury plaintiffs' failure to present such evidence, as part and parcel of their contention that remediation is necessary only to the extent that DDTr contamination on plaintiffs' properties implicates health concerns. By the same token, plaintiffs will be allowed to put on their evidence of expected background concentrations of DDTr, and to argue that the proper measure of damages is the cost of removing this unwanted substance that Ciba tortiously caused to be in their homes, irrespective of health and risk assessment considerations. Either side may comment on or highlight perceived deficiencies in the damages-related evidence offered by the other.[4] *See generally Hrichak v.*

---

      [4]      In an apparent effort to salvage half a loaf, plaintiffs concede in their reply brief that "Defendants are entitled to make references to their own toxicologist and evidence regarding the health risks of DDTr." (Doc. 347, at 7.) If that is true, then it is unclear why plaintiffs were seeking to exclude this evidence via *Daubert* motion that was pending at the time plaintiffs made this representation. If plaintiffs no longer wished to challenge the admissibility of Dr. Anderson's testimony, then the proper means of conveying that change of heart was not to bury it in the briefing on a 22-part Motion in Limine, but instead to file a notice withdrawing their *Daubert* motion as to Dr. Anderson, so as to avert the commitment of scarce judicial resources to consider that motion. In any event, plaintiffs go on to state in their reply that what they really want is for defendants to be proscribed from "comment[ing] on Plaintiffs not having a toxicologist or medical expert in this case." (*Id.*) Contrary to plaintiffs' position, the Court finds that such commentary would not necessarily be confusing or misleading to the jury. Defendants are proffering the expert testimony of Dr. Anderson as to the concentrations of DDTr at which

*Pion*, 522 F. Supp.2d 283, 290 (D. Me. 2007) ("It is perfectly permissible for counsel to comment on an opposing party's failure to produce evidence to sustain his burden of proof.").

For these reasons, plaintiffs' Motion in Limine is **denied** as to this issue.

### K.     Lack of Diminution in Value of McIntosh Properties.

Plaintiffs next seek to exclude defendants from making "references to a lack of diminution in value of properties, ... including testimony by Defendants' expert, Williams [*sic*] Desvousges." (Doc. 311, at 5.)  By Order entered on March 2, 2010, this Court excluded Dr. Desvousges because his "opinions are not relevant to any remaining issue for trial." (Doc. 382, at 3.)  In light of this determination, and the fact that the issue of diminution in value is no longer a part of this case, plaintiffs' Motion in Limine is **moot** on this point.[5]

### L.     Dr. Zannetti's Testimony Concerning Vapor/Air Emission Rates.

The twelfth ground for plaintiffs' Motion in Limine is another duplicate of an issue that this Court has thoroughly and conclusively addressed in resolving an expert challenge.  In

---

health risks are triggered.  Surely defendants may point out in their closing argument that Dr. Anderson's testimony in this regard is unrebutted, and that plaintiffs have come forward with no risk assessment of their own.  In response, of course, plaintiffs are free to argue to the jury that Dr. Anderson's testimony, and risk assessment evidence more generally, is not important in this case because, in plaintiffs' view, the proper remedy for the injury received is removal of Ciba's DDTr from plaintiffs' property because plaintiffs do not want it there, regardless of any health risks it may or may not cause.  Under plaintiffs' theory, then, the simple reason why they did not hire a toxicologist is that risk assessment does not matter in measuring the harm for which they seek recompense.  There is nothing confusing, misleading or unfairly prejudicial about these types of arguments.  Ultimately, it will be for the jury to sort through these competing damages theories, and this Court will not grant plaintiffs' request to cripple defendants' ability to comment on the limitations of plaintiffs' damages evidence.

[5]     As they did in briefing the *Daubert* motion concerning Dr. Desvousges, defendants attempt to inject uncertainty and wiggle room into this issue by stating that "[e]vidence of increase in value of Plaintiffs' property may be relevant to the case" and that the jury "is entitled to hear whether or not Plaintiffs will receive a windfall." (Doc. 325, at 11.) There is no indication, however, that any party intends to offer evidence of an increase in value, or that any such evidence exists.  As it stands, defendants' passing references to a "windfall" (and plaintiffs' opposition to same) are a mere afterthought in their briefs, and are not sufficiently developed to facilitate cogent treatment.  Should this issue arise at trial, the Court will hear from the parties at that time, in the proper context, as to whether and to what extent defendants can present "windfall" evidence and argument.

particular, plaintiffs seek to exclude "Paolo Zannetti's expert testimony, opinions, and reports to the extent they refer to vapor/air emission rates (*i.e.* percentage lost in communition [*sic*]) for the DDT production at Ciba-Geigy plant." (Doc. 311, at 6.) In light of the comprehensive briefing by the parties in the *Daubert* context, and the Court's detailed ruling on this very issue via Order (doc. 385) entered on March 2, 2010, the parties' re-briefing of this issue in the context of plaintiffs' Motion in Limine is redundant and unnecessary. The Motion in Limine is **moot** in this regard.

   *M.* *References to the MOWA Tribe Litigation.*

Included in plaintiffs' Motion in Limine is a request for exclusion of references to pending state-court litigation filed by the Mobile Washington Band of the Choctaw Indian Tribe (the "MOWA Tribe Litigation") relating to alleged DDT and benzene contamination from an incinerator in Mount Vernon, Alabama. Plaintiffs wish to preclude defendants from both (a) referencing the allegations of the MOWA Tribe Litigation, and (b) arguing that the Mt. Vernon incinerator at issue in that case is an alternate source of the DDTr found in plaintiffs' homes. Defendants counter that such evidence is admissible because (a) one of the plaintiffs in this case, Wilford Taylor, is heavily involved in the MOWA Tribe Litigation, and has changed his story in that case to attribute the DDT contamination on his property to the incinerator, whereas in this case he attributes it to Ciba, such that his credibility is suspect; and (b) DDT from the Mt. Vernon site could have traveled to McIntosh and could therefore be the source of plaintiffs' contamination.

To the extent that defendants can adduce evidence in support of their position, as articulated *supra*, they will be permitted to do so. Thus, if defendants can show that in the MOWA Tribe Litigation, plaintiff Taylor alleges that the DDT contamination on his property came from the incinerator, but in this case he alleges that the DDT contamination on his same property came from the Ciba plant, evidence about his claims in the MOWA Tribe Litigation would be relevant and admissible here.[6] Similarly, defendants may offer evidence (if any exists)

---

   [6] Plaintiffs state "upon information and belief" the MOWA Tribe Litigation does not involve claims that Taylor's property in McIntosh is contaminated. (Doc. 347, at 9.) The "upon information and belief" qualifier leaves unanswered the objective question of whether the MOWA Tribe Litigation does or does not concern the same parcel owned by Taylor that is at

supporting a reasonable inference that the incinerator may be a source of the DDT contamination found in plaintiffs' homes.[7]  For these reasons, the Motion in Limine is **denied** on this point, provided that plaintiffs may renew their objection if defendants seek to introduce the allegations of the MOWA Tribe Litigation without a proper predicate (*i.e.*, without establishing that plaintiff Taylor is seeking recovery for the same contamination at the same property in that case as he is in this case) or if defendants fail to adduce non-speculative evidence that the Mt. Vernon incinerator may be a source of the DDT contamination of which plaintiffs complain herein.

### N.    *Horsak's Opinions Concerning the Need for Remediation.*

Plaintiffs also interpose a series of objections to areas of potential cross-examination of their remediation expert, Randy Horsak.  These objections will be addressed in subsections N, O and P of this Order.

Initially, plaintiffs seek to exclude cross-examination of Horsak on the need for remediation at plaintiffs' homes.  In his deposition, Horsak opined that in the absence of a risk to human health caused by DDTr contamination, "there's probably no need to clean it up" and that toxicologists or medical doctors typically provide input on appropriate clean-up levels for Horsak's cost estimates.  (Doc. 312, Exh. 2 at 78, 85.)  Plaintiffs contend that this type of testimony by Horsak is inadmissible because it exceeds his expert involvement in this case.  This objection is without merit.  It is entirely proper for defendants to cross-examine Horsak concerning his methodology for clean-up estimates and to elicit any opinions he may have concerning the remediation targets used in his analyses.  If he has no opinions on those topics

---

issue here.  To the extent that the parties themselves do not know, defendants will be permitted to elicit testimony from Taylor on that point; provided, however, that if the MOWA Tribe Litigation does not pertain to Taylor's property at issue in this case, then defendants will not be allowed to rely on the reasoning articulated in their briefs to proceed further by asking Taylor about his allegations of contamination in a different case that involve a different piece of property.

[7]      Plaintiffs insist that there is no such evidence, and that defendants' own expert, Dr. Langseth, has disqualified the incinerator as a DDT source in McIntosh.  But if defendants are able to marshal supporting evidence of this kind, it would bear directly on the issue of causation (and in particular, defendants' theory that the DDT of which plaintiffs complain did not originate from the Ciba plant) and would therefore be admissible.

because they are beyond the scope of his expertise in this case, then he should say so, subject to defendants' ability to use his deposition transcript for impeachment purposes.  But if Horsak offers those opinions on cross-examination (as he did during his deposition), or if defendants impeach him on this point, then plaintiffs will have the opportunity on re-direct to bring out testimony concerning the limitations of his expert involvement in this case, the fact that plaintiffs never consulted with him as to the "need" for clean-up, and the viability and legitimacy of non-health criteria for remediation targets, as discussed at page 5, footnote 5 of the *Daubert* Order (doc. 383) concerning Horsak entered on March 2, 2010.  Plaintiffs will also be able to argue to the jury that whether Horsak thinks DDT cleanup is "needed" (from whatever standpoint he made that assessment) is a separate question from whether plaintiffs may legally be awarded their remediation costs in this case.  (*See* doc. 284, at 19.)  Plaintiffs therefore have ample means of insulating themselves from unfair prejudice arising out of what is plainly a proper area for cross-examination into Horsak's expert opinions and methodologies in this case.

Plaintiffs' Motion in Limine is **denied** in this respect.[8]

### O.     *Horsak's Opinions Concerning Widespread Nature of DDT.*

During his deposition, Horsak also offered an opinion that "there is widespread DDT contamination on all levels" and that such contamination exists "throughout the world." (Horsak Dep., at 89.)  Plaintiffs ask that defendants be barred from referencing that testimony at trial

---

[8] A point of clarification may be helpful.  In their Motion in Limine, plaintiffs rely heavily on this Court's observation in a summary judgment Order dated October 1, 2009, that "Horsak's personal opinions about whether and to what extent remediation is 'needed' or 'required' are unilluminating because they are beyond the scope of his limited expert involvement in the case." (Doc. 284, at 19.)  In arguing that defendants should be barred from eliciting those personal opinions from Horsak at trial, plaintiffs take the above-quoted passage out of context.  On summary judgment, Ciba was using Horsak's personal opinions on the need for clean-up to bolster its contention that risk to human health is a mandatory prerequisite to recovery of remediation costs in a property damage case.  The Court's point in the quoted language was that Horsak's off-the-cuff personal opinion on the "need" for clean-up as set forth in his deposition was not binding on plaintiffs as an admission or otherwise because plaintiffs did not retain Horsak to evaluate the need for clean-up, so he could not be speaking for plaintiffs in offering those opinions.  Of course, to say that Horsak's personal views on the necessity (or lack thereof) of remediation are not binding on plaintiffs because he was not retained to consult with plaintiffs on that topic is not to say that such personal views are inadmissible under the Federal Rules of Evidence.  Plaintiffs' Motion in Limine hinges on a blurring of this distinction.

because defendants "oversimplify and mischaracterize" the testimony and because his opinions as to the widespread nature of the DDT are "beyond the scope of his limited expertise in this case." (Doc. 311, at 8.)  The latter argument fails for the same reasons identified in subsection N, *supra*.  To the extent that Horsak has opinions concerning the extent of DDT contamination worldwide, defendants may elicit them from him on cross-examination (and may use his deposition transcript for impeachment) regardless of the scope of his engagement for plaintiffs.  He may wish to explain or elaborate on those opinions during re-direct.  But the mere fact that plaintiffs did not retain Horsak to offer opinions as to the extent of worldwide DDT contamination does not strip defense counsel of the right to ask him the question at trial.

As for plaintiffs' suggestion that this "widespread" point is somehow a self-serving mischaracterization of Horsak's testimony by defendants, the undersigned has previously rejected this very argument.[9]  In a summary judgment Order dated October 1, 2009, the Court wrote the following: "Without doubt, the thrust of Horsak's testimony was that there is widespread DDT contamination throughout the world, just as defendants state.  That Horsak qualified his remarks by stating that DDT is not ubiquitous like hydrogen or oxygen in no way blunts or modifies the plain meaning of his statements about DDT's widespread nature." (Doc. 286, at 12 n.13.)  Besides, if plaintiffs' counsel or Horsak feels that defendants are mischaracterizing his testimony at trial, there will be ample opportunity for them to clarify his views from the witness stand.

The Motion in Limine is **denied** on this point.

### P. *Origins of 10 ppb Remediation Target.*

To round out the trilogy of Horsak-related objections in the Motion in Limine, plaintiffs seek to prevent defendants from commenting "that Plaintiffs' counsel picked the 10 ppb 'background level' out of thin air and directed Randy Horsak to use it, with no foundation in

---

[9] In this respect, plaintiffs' Motion in Limine is the latest in a disturbing pattern by both sides of simply ignoring rulings in this case that are not to their liking, and re-arguing the same point later on (without mentioning the previous decision) in hopes that the Court and/or opposing counsel will not recall what has already transpired.  This practice is both inefficient and disrespectful, and will not be tolerated.  The parties must acknowledge and abide by this Court's rulings, rather than cherry-picking the ones they like and endeavoring to sweep the remainder under the rug.

science or risk assessment." (Doc. 311, at 9.)

But defense counsel is unquestionably permitted to cross-examine Horsak (plaintiffs' remediation cost expert) about the source of the inputs into his model.  Moreover, the law is clear that counsel have "leeway in closing arguments to suggest inferences based on the evidence, highlight weaknesses in the opponent's case, and emphasize strengths in their own case." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008); *see also Ratliff v. Schiber Truck Co.*, 150 F.3d 949, 957 (8th Cir. 1998) ("Counsel are given wide latitude in arguing inferences from the evidence presented.").  Thus, defendants are free to elicit testimony from Horsak that the 10 ppb remediation value was provided to him by plaintiffs' counsel, and to argue reasonable inferences that such evidence might raise.  It is then incumbent on plaintiffs to show the jury that any adverse inferences are unwarranted by presenting other testimony and argument as to the true source of the 10 ppb figure.  The Court will not pretermit defendants' right to argue reasonable inferences from the evidence, or to suggest to the jury that Marco Kaltofen's expert opinion as to the 10 ppb background level may not have been plaintiffs' counsel's only consideration in instructing Horsak to apply a 10 ppb remediation target.  The Motion in Limine is **denied** insofar as it would constrain defendants' ability to cross-examine Horsak about the source of his inputs for the remediation cost model or to argue reasonable inferences from evidence presented at trial.[10]

### Q.     *Mary Ferrell's Meeting with an Attorney in 1986.*

Defendants apparently intend to call a former plaintiff, Mary Ferrell, to testify at trial about a meeting that she had with an attorney in 1986 to discuss the possibility of suing Ciba for contamination.  Plaintiffs ask that defendants be forbidden from doing so, on the ground that the

---

[10] It appears that the genesis of plaintiffs' Motion on this point is a statement in a summary judgment Order dated October 1, 2009, wherein the Court opined that "plaintiffs have clearly come forward with a record basis for the 10 ppb figure utilized in Horsak's estimates." (Doc. 284, at 8 n.16.)  But plaintiffs overlook the context of that determination.  For the Court to find a record basis for the 10 ppb remediation target, such that there are genuine issues of material fact as to damages precluding entry of summary judgment for Ciba, is not to declare plaintiffs' damages evidence unassailable at trial.  Yet plaintiffs would parlay the Court's finding of a record basis for the 10 ppb figure into a blanket prohibition on defendants' ability to challenge the credibility of that record evidence.  Such a contention overstates by a considerable margin the import of the underlying ruling.

dismissal of Ferrell's claims renders such evidence irrelevant.

As plaintiffs know, however, defendants would elicit testimony about the 1986 lawyer meeting not to bolster untimeliness arguments about Ferrell's now-dismissed claims, but to suggest that the claims of test plaintiff Johnnie Ware (and perhaps others) are time-barred because Ware attended that meeting. The Court has previously identified the nexus between Ferrell's testimony on this point and the timeliness of Ware's claims as a jury question.[11] Because evidence concerning Ware's attendance (and perhaps participation) at the 1986 lawyer meeting clearly bears on the timeliness of Ware's claims, that evidence is relevant and not unfairly prejudicial. Plaintiffs' Motion in Limine is **denied** insofar as it seeks exclusion of Ferrell's testimony on this point.[12]

### R.    Mary Ferrell's Application of DDT to Her Property.

Next, plaintiffs maintain that any references to former plaintiff Ferrell's application of DDT to her property should be excluded as irrelevant and unfairly prejudicial. Defendants explain, however, that they wish to present such evidence to demonstrate that "DDT was widely used by the public" and "the contamination could have come from somewhere other than the Defendants' facilities" because "DDT can travel from one residence to another." (Doc. 325, at 15-16.) Although the household DDT usage patterns of a non-plaintiff are of limited relevance to the issues remaining for trial, such evidence is material to the causation question in the manner that defendants have described; therefore, the Court will allow some leeway to

---

[11]   In particular, the undersigned wrote as follows: "Contrary to defendants' argument, the evidence does not unambiguously show that Ware (as opposed to Ferrell) 'consult[ed] a lawyer in 1986' ... or that he did anything other than tag along. The evidence is nothing more than that Ware was present when Ferrell consulted a lawyer in 1986 about filing suit. That difference may (or may not) matter for FRCD purposes. Either way, it is a fact-intensive determination that is properly reserved for the jury." (Doc. 287, at 20 n.20.)

[12]   In their reply brief, plaintiffs maintain that Ferrell's testimony that Ware accompanied her to the lawyer meeting is inadmissible hearsay, apparently because that testimony is set forth in a deposition transcript. (Doc. 347, at 11.) But defendants are serving Ferrell with a trial subpoena and evidently seek to call her as a live witness. (Doc. 388.) By all appearances, presenting Ferrell as a defense witness on this point would obviate plaintiffs' undeveloped hearsay objection.

defendants in introducing this evidence.  The Motion in Limine is **denied** in this respect.[13]

### S.        *Elliott Fields' Statement regarding DDT Storage.*

Plaintiffs' next ground for relief in their Motion in Limine is that former plaintiff Elliott Kevin Fields' deposition testimony that "his father-in-law told him that bags of DDT from Ciba-Geigy were stored on his property" should be excluded on grounds of hearsay and relevance. (Doc. 311, at 10.)  Defendants' response adequately addresses the relevance issue, but is silent as to hearsay.  Moreover, the Motion in Limine marks the second occasion on which defendants have been alerted to the hearsay problem exhibited by this evidence.  The Court previously noted on this very point that "Fields' testimony is hearsay, and defendants provide no explanation for how they intend to reduce it to admissible form at trial."  (Doc. 286, at 11 n.12.)  In the absence of any indication by defendants that Fields' hearsay statements as to what his father-in-law told him about DDT storage on property might be admissible, the Motion in Limine is **granted** on this point, and this evidence will be **excluded** pursuant to Rule 802, Fed.R.Evid.

### T.        *Ruth Everette's Parents' Application of DDT to Their Property.*

Plaintiffs also seek to preclude defendants from presenting evidence that test plaintiff Ruth Everette's late parents applied DDT to their property, which is different from the property that Everette claims was damaged by Ciba.  This objection is supported by plaintiffs' contentions that (i) Everette's parents' property is not at issue in this lawsuit, (ii) Everette's parents are no longer alive and cannot verify or refute this allegation, and (iii) Everette's parents' use of DDT on their property on one occasion is not probative as to whether DDT was ever applied to Everette's property.  In so arguing, however, plaintiffs overlook the relevance of this evidence to demonstrate that DDT was widely used by the public.  Assuming a proper evidentiary predicate is laid to show that DDT can travel from one residence to another, the type of usage in which

---

[13]     Plaintiffs improperly raise a new objection to this line of evidence in their reply brief, asserting for the first time that "the record does not prove that Ms. Ferrell ever applied DDT to her property."  (Doc. 347, at 11.)  Once again, defendants will be permitted to argue reasonable inferences from the evidence.  Ferrell stated in her deposition that she used DDT "[i]f it was in anything that was manufactured to spray, you know, bugs or kill grass around the house."  (Doc. 347, Exh. A, at 35-36.)  A reasonable inference from this testimony is that Ferrell did in fact use products containing DDT in her home; therefore, the Court will allow defendants to elicit such testimony and argue reasonable inferences from same.

Everette's parents engaged is another possible source of the DDT found on plaintiffs' properties. In short, plaintiffs' objection to this testimony fails for the reasons previously discussed in subsection R, *supra*, and defendants will be allowed some limited opportunity to adduce this evidence at trial.  The Motion in Limine is **denied** as to this issue.[14]

### U.     *Presence of Other Contaminants in Dust Samples.*

The twenty-first element of plaintiffs' Motion in Limine concerns sampling results for contaminants other than DDT.  In particular, plaintiffs ask that defendants not be allowed to contend that "the sampling results for all Test Plaintiffs revealed numerous contaminants besides DDT" on the ground that such evidence "is irrelevant, misleading, highly prejudicial, and calculated solely to inflame the jury."  (Doc. 311, at 11.)  Plaintiffs indicate that only one dust sample from one test plaintiff's home (that of Etoria Toole) was tested for chemicals other than DDT, such that there is no evidence that other test plaintiffs' samples included chemicals other than DDT.  In response, defendants assert as follows: (i) the Toole sample reveals other contaminants that are relevant to the defense theory that plaintiffs' damages were caused by contaminants other than DDT; (ii) defendants believe that if DDT from the Ciba plant migrated to plaintiffs' properties, then other chemicals manufactured by Ciba should likewise have been found in those dust samples, yet plaintiffs did not test most of those samples for chemicals other than DDT; and (iii) the presence of non-Ciba chemicals and contaminants throughout McIntosh suggests that the Ciba facility is not responsible for contamination found in the community.

Plaintiffs' Motion in Limine is **granted** on this point, as far as it goes.  It is undisputed

---

[14]     To be clear, defendants are not suggesting that Everette's parents sprayed DDT on Everette's property; rather, defendants wish to present evidence of Everette's parents' spraying activities to demonstrate household usage patterns of DDT products.  If non-plaintiffs in the McIntosh community were routinely spraying DDT on their properties, then plaintiffs might have been doing the same thing, even if they now deny it.  Besides, if non-plaintiffs were spraying DDT, that substance might have traveled from those properties onto plaintiffs' properties in the same manner that plaintiffs contend DDT traveled from the Ciba site to their properties.  Of course, this entire line of reasoning is predicated on the assumption (which the parties have not explored) that Everette has personal knowledge of her parents' DDT application activities, such that her testimony in this regard would be non-hearsay.  If Everette possesses the requisite personal knowledge, then she may testify to same, notwithstanding plaintiffs' objection that her parents are deceased and therefore unable to verify their own DDT usage patterns.

that, other than test plaintiff Toole, there is no evidence that dust samples for other test plaintiffs include contaminants other than DDT because those samples were not tested for any other chemicals. Defendants will not be permitted to argue that "the sampling results for all Test Plaintiffs revealed numerous contaminants besides DDT" (doc. 311, at 11) because such a statement is false. That said, defendants are free to introduce evidence of the various contaminants contained in the Toole sample; to develop evidence that plaintiffs could have tested, but did not test, the other samples for chemicals other than DDT; and to argue that this omission may have been motivated by strategic purposes.

### V. *The 1948 Nobel Prize Award.*

Finally, plaintiffs urge the Court to block defendants from telling the jury that Paul Hermann Muller received the Nobel Prize in 1948 for discovering the efficiency of DDT as a contact poison. According to plaintiffs, this fact is "entirely immaterial," "harmful" and "unjustly prejudicial." (Doc. 311, at 11.) Contrary to plaintiffs' objection, this fact is classic background information that is relevant to the issues joined for trial. In any logical opening statement and presentation of evidence, the parties will want to explain to the jury what DDT is and why Ciba was manufacturing it in McIntosh in the 1950s and 1960s. In that regard, it would be entirely proper for defendants to make limited reference to the positive qualities of DDT just as plaintiffs may make limited reference to the negative qualities of DDT. The jury is entitled to hear both, subject to the limitation that if either side bogs down the proceedings with excessive or cumulative evidence on what is nothing more than a minor, gilding-the-lily point, the Court will entertain Rule 403 objections. But plaintiffs' assertion that any reference to the favorable attributes and public perception of DDT at the time of its manufacture by Ciba is irrelevant and prejudicial is simply not persuasive. Accordingly, the Motion in Limine is **denied** on this point.

### III. Conclusion.

For all of the foregoing reasons, plaintiffs' Motion in Limine (doc. 311) is **granted in part**, and **denied in part**, as set forth herein.

DONE and ORDERED this 22nd day of March, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE