**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CLEON ABRAMS, SR.,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 08-0068-WS-B** |
| | ) | |
| **CIBA SPECIALTY CHEMICALS** | ) | |
| **CORPORATION,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter comes before the Court on defendants' Motion in Limine (doc. 303). The Motion has been briefed and is ripe for disposition.

**I.        Nature of the Case.**

Plaintiffs are owners of property in and around McIntosh, Alabama, who allege that their homes have been contaminated by DDT and its metabolites (collectively, "DDTr") emanating from a nearby chemical manufacturing facility owned and operated by defendants (collectively, "Ciba"). On that basis, plaintiffs have brought causes of action against Ciba sounding in trespass, negligence, and nuisance. Although they initially claimed damages in the form of diminution of their property's value, plaintiffs have since abandoned that theory of recovery, and are now seeking an award of compensatory damages for restoration costs, that is, the cost of reducing DDTr concentrations in their dwellings to a level of 10 parts per billion.

This action is set for trial before the undersigned on March 30, 2010. Defendants seek to exclude plaintiffs from introducing evidence or argument at trial concerning five enumerated topics. With respect to all of these categories, defendants' position is that they "are wholly irrelevant and unduly prejudicial," such that allowing plaintiffs to discuss them at trial "would serve no other purpose than to inflame or distract the jury from the real issue in this case." (Doc. 303, at 5.) For their part, plaintiffs dispute defendants' characterization as to each of these items; therefore, the Court will address them sequentially.

**II.    Analysis.**

   *A.    Ground/Surface Water Contamination.*

   First, defendants contend that plaintiffs should not be allowed to introduce evidence concerning groundwater or surface water contamination.  Defendants reason that plaintiffs have never asserted, much less presented any evidence, that the DDTr contamination in their homes was transported from the Ciba plant by groundwater or surface water pathways, such that testimony or exhibits relating to these forms of contamination would be irrelevant and potentially confusing to the jury.  Plaintiffs readily admit that their expert, Dr. Scates, has concluded that air was the primary pathway of contamination in this case, and that they "are not pursuing direct surface water or any groundwater pathways."  (Doc. 332, at 2.)  Nonetheless, plaintiffs assert that they should be allowed to address surface water contamination at trial in a "limited context" for various purposes, such as "to prove where Defendants were polluting" and "Defendants' standard of care in disposing [of] DDTr."  (*Id.* at 2-3.)

   There is at least a germ of merit to each side's position.  After all, plaintiffs bear the burden of establishing how the DDT arrived in their homes from the Ciba plant.  In order to do so, plaintiffs are entitled to some latitude to present evidence about the manner, mechanisms, and frequency in which DDT escaped from the Ciba site.  The challenged evidence is plainly relevant to a degree, because it suggests that Ciba was careless (or worse) in DDT waste disposal practices, and that DDT was being carried from the Ciba plant into the community, into floodplains, and into other locations, from whence the wind transported it to plaintiffs' homes.[1] At the same time, however, it would be unhelpful, confusing and wasteful to allow the trial to degenerate into a lengthy exposition of groundwater and surface water transport of DDT, when

---

[1]    In other words, just because plaintiffs posit that their homes were infiltrated by airborne DDT does not mean that air was the exclusive method of transportation, bearing DDT particles for the entire duration of their odyssey from the Ciba plant floor to their final resting place on plaintiffs' refrigerator coils.  It is possible, and plaintiffs intend to present evidence to show, that at least a portion of the DDT left the Ciba production facility by (for example) surface water discharge, was deposited in a different location, and was then carried by winds from that secondary location to plaintiffs' homes.  In light of this theory, to exclude all evidence of surface water contamination would be to deprive plaintiffs of the ability to tell the full story of how they contend Ciba's DDT reached their property.

plaintiffs have no expert or other testimony to suggest that the DDT in their homes arrived directly through groundwater or surface water pathways. This Court has previously written to the proper balance that should be afforded this type of evidence in the following terms:

> "[I]f Ciba was lax in allowing DDT wastes to infiltrate the McIntosh community through pathways that did not affect plaintiffs' homes, that fact would lend credence to plaintiffs' theory that Ciba allowed DDT wastes to travel offsite through other pathways that did affect plaintiffs' homes. That said, the relevance of this evidence is more tangential and indirect than compelling and direct. The Court will not exclude Kaltofen's opinions concerning the various pathways through which DDT left the Ciba site, and the sampling evidence of same, but it will insist that the time spent presenting the evidence on this collateral matter not be disproportional to its clearly minor significance to the case. Should plaintiffs ... belabor these points at trial, the Court will entertain Rule 403 objections from the defense to prevent the trial from being derailed by a tangent."

(Doc. 386, at 15.)

That approach resonates equally in the face of the concerns articulated in defendants' Motion in Limine. Plaintiffs may address surface water contamination (but not groundwater, which plaintiffs concede is not a relevant pathway in this case at all) to a limited extent, in order to demonstrate causation between Ciba's activities and the DDT found in plaintiffs' homes. However, should plaintiffs attempt to transform this trial into a seminar on surface water pathways, bombarding the jury with extensive marginally relevant evidence about surface water contamination when everyone agrees that the primary direct pathway involved in this case is air/wind, the Court will sustain a properly framed Rule 403 objection by defendants. Also, with regard to the "fish kills" in the Tombigbee River, plaintiffs have prudently agreed to refrain from discussing such inflammatory, minimally relevant evidence at trial. The Court will enforce that entirely warranted concession.

In light of the foregoing discussion, defendants' Motion is **granted in part**, and **denied in part** as to evidence of groundwater and surface water contamination pathways.

### B. *Chemicals other than DDT.*

Everyone agrees that plaintiffs' claims in this case are limited to DDT contamination, and that plaintiffs are not seeking damages from contamination by any other Ciba chemicals. (Doc. 303, at 7; doc. 332, at 3.) Yet both parties have expressed their intention at various times to introduce evidence concerning other chemicals for various purposes. For example, defendants

want to talk about other contaminants that were or were not found in the dust samples taken from plaintiffs' homes, because the composition of those samples may make it more or less likely that the DDT found therein came from Ciba, as opposed to some other source.[2]  And defendants also want to argue that the presence of any non-Ciba chemicals in plaintiffs' homes diminishes plaintiffs' damages because it implies that what plaintiffs are seeking to remediate consists not only of DDT contamination by Ciba, but also of contamination by other chemicals for which third parties (not Ciba) are to blame.  Meanwhile, plaintiffs want to talk about other chemicals produced by Ciba that are contaminating the McIntosh community, to paint Ciba as a bad actor that was irresponsible in its handling of various chemicals.  Plaintiffs may also wish to show that Ciba's McIntosh facility produced other chemicals in their homes besides DDT, on the ground that such evidence makes it more likely that Ciba is responsible for the DDT in their homes, as well.  In their Motion in Limine, defendants seek to prevent plaintiffs from introducing evidence or exhibits "which relate to the Defendants' manufacture or storage of chemicals other than DDT."  (Doc. 303, at 8.)  Plaintiffs counter that both parties should agree not to talk about substances other than DDT, a proposal which defendants have derided as an apples-to-oranges comparison.

After careful consideration of both sides' arguments, the Court finds that defendants have the upper hand on this issue.  Notwithstanding the fact that this action is confined to allegations of DDT contamination to plaintiffs' properties, evidence concerning other chemicals is both relevant and admissible to the extent that it is linked to issues of causation and/or damages.  In other words, it is appropriate for any party to point to chemicals that were present or missing from plaintiffs' homes, and to extrapolate from that fact reasonable inferences concerning causation or damages, as outlined above.  It is neither relevant nor proper, however, for plaintiffs to introduce evidence that Ciba may have contaminated McIntosh with non-DDT chemicals, in

_____

[2]      This scenario could play to defendants' advantage in two different ways.  If the samples contain DDT but do not contain other chemicals that Ciba manufactured at its McIntosh facility, then defendants could argue that the paucity of other Ciba chemicals in the samples tends to make it less likely that Ciba was the source of the DDT found in those samples.  Similarly, if the samples contain DDT but also contain chemicals that Ciba never manufactured, then Ciba could argue that the presence of non-Ciba substances suggests another source of contamination that could also be responsible for the DDT.

the absence of some nexus between those contaminants and plaintiffs' injuries. In other words, to the extent that plaintiffs want to show that Ciba released dioxins or Galecron (for example) into the environment, that evidence is both irrelevant and highly prejudicial without some factual or analytical basis for connecting that evidence to plaintiffs' injuries arising from their claims of DDT contamination. Although the parties have engaged in several iterations of briefing on this issue in recent months, plaintiffs have yet to submit any reasonable explanation for how evidence of Ciba's emission of non-DDT chemicals, without more, is relevant to any triable issue joined herein. If anything, it appears that plaintiffs are seeking to smear Ciba as a serial polluter, to taint Ciba in the jury's eyes as an unrepentant scofflaw, independent of anything it did or did not do with respect to DDT and plaintiffs' properties. Such an improper purpose will not be countenanced on this meager showing.[3] *See generally* Rule 404(b), Fed.R.Evid. (evidence of other acts is not admissible to show action in conformity therewith).

For these reasons, defendants' Motion in Limine is **granted** as to this issue, and plaintiffs will be barred from introducing evidence or argument concerning the emission of substances other than DDT from the Ciba facility into the McIntosh community. There are three caveats. First, the Court has indicated in a contemporaneous ruling that both sides are entitled to offer limited background evidence into the operations of the Ciba plant, as a part of telling their story to the jury. If either side wishes to introduce basic evidence about the substances produced at

---

[3]     This determination is consistent with the Court's recent ruling on defendants' *Daubert* Motion pertaining to Marco Kaltofen, which included the following passage:

> "Kaltofen's opinion is riddled with references to chemicals ... that do not appear directly linked to the claims joined for trial in this case ... such as dioxins and furans. ... The Court is at a loss to understand how expert testimony concerning sources and concentrations of these chemicals is relevant to the task at hand, which is whether plaintiffs' homes are contaminated with DDT and its metabolites and whether Ciba tortiously caused those substances to be there. Plaintiffs have not responded to this objection and have not provided any explanation for how expert testimony about Ciba contaminants other than DDTr would logically advance a material aspect of this case. Moreover, even if it were relevant, the Court perceives an unacceptably high risk of jury confusion, unfair prejudice and wasted time if Kaltofen is permitted to testify about chemicals other than DDTr."

(Doc. 386, at 14-15.)

the Ciba facility, their uses and their dates of manufacture, all in the vein of background information, the Court will allow it. Second, to the extent that plaintiffs are able to connect evidence of other substances emitted by Ciba to their property (*e.g.*, if a non-DDT substance made by Ciba was in fact found on plaintiffs' property), this Order will not preclude them from presenting such evidence for causation purposes.[4] And third, to the extent that defendants may argue or present evidence that certain contaminants found in plaintiffs' homes did not originate from Ciba, or that certain Ciba chemicals were never found in plaintiffs' homes, in furtherance of defendants' causation and damages theories of defense, as addressed *supra*, nothing herein would preclude plaintiffs from presenting contrary evidence or argument in rebuttal.

### C. Out-of-Court Statements by Unrelated Third Parties.

As the third prong of their Motion in Limine, defendants broadly request that plaintiffs be prevented "from relying on any documents and out of court statements by third parties that have no legal relationship to the defendants." (Doc. 303, at 8.) In this regard, defendants generalize about "hundreds of exhibits" (doc. 346, at 6), positing that plaintiffs intend to introduce them as evidence of defendants' knowledge when they show nothing of the sort, that such documents are not relevant, and that such documents constitute inadmissible hearsay. Plaintiffs respond that these documents are not only relevant but "invaluable" to their case by showing defendants' knowledge that DDT was on their land and was being released into the community, their failure to take appropriate remedial action, and their failure to notify plaintiffs of same (which plaintiffs contend is relevant for timeliness purposes in establishing when each plaintiff knew or should have known of the alleged contamination).

The fundamental problem with the parties' briefs on this point is that they are presented at a high level of abstraction. Without examining the specific documents, the context in which plaintiffs seek to introduce them, and the evidentiary foundation for each, the Court lacks sufficient information to enter a blanket order that admits or excludes these "hundreds of exhibits" *in toto*, much less to apply hearsay principles to them collectively and in a vacuum.

---

[4]     In this manner, plaintiffs and defendants will be treated alike. No matter who is introducing it, evidence of other Ciba chemical emissions or contamination anywhere is admissible only to the extent that it has an identifiable nexus to causation or damages issues.

Accordingly, the Motion in Limine is **denied** on this point at this time, subject to defendants' right to renew these objections to admissibility on an exhibit-by-exhibit basis as appropriate.

### D.     *Harmful Effects of DDT on People, Animals and Plants.*

Next, defendants ask the Court to block plaintiffs from introducing evidence "relating to fish, trees, wildlife, public health assessments, and toxicity of DDT." (Doc. 303, at 10.) In particular, defendants maintain that this evidence is irrelevant because plaintiffs are not claiming personal injury, are not claiming to suffer from DDT-related health issues, and have not performed a risk assessment of their own. According to defendants, plaintiffs' only possible reason for injecting such evidence into the case would be to inflame and prejudice the jury.

Defendants' position on this issue is unpersuasive for four reasons. First, as noted in a contemporaneous Order on plaintiffs' Motion in Limine, both sides may present limited background information to the jury about the nature and properties of DDT. In any logical opening statement and presentation of evidence, the parties may want to explain to the jury what DDT is, why Ciba was manufacturing it, and why plaintiffs say they have been harmed by its presence on their property. In that regard, it would be entirely proper for plaintiffs to make limited reference to the negative qualities of DDT, just as defendants may make limited reference to the positive qualities of DDT. To the extent that defendants' Motion in Limine seeks to prevent plaintiffs from doing so, it is not meritorious.

Second, in the same breath that they seek to restrict plaintiffs from introducing any evidence about the human health effects of DDT, defendants acknowledge their intent to offer expert testimony from Dr. Elizabeth Anderson on that very subject. If (as this Court has previously held) defendants are entitled to introduce evidence of the human health effects of DDT,[5] it would be inappropriate and unfair to constrain plaintiffs from offering contrary evidence or from engaging in vigorous cross-examination (utilizing exhibits, as appropriate) of

---

[5]       In denying plaintiffs' Motion to Exclude Elizabeth Anderson's Expert Testimony, Opinions, and Reports, the undersigned opined as follows: "Just as the Court cannot conclusively rule out the jury's use of non-health considerations in deciding whether plaintiffs have been damaged and if so, to what degree, the Court likewise cannot foreclose the jury's consideration of health evidence as a tool for answering those queries. ... Dr. Anderson's opinions concerning the absence of health effects are therefore directly relevant to damages issues in this case." (Doc. 384, at 6-7.)

Dr. Anderson on this point.  In effect, defendants propose that they be allowed to introduce considerable evidence on health effects of DDT, but that plaintiffs be denied a reciprocal right and be denied even the opportunity to engage in meaningful questioning or criticism of defendants' expert concerning health risks of DDT.  This the Court will not do.

Third, plaintiffs correctly note that "some evidence as to the potential harm of DDT is necessary and relevant to Plaintiffs' proofs on damages, particularly to Plaintiffs' proving interference with the use and enjoyment of their properties."  (Doc. 332, at 7.)  Simply put, plaintiffs have to convince the jury that they do not want to have the DDT on their property, that they have been damaged by its presence, and that Ciba should pay for the removal of that DDT. Limited evidence of the health effects of DDT contamination may be critical to explaining why plaintiffs do not want this chemical on their property, and why its presence would interfere with their use and enjoyment of the property, even if that contaminant has been measured in quantities below the threshold for adverse health effects as identified by Dr. Anderson.  It will then be for the jury to decide whether plaintiffs have been injured at all, or whether the quantities of DDT found on their property are simply too minute for plaintiffs to have sustained interference with use and enjoyment of their property by its mere presence in their homes.[6]

Fourth, in what has become an altogether commonplace occurrence in this litigation, defendants' Motion in Limine on this point inexplicably disregards the Court's previous rulings in this very case.  On October 1, 2009, mere weeks before defendants filed their Motion in Limine, the Court expressly found that both sides could present evidence of health effects of DDT, pursuant to the following reasoning:

> "[T]he parties (and principally Ciba) may have valid reason to present limited evidence to the jury concerning the human health dimension of the DDT contamination observed on test plaintiffs' properties.  After all, upon learning that DDT is a possible or probable human carcinogen, the jury's verdict on damages may be unfairly skewed by inappropriate conclusions about health risks presented

---

[6]     Defendants' suggestion that the jury will be misled and confused by such evidence into thinking plaintiffs' health is at risk is not compelling.  The Court is confident that defendants will be able to utilize Dr. Anderson's testimony, as well as cross-examination of plaintiffs and closing argument, to render it absolutely clear to the jury that plaintiffs are not seeking recovery for personal injury and that there is no scientific evidence that plaintiffs' health is in danger because of the DDT found in their homes.

> by defendants' actions.  Under the circumstances, it is reasonable to allow the
> parties to present scientific evidence concerning the human health implications of
> the DDT contamination found on test plaintiffs' properties, so that the jury will be
> able to place in appropriate scientific context the measured concentrations of
> DDT for purposes of determining the sums that would compensate test plaintiffs
> for the complained-of injuries to their property."

*Abrams v. Ciba Specialty Chemicals Corp.*, 663 F. Supp.2d 1243, 1258-59 (S.D. Ala. 2009).

Thus, the Court has already found that both sides may offer limited evidence of human health implications of DDT, and nothing in defendants' briefs concerning their Motion in Limine warrants a modification of that determination.

Defendants' Motion in Limine is **denied** on this point.  The Court hastens to add, however, that its previous admonitions to the parties concerning excessive detours into health issues will not be permitted.  *See Abrams*, 663 F. Supp.2d at 1259 ("the Court has no intention of allowing this property damage trial to be derailed by extensive evidence of human health considerations").  Should plaintiffs abuse the leeway granted them by this Order, the Court will entertain any Rule 403 objection that defendants might raise.

### E.  *Documents Intended to Inflame and Mislead the Jury.*

Finally, defendants contend in their Motion in Limine that plaintiffs should be precluded from offering evidence or argument that Ciba "hid information about contamination in order to save money," or any other evidence or argument "related to saving money or destroying documents."  (Doc. 303, at 11-12.)  Plaintiffs counter that this objection is too vague to enable them to respond meaningfully.  The Court agrees that attempting to resolve the admissibility of potentially large numbers of exhibits based on this amorphous, ill-defined Motion, devoid of any context or explanation, is not a constructive exercise.  While defendants do elaborate on this aspect of their Motion in Limine via a reply brief, the parties have been repeatedly cautioned that new arguments are not cognizable on reply briefs.  Plaintiffs have not had a fair opportunity to be heard in connection with Ciba's new arguments in its reply.  Therefore, the Motion in Limine is **denied** on this point, provided, however, that defendants will be permitted to renew their objection in connection with specific documents or arguments at an appropriate time at trial.

## III.  Conclusion.

For all of the foregoing reasons, defendants' Motion in Limine (doc. 303) is **granted in**

**part**, and **denied in part**, as set forth above.

      DONE and ORDERED this 22nd day of March, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE